# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

----------------------------------------------------------------------x

SOUTHERN REALTY TRUST HOLDINGS LLC, and
SUNRISE REALTY TRUST HOLDINGS I LLC

                                         Plaintiffs,

-against-

ROBERTO CASTRO CONTRERAS,

                                      Defendant.

----------------------------------------------------------------------x

**SUMMONS**

Index No.:

Date Index No. Purchased:
April 17, 2026

Basis For Venue

CPLR § 501: At issue contractual provisions designate New York County as place of trial.

CPLR § 509: Plaintiff designates New York County as place of trial.

TO THE ABOVE-NAMED DEFENDANT:

**YOU ARE HEREBY SUMMONED** to answer the notice of motion for summary judgment in lieu of complaint in this action and serve a copy of your answering papers on Plaintiffs' attorneys no later than ten days before the return date set forth in said notice of motion. In case of your failure to appear, judgment will be taken against you by default of the relief demanded in the motion for summary judgment in lieu of complaint.

The basis of venue is that Plaintiffs designate New York County as the place of trial pursuant to CPLR § 509. Further, pursuant to CPLR § 501, the basis of venue is a contractual provision in the agreements at issue herein.

[Text continues on following page]

86235996;1

Dated:  New York, New York
       April 17, 2026

**AKERMAN LLP**

By: */s/ Mark S. Lichtenstein*
    Mark S. Lichtenstein, Esq.
    Keith Blackman, Esq.
1251 Avenue of the Americas, 37th Floor
New York, NY 10020
Tel. No.: (212) 880-3800
E-mail: mark.lichtenstein@akerman.com
E-mail: keith.blackman@akerman.com

*Attorneys for Plaintiffs Southern Realty Trust Holdings
LLC and  Sunrise Realty Trust Holdings I LLC*

Defendant's Address:

Roberto Castro Contreras
c/o DC Partners Management
2000 W Loop S Floor 21
Houston, Texas 77027

2

86235996;1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------------x

SOUTHERN REALTY TRUST HOLDINGS LLC, and            Index No.:
SUNRISE REALTY TRUST HOLDINGS I LLC

                                                    Mot. Seq. #001

                                    Plaintiffs,     **NOTICE OF CPLR § 3213
                                                    MOTION FOR SUMMARY
                    -against-                       JUDGMENT IN LIEU OF
                                                    COMPLAINT**

ROBERTO CASTRO CONTRERAS,

                                    Defendant.

-------------------------------------------------------------------------x


**PLEASE TAKE NOTICE THAT**, upon the Summons dated April 17, 2026; the accompanying Affirmation of Brian Sedrish in Support of Plaintiffs Southern Realty Trust Holdings LLC ("***SRT***") and  Sunrise Realty Trust Holdings I LLC ("***SUNS***," together with SRT, "***Plaintiffs***") CPLR § 3213 Motion for Summary Judgment in Lieu of Complaint ("***Motion***"), sworn to on April 17, 2026, and the exhibits attached thereto; and the accompanying Memorandum of Law in Support of Plaintiffs' Motion dated April 17, 2026, Plaintiffs will move this Court at the Motion Submission Part, Room 130, at the Courthouse, located at 60 Centre Street, New York, New York 10007 on June 12, 2026 at 9:30 a.m., or as soon thereafter as counsel can be heard, for an order, pursuant to CPLR § 3213, granting summary judgment in lieu of complaint, in favor of Plaintiffs and against Defendant Roberto Castro Contreras in the amount of $6,728,313.11, plus accrued interest and attorneys' fees, and for such other and further relief as the Court deems just and proper, upon the grounds that this action is based upon an instrument for the payment of money only that is now due and payable, and that there is no defense to the action.

86234990;1

**PLEASE TAKE FURTHER NOTICE THAT**, pursuant to CPLR §§ 2214(b) and 3213, answering papers (and a notice of cross-motion, with supporting papers) if any, must be served upon the undersigned at least ten (10) days before the return date of this motion, and any reply papers shall be served at least one (1) day before the return date of this motion.

Dated:  New York, New York
         April 17, 2026

                                         AKERMAN LLP

                                         By:  /s/ *Mark S. Lichtenstein*
                                              Mark S. Lichtenstein, Esq.
                                              Keith Blackman, Esq.
                                         1251 Avenue of the Americas, 37th Floor
                                         New York, NY 10020
                                         Tel. No.: (212) 880-3800
                                         E-mail: mark.lichtenstein@akerman.com
                                         E-mail: keith.blackman@akerman.com

                                         *Attorneys for Plaintiffs Southern Realty Trust Holdings LLC and  Sunrise Realty Trust Holdings I LLC*

TO:     Roberto Castro Contreras
        c/o DC Partners Management
        2000 W Loop S Floor 21
        Houston, Texas 77027

        *Defendant*

2

86234990;1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------x

SOUTHERN REALTY TRUST HOLDINGS LLC, and
SUNRISE REALTY TRUST HOLDINGS I LLC

Index No.:

Plaintiffs,          Mot. Seq. #001

-against-

ROBERTO CASTRO CONTRERAS,

Defendant.

-------------------------------------------------------------------x

### AFFIRMATION OF BRIAN SEDRISH IN SUPPORT OF PLAINTIFFS' CPLR § 3213 MOTION FOR SUMMARY JUDGMENT IN LIEU OF COMPLAINT

Brian Sedrish, hereby affirms the following, pursuant to CPLR § 2106, under the penalty of perjury:

1.      I am Chief Executive Officer for Plaintiffs Southern Realty Trust Holdings LLC ("**SRT**") and Sunrise Realty Trust Holdings I LLC ("**SUNS**," together with SRT, "**Plaintiffs**"). As such, I am authorized to act on behalf of Plaintiffs. I am authorized to, and hereby do, make this Affirmation in Support of Plaintiffs' CPLR § 3213 Motion for Summary Judgment in Lieu of Complaint ("**Affirmation**").

2.      My job responsibilities as Chief Executive Officer include the review, verification, and research of facts in sworn documents that are involved in litigation. In such capacity, I personally have worked on and have supervised work relating to Plaintiffs' rights and interests in the secured loan made to Lex Avenue Hotel, LLC ("**Borrower**") that are at issue in this matter (the "**Loan**").

86174656;2
86174656;6

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 7 of 316

3. I am familiar with the record-keeping practices and systems that Plaintiffs use to record and create information related to the Loan, including the processes by which Plaintiffs obtain loan information in those systems. It is the regular course of business of Plaintiffs to make and maintain such business records relating to its loans. While many of the processes are automated, where an employee or agent of Plaintiffs manually enters data relating to a loan on those systems, the employee or agent has personal knowledge of that information and enters it into the system at or near the time that the knowledge is acquired. I have reviewed and relied upon business records for the Loan in making this Affirmation, including the business records attached to this Affirmation. Those business records were made and maintained by Plaintiffs in the course of their regularly conducted business activities. The entries in the business records for the Loan were made at or near the time of the transaction reflected therein either by Plaintiffs' employee or agent with personal knowledge or from information transmitted by Plaintiffs' employee or agent with personal knowledge. To the extent that the business records were created by prior holders and/or owners of the Loan, those records have been reviewed for accuracy before being integrated into Plaintiffs' business records, consistent with Plaintiffs' regular business practices. Plaintiffs' records are kept and relied upon as a regular practice and in the ordinary course of business.

4. Based on the foregoing, I am familiar with how each document attached to this Affirmation was retrieved and compiled, and I have personally reviewed each document attached to this Affirmation. Further, I have personal knowledge of the facts described in this Affirmation based on my own knowledge and from my review of the business records of Plaintiffs concerning the Loan Documents (defined below). All such business records were created and/or maintained in the course of Plaintiffs' business and in accordance with the normal business practices detailed

2

86174656;6

above. If called upon to testify as to the matters set forth in this Affirmation, I could and would competently testify thereto, since the facts set forth herein are known to me to be true.

## I.    THE LOAN

5.    Defendant Roberto Castro Contreras ("**Guarantor**") and Borrower agreed to and executed various documents in connection with the Loan.[1] Each document is defined and described below.

### A.    The Loan

#### The Notes And Loan Agreement

6.    On July 31, 2024, SRT and Sunrise Realty Trust, Inc. ("**SUN**", together with SRT, "**Original Lenders**") made the Loan in the principal amount of $44,000,000.00 to Borrower.

7.    The Loan was evidenced by a certain Promissory Note, dated July 31, 2024, in the original principal amount of $44,000,000.00 ("**Original Note**"). A true and correct copy of the Original Note is attached as **Exhibit A**.

8.    In connection with the Loan, Borrower and Original Lenders entered into that certain Loan Agreement ("**Loan Agreement**") dated as of July 31, 2024. The Loan Agreement, among other things, describes the loan transaction and the various security interests securing the Loan. A true and correct copy of the Loan Agreement is attached as **Exhibit B**.

#### The Pledge Agreement and Assignment of Loan Documents

9.    The Loan is secured by, among other things, a certain Pledge and Security Agreement, dated as of July 31, 2024, executed by Lexav Owner, LLC, the legal and beneficial owner of 100% of Borrower's outstanding limited liability company interests, for the benefit of

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Loan Documents.

3

86174656;6

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 9 of 316

Original Lender (the "***Pledge Agreement***"). A true and correct copy of the Pledge Agreement is attached as **Exhibit C**.

10.      SRT remained a holder of the Loan Documents (defined below).  By virtue of duly executed and, where applicable, recorded assignment documents, SUNS succeeded to SUN's ownership of the Loan Documents, and pursuant to a Note Splitter and Loan Modification Agreement ("***Note Splitter***"), the Original Note was split into (a) that certain Replacement Promissory Note A-1, effective as of November 27, 2024, in the principal amount of $15,400,000, made by Borrower in favor of SRT, and (b) that certain Replacement Promissory Note A-2, made effective as of November 27, 2024, in the principal amount of $28,600,000, by Borrower in favor of SUNS (collectively, the "***Note***"). True and correct copies of the assignments are attached as **Exhibit D,** a true and correct copy of the Note Splitter is attached as **Exhibit I**, and true and correct copies of the Note are attached as **Exhibit J**.

11.      The Note, Loan Agreement, Pledge Agreement, Guaranty (as defined below), and all other documents evidencing, securing, or relating to the Loan are sometimes collectively referred to herein as the "***Loan Documents***."

**II.      THE RELEVANT TERMS OF THE NOTE AND LOAN AGREEMENT**

12.      In relevant part, and among other things, the Note provides that "[t]he Debt shall without notice become immediately due and payable at the option of Lender, if any payment required in this Note is not paid (a) in accordance with the terms of the Loan Agreement, or (b) on the happening of any other Event of Default." (Ex. J, Note, Art. 2.)

13.      In turn, the Loan Agreement details Borrower's debt payment requirements, including Borrower's obligation to make monthly debt service payments and to pay all interest accrued and unpaid, and all other sums due from Borrower under the Loan Documents (the "***Debt***," as more fully defined in the Loan Agreement). (Ex. B, Loan Agmt. §§ 1.1, 2.3.2.)

4

86174656;6

14.     The Loan Agreement also provides that an Event of Default occurs if, among other things, any amount due under the Loan Documents is not paid when due. (Ex. B, Loan Agmt. § 8.1(a).)

15.     The Loan Agreement provides that Plaintiffs are entitled to all of their expenses, including reasonable attorneys' fees and disbursements, incurred in connection with, among other things, Plaintiffs enforcing their rights under the Loan Documents. (Ex. B, Loan Agmt. § 10.13.)

## III.     THE GUARANTIES

16.     On or about July 31, 2024, Guarantor agreed to and entered into that certain Guaranty of Interest and Carry Costs (the "***Guaranty***"). A true and correct copy of the Guaranty is attached as **Exhibit E**. (*Id*.)

17.     In relevant part, and among other things, the Guaranty provides that Guarantor "hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise. Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor." (Ex. E, Guaranty § 1.1.)

18.     Moreover, Guarantor agreed that "[t]his Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection." (Ex. E, Guaranty § 1.3.)

19.     The Guaranty defines the Guaranteed Obligations as follows:

Collectively, the payment in full, after application of all Gross Income from Operations generated by the Property for the applicable period, of all Taxes, Insurance Premiums, Other Charges, Operating Expenses, required Reserve Account deposits, interest due and payable on the Loan, any Projected Interest Shortfall due and payable from Borrower in accordance with Section 7.2.4 of the Loan Agreement, and all other operating expenses to the extent not described above, in each case to the extent necessary to own and operate the Property, and in

5

86174656;6

each case as and when due and payable, whether same are incurred prior to, on or after an Event of Default or prior to or after Lender's exercise of remedies in connection with the Loan, including any foreclosure or deed or assignment in lieu thereof. For the avoidance of doubt, Lender shall not be required to demonstrate a loss, liability or other impairment under the Loan in order to enforce Guarantor's obligations under this Guaranty. The indebtedness guaranteed by Guarantor hereunder shall be deemed to be the last indebtedness which remains outstanding under the Loan Documents after the application of payments received from Borrower and the application of proceeds received from the foreclosure of the Security Instrument and other liquidation of any Collateral for the Loan, and Guarantor may not claim or contend so long as any such indebtedness remains outstanding that any payments received by Lender from Borrower or otherwise, or proceeds received by Lender on the liquidation of the Collateral, shall have reduced or discharged any Guarantor's liability or obligations hereunder.

(Ex. E, Guaranty § 1.2.)

20.     Moreover, the Guaranty provides that "The Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder, shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower, or any other party, against Lender or against payment of the Guaranteed Obligations, whether such offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise." (Ex. E, Guaranty § 1.4.)

21.     The Guaranty further provides that "[i]f all or any part of the Guaranteed Obligations shall not be paid when due, whether at demand, maturity, acceleration or otherwise, Guarantor shall, immediately upon demand by Lender, and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity, or any other notice whatsoever, all such notices being hereby waived by Guarantor pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein." (Ex. E, Guaranty § 1.5.)

22.     Moreover, the Guaranty provides that "In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall, immediately upon

6

86174656;6

Case 1:26-cv-04240-RA     Document 1-1     Filed 05/20/26     Page 12 of 316

demand by Lender, pay to Lender (a) the applicable Guaranteed Obligations and (b) all costs and expenses (including court costs and attorneys' fees and costs) incurred by Lender or its successors or assigns in the enforcement hereof or the preservation of Lender's rights hereunder, in each case together with interest thereon at the Default Rate from the date requested by Lender until the date of payment to Lender." (Ex. E, Guaranty § 1.10.)

## IV.   GUARANTOR IS LIABLE FOR INTEREST AND CARRY AMOUNTS DUE UNDER THE GUARANTY

23.   Borrower defaulted under the Loan by, among other things, failing to pay Plaintiffs all amounts when due on at least the November 10, 2025 Payment Date through present (collectively, the "***Payment Events of Default***"). (Ex. B, Loan Agreement § 8.1.)

24.   Borrower's Payment Events of Default include, but are not limited to, Borrower's failure to pay interest payable under the Loan Documents at the Interest Rate or the Default Rate and to pay the Projected Interest Shortfall (the "***Carry Shortfall Amount***"). (Ex. B, Loan Agmt. §§ 2.3.2, 7.2.4.)

25.   Therefore, Borrower failed to pay certain of the Guaranteed Obligations as defined in the Guaranty. (Ex. E, Guaranty §§ 1.1, 1.2.)

26.   Guarantor is, in turn, liable for the Guaranteed Obligations under the Guaranty. (Ex. E, Guaranty §§ 1.1, 1.2.)

## V.   THE AMOUNTS DUE AND OWING BY GUARANTOR

27.   On December 16, 2025, Plaintiffs accelerated the Loan given Borrower's various Events of Default (the "***Acceleration Notice***"). A true and correct copy of the Acceleration Notice is attached as **Exhibit F**.

28.   Guarantor is liable for the amounts due under the Guaranty. As of March 30, 2026, those Guaranty amounts totaled $6,728,313.11, comprised of the following:

7

86174656;6

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 13 of 316

    a.        2025 Property Taxes: $2,051,669.91

    b.        Interest: $2,415,825.47

    c.        Servicing Fee: $10,500.00

    d.        Late Fees: $49,063.04

    e.        Legal Fees: $272,038.00

    f.        Net Carry Costs: $1,929,216.69

29.    A true and correct copy of a Statement calculating the above items as of March 30, 2026 and used by Plaintiffs to track interest and other costs which are due and owing under the Loan Documents, among other amounts, is attached hereto as **Exhibit G**.

30.    The Guaranty contains no end date for Guarantor's obligation for carrying costs, and accordingly those costs continue to accrue. These outstanding amounts due under the Guaranty set forth above and in Exhibit G include the expected future operating shortfalls through December 31, 2027.

31.    Plaintiffs demanded that Guarantor pay all due and owing Guaranteed Obligations (as defined in the Guaranty). A true and correct copy of Plaintiffs' March 30, 2026 demand upon Guarantor is attached as **Exhibit H**.

32.    Guarantor did not repay the Guaranteed Obligations despite that demand for payment.

33.    Plaintiffs incurred attorneys' fees and costs in connection with enforcing the Loan. Plaintiffs will continue to incur fees and costs throughout this matter.

8

86174656;6

I affirm this 17th day of April, 2026, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

Brian Sedrish

86174656;2

FILED: NEW YORK COUNTY CLERK 04/17/2026 04:35 PM
NYSCEF DOC. NO. 3
Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 15 of 316

INDEX NO. 652311/2026
RECEIVED NYSCEF: 04/17/2026

## COMMERCIAL DIVISION RULE 17 CERTIFICATION OF COMPLIANCE

I, counsel for Plaintiffs Southern Realty Trust Holdings LLC and Sunrise Realty Trust Holdings I LLC, hereby certify, pursuant to Rule 17 of the Rules for the Commercial Division of the Supreme Court that the above Memorandum of Law in Support of Plaintiffs' CPLR § 3213 Motion for Summary Judgment in Lieu of Complaint contains 2,278 words, inclusive of headings and exclusive of the caption, table of contents, table of authorities, the signature block and this Statement, in compliance with Rule 17.

Dated:  New York, New York
       April 17, 2026

**AKERMAN LLP**

By: _/s/ Mark S. Lichtenstein_
    Mark S. Lichtenstein, Esq.
    Keith Blackman, Esq.
1251 Avenue of the Americas, 37th Floor
New York, NY 10020
Tel. No.: (212) 880-3800
E-mail: mark.lichtenstein@akerman.com
E-mail: keith.blackman@akerman.com

*Attorneys for Plaintiffs Southern Realty Trust Holdings*
*LLC and Sunrise Realty Trust Holdings I LLC*

10

86174656;6

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 16 of 316

# EXHIBIT A

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 17 of 316

## PROMISSORY NOTE

**$44,000,000.00**                                                New York, New York
                                                                  July 31, 2024

FOR VALUE RECEIVED **LEX AVENUE HOTEL, LLC**, a Delaware limited liability company (together with its permitted successors and assigns, "**Borrower**"), as maker, and having its principal place of business at 2506 W. Main, 5th Floor, Houston, Texas 77098, hereby unconditionally promises to pay to the order of **SOUTHERN REALTY TRUST HOLDINGS LLC**, a Delaware limited liability company ("**SRH**"), and **SUNRISE REALTY TRUST, INC.**, a Maryland corporation ("**SRT**"; whereas SRT and SRH, individually and/or collectively as the context may require, together with their respective successors and assigns, the "**Lender**"), or at such other place as the holder hereof may from time to time designate in writing, the maximum principal sum of up to **Forty-Four Million and No/100 Dollars ($44,000,000.00)**, or so much thereof as is advanced pursuant to that certain Loan Agreement, dated the date hereof, between Borrower and Lender (as the same may be amended, modified, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), including without limitation any Exit Fee, in lawful money of the United States of America, with interest thereon to be computed from the date of this Promissory Note (as the same may be amended, supplemented, restated, replaced or otherwise modified from time to time, this "**Note**") at the Interest Rate (as defined in the Loan Agreement), and to be paid in accordance with the terms of this Note and the Loan Agreement. All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement.

### ARTICLE 1:  PAYMENT TERMS

Borrower agrees to pay the principal sum of this Note and interest on the unpaid principal sum of this Note and all other amounts due under the Loan Agreement and other Loan Documents from time to time outstanding without relief from valuation and appraisement laws at the rates and at the times specified in the Loan Agreement and the outstanding balance of the principal sum of this Note and all accrued and unpaid interest thereon and all other amounts due under the Loan Agreement and other Loan Documents shall be due and payable, in all events, on the Maturity Date.

### ARTICLE 2:  DEFAULT AND ACCELERATION

The Debt, including without limitation, the Exit Fee, shall without notice become immediately due and payable at the option of Lender, if any payment required in this Note is not paid (a) in accordance with the terms of the Loan Agreement, or (b) on the happening of any other Event of Default.

### ARTICLE 3:  LOAN DOCUMENTS

This Note is secured by the Security Instrument and the other Loan Documents. All of the terms, covenants and conditions contained in the Loan Agreement, the Security Instrument and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein. In the event of a conflict or inconsistency between the

[Initial Page to Promissory Note]

terms of this Note and the Loan Agreement, the terms and provisions of the Loan Agreement shall govern.

## ARTICLE 4:  SAVINGS CLAUSE

Notwithstanding anything to the contrary contained herein, (a) all agreements and communications between Borrower and Lender are hereby and shall automatically be limited so that, after taking into account all amounts deemed interest, the interest contracted for, charged or received by Lender shall never exceed the Maximum Legal Rate or amount, (b) in calculating whether any interest exceeds the Maximum Legal Rate, all such interest shall be amortized, prorated, allocated and spread over the full amount and term of all principal indebtedness of Borrower to Lender, and (c) if through any contingency or event Lender receives or is deemed to receive interest in excess of the Maximum Legal Rate, any such excess shall be deemed to have been applied toward payment of the principal of any and all then outstanding indebtedness of Borrower to Lender.

## ARTICLE 5:  NO ORAL CHANGE

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

## ARTICLE 6:  WAIVERS

Except as otherwise expressly provided in the Loan Agreement and other Loan Documents, Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby jointly and severally waive presentment and demand for payment, notice of dishonor, notice of intention to accelerate, notice of acceleration, protest and notice of protest and non-payment and all other notices of any kind.  No release of any security for the Debt or extension of time for payment, of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Loan Agreement or the other Loan Documents made by agreement between Lender or any other Person shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and any other Person who may become liable for the payment of all or any part of the Debt, under this Note, the Loan Agreement or the other Loan Documents.  No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Loan Agreement or the other Loan Documents.  If Borrower is a partnership or limited liability company, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the individuals or entities comprising the partnership or limited liability company, and the term "Borrower," as used herein, shall include any alternate or successor partnership or limited liability company, but any predecessor partnership or limited liability company and their partners or members shall not thereby be released from any liability.  If Borrower is a corporation, the agreements contained herein shall remain in full force and be applicable notwithstanding any changes in the shareholders comprising, or the officers and directors relating to, the corporation, and the term "Borrower" as used herein, shall include any alternative or successor corporation, but any predecessor corporation

shall not be relieved of liability hereunder.  Nothing in the foregoing two sentences shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in such partnership, limited liability company or corporation, as applicable, which may be set forth in the Loan Agreement, the Security Instrument or any other Loan Document.

### ARTICLE 7:  TRANSFER

Upon the transfer of this Note, Lender may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under Legal Requirements given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.

### ARTICLE 8:  EXCULPATION

The provisions of <u>Section 3.1</u> of the Loan Agreement are hereby incorporated by reference into this Note to the same extent and with the same force as if fully set forth herein.

### ARTICLE 9:  GOVERNING LAW

**THIS NOTE WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER  IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES IRREVOCABLY AND UNCONDITIONALLY AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS NOTE AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS NOTE, AND THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.**

**ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST BORROWER ARISING OUT OF OR RELATING TO THIS NOTE MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT LOCATED IN THE STATE OF NEW YORK, INCLUDING WITHOUT LIMITATION, ANY STATE OR FEDERAL COURT LOCATED IN THE COUNTY OF NEW YORK AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON**

**VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT:**

> C T CORPORATION SYSTEM
> 28 LIBERTY STREET, 42ND FLOOR
> NY, NY 10005

**AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING INCLUDING WITHOUT LIMITATION THOSE IN THE STATE OF NEW YORK.  BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK**

**(WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.  NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST BORROWER IN ANY JURISDICTION.**

## ARTICLE 10:  NOTICES

All notices or other written communications hereunder shall be delivered in accordance with Section 10.6 of the Loan Agreement.

[THE REMAINDER OF THE PAGE IS INTENTIONALLY BLANK]

IN WITNESS WHEREOF, Borrower has duly executed this Promissory Note as of the day and year first above written.

BORROWER:

**LEX AVENUE HOTEL, LLC,**
a Delaware limited liability company

By: _____
Name: Acho Axuike
Title: Vice President

[signature page to Promissory Note – Thompson Hotel]

Case 1:26-cv-04240-RA     Document 1-1     Filed 05/20/26     Page 22 of 316

# EXHIBIT B

# LOAN AGREEMENT

Dated as of July 31, 2024

between

## LEX AVENUE HOTEL, LLC,

a Delaware limited liability company,

as Borrower

and

## SOUTHERN REALTY TRUST HOLDINGS LLC, a Delaware limited liability company, and SUNRISE REALTY TRUST, INC., a Maryland corporation,

individually and collectively, as Lender

# TABLE OF CONTENTS

**Page**

Article I DEFINITIONS; PRINCIPLES OF CONSTRUCTION .................................................. 1

Section 1.1    Definitions ................................................................................... 1
Section 1.2    Principles of Construction ........................................................... 39

Article II GENERAL TERMS ........................................................................................ 39

Section 2.1    Loan Commitment; Disbursement to Borrower .................................. 39
2.1.1    Agreement to Lend and Borrow ............................................... 39
2.1.2    Initial and Future Disbursements to Borrower .......................... 39
2.1.3    The Note, Security Instrument and Loan Documents .................. 39
2.1.4    Use of Proceeds ................................................................... 39
2.1.5    Intentionally omitted ............................................................. 40

Section 2.2    Interest Rate ............................................................................. 40
2.2.1    Interest Rate ........................................................................ 40
2.2.2    Interest Calculation .............................................................. 40
2.2.3    Determination of Interest Rate ............................................... 40
2.2.4    Default Rate ........................................................................ 43
2.2.5    Usury Savings ..................................................................... 43
2.2.6    Breakage Indemnity ............................................................. 43

Section 2.3    Debt Service Payments ............................................................... 43
2.3.1    Payments Generally .............................................................. 43
2.3.2    Monthly Debt Service Payment ............................................... 44
2.3.3    Payment on Maturity Date ...................................................... 44
2.3.4    Late Payment Charge ........................................................... 44
2.3.5    Method and Place of Payment ................................................ 44

Section 2.4    Prepayments ............................................................................. 44
2.4.1    Voluntary Prepayments ......................................................... 44
2.4.2    Mandatory Prepayments ........................................................ 45
2.4.3    Prepayments Made While an Event of Default Exists .................. 45

Section 2.5    Future Advances ........................................................................ 46
2.5.1    Future Interest Shortfall Advances .......................................... 46
2.5.2    Earnout Advances ................................................................ 46

Section 2.6    Release of Property .................................................................... 47
Section 2.7    Cash Management ...................................................................... 48
2.7.1    Clearing Account .................................................................. 48
2.7.2    Cash Management Account ..................................................... 49

Section 2.8    Intentionally omitted .................................................................. 51
Section 2.9    Extension Options ...................................................................... 51

i

## TABLE OF CONTENTS
### (Continued)

**Page**

2.9.1    Extension Options ................................................................ 51
2.9.2    Extension Documentation ..................................................... 52

Section 2.10    Change in Law; Taxes ............................................... 52
2.10.1    Increased Costs .................................................................. 52
2.10.2    Other Taxes ......................................................................... 53

Section 2.11    Taxes ........................................................................ 53
Section 2.12    OID ............................................................................ 55
Section 2.13    Survival ..................................................................... 55

Article III EXCULPATION .......................................................................... 55

Section 3.1    Exculpation ................................................................ 55

Article IV REPRESENTATIONS AND WARRANTIES ................................ 59

Section 4.1    Borrower Representations ......................................... 59
4.1.1    Organization ........................................................................ 60
4.1.2    Proceedings ......................................................................... 60
4.1.3    No Conflicts ......................................................................... 60
4.1.4    Litigation .............................................................................. 61
4.1.5    Agreements ......................................................................... 61
4.1.6    Title ...................................................................................... 61
4.1.7    Solvency ............................................................................... 61
4.1.8    Full and Accurate Disclosure .............................................. 62
4.1.9    No Plan Assets .................................................................... 62
4.1.10    Compliance ........................................................................ 62
4.1.11    Financial Information ......................................................... 63
4.1.12    Condemnation ................................................................... 63
4.1.13    Federal Reserve Regulations ............................................ 63
4.1.14    Utilities and Public Access ............................................... 63
4.1.15    Not a Foreign Person ........................................................ 64
4.1.16    Separate Lots .................................................................... 64
4.1.17    Assessments ..................................................................... 64
4.1.18    Enforceability .................................................................... 64
4.1.19    No Prior Assignment ......................................................... 64
4.1.20    Insurance ........................................................................... 64
4.1.21    Use of Property ................................................................. 64
4.1.22    Certificate of Occupancy; Licenses ................................. 64
4.1.23    Flood Zone ........................................................................ 64
4.1.24    Physical Condition ............................................................ 65
4.1.25    Boundaries ........................................................................ 65
4.1.26    Leases ............................................................................... 65
4.1.27    Survey ............................................................................... 65

ii

# TABLE OF CONTENTS
## (Continued)

**Page**

| | | |
|---|---|---|
| 4.1.28 | Principal Place of Business; State of Organization | 66 |
| 4.1.29 | Filing and Recording Taxes | 66 |
| 4.1.30 | Special Purpose Entity/Separateness | 66 |
| 4.1.31 | Management Agreement | 67 |
| 4.1.32 | Illegal Activity | 68 |
| 4.1.33 | No Change in Facts or Circumstances; Disclosure | 68 |
| 4.1.34 | Investment Company Act | 68 |
| 4.1.35 | Embargoed Person | 68 |
| 4.1.36 | Clearing Account and Cash Management Account | 69 |
| 4.1.37 | Filing of Returns; Payment of Taxes | 69 |
| 4.1.38 | REA | 70 |
| 4.1.39 | Environmental Representations | 70 |
| 4.1.40 | Labor Matters | 70 |
| 4.1.41 | Condominium Documents. | 70 |
| 4.1.42 | Ground Lease Representations. | 71 |
| 4.1.43 | Survival of Representations | 73 |

**Article V BORROWER COVENANTS** ... 73

| | | |
|---|---|---|
| Section 5.1 | Affirmative Covenants | 73 |
| 5.1.1 | Existence; Compliance with Legal Requirements | 73 |
| 5.1.2 | Taxes and Other Charges | 74 |
| 5.1.3 | Litigation | 75 |
| 5.1.4 | Access to Property | 75 |
| 5.1.5 | Notice of Default | 75 |
| 5.1.6 | Cooperate in Legal Proceedings | 75 |
| 5.1.7 | Perform Loan Documents | 75 |
| 5.1.8 | Award and Insurance Benefits | 75 |
| 5.1.9 | Further Assurances | 75 |
| 5.1.10 | Mortgage Taxes | 76 |
| 5.1.11 | Financial Reporting | 76 |
| 5.1.12 | Business and Operations | 79 |
| 5.1.13 | Title to the Property | 79 |
| 5.1.14 | Costs of Enforcement | 80 |
| 5.1.15 | Estoppel Statement | 80 |
| 5.1.16 | Estoppel Certificates | 81 |
| 5.1.17 | Loan Proceeds | 81 |
| 5.1.18 | Performance by Borrower | 81 |
| 5.1.19 | Confirmation of Representations | 81 |
| 5.1.20 | No Joint Assessment | 81 |
| 5.1.21 | Leasing Matters | 81 |
| 5.1.22 | Alterations | 82 |
| 5.1.23 | Operation of Property | 82 |
| 5.1.24 | No Credits on Account of the Obligations | 83 |

## TABLE OF CONTENTS
### (Continued)

**Page**

5.1.25 Personal Property ..................................................................................... 83
5.1.26 Appraisals ................................................................................................. 84
5.1.27 Financing Statements ............................................................................... 84
5.1.28 Intentionally omitted. ............................................................................... 84
5.1.29 ERISA ...................................................................................................... 84
5.1.30 Condominium. .......................................................................................... 85
5.1.31 Condominium Obligations. ...................................................................... 87
5.1.32 Resignation of Condominium Board Members. ....................................... 87
5.1.33 Condominium Voting. .............................................................................. 87
5.1.34 The Ground Lease. ................................................................................... 88
5.1.35 Hotel Covenants ...................................................................................... 89

Section 5.2 Negative Covenants ................................................................................. 90
5.2.1 Operation of Property .............................................................................. 90
5.2.2 Liens ......................................................................................................... 91
5.2.3 Dissolution ............................................................................................... 91
5.2.4 Change in Business .................................................................................. 92
5.2.5 Debt Cancellation ..................................................................................... 92
5.2.6 Zoning ...................................................................................................... 92
5.2.7 No Joint Assessment ................................................................................ 92
5.2.8 Principal Place of Business and Organization ......................................... 92
5.2.9 ERISA ...................................................................................................... 92
5.2.10 Transfers .................................................................................................. 92
5.2.11 REA .......................................................................................................... 95
5.2.12 Special Purpose Entity/Separateness ...................................................... 95
5.2.13 Embargoed Person; OFAC ...................................................................... 95

Section 5.3 Intentionally omitted. .............................................................................. 95
Section 5.4 Environmental Covenants ........................................................................ 95
Section 5.5 Labor Matters ........................................................................................... 96

Article VI INSURANCE; CASUALTY; CONDEMNATION ...................................................... 97

Section 6.1 Insurance .................................................................................................. 97
Section 6.2 Casualty .................................................................................................... 101
Section 6.3 Condemnation ........................................................................................... 101
Section 6.4 Restoration ................................................................................................ 102

Article VII RESERVE FUNDS ..................................................................................... 107

Section 7.1 Tax and Insurance Escrow ....................................................................... 107
7.1.1 Tax and Insurance Escrow Funds ............................................................ 107
7.1.2 Disbursements from Tax and Insurance Escrow Funds ........................... 107

Section 7.2 FF&E Reserve ........................................................................................... 108

## TABLE OF CONTENTS
### (Continued)

**Page**

7.2.1 FF&E Reserve Funds. .......................................................................... 108

7.2.2 Release of FF&E Reserve Funds. ....................................................... 108

7.2.3 Balance in the FF&E Reserve Account. ............................................. 109

7.2.4 Interest Shortfall Reserve Funds ....................................................... 109

Section 7.3 Required Repair Funds ....................................................................... 110

7.3.1 Deposits ............................................................................................. 110

7.3.2 Disbursements of Required Repair Funds .......................................... 110

7.3.3 Balance in Required Repair Account .................................................. 111

Section 7.4 Excess Cash Reserve Funds ............................................................... 111

Section 7.5 Reserve Funds, Generally .................................................................. 112

Article VIII DEFAULTS ................................................................................................ 113

Section 8.1 Event of Default ................................................................................. 113

Section 8.2 Remedies ............................................................................................ 117

Article IX SPECIAL PROVISIONS .............................................................................. 119

Section 9.1 Transfer of Loan ................................................................................. 119

Section 9.2 Cooperation ........................................................................................ 120

Section 9.3 Servicer .............................................................................................. 120

Section 9.4 Restructuring of Loan ........................................................................ 121

Article X MISCELLANEOUS ........................................................................................ 123

Section 10.1 Survival .............................................................................................. 123

Section 10.2 Lender's Discretion ............................................................................ 123

Section 10.3 Governing Law ................................................................................... 123

Section 10.4 Modification, Waiver in Writing ........................................................ 125

Section 10.5 Delay Not a Waiver ............................................................................ 125

Section 10.6 Notices ............................................................................................... 125

Section 10.7 Trial by Jury ....................................................................................... 126

Section 10.8 Headings ............................................................................................ 126

Section 10.9 Severability ........................................................................................ 126

Section 10.10 Preferences ........................................................................................ 126

Section 10.11 Waiver of Notice ................................................................................ 127

Section 10.12 Remedies of Borrower ....................................................................... 127

Section 10.13 Expenses; Indemnity ......................................................................... 127

Section 10.14 Schedules Incorporated ..................................................................... 129

Section 10.15 Offsets, Counterclaims and Defenses ............................................... 129

Section 10.16 No Joint Venture or Partnership; No Third Party Beneficiaries ........... 129

Section 10.17 Publicity ............................................................................................. 129

Section 10.18 Waiver of Marshalling of Assets ....................................................... 129

## TABLE OF CONTENTS
### (Continued)

**Page**

| | | |
|---|---|---|
| Section 10.19 | Waiver of Counterclaim | 130 |
| Section 10.20 | Conflict; Construction of Documents; Reliance | 130 |
| Section 10.21 | Brokers and Financial Advisors | 130 |
| Section 10.22 | Prior Agreements | 130 |
| Section 10.23 | Cumulative Rights | 131 |
| Section 10.24 | Counterparts | 131 |
| Section 10.25 | Time Is of the Essence | 131 |
| Section 10.26 | Consent of Holder | 131 |
| Section 10.27 | Successor Laws | 131 |
| Section 10.28 | Performance by Borrower and Lender; Reliance on Third Parties | 131 |
| Section 10.29 | Intentionally omitted | 131 |
| Section 10.30 | Intentionally omitted | 131 |
| Section 10.31 | Intentionally omitted | 131 |
| Section 10.32 | Negation of Implied Right to Cure Events of Default | 132 |
| Section 10.34 | Lead Lender. | 132 |

## <u>SCHEDULES</u>

| | |
|---|---|
| SCHEDULE I | Rent Roll/List of Leases |
| SCHEDULE II | Required Repairs/Deadlines for Completion |
| SCHEDULE III | Borrower Organizational Chart |
| SCHEDULE IV | Deposit Amounts |
| SCHEDULE V | Federal Tax ID Numbers |
| SCHEDULE VI | REA |
| SCHEDULE VII | Form of U.S. Tax Compliance Certificate |

## LOAN AGREEMENT

This LOAN AGREEMENT, dated as of July 31, 2024 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**"), is made between **SOUTHERN REALTY TRUST HOLDINGS LLC**, a Delaware limited liability company ("**SRH**"), having an address c/o Southern Realty Trust Inc., 2 Wisconsin Circle #700, Chevy Chase, Maryland  20815, and **SUNRISE REALTY TRUST, INC.**, a Maryland corporation ("**SRT**"), having an address at c/o SOUTHERN REALTY TRUST HOLDINGS LLC., 525 Okeechobee Blvd., Suite 1650, West Palm Beach, FL  33401, (whereas SRT and SRH, individually and/or collectively as the context may require, together with their respective successors and assigns, the "**Lender**"),  and **LEX AVENUE HOTEL, LLC**, a Delaware limited liability company, having its principal place of business at 2506 W. Main, 5th Floor, Houston, Texas 77098 ("**Borrower**").

W I T N E S S E T H:

WHEREAS, Borrower desires to obtain a loan in the maximum principal amount of up to **FORTY-FOUR MILLION and No/100 DOLLARS ($44,000,000.00)** from Lender pursuant to this Agreement and the other Loan Documents (as hereinafter defined) (the "**Loan**"); and

WHEREAS, Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms of this Agreement and the other Loan Documents.

NOW THEREFORE, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

## ARTICLE I

## DEFINITIONS; PRINCIPLES OF CONSTRUCTION

Section 1.1    Definitions.   For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"**Affiliate**" shall mean, as to any Person, any other Person that, (i) directly or indirectly, is in Control of, is Controlled by or is under common Control with such Person, (ii) owns directly or indirectly twenty percent (20%) or more of all equity interest in such Person, or (iii) is a director or officer of such Person or of an Affiliate of such Person.

"**Affiliated Manager**" shall mean any Manager in which Borrower or Guarantor has, directly or indirectly, any legal, beneficial or economic interest.

"**Agreement**" shall have the meaning set forth in the introductory paragraph hereto.

"**ALTA**" shall mean American Land Title Association or any successor thereto.

1

"**Annual Budget**" shall mean the operating budget, including all planned Capital Expenditures, for the Property prepared by Borrower in accordance with Section 5.1.11(e) hereof for the applicable Fiscal Year or other period.

"**Appraisal**" shall mean an "as is" appraisal acceptable to Lender prepared in accordance with the requirements of FIRREA, prepared by an independent third-party appraiser selected by Lender holding an MAI designation, who is state licensed or state certified if required under the laws of the state where the Property is located, who meets the requirements of FIRREA.

"**Approved Annual Budget**" shall have the meaning set forth in Section 5.1.11(e) hereof.

"**Approved FF&E Expenditures**" shall mean the cost of FF&E Expenditures incurred by Borrower and either (i) included in the Approved Annual Budget or (ii) approved by Lender, which approval shall not be unreasonably withheld or delayed.

"**Approved Rating Agencies**" shall mean each of S&P, Moody's, Kroll and DBRS Morningstar or any other nationally recognized statistical rating agency which has been approved by Lender and designated by Lender to assign a rating to the Securities.

"**Assignment of Leases**" shall mean that certain first priority Assignment of Leases and Rents, dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, assigning to Lender all of Borrower's interest in and to the Leases and Rents of the Property as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Management Agreement**" shall mean that certain Assignment of Management Agreement and Subordination of Management Fees, dated as of the date hereof, among Lender, Borrower and Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Parking Management Agreement**" shall mean that certain Assignment of Parking Management Agreement and Subordination of Management Fees, dated as of the date hereof, among Lender, Borrower and Manager (Parking), as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Award**" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or part of the Property.

"**Backward-Looking Special Purpose Entity Representations and Warranties**" shall have the meaning set forth in Section 4.1.30 hereof.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means in relation to an EEA Member Country which has implemented, or which at any time implements, Article 55 of Directive 2014/59/EU (as amended or re-enacted or successor thereto) establishing a framework for the recovery and resolution of

credit institutions and investment firms, the relevant implementing law or Regulation as described in the EU Bail-In Legislation Schedule from time to time.

"**Bankruptcy Action**" shall mean with respect to any Person (a) such Person filing a voluntary petition under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law; (b) the filing of an involuntary petition against such Person under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law, or soliciting or causing to be solicited petitioning creditors for any involuntary petition against such Person; (c) such Person filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law, or soliciting or causing to be solicited petitioning creditors for any involuntary petition from any Person; (d) such Person consenting to or acquiescing in or joining in an application for the appointment in a judicial, quasi-judicial or administrative proceeding of a custodian, receiver, trustee, assignee, sequestrator (or similar official), liquidator, or examiner for such Person or any portion of the Property; (e) the filing of a petition against a Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the Bankruptcy Code or any other applicable law; (f) under the provisions of any other law for the relief or aid of debtors, an action taken by any court of competent jurisdiction that allows such court to assume custody or Control of a Person or of the whole or any substantial part of its property or assets or (g) such Person making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, 11 U.S.C. § 101, et seq., as the same may be amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights or any other federal or state bankruptcy or insolvency law.

"**Basic Carrying Costs**" shall mean, for any period, the sum of the following costs: (a) Taxes, (b) Other Charges and (c) Insurance Premiums.

"**Benchmark Replacement Condition**" means, with respect to any conversion of the Loan to a Substitute Rate Loan at any such time that the Loan is included in a Securitization that is a REMIC Trust, either (i) Lender shall have received an opinion of nationally recognized tax counsel as to the compliance of such conversion with applicable requirements as determined under the Code, the regulations, revenue rulings, revenue procedures and other administrative, legislative and judicial guidance relating to the tax treatment of REMIC Trusts (which such opinion shall be, in form and substance and from a provider, in each case, reasonably acceptable to Lender) or (ii) Lender has evidence acceptable to Lender that formal guidance issued by the IRS provides that such conversion will comply with applicable tax requirements.

"**Borrower**" shall have the meaning set forth in the introductory paragraph hereto.

"**Borrower's Operating Account**" shall mean account number 4129286225 with Wells Fargo Bank, N.A..

3

"**Breakage Costs**" shall have the meaning set forth in Section 2.2.6 hereof.

"**Broker**" shall have the meaning set forth in Section 10.21 hereof.

"**Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which any of the following institutions is not open for business: (a) banks and savings and loan institutions in New York, New York, (b) the trustee under a Securitization (or, if no Securitization has occurred, Lender), (c) any Servicer, (d) the financial institution that maintains any collection account for or on behalf of any Servicer or any Reserve Funds, (e) the New York Stock Exchange or (f) the Federal Reserve Bank of New York.

"**Capital Expenditures**" shall mean, for any period, the amount expended for items capitalized under GAAP, and the Uniform System of Accounts for Hotels (including expenditures for building improvements or major repairs, leasing commissions and tenant improvements).

"**Cash Management Account**" shall have the meaning set forth in Section 2.7.2(a) hereof.

"**Cash Management Agreement**" shall mean a cash management agreement entered into by and among: Borrower, Manager, Deposit Bank and Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Cash Trap Cure**" shall mean the occurrence of any of the following with respect to the applicable Cash Trap Event: (i) in the case of a Cash Trap Event set forth in clause (i) of the definition of Cash Trap Event, Lender accepts a cure of the Event of Default giving rise to such Cash Trap Event (in its sole and absolute discretion) and no other Event of Default has occurred which is continuing, and (ii) in the case of a Cash Trap Event set forth in clause (ii) of the definition of Cash Trap Event with respect to Manager only, if Borrower replaces Manager with a Qualified Manager under a Replacement Management Agreement.

"**Cash Trap Event**" shall mean the occurrence of any of the following: (i) an Event of Default; or (ii) a Bankruptcy Action with respect to Borrower, Pledgor, Guarantor or Manager.

"**Cash Trap Period**" shall be deemed to commence upon the occurrence of a Cash Trap Event and shall continue until all Cash Trap Events have been the subject of a Cash Trap Cure.

"**Casualty**" shall have the meaning set forth in Section 6.2 hereof.

"**Casualty Consultant**" shall have the meaning set forth in Section 6.4(b)(iii) hereof.

"**Casualty Threshold**" shall have the meaning set forth in Section 6.2 hereof.

"**Certification of Documents**" shall mean that certain Borrower's Certification certifying Borrower's financial statements, and organizational documents, dated as of the date hereof, made by Borrower for the benefit of Lender.

"**Change in Law**" shall mean the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or

4

application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law and whether or not failure to comply therewith would be unlawful) by any Governmental Authority, provided that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Clearing Account**" shall have the meaning set forth in Section 2.7.1(a) hereof.

"**Clearing Account Agreement**" shall mean that certain Deposit Account Control Agreement dated as of the date hereof, and entered into among Borrower, Manager, Lender and the Clearing Bank, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, relating to funds deposited into the Clearing Account.

"**Clearing Bank**" shall mean Wells Fargo Bank, National Association, or any successors or permitted assigns thereof.

"**Closing Date**" shall mean the date of this Agreement.

"**Closing Payment**" shall mean an amount equal to Four Hundred Twenty Thousand and No/100 Dollars ($420,000.00).

"**Co-Lender Agreement**" shall have the meaning set forth in Section 10.34 hereof.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Collateral**" shall have the meaning set forth in the Security Instrument.

"**Common Charges**" shall mean any and all common charges, association fees or dues or other recurring expenses, or any regular or special assessments, or any other fees or charges due and payable by Borrower under any Condominium Declaration or any other Condominium Document.

"**Condemnation**" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"**Condemnation Proceeds**" shall have the meaning set forth in Section 6.4(b) hereof.

"**Condominium**" shall mean any condominium and/or sub-condominium regime created pursuant to the Condominium Declaration, including, without limitation, the SCH San Antonio Master Condominium created pursuant to the Master Declaration (the "**Master Condominium**")

5

and The Arts Residences, a Condominium, created pursuant to The Arts Declaration (the "**Residential Condominium**").

"**Condominium Act**" shall mean the Uniform Condominium Act (Texas Property Code), Chapter 82, and all modifications, supplements and replacements thereof and all regulations with respect thereto, now or hereafter enacted or promulgated.

"**Condominium Association**" shall mean the Master Association and the Residential Association.

"**Condominium Board**" shall mean the Board of Directors of each of the Master Association and the Residential Association.

"**Condominium Declaration**" shall mean each of the following (i) The Arts Declaration, and (ii) the SCH San Antonio Master Condominium Declaration.

"**Condominium Documents**" shall mean all documents necessary for the creation of any Condominium and the operation of any portion of the Property as a condominium Unit, and all other reports, disclosure statements and documents relating to any Condominium, including any documents necessary to establish and operate a separate condominium association to regulate and administer any Condominium, and all exhibits, amendments or supplements thereto from time to time, and otherwise used in connection with the creation of a Condominium and the operation of any Condominium.

"**Condominium Property**" shall mean any portion of the Property that is subject to the Master Condominium Documents.

"**Control**" shall mean, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of such Person, whether through ownership of voting securities, by contract or otherwise (it being acknowledged that (i) a Person shall not be deemed to lack Control of another Person even though certain decisions may be subject to customary "major decision" consent or approval rights of limited partners, shareholders or members, as applicable and (ii) for the avoidance of doubt, a Person shall be deemed to Control a corporation if such Person (or such Person together with its Affiliates) holds outstanding shares in such corporation carrying votes in sufficient number to elect a majority of the board of directors of such corporation). "**Controlled**" and "**Controlling**" shall have correlative meanings.

"**Coupon Floor**" means the sum of (a) the Term SOFR Floor and (b) the Spread.

"**Covered Rating Agency Information**" shall have the meaning set forth in Section 10.13(d) hereof.

"**DBRS Morningstar**" shall mean DBRS Morningstar group of companies.

"**Debt**" shall mean the Outstanding Principal Balance together with all interest accrued and unpaid thereon and all other sums (including any Breakage Costs) due to Lender in respect of the Loan under the Note, this Agreement, the Security Instrument or any other Loan Document.

"**Debt Service**" shall mean, with respect to any particular period of time, scheduled principal and interest payments due under this Agreement and the Note.

"**Debt Service Coverage Ratio**" shall mean, as of any date of calculation, the ratio calculated by Lender of (a) the Net Operating Income as of such date, to (b) the Debt Service for the twelve (12) month period commencing as of the date of calculation, (1) assuming interest accrues on the sum of the Outstanding Principal Balance and the then unfunded Future Advance Amount, and (2) taking into account the forward Term SOFR curve then in effect as promulgated by Chatham Financial or, if such forward Term SOFR curve is not available from Chatham Financial, then the forward Term SOFR curve then in effect as promulgated by Bloomberg (or, if the Substitute Rate or Prime Rate is then in effect hereunder, the equivalent curve as reasonably determined by Lender) or such other forward benchmark rate curve as selected by Lender in its reasonable discretion. The calculation of Debt Service Coverage Ratio as determined by Lender shall be conclusive and binding on Borrower absent manifest error.

"**Debt Yield**" shall mean, as of any date of calculation, the percentage calculated by Lender equal to the quotient, stated as a percentage, obtained by dividing (i) the Net Operating Income as of such date by (ii) the sum of the Outstanding Principal Balance and the then unfunded Future Advance Amount. The calculation of Debt Yield as determined by Lender shall be conclusive and binding on Borrower absent manifest error.

"**Default**" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would constitute an Event of Default.

"**Default Rate**" shall mean a rate per annum equal to the lesser of (a) the Maximum Legal Rate and (b) five percent (5%) above the Interest Rate.

"**Deposit Bank**" shall mean an Eligible Institution acting as the "Deposit Bank" under the Cash Management Agreement, reasonably selected by Lender.

"**Disclosure Document**" shall mean a prospectus, prospectus supplement, private placement memorandum, offering memorandum, offering circular, term sheet, road show presentation materials or other offering documents or marketing materials, in each case in preliminary or final form, used to offer Securities in connection with a Securitization.

"**Disregarded Entity**" shall mean an entity disregarded from its owner for federal income tax purposes under United States Treasury Regulations Section 301.7701-3.

"**Dollars**" and the sign "**$**" shall mean lawful money of the United States of America.

"**Earnout Advance**" shall have the meaning set forth in Section 2.1.2 hereof.

"**Earnout Advance Amount**" shall have the meaning set forth in Section 2.1.2 hereof.

"**Earnout Funding Fee**" shall mean a non-refundable fee equal to one percent (1%) of the amount of each Earnout Advance.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any member state of the European Union, Iceland, Liechtenstein, Norway and any other member of the European Economic Area at any given time.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution and/or which otherwise has authority to exercise or regulate a Bail-In Action.

"**Eligible Account**" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (a) an account or accounts maintained with a federal or state-chartered depository institution or trust company which complies with the definition of "Eligible Institution" or (b) a segregated trust account or accounts maintained with a federal- or state-chartered depository institution or trust company acting in its fiduciary capacity that has a Moody's rating of at least "Baa3" and which, in the case of a state-chartered depository institution or trust company, is subject to regulations substantially similar to 12 C.F.R. § 9.10(b), having in either case a combined capital and surplus of at least Fifty Million and No/100 Dollars ($50,000,000.00) and subject to supervision or examination by federal and state authority, as applicable. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Institution**" shall mean (a) a depository institution or trust company insured by the Federal Deposit Insurance Corporation, the short-term unsecured debt obligations or commercial paper of which are rated at least "A-1+" by S&P and "P-1" by Moody's, in the case of accounts in which funds are held for thirty (30) days or less (or, in the case of accounts in which funds are held for more than thirty (30) days, the long-term unsecured debt obligations of which are rated at least "A+" by S&P and "Aa1" by Moody's) or (b) in its capacity as Deposit Bank and/or Clearing Bank, Wells Fargo Bank, National Association, provided that its ratings are not reduced below the ratings in effect as of the Closing Date.

"**Embargoed Person**" shall mean any person, entity or government subject to trade restrictions under U.S. law, including, but not limited to, The USA Patriot Act (including the anti-terrorism provisions thereof), the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701, et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder including those related to Specially Designated Nationals and Specially Designated Global Terrorists, with the result that the investment in Borrower, Pledgor or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan made by Lender is in violation of law.

"**Environmental Indemnity**" shall mean that certain Environmental Indemnity Agreement, dated as of the date hereof, executed by Borrower and Guarantor in connection with

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 38 of 316

the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Environmental Reports**" shall have the meaning set forth in Section 4.1.39 hereof.

"**Environmental Statutes**" shall mean any present and future federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law, relating to protection of human health or the environment, relating to Hazardous Substances, and/or relating to liability for or costs of other actual or threatened danger to human health or the environment. The term "Environmental Statutes" includes, but is not limited to, the following statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto, and any state or local statutes, ordinances, rules, regulations and the like addressing similar issues: the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Substances Transportation Act; the Resource Conservation and Recovery Act (including but not limited to Subtitle I relating to underground storage tanks); the Solid Waste Disposal Act; the Clean Water Act; the Clean Air Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Occupational Safety and Health Act; the Federal Water Pollution Control Act; the Federal Insecticide, Fungicide and Rodenticide Act; the Endangered Species Act; the National Environmental Policy Act; and the Rivers and Harbors Appropriation Act. The term "Environmental Statutes" also includes, but is not limited to, any present and future federal, state and local laws, statutes, ordinances, rules, regulations, permits or authorizations and the like, as well as common law, that (a) condition transfer of property upon a negative declaration or other approval of a Governmental Authority of the environmental condition of the Property or any portion thereof; (b) require notification or disclosure of releases of Hazardous Substances or other environmental condition of a property to any Governmental Authority or other Person, whether or not in connection with any transfer of title to or interest in such property; (c) impose conditions or requirements in connection with permits or other authorization for lawful activity; (d) relate to nuisance, trespass or other causes of action related to the Property or any portion thereof; or (e) relate to wrongful death, personal injury, or property or other damage in connection with any physical condition or use of the Property or any portion thereof.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and the rulings issued thereunder.

"**ERISA Affiliate**" shall mean each person (as defined in Section 3(9) of ERISA) that together with Borrower or Guarantor would be deemed to be a "single employer" within the meaning of Section 414(b), (c), (m), (n) or (o) of the Code.

"**EU Bail-In Legislation Schedule**" means the document described as such and published by the Loan Market Association (or any successor person) from time to time.

"**Event of Default**" shall have the meaning set forth in Section 8.1(a) hereof.

"**Excess Cash**" shall have the meaning set forth in Section 2.7.2(b)(vii) hereof.

"**Excess Cash Reserve Account**" shall have the meaning set forth in Section 7.6 hereof.

"**Excess Cash Reserve Funds**" shall have the meaning set forth in Section 7.6 hereof.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as the same may be amended, modified or replaced, from time to time.

"**Exchange Act Filing**" shall have the meaning set forth in Section 5.1.11(g) hereof.

"**Excluded Tax**" shall mean any of the following Taxes required to be withheld or deducted from a payment to Lender: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes and branch profits Taxes, in each case, (i) imposed as a result of Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Taxes (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Foreign Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Foreign Lender with respect to an applicable interest in the Loan pursuant to a law in effect on the date on which (i) such Foreign Lender acquires such interest in the Loan or (ii) such Foreign Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.11 hereof, amounts with respect to such Taxes were payable either to such Foreign Lender's assignor immediately before such Foreign Lender became a party hereto or to such Foreign Lender immediately before it changed its lending office and (c) any U.S. federal withholding Taxes imposed under FATCA.

"**Extension Fee**" shall mean a non-refundable fee equal to (1) 0.25% of the Maximum Principal Amount as of the date that Borrower delivers the First Extension Notice payable on or prior to the Stated Maturity Date, and  (2) 0.25% of the Maximum Principal Amount as of the date that Borrower delivers the Second Extension Notice payable on or prior to the First Extended Maturity Date.

"**Extension Notice**" shall mean the First Extension Notice or the Second Extension Notice, as applicable.

"**Extension Option**" shall mean the First Extension Option or the Second Extension Option, as applicable.

"**Extraordinary Expense**" shall have the meaning set forth in Section 5.1.11(f) hereof.

"**FATCA**" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"**FIRREA**" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as the same may be amended from time to time.

"**Fee Estate**" shall mean the fee interest of the Fee Owner under the Ground Lease in the land and the improvements demised under the Ground Lease.

10

"**Fee Owner**" shall mean the owner of the lessor's interest in the Ground Lease and the Fee Estate.

"**FF&E**" shall mean fixtures, furnishings, equipment, furniture, and other items of tangible personal property now or hereafter located in or on the Property or the Improvements or used in connection with the use, occupancy, operation and maintenance of all or any part of the hotel located on the Property, other than stocks of food and other supplies held for consumption in normal operation but including, without limitation, appliances, machinery, equipment, signs, artwork, office furnishings and equipment, guest room furnishings, and specialized equipment for kitchens, laundries, bars, restaurant, public rooms, health and recreational facilities, linens, dishware, all partitions, screens, awnings, shades, blinds, floor coverings, hall and lobby equipment, heating, lighting, plumbing, ventilating, refrigerating, incinerating, elevators, escalators, air conditioning and communication plants or systems with appurtenant fixtures, vacuum cleaning systems, call or beeper systems, security systems, sprinkler systems and other fire prevention and extinguishing apparatus and materials; reservation system computer and related equipment; all equipment, manual, mechanical or motorized, for the construction, maintenance, repair and cleaning of, parking areas, walks, underground ways, truck ways, driveways, common areas, roadways, highways and streets; and the Vehicles (as defined in the Uniform System of Accounts for Hotels).

"**FF&E Expenditures**" for any period shall mean the amount expended for FF&E Work in, at or to the Property.

"**FF&E Reserve Account**" shall have the meaning set forth in Section 7.2.1 hereof.

"**FF&E Reserve Funds**" shall have the meaning set forth in Section 7.2.1 hereof.

"**FF&E Reserve Monthly Deposit**" shall have the meaning set forth in Section 7.2.1.

"**FF&E Work**" shall have the meaning set forth in Section 7.2.1 hereof.

"**First Extended Maturity Date**" shall have the meaning set forth in Section 2.9.1 hereof.

"**First Extension Notice**" shall have the meaning set forth in Section 2.9.1 hereof.

"**First Extension Option**" shall have the meaning set forth in Section 2.9.1 hereof.

"**First Payment Date**" shall have the meaning set forth in Section 2.3.2 hereof.

"**Fiscal Year**" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during the term of the Loan.

"**Foreign Lender**" shall mean a Lender at any time that it is not a U.S. Person.

"**Full Replacement Cost**" shall have the meaning set forth in Section 6.1(a)(i) hereof.

"**Future Advance**" shall mean any Future Interest Shortfall Advance and/or any Earnout Advance, as applicable.

11

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 41 of 316

"**Future Interest Shortfall Advance**" shall have the meaning set forth in Section 2.1.2 hereof.

"**Future Interest Shortfall Advance Amount**" shall have the meaning set forth in Section 2.1.2 hereof.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"**Governmental Authority**" shall mean any court, board, agency, commission, office or other authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city, foreign or otherwise) whether now or hereafter in existence.

"**Gross Income from Operations**" shall mean, for any period, all income, computed in accordance with GAAP (and the Uniform System of Accounts for Hotels), derived from the ownership and operation of the Property or any portion thereof from whatever source during such period, including, but not limited to, Rents, utility charges, escalations, forfeited security deposits, interest (if any) on credit accounts and on Reserve Funds, concession fees and charges, business interruption or other loss of income or rental insurance proceeds, service fees or charges, license fees, sums paid from users of parking spaces and other facilities or amenities located on the Property, but excluding (a) other than with respect to Hotel Transactions, Rents from Tenants that (i) are in default under the applicable Lease, (ii) are not in physical occupancy of the applicable leased premises (i.e., have vacated the applicable leased premises) or have otherwise "gone dark", (iii) have less than six (6) months remaining on the term of the applicable Lease or have a termination option exercisable within six (6) months of the date of determination, (iv) except as set forth above, are then in a free rent period, or (v) are, or whose lease guarantor is, the subject of, or otherwise subject to, a Bankruptcy Action, (b) sales, use and occupancy or other taxes on receipts required to be accounted for by Borrower to any Governmental Authority, (c) refunds and uncollectible accounts, (d) proceeds from the sale of furniture, fixtures and equipment, (e) Insurance Proceeds and Condemnation Proceeds (other than business interruption or other loss of income insurance) payable following a Casualty or Condemnation of all or any portion of the Property, and (f) any disbursements to Borrower from any of the Reserve Funds.

"**Ground Lease**" shall mean, that certain Amended and Restated Ground Lease dated January 25, 2018 by and between Leo Terra 3, L.P., a Texas limited partnership (as successor in interest to Edmund S. Beck and wife, Jutta A. Beck), as Landlord and Borrower, as Tenant (and successor in interest to 101 Lexington Tower, LLC, a Delaware limited liability company), as the same may be amended, restated, assigned, replaced, supplemented or otherwise modified for time to time.

"**Guarantor**" shall mean Roberto Castro Contreras.

"**Guaranty**" shall mean, the Recourse Guaranty and the Interest and Carry Guaranty.

"**Hazardous Substances**" shall include, but are not limited to, (a) any and all substances (whether solid, liquid or gas) defined, listed, or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, or words of similar meaning or regulatory effect under any present or future Environmental Statutes or that

may have a negative impact on human health or the environment, including, but not limited to, petroleum and petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead, radon, radioactive materials, flammables and explosives, but excluding substances of kinds and in amounts ordinarily and customarily used or stored in such properties similar to the Property for the purposes of cleaning or other maintenance or operations and otherwise in compliance with all Environmental Statutes, and (b) mold, mycotoxins, microbial matter, and/or airborne pathogens (naturally occurring or otherwise) which pose a threat (imminent or otherwise) to human health or the environment or adversely affect the Property or any portion thereof, and, with respect to microbial matter and airborne pathogens, that are present at the Property in higher levels than levels that are permitted under Environmental Statutes without necessitating remediation.

"**Hotel Management SNDA**" shall mean that certain Subordination, Non-Disturbance and Attornment Agreement made and entered into as of the 31st day of July, 2024, by and between Borrower, Lender, Manager and Guarantor with respect to the Property.

"**Hotel Transactions**" shall mean, collectively, (i) occupancy arrangements for customary hotel transactions in the ordinary course of Borrower's business conducted at the hotel, including nightly rentals (or licensing) of individual hotel rooms or suites, banquet room use and food and beverage services and (ii) informational or guest services which are terminable on one month's notice or less without cause and without penalty or premium, including co-marketing, promotional services and outsourced services.

"**Improvements**" shall have the meaning set forth in the granting clause(s) of the Security Instrument.

"**Increased Costs**" shall have the meaning set forth in Section 2.10.1 hereof.

"**Indebtedness**" shall mean for any Person, on a particular date, the sum (without duplication) at such date of (a) all indebtedness or liability of such Person (including, without limitation, amounts for borrowed money and indebtedness in the form of mezzanine debt and preferred equity); (b) obligations evidenced by bonds, debentures, notes, or other similar instruments; (c) obligations for the deferred purchase price of property or services (including trade obligations); (d) obligations under letters of credit; (e) intentionally omitted; (f) all guaranties, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds, to invest in any Person, or otherwise to assure a creditor against loss; (g) intentionally omitted and (h) obligations secured by any Liens, whether or not the obligations have been assumed (other than Permitted Encumbrances).

"**Indemnified Liabilities**" shall have the meaning set forth in Section 10.13(b) hereof.

"**Indemnified Parties**" shall mean Lender and any Affiliate or designee of Lender that has filed any registration statement relating to a Securitization or has acted as the sponsor or depositor in connection with a Securitization, any Affiliate of Lender that acts as an underwriter, placement agent or initial purchaser of Securities issued in a Securitization, any other co-underwriters, co-placement agents or co-initial purchasers of Securities issued in a Securitization, and each of their

13

respective officers, directors, partners, employees, representatives, agents and Affiliates and each Person who Controls any such Person within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act, any Person that is or will have been involved in the origination of the Loan, any Person that is or will have been involved in the servicing of the Loan, any Person in whose name the encumbrance created by the Security Instrument is or will have been recorded, any Person that may hold or acquire or will have held a full or partial interest in the Loan (including, but not limited to, investors or prospective investors in the Securities, as well as custodians, trustees and other fiduciaries that hold or have held a full or partial interest in the Loan for the benefit of third parties) as well as the respective directors, officers, shareholders, partners, employees, agents, servants, representatives, contractors, subcontractors, Affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including, but not limited to, any other Person that holds or acquires or will have held a participation or other full or partial interest in the Loan, whether during the term of the Loan or as a part of or following a foreclosure of the Loan and including, but not limited to any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business).

"**Indemnified Taxes**" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower or Guarantor under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"**Independent Director**" shall mean an individual who has prior experience as an independent director, independent manager or independent member with at least three years of employment experience and who is provided by CT Corporation, Corporation Service Company, National Registered Agents, Inc., Wilmington Trust Company, Stewart Management Company, Lord Securities Corporation or, if none of those companies is then providing professional Independent Directors, another nationally-recognized company reasonably approved by Lender, in each case that is not an Affiliate of Borrower and that provides professional Independent Directors and other corporate services in the ordinary course of its business, and which individual is duly appointed as an Independent Director and is not, and has never been, and will not while serving as Independent Director be, any of the following:

(a)     a member, partner, equityholder, manager, director, officer or employee of Borrower or any of its equityholders or Affiliates (other than as an Independent Director of Borrower or an Affiliate of Borrower that is not in the direct chain of ownership of Borrower and that is required by a creditor to be a single purpose bankruptcy remote entity, provided that such Independent Director is employed by a company that routinely provides professional Independent Directors or managers in the ordinary course of its business);

(b)     a creditor, supplier or service provider (including provider of professional services) to Borrower or any of its equityholders or Affiliates (other than a nationally recognized company that routinely provides professional Independent Directors and other corporate services to Borrower or any of its Affiliates in the ordinary course of its business);

(c)     a family member of any such member, partner, equityholder, manager, director, officer, employee, creditor, supplier or service provider; or

Case 1:26-cv-04240-RA   Document 1-1   Filed 05/20/26   Page 44 of 316

(d)        a Person that controls (whether directly, indirectly or otherwise) any of (a), (b) or (c) above.

A natural person who otherwise satisfies the foregoing definition and satisfies subparagraph (a) by reason of being the Independent Director of a "special purpose entity" affiliated with Borrower shall be qualified to serve as an Independent Director of Borrower, provided that the fees that such individual earns from serving as an Independent Director of Affiliates of Borrower in any given year constitute in the aggregate less than five percent (5%) of such individual's annual income for that year. For purposes of this paragraph, a "special purpose entity" is an entity, whose organizational documents contain restrictions on its activities and impose requirements intended to preserve such entity's separateness that are substantially similar to those contained in the definition of Special Purpose Entity of this Agreement.

"**Initial Advance**" shall have the meaning set forth in Section 2.1.2 hereof.

"**Initial Insurance Premiums Deposit**" shall mean the amount set forth on Schedule IV.

"**Initial Tax Deposit**" shall mean the amount set forth on Schedule IV.

"**Insurance Premiums**" shall have the meaning set forth in Section 6.1(b) hereof.

"**Insurance Proceeds**" shall have the meaning set forth in Section 6.4(b) hereof.

"**Interest and Carry Guaranty**" shall mean that certain Guaranty of Interest and Carry Costs dated as of the date hereof, from Guarantor in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Interest Determination Date**" shall mean, (a) with respect to the initial Interest Period, the date that is two (2) U.S. Government Securities Business Days before the Closing Date and (b) with respect to any other Interest Period, the date that is two (2) U.S. Government Securities Business Days prior to the ninth (9th) day of the calendar month in which such Interest Period commences. The Interest Determination Date shall be subject to adjustment as described Section 2.2.3(c)(vii) and/or Section 2.3.2 hereof.

"**Interest Period**" shall mean (a) initially, the period commencing on and including the Closing Date and ending on and including the eighth (8th) day of the calendar month following the Closing Date, and (b) thereafter, for any specified Payment Date including the Maturity Date, the period commencing on and including the ninth (9th) day of the calendar month prior to the calendar month in which such Payment Date occurs and ending on and including the eighth (8th) day of the calendar month in which such Payment Date occurs. The Interest Period shall be subject to adjustment as described in Section 2.3.2 hereof.

"**Interest Rate**" shall mean, with respect to each Interest Period, an interest rate per annum at which the Outstanding Principal Balance bears interest from time to time in accordance with the provisions of Section 2.2 hereof.

"**Interest Shortfall**" shall mean as of any Payment Date (whether or not a Cash Trap Period is in effect), the positive difference between (x) the amounts needed on such Payment Date to make the Monthly Debt Service Payment Amount, minus (y) the amount of Rents available in the Cash Management Account on such Payment Date to make such payments, after taking into account the priority of payment in Section 2.7.2(b) (and, if no Cash Trap Period is in effect, assuming the application of all Rents received during such month on such Payment Date pursuant to Section 2.7.2(b)), each as determined by Lender.  In no event shall the Interest Shortfall be a negative number. The calculation of the Interest Shortfall by Lender shall be conclusive and binding on Borrower absent manifest error.

"**Interest Shortfall Reserve Account**" shall have the meaning set forth in Section 7.3.1 hereof.

"**Interest Shortfall Reserve Funds**" shall have the meaning set forth in Section 7.3.1 hereof.

"**Inventory**" shall have the meaning defined in the UCC, including items which would be entered on a balance sheet under the line items for "Inventories" or "china, glassware, silver, linen and uniforms" under the Uniform System of Accounts for Hotels.

"**Investor**" shall have the meaning set forth in Section 9.1(a) hereof.

"**IRS**" shall mean the United States Internal Revenue Service.

"**Kroll**" shall mean Kroll Bond Rating Agency, Inc.

"**Lead Lender**" shall have the meaning set forth in Section 10.34 hereof.

"**Lease**" shall mean any lease, sublease or subsublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property entered into by or on behalf of Borrower, and (a) every modification, amendment or other agreement relating to such lease, sublease, subsublease, or other agreement entered into in connection with such lease, sublease, subsublease, or other agreement, and (b) every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto. As used herein, the term "Leases" shall not include Hotel Transactions.

"**Leasehold Interest**" shall mean Borrower's leasehold interest in the Ground Lease.

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions, permits or requirements of Governmental Authorities applicable to Borrower or the Property (or any portion thereof or any part thereof), or the administration thereof, or the construction, use, alteration or operation of the Property, or any part thereof, whether now or hereafter enacted and in force, any Environmental Statutes, the Condominium Act, the Americans with Disabilities Act of 1990, as amended, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances

16

contained in any instruments, either of record or known to Borrower, at any time in force affecting Borrower, the Property or any part thereof, including, without limitation, any which may (a) require repairs, modifications or alterations in or to the Property or any part thereof, or (b) in any way limit the use and enjoyment thereof.

"**Lender**" shall have the meaning set forth in the introductory paragraph hereto.

"**Liabilities**" shall have the meaning set forth in Section 9.2 hereof.

"**Licenses**" shall have the meaning set forth in Section 4.1.22 hereof.

"**Lien**" shall mean any mortgage, deed of trust, deed to secure debt, indemnity deed of trust, lien (statutory or otherwise), pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest, PACE Loan, or any other encumbrance, charge or transfer of, or any agreement to enter into or create any of the foregoing, on or affecting Borrower, the Property, or any portion thereof or any interest therein, or any direct or indirect interest in Borrower, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"**Loan**" shall have the meaning set forth in the recitals hereof.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Security Instrument, the Assignment of Leases, the Environmental Indemnity, the Assignment of Management Agreement, the Guaranty, the Clearing Account Agreement, the Cash Management Agreement, as applicable, the Certification of Documents, the Post-Closing Agreement, the Pledge Agreement, the Hotel Management SNDA, the Assignment of Parking Management Agreement, the and all other documents executed and/or delivered in connection with the Loan.

"**Loan to Value Ratio**" shall mean, as of the date of its calculation, the ratio of (a) the sum of (x) the Outstanding Principal Balance as of the date of such calculation and (y) the amount of all unadvanced Future Advances as of the date of calculation to (b) the fair market value of the Property, as determined by an Appraisal (if a Securitization has occurred, for purposes of any REMIC provision, counting only real property and excluding any personal property or going concern value).

"**Losses**" shall have the meaning set forth in Section 3.1(b) hereto.

"**Key Money**" shall mean an amount of $2,500,000.00 previously paid by Manager to Borrower under the Management Agreement, together with any other amount constituting key money that is disbursed pursuant to the Management Agreement.

"**Management Agreement**" shall mean that certain Hotel Management Agreement dated December 15, 2015 entered into by and between Borrower (as successor in interest to Thompson San Antonio Investors LP) and Manager, pursuant to which Manager is to provide hotel and management, leasing and other services with respect to the Property, as the same may be amended, restated or modified, or, if the context requires, the Replacement Management Agreement.

17

"**Management Agreement (Parking)**" shall mean that certain Management Agreement dated November 1, 2020 entered into by and between Borrower and Manager (Parking), pursuant to which Manager is to provide parking management and other services with respect to parking required for the Property, as the same may be amended, restated or modified, or, if the context requires, the Replacement Management Agreement (Parking).

"**Manager**" shall mean Thompson Hotels LLC, a Delaware limited liability company, or, if the context requires, a Replacement Manager that is managing the Property in accordance with the terms and provisions of this Agreement pursuant to a Replacement Management Agreement.

"**Manager (Parking)**" shall mean LAZ PARKING TEXAS, LLC, a Connecticut limited liability company, or, if the context requires, a Replacement Manager that is managing the parking required for the Property in accordance with the terms and provisions of this Agreement pursuant to a Replacement Management Agreement (Parking).

"**Master Association**" shall mean The SCH San Antonio Master Condominium Owners Association formed pursuant to the Texas Business Organizations Code, the Condominium Act and the Master Condominium Documents to manage the Master Condominium on behalf of all the owners of the Units comprising the Master Condominium.

"**Master Condominium Documents**" shall mean the Condominium Documents covering the Master Condominium.

"**Master Declaration**" or "**The SCH San Antonio Master Condominium Declaration**" shall mean that certain Amended and Restated Condominium Declaration for SCH San Antonio Master Condominium dated October 30, 2018 and recorded October 30, 2020 as Document No. 20200262732 in the Official Records, as amended by that certain First Amendment to the Amended and Restated Condominium Declaration for SCH San Antonio Master Condominium dated December 14, 2021 and recorded December 22, 2021 as Document No. 20210355555 in the Official Records and assigned to Borrower pursuant to that certain Assignment of Master Declarant's Rights dated February 23, 2022 and recorded February 25, 2022 as Document No. 20220047574 in the Official Records, as may be further amended or supplemented.

"**Material Action**" shall mean, with respect to Borrower, to consolidate, divide or merge Borrower with or into any Person, or sell all or substantially all of the assets of Borrower (unless such sale results in the repayment, in full, of the Loan), or to institute a Bankruptcy Action or take action in furtherance of any such action, or, to the fullest extent permitted by law, to dissolve or liquidate Borrower.

"**Material Adverse Change**" shall mean that the business, operations, prospects, property, assets, liabilities or financial condition of any applicable Person and each of their subsidiaries, taken as a whole, or the ability of any such Person to perform its obligations under the Loan Documents, has changed in a manner which could reasonably be expected to impair the value of Lender's security for the Loan or prevent timely repayment of the Loan or otherwise prevent the applicable Person from timely performing any of its material obligations under the Loan Documents, as the case may be, as determined by Lender in its reasonable discretion.

18

"**Material Agreements**" shall mean each contract and agreement relating to the ownership, management, development, use, operation, leasing, maintenance, repair or improvement of the Property or any portion thereof, other than the Management Agreement, and the Leases, as to which either (a) there is an obligation of Borrower to pay more than One Hundred Thousand and No/100 Dollars ($100,000.00) in the aggregate, (ii) the term thereof extends beyond one year; in each case, unless cancelable on thirty (30) days or less notice without requiring the payment of termination fees or payments of any kind, (iii) is a franchise agreement or similar agreement relating to the licensing of any hotel brand, or (iv) is an agreement for the rental of rooms that (X) equals ten percent (10%) or more of the total number of hotel rooms for a period of thirty (30) or more nights, or (Y) has a contract amount that equals or exceeds $250,000.00.

"**Maturity Date**" shall mean the Stated Maturity Date, provided that (a) if Borrower timely and properly exercises the First Extension Option pursuant to Section 2.9, the Maturity Date shall be the First Extended Maturity Date and (b) if Borrower timely and properly exercises the Second Extension Option pursuant to Section 2.9, the Maturity Date shall be the Second Extended Maturity Date, or such earlier date on which the final payment of principal of the Note becomes due and payable as herein or therein provided, whether at the Stated Maturity Date, by declaration of acceleration, or otherwise.

"**Maximum Legal Rate**" shall mean the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Maximum Principal Amount**" shall mean an amount equal to $44,000,000.00.

"**Mold**" shall mean fungi that reproduces through the release of spores or the splitting of cells or other means, including, but not limited to, mold, mildew, fungi, fungal spores, fragments and metabolites such as mycotoxins and microbial organic compounds.

"**Monthly Debt Service Payment Amount**" shall have the meaning set forth in Section 2.3.2 hereof.

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Multiemployer Plan**" shall mean a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which Borrower, Guarantor or any ERISA Affiliate of any of them is making or accruing an obligation to make contributions or has within any of the preceding five (5) plan years made or accrued an obligation to make contributions.

"**Net Operating Income**" shall mean, as of any date of determination, the amount calculated by Lender by subtracting (a) Operating Expenses as of such date for the twelve (12) month period ending with the most recent calendar month reported from (b) the Gross Income from Operations for such twelve (12) month period.

"**Net Proceeds**" shall have the meaning set forth in Section 6.4(b) hereof.

19

"**Net Proceeds Account**" shall have the meaning set forth in Section 6.4(b)(ii) hereof.

"**Net Proceeds Deficiency**" shall have the meaning set forth in Section 6.4(b)(vi) hereof.

"**New Mezzanine Loan**" shall have the meaning set forth in Section 9.4(a) hereof.

"**New Notes**" shall have the meaning set forth in Section 9.4(a) hereof.

"**Note**" shall mean that certain Promissory Note of even date herewith in the principal amount of up to Forty-Four Million and No/100 Dollars ($44,000,000.00), made by Borrower in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Obligations**" shall mean, collectively, Borrower's obligations for the payment of the Debt and the performance of the Other Obligations.

"**OFAC**" shall mean the Office of Foreign Asset Control of the U.S. Department of the Treasury.

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower which is signed by an authorized officer of (a) the general partner or managing member of Borrower or (b) Manager, in each case, provided Borrower agrees in writing that such shall be deemed to be signed by and bind Borrower.

"**OID**" shall have the meaning set forth in Section 2.12 hereof.

"**Operating Expenses**" shall mean, as of any date of calculation, the total of all expenditures, computed in accordance with GAAP (and the Uniform System of Accounts for Hotels), of whatever kind relating to the operation, maintenance and management of the Property, which expenditures are incurred on a regular monthly or other periodic basis, including without limitation, utilities, ordinary repairs and maintenance, insurance, license fees, Taxes, Other Charges, advertising expenses, management fees, payroll and related taxes, computer processing charges, operational equipment, tenant improvement and leasing commissions, or other lease payments as approved by Lender, and other similar costs, in each case, for the twelve (12) month period ending with the most recent calendar month reporting. Notwithstanding anything to the contrary in the foregoing, Operating Expenses shall (w) not include depreciation, amortization and other non-cash items, debt service, Capital Expenditures, any contributions to any of the Reserve Funds (except the FF&E Reserve Funds), income taxes or other taxes in the nature of income taxes on sales, or use taxes required to be paid to any Governmental Authority, equity distributions, and other extraordinary and non-recurring items, and legal or other professional services fees and expenses unrelated to the operation of the Property, (x) be increased to reflect known increases in Operating Expenses that are anticipated, in Lender's reasonable determination, to occur within the succeeding twelve (12) month period including without limitation those related to Property Taxes and Insurance Premiums, (y) include the greater of (I) the actual fees paid to the each of the Manager and Manager (Parking) pursuant to the Management Agreement and Management Agreement (Parking) respectively, for such period of determination and (II) an amount equal to three percent (3%) of Gross Income from Operations for such period for each of the Manager and Manager (Parking), and (z) imputed capital improvement/FF&E expenditures amount equal to the

20

amount required to be deposited under Section 7.2 (whether into the FF&E Reserve Account or pursuant to the Hotel Management Agreement, or any appliable franchise agreement or each of them as may be applicable).  Operating Expenses shall also include all franchise fees and expenses incurred in connection with the any franchise agreement and all other expenses not otherwise specifically referred to in this definition which are referred to as "**Administrative and General Expenses**" in the Uniform System of Accounts for Hotels.  Notwithstanding anything to the contrary contained herein, Lender shall have the right to adjust the calculation of Operating Expenses retroactively in connection with any adjustment of the franchise fees under any applicable franchise agreement pursuant to the terms thereof. Notwithstanding anything to the contrary contained herein, in no event shall asset management fees constitute Operating Expenses.

"**Other Charges**" shall mean all ground rents, maintenance charges, impositions other than Taxes, any "common expenses" or expenses allocated to and required to be paid by Borrower under any REA and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property or any portion thereof, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Other Connection Taxes**" shall mean Taxes imposed as a result of a present or former connection between a Lender and the jurisdiction imposing such Tax (other than connections arising from such Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in the Loan or Loan Document).

"**Other Obligations**" shall mean (a) the performance of all obligations of Borrower contained herein; (b) the performance of each obligation of Borrower contained in any other Loan Document; (c) the payment of all costs, expenses, legal fees and liabilities incurred by Lender in connection with the enforcement of any of Lender's rights or remedies under the Loan Documents, or any other instrument, agreement or document which evidences or secures any other Obligations or collateral therefor, whether now in effect or hereafter executed; and (d) the payment, performance, discharge and satisfaction of all other liabilities and obligations of Borrower to Lender, whether now existing or hereafter arising, direct or indirect, absolute or contingent, and including, without limitation, each liability and obligation of Borrower under any one or more of the Loan Documents and any amendment, extension, modification, replacement or recasting of any one or more of the instruments, agreements and documents referred to herein or therein or executed in connection with the transactions contemplated hereby or thereby.

"**Other Taxes**" shall have the meaning set forth in Section 2.10.2 hereof.

"**Other UCC State**" shall have the meaning set forth in the definition of "UCC".

"**Outstanding Principal Balance**" shall mean, as of any date, the outstanding principal balance of the Loan.

"**PACE Loan**" shall mean (x) any "Property-Assessed Clean Energy loan" or (y) any other indebtedness, without regard to the name given to such indebtedness, which is (i) incurred for improvements to the Property for the purpose of increasing energy efficiency, increasing use of

21

renewable energy sources, resource conservation, or a combination of the foregoing, and (ii) repaid through multi-year assessments against the Property.

"**Participant Register**" shall have the meaning set forth in Section 9.1(c) hereof.

"**Payment Date**" shall mean, commencing with the First Payment Date, the ninth (9th) day of each calendar month during the term of the Loan until and including the Maturity Date or, for purposes of making payments hereunder, but not for purposes of calculating Interest Periods, if such day is not a Business Day, the immediately preceding Business Day.  The Payment Date shall be subject to adjustment as described in Section 2.3.2 hereof.

"**PCR**" shall have the meaning set forth on Schedule II hereof.

"**Pension Plan**" shall mean any "pension plan" (as defined in Section 3(2) of ERISA), other than a Multiemployer Plan, subject to Title IV of ERISA and/or Section 412 of the Code to which Borrower, Guarantor or any ERISA Affiliate of any of them is making or accruing an obligation to make contributions or has within any of the preceding five plan years made or accrued an obligation to make contributions or otherwise has any liability with respect thereto.

"**Permitted Encumbrances**" shall mean, collectively (a) the Liens and security interests created by the Loan Documents, (b) all Liens, encumbrances and other matters disclosed in "Schedule B" of the Title Insurance Policy, (c) the Liens, if any, for Taxes imposed by any Governmental Authority which are not yet due, (d) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion, and (e) any workers', mechanics' or other similar Liens on the Property provided that any such Lien is being contested in accordance with the terms of this Agreement and the other Loan Documents, solely to the extent that the items set forth in clauses (a)-(e) of this definition, do not, in the aggregate, materially adversely affect the value or use of the Property or any portion thereof or Borrower's ability to repay the Loan.

"**Permitted Investments**" shall mean any one or more of the following obligations or securities acquired at a purchase price of not greater than par, including those issued by the Servicer or the trustee under any Securitization, if any has occurred, or any of their respective Affiliates, payable on demand or having a maturity date not later than the Business Day immediately prior to the first Payment Date following the date of acquiring such investment and meeting one of the appropriate standards set forth below:

(a)    the following obligations of, or the following obligations directly and unconditionally guaranteed as to principal and interest by, the U.S. government or any agency or instrumentality thereof, when such obligations are backed by the full faith and credit of the United States of America and have maturities not in excess of one year:

(i)    U.S. Treasury obligations (all direct or fully guaranteed obligations);

(ii)    U.S. Department of Housing and Urban Development public housing agency bonds (previously referred to as local authority bonds);

22

(iii)     Federal Housing Administration debentures;

(iv)     Government National Mortgage Association (GNMA) guaranteed mortgage-bank securities or participation certificates;

(v)     RefCorp debt obligations; and

(vi)     SBA-guaranteed participation certificates and guaranteed pool certificates;

(b)     federal funds, unsecured certificates of deposit, time deposits, banker's acceptances, and repurchase agreements having maturities of not more than 90 days of any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia, the short-term debt obligations of which are rated (i) "A-1+" (or the equivalent) by S&P and, if it has a term in excess of three months, the long-term debt obligations of which are rated "AAA" (or the equivalent) by S&P, and that (1) is at least "adequately capitalized" (as defined in the regulations of its primary federal banking regulator) and (2) has Tier 1 capital (as defined in such regulations) of not less than One Billion and No/100 Dollars ($1,000,000,000.00), (ii) in one of the following Moody's rating categories:  (1) for maturities less than one month, a long-term rating of "A2" or a short-term rating of "P-1", (2) for maturities between one and three months, a long-term rating of "A1" and a short-term rating of "P-1", (3) for maturities between three months to six months, a long-term rating of "Aa3" and a short-term rating of "P-1" and (4) for maturities over six months, a long-term rating of "Aaa" and a short-term rating of "P-1", or such other ratings as confirmed by Lender in its sole discretion (and in a Rating Agency Confirmation if a Securitization has occurred);

(c)     deposits that are fully insured by the Federal Deposit Insurance Corporation;

(d)     commercial paper rated (i) "A–1+" (or the equivalent) by S&P and having a maturity of not more than 90 days and (ii) in one of the following Moody's rating categories:  (1) for maturities less than one month, a long-term rating of "A2" or a short-term rating of "P-1", (2) for maturities between one and three months, a long-term rating of "A1" and a short-term rating of "P-1", (3) for maturities between three months to six months, a long-term rating of "Aa3" and a short-term rating of "P-1" and (4) for maturities over six months, a long-term rating of "Aaa" and a short-term rating of "P-1";

(e)     any money market funds that (i) has substantially all of its assets invested continuously in the types of investments referred to in subparagraph (a) above, (ii) has net assets of not less than Five Billion and No/100 Dollars ($5,000,000,000.00), and (iii) has the highest rating obtainable from S&P and Moody's; and

(f)     such other investments as to which each Approved Rating Agency shall have delivered a Rating Agency Confirmation (if a Securitization has occurred) and to which Lender shall have approved in its sole discretion.

Notwithstanding the foregoing, "Permitted Investments" (i) shall exclude any security with the S&P's "r" symbol (or any other Approved Rating Agency's corresponding symbol) attached to the rating (indicating high volatility or dramatic fluctuations in their expected returns because

23

of market risk), as well as any mortgage-backed securities and any security of the type commonly known as "strips"; (ii) shall be limited to those instruments that have a predetermined fixed dollar of principal due at maturity that cannot vary or change; (iii) shall only include instruments that qualify as "cash flow investments" (within the meaning of Section 860G(a)(6) of the Code); and (iv) shall exclude any investment where the right to receive principal and interest derived from the underlying investment provides a yield to maturity in excess of one hundred and twenty percent (120%) of the yield to maturity at par of such underlying investment. Interest may either be fixed or variable, and any variable interest must be tied to a single interest rate index plus a single fixed spread (if any) and move proportionately with that index. No investment shall be made which requires a payment above par for an obligation if the obligation may be prepaid at the option of the issuer thereof prior to its maturity. All investments shall mature or be redeemable upon the option of the holder thereof on or prior to the earlier of (x) three months from the date of their purchase and (y) the Business Day preceding the day before the date such amounts are required to be applied hereunder.

"**Permitted Transfer**" shall mean any transfer expressly permitted pursuant to Section 5.2.10(d) hereof.

"**Person**" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, Governmental Authority, or any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Personal Property**" shall have the meaning set forth in the granting clause(s) of the Security Instrument.

"**Policies**" shall have the meaning set forth in Section 6.1(b) hereof.

"**Pledge Agreement**" shall mean that certain Pledge and Security Agreement dated as of the date hereof, from the Pledgor in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Pledged Collateral**" shall mean, collectively, the "Collateral" as such term is defined in the Pledge Agreement.

"**Pledged Interests**" shall mean, collectively, the "Pledged Interests" as such term is defined in the Pledge Agreement.

"**Pledgor**" shall mean **LEXAV OWNER, LLC**, a Delaware limited liability company.

"**Pledgor UCC-1**" shall have the meaning set forth in Section 4.1.6 hereof.

"**Post-Closing Agreement**" shall mean that certain Post Closing Agreement, dated as of the date hereof, made by Borrower in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Prime Rate**" shall mean, with respect to each Interest Period for which interest is calculated using the Prime Rate Index pursuant to Section 2.2 hereof, the sum of (i) the per annum

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 54 of 316

rate of interest of the Prime Rate Index, determined as of the Interest Determination Date applicable to such Interest Period, and (ii) the Prime Rate Adjustment.

"**Prime Rate Adjustment**" shall mean the difference (expressed as the number of basis points and which may be a positive or negative value or zero) between (a) the Term SOFR on the date Term SOFR was last applicable and able to be determined in accordance with the definition thereof with respect to the Loan and (b) the Prime Rate Index on the date that Term SOFR was last applicable and able to be determined with respect to the Loan.

"**Prime Rate Floor**" shall mean four and one half of one percent (4.50%).

"**Prime Rate Index**" shall mean the annual rate of interest publicly announced by Wells Fargo Bank, N.A. in San Francisco, California, as its prime rate, as such rate shall change from time to time. If Wells Fargo Bank, N.A. ceases to announce a prime rate, Prime Rate shall mean the rate of interest published in The Wall Street Journal from time to time as the "Prime Rate" for the U.S. If more than one "Prime Rate" is published in The Wall Street Journal for a day, the average of such "Prime Rates" shall be used, and such average shall be rounded up to the nearest one hundredth of one percent (0.01%). If The Wall Street Journal ceases to publish the "Prime Rate," Lender shall select an equivalent publication that publishes such "Prime Rate," and if such "Prime Rates" are no longer generally published or are limited, regulated or administered by a governmental or quasigovernmental body, then Lender shall select a comparable interest rate index. With respect to each Interest Period for which interest is calculated using the Prime Rate pursuant to Section 2.2 hereof, the Prime Rate shall be determined as of the Interest Determination Date applicable to such Interest Period.

"**Prime Rate Loan**" shall mean the Loan at such time as interest thereon accrues at a rate of interest based upon the Prime Rate in accordance with the terms of this Agreement.

"**Principal**" shall mean the Special Purpose Entity that is the general partner of Borrower, if Borrower is a limited partnership, or member of Borrower, if Borrower, is a limited liability company other than a Delaware single-member limited liability company that satisfies the requirements of a Special Purpose Entity.

"**Prohibited Transaction**" shall mean any action or transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, this Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA or Section 4975 of the Code.

"**Projected Interest Shortfall**" shall mean, the amount determined by Lender in its reasonable discretion to be necessary to pay all Interest Shortfalls (with the Term SOFR, Prime Rate or Substitute Index portion of such Interest Rate, as applicable, calculated using the forward Term SOFR curve (or forward Prime Rate or Substitute Index curve, if applicable) then in effect as promulgated by Chatham Financial or, if such forward curve is not available from Chatham Financial, then the forward curve then in effect as promulgated by Bloomberg or another source selected by Lender, and after taking into account the then balance of the Interest Shortfall Reserve

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 55 of 316

Account) through and including the then applicable Maturity Date (i.e., the Stated Maturity Date, the First Extended Maturity Date, or the Second Extended Maturity Date, as applicable).

"**Property**" shall mean, (1) each parcel of real property, the Improvements thereon and all personal property owned by Borrower and encumbered by the Security Instrument, together with all rights pertaining to such property and Improvements, as more particularly described in the granting clause(s) of the Security Instrument and referred to therein as the "Property" and (2) the Pledged Collateral and all property owned by Pledgor.

"**Property Taxes**" shall mean all taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against (a) the Property or any part thereof, together with all interest and penalties thereon and (b) the rents, issues, income or profits thereof or upon the lien or estate hereby created, whether any or all of said taxes, assessments or charges be levied directly or indirectly or as excise taxes or ad valorem real estate or personal property taxes or as income taxes.

"**Provided Information**" shall mean any and all financial and other information provided at any time by, or on behalf of, Borrower, Manager or Guarantor with respect to the Property, Borrower, Guarantor and/or Manager.

"**Rating Agencies**" shall mean each of S&P, Moody's, Kroll, DBRS Morningstar or any other nationally recognized statistical rating agency which has assigned a rating to the Securities, if any.

"**Rating Agency Confirmation**" shall mean a written affirmation from a Rating Agency that the credit rating of the Securities issued by such Rating Agency immediately prior to the occurrence of the event with respect to which such Rating Agency Confirmation is sought will not be qualified, downgraded or withdrawn as a result of the occurrence of such event, which affirmation may be granted or withheld in such Rating Agency's sole and absolute discretion.

"**Recourse Guaranty**" shall mean that certain Guaranty of Recourse Obligations dated as of the date hereof, from Guarantor in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**REA**" shall mean, collectively, as the same may be amended, restated, supplemented or otherwise modified from time to time, those certain documents related to the `SCH San Antonio Master Condominium Declaration and The Arts Declaration, more specifically described on **Schedule VI**.

"**Register**" shall have the meaning set forth in <u>Section 9.1(b)</u> hereof.

"**Regulation**" includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or of any regulatory, self-regulatory or other authority or organization.

"**Regulation AB**" shall mean Regulation AB under the Securities Act and the Exchange Act, as such Regulation may be amended from time to time.

"**Release**" shall mean, with respect to any Hazardous Substance, any release, deposit, discharge, emission, leaking, leaching, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing (including the abandonment or discharging of barrels, containers or other closed receptacles containing Hazardous Substances) into the environment or other movement of Hazardous Substances.

"**Relevant Government Body**" shall mean the Board of Governors of the Federal Reserve System and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System and/or the Federal Reserve Bank of New York or any successor thereto.

"**Remediation**" shall mean any response, remedial, removal, or corrective action; any activity to clean up, detoxify, decontaminate, contain or otherwise remediate any Hazardous Substance; any actions to prevent, cure or mitigate any Release of any Hazardous Substance; any action to comply with any Environmental Statutes or with any permits issued pursuant thereto; any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, or laboratory or other analysis, or evaluation relating to any Hazardous Substances or to anything referred to herein.

"**REMIC Trust**" shall mean a "real estate mortgage investment conduit" (within the meaning of Section 860D of the Code) that holds the Note.

"**Rents**" shall mean all rents (including additional rents of any kind and percentage rents), rent equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a Bankruptcy Action) or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other payments and consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or Pledgor or any of its agents or employees from any and all sources arising from or attributable to the Property or any portion thereof, and the Improvements, including charges for oil, gas, water, steam, heat, ventilation, air-conditioning, electricity, license fees, maintenance fees, charges for Property Taxes, operating expenses or other amounts payable to Borrower (or for the account of Borrower), revenues from telephone services, vending, and all receivables, customer obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Property (or any portion thereof) or rendering of services by Borrower, Pledgor, Manager, or any of their respective agents or employees and proceeds, if any, from business interruption or other loss of income insurance, and any distributions due and payable to Pledgor by Pledgee. Rents shall include revenues from the rental of rooms, guest suites, conference and banquet rooms, food and beverage facilities, health clubs, spas or other amenities, telephone services, laundry, vending, television and parking and all other items of revenue, receipts or other income as identified in the Uniform System of Accounts for Hotels.

"**Repayment Date**" shall mean the date of a prepayment of the Loan pursuant to the provisions of Section 2.4 hereof.

27

"**Replacement Assignment of Rate Cap**" shall have the meaning set forth in Section 2.8.3(b) hereof.

"**Replacement Management Agreement**" shall mean, collectively, (a) either (i) a management agreement with a Replacement Manager substantially in the same form and substance as the Management Agreement, or (ii) a management agreement with a Replacement Manager which is reasonably acceptable to Lender in form and substance, provided that, with respect to this clause (ii), if a Securitization has occurred, Lender, at its option, may require that Borrower obtain a Rating Agency Confirmation from each Approved Rating Agency with respect to each such management agreement; and (b) an assignment of management agreement and subordination of management fees substantially in the form then used by Lender (or of such other form and substance reasonably acceptable to Lender), executed and delivered to Lender by Borrower and such Replacement Manager at Borrower's expense.

"**Replacement Management Agreement (Parking)**" shall mean, collectively, (a) either (i) a management agreement with a Replacement Manager (Parking) substantially in the same form and substance as the Parking Management Agreement, or (ii) a management agreement with a Replacement Manager (Parking) which is reasonably acceptable to Lender in form and substance; and (b) an assignment of management agreement and subordination of management fees substantially in the form then used by Lender (or of such other form and substance reasonably acceptable to Lender), executed and delivered to Lender by Borrower and such Replacement Manager (Parking) at Borrower's expense.

"**Replacement Manager**" shall mean either (a) Manager, its permitted successors and assigns under the Management Agreement or (b) in the sole discretion of Lender, a Person that is a reputable and experienced management organization (which may be an Affiliate of Borrower) possessing experience in managing properties similar in size, scope, use and value as the Property, provided, that (i) if the Loan has been Securitized, Borrower shall have obtained a Rating Agency Confirmation from each Approved Rating Agency with respect to the change of management of the Property, (ii) intentionally deleted, and (iii) such Person shall have entered into a Replacement Management Agreement and an assignment of management agreement in form and substance reasonably acceptable to Lender.

"**Replacement Manager (Parking)**" shall mean either (a) Manager (Parking), its permitted successors and assigns under the Parking Management Agreement or (b) in the sole discretion of Lender, a Person that is a reputable and experienced management organization (which may be an Affiliate of Borrower) possessing experience in managing parking for properties similar in size, scope, use and value as the Property, provided, such Person shall have entered into a Replacement Management Agreement (Parking) and an assignment of management agreement in form and substance reasonably acceptable to Lender.

"**Required Records**" shall have the meaning set forth in Section 5.1.11(k) hereof.

"**Required Repair Account**" shall have the meaning set forth in Section 7.5.1 hereof.

"**Required Repair Funds**" shall have the meaning set forth in Section 7.5.1 hereof.

"**Required Repairs**" shall have the meaning set forth in Section 7.5.1 hereof.

"**Required Repairs Amount**" shall mean the amount set forth on <u>Schedule IV</u>.

"**Reserve Accounts**" shall mean, collectively, the Tax and Insurance Escrow Account, the FF&E Reserve Account, the Interest Shortfall Reserve Account, the Required Repairs Account, the Excess Cash Reserve Account, the Net Proceeds Account and any other escrow or reserve account established pursuant to the Loan Documents.

"**Reserve Funds**" shall mean, collectively, the Tax and Insurance Escrow Funds, the FF&E Reserve Funds, the Interest Shortfall Reserve Funds, the Required Repair Funds the Excess Cash Reserve Funds and any other escrow or reserve fund established pursuant to the Loan Documents.

"**Residential Association**" shall mean The Arts Condominium Owners Association formed pursuant to the Texas Business Organizations Code, the Condominium Act and the Residential Condominium Documents to manage the Residential Condominium on behalf of all the owners of the Units comprising the Residential Condominium.

"**Residential Condominium Documents**" shall mean the Condominium Documents covering the Residential Condominium.

"**Residential Declaration**" or "**The Arts Declaration**" shall mean that certain Amended and Restated Declaration of The Arts Residences, a Condominium effective January 25, 2018 and recorded October 30, 2020 as Document No. 20200262722 in the Official Public Records of Bexar County, Texas ("<u>Official Records</u>"), as amended by that certain First Amendment to the Amended and Restated Declaration of The Arts Residences, a Condominium dated December 14, 2021 and recorded December 22, 2021 as Document No. 20210355549 in the Official Records, as may be further amended or supplemented.

"**Restoration**" shall mean the repair and restoration of the Property or any portion thereof after a Casualty or Condemnation as nearly as possible to the condition the Property (or such portion thereof) was in immediately prior to such Casualty or Condemnation, with such alterations as may be approved by Lender in its sole discretion.

"**Restricted Party**" shall mean, collectively (a) Borrower, Guarantor, Pledgor, and any Affiliated Manager, and (b) any shareholder, partner, member, non-member manager, direct or indirect legal or beneficial owner, agent or employee of Borrower, Guarantor, any Affiliated Manager or any non-member manager of any of the foregoing.

"**Retention Amount**" shall have the meaning set forth in <u>Section 6.4(b)(iv)</u> hereof.

"**RICO**" shall mean the Racketeer Influenced and Corrupt Organizations Act.

"**S&P**" shall mean S&P Global Ratings, a Standard & Poor's Financial Services LLC business.

"**Sale or Pledge**" shall mean a voluntary or involuntary sale, conveyance, change of control, assignment, transfer, encumbrance, pledge, grant of an option or other transfer or disposal of a legal or beneficial interest, whether direct or indirect.

"**Second Extended Maturity Date**" shall have the meaning set forth in Section 2.9.1 hereof.

"**Second Extension Notice**" shall have the meaning set forth in Section 2.9.1 hereof.

"**Second Extension Option**" shall have the meaning set forth in Section 2.9.1 hereof.

"**Securities**" shall have the meaning set forth in Section 9.1(a) hereof.

"**Securities Act**" shall mean the Securities Act of 1933, as the same shall be amended from time to time.

"**Securitization**" shall have the meaning set forth in Section 9.1(a) hereof.

"**Security Instrument**" shall mean that certain first priority Fee and Leasehold Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing, dated the date hereof, executed and delivered by Borrower as security for the Obligations which encumbers the Property or any portion thereof, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Servicer**" shall have the meaning set forth in Section 9.3 hereof.

"**Servicing Agreement**" shall have the meaning set forth in Section 9.3 hereof.

"**Severed Loan Documents**" shall have the meaning set forth in Section 8.2(c) hereof.

"**SOFR**" shall mean a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"**SOFR Administrator**" shall mean the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"**Special Purpose Entity**" shall mean a corporation, limited partnership or limited liability company which at all times prior to, on and after the date hereof:

(a)     was, is and will be organized solely for the purpose of (i) in the case of Borrower, acquiring, developing, owning, holding, selling, financing, leasing, transferring, exchanging, managing and operating the Property (and no other property), entering into this Agreement with Lender and performing its obligations under the Loan Documents, refinancing the Property in connection with a permitted repayment of the Loan, and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing,  or (ii) in the case of Pledgor, acquiring, owning, holding, selling, transferring and exchanging the Pledged Interests (and no other property), entering into certain Loan Documents with Lender and performing its obligations under the Loan Documents and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing;

(b)     has not been, is not, and will not be engaged, in any business unrelated to (i) in the case of Borrower, the acquisition, development, ownership, management, financing, disposition,

30

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 60 of 316

or operation of the Property, or (ii) in the case of Pledgor, acquisition and ownership of the Pledged Interests;

(c)      has not had, does not have, and will not have, any assets other than (i) in the case of Borrower, those related to the Property or (ii) in the case of Pledgor, those related to the Pledged Interests;

(d)      has not engaged in, sought or consented to, and will not engage in, seek or consent to, any dissolution, winding up, liquidation, division, consolidation, merger, sale of all or substantially all of its assets (unless such sale will result in the repayment in full of the Loan), transfer of partnership or membership interests (if such entity is a general partner in a limited partnership or a member in a limited liability company) or amendment of its limited partnership agreement, articles of incorporation, articles of organization, certificate of formation or operating agreement (as applicable) with respect to the matters set forth in this definition;

(e)      if such entity is a limited partnership, has had, now has, and will have as its only general partners, Special Purpose Entities each of which (i) is a corporation or single-member Delaware limited liability company or multimember Delaware limited liability company treated as a single member limited liability company that complies with the requirements set forth in subparagraph (h) hereof, (ii) has one (1) Independent Director, and (iii) holds a direct interest as general partner in the limited partnership of not less than one-half-of-one percent (0.5%) (or one-tenth-of-one percent (0.1%,) if the limited partnership is a Delaware entity);

(f)      if such entity is a corporation, has had, now has and will have at least one (1) Independent Director, and has not caused or allowed, and will not cause or allow, the board of directors of such entity to take any Bankruptcy Action or any other Material Action either with respect to itself or, if the corporation is Pledgor, with respect to the Pledgee, or any action requiring the unanimous affirmative vote of one hundred percent (100%) of the members of its board of directors unless the one (1) Independent Director shall have participated in such vote and shall have voted in favor of such action;

(g)      if such entity is a limited liability company with more than one member, has had, now has and will have at least one member that is a Special Purpose Entity (i) that is a corporation (ii) that has at least one (1) Independent Director, and (iii) that directly owns at least one-half-of-one percent (0.5%) of the equity of the limited liability company (or one-tenth-of-one percent (0.1%) if the limited liability company is a Delaware entity);

(h)      if such entity is a limited liability company with only one member, has been, now is, and will be a limited liability company organized in the State of Delaware that (i) has at least one (1) Independent Director, (ii) has not caused or allowed, and will not cause or allow the members or managers of such entity to take any Bankruptcy Action or any other Material Action, either with respect to itself or, if the company is a Pledgor, with respect to Pledgee, unless the one (1) Independent Director then serving as a manager of the company shall have consented in writing to such action, and (iii) has and shall have either (x) a member which owns no economic interest in the company, has signed the company's limited liability company agreement and has no obligation to make capital contributions to the company, or (y) two (2) natural persons or one entity that is not a member of the company, that has signed its limited liability company agreement

31

and that, under the terms of such limited liability company agreement becomes a member of the company immediately prior to the withdrawal or dissolution of the last remaining member of the company;

(i)    has been, is and intends to remain solvent and has paid and shall pay its debts and liabilities from its then available assets (including a fairly allocated portion of any personnel and overhead expenses that it shares with any Affiliate) from its assets as the same shall become due, and has maintained and shall maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations (provided, however, the forgoing shall not require any shareholder, partner, or member of such entity, as applicable, to make additional capital contributions to such entity);

(j)    has not failed, and will not fail, to correct any known misunderstanding regarding the separate identity of such entity and has not and shall not identify itself as a division of any other Person;

(k)    has maintained and will maintain its accounts, books and records separate from any other Person and has filed and will file its own Tax returns, except to the extent that it has been or is required to file consolidated Tax returns by law or is treated as a Disregarded Entity and is not required to file a particular Tax return;

(l)    has maintained and will maintain its own records, books, resolutions and agreements;

(m)    (i) has not commingled, and will not commingle, its funds or assets with those of any other Person and (ii) other than as provided in the Cash Management Agreement, has not participated and will not participate in any cash management system with any other Person;

(n)    has held and will hold its assets in its own name;

(o)    has conducted and shall conduct its business in its own name or in a name franchised or licensed to it by an entity other than an Affiliate of itself or of Borrower, except for business conducted on behalf of itself by another Person under a business management services agreement that is on commercially reasonable terms, so long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of Borrower;

(p)    has maintained and will maintain its books, bank accounts, balance sheets, financial statements, accounting records and other entity documents separate from any other Person and has not permitted, and will not permit, its assets to be listed as assets on the financial statement of any other entity except as required by GAAP or the Uniform System of Accounts for Hotels; provided, however, that appropriate notation shall be made on any such consolidated statements to indicate its separateness from such Affiliate and to indicate that its assets and credit are not available to satisfy the debt and other obligations of such Affiliate or any other Person and such assets shall be listed on its own separate balance sheet;

(q)    has paid and will pay its own liabilities and expenses, including the salaries of its own employees, out of its own funds and assets, and has maintained and will maintain a sufficient number of employees in light of its contemplated business operations (provided, however, the

foregoing shall not require any shareholder, partner or member of such entity, as applicable, to make additional capital contributions to such entity);

(r)     has observed and will observe all partnership, corporate or limited liability company formalities, as applicable;

(s)     has had no and will have no Indebtedness (including loans, whether or not such loans are evidenced by a written agreement) other than (I) with respect to Borrower, (i) the Loan, (ii) unsecured trade and operational debt incurred in the ordinary course of business relating to the ownership and operation of the Property and the routine administration of Borrower, in amounts not to exceed two percent (2%) of the original principal amount of the Loan, in the aggregate, which liabilities are not more than ninety (90) days past the date incurred, are not evidenced by a note and are paid when due, and which amounts are normal and reasonable under the circumstances, and (iii) such other liabilities that are expressly permitted pursuant to this Agreement (including any Key Money delivered pursuant to the Management Agreement) and (II) with respect to Pledgor (i) the Indebtedness secured by the Pledge Agreement, (ii) unsecured operational debt incurred in the ordinary course of business relating to the ownership of the Pledged Interests and the routine administration of the Pledgor, in amounts not to exceed $50,000 in the aggregate, which liabilities are not more than ninety (90) days past the date incurred, are not evidenced by a note and are paid when due, and which amounts are normal and reasonable under the circumstances, and (iii) such other liabilities that are expressly permitted pursuant to the Loan Documents, the Pledge Agreement, and any Pledgor guaranty with respect to the Pledge Agreement;

(t)     has not assumed or guaranteed or become obligated for, and will not assume or guarantee or become obligated for, the debts of any other Person and has not held out and will not hold out its credit as being available to satisfy the obligations of any other Person except as permitted or required pursuant to this Agreement (other than, with respect to the Pledgor, pursuant to the Pledge Agreement);

(u)     has not acquired and will not acquire obligations or securities of its partners, members or shareholders or any other Affiliate;

(v)     has allocated and will allocate, fairly and reasonably, any overhead expenses that are shared with any Affiliate, including, but not limited to, paying for shared office space and services performed by any employee of an Affiliate;

(w)     has maintained and used, now maintains and uses, and will maintain and use, separate stationery, invoices and checks bearing its name, which stationery, invoices and checks utilized by the Special Purpose Entity or utilized to collect its funds or pay its expenses have borne, and shall bear its own name and have not borne and shall not bear the name of any other entity unless such entity is clearly designated as being the Special Purpose Entity's agent;

(x)     except pursuant to the Loan Documents including without limitation the Pledge Agreement (and any prior loans secured by the Property, each of which has been repaid in full), has not pledged and will not pledge its assets for the benefit of any other Person;

33

(y)      has held itself out and identified itself, and will hold itself out and identify itself, as a separate and distinct entity under its own name or in a name franchised or licensed to it by an entity other than an Affiliate of Borrower and not as a division or part of any other Person, except for services rendered under a business management services agreement with an Affiliate that complies with the terms contained in subparagraph (z) of this definition, so long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of Borrower;

(z)      has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(aa)     has not made and will not make loans to any Person or hold evidence of indebtedness issued by any other Person (other than cash and investment-grade securities issued by an entity that is not an Affiliate of or subject to common ownership with such entity);

(bb)     has not identified and will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it, and has not identified itself, and shall not identify itself, as a division of any other Person;

(cc)     has not entered into or been a party to, and shall not enter into or be a party to, any transaction with its partners, members, shareholders or Affiliates except (i) in the ordinary course of its business and on terms which are intrinsically fair, commercially reasonable and are substantially similar to those that would be obtained in a comparable arm's-length transaction with an unrelated third party, and (ii) as otherwise expressly permitted by this Agreement;

(dd)     other than capital contributions and distributions permitted under the terms of its organizational documents and the Loan Documents, has not entered into or been a party to, and shall not enter into or be a party to, any transaction with its partners, members, shareholders or Affiliates except (i) in the ordinary course of its business and on terms which are intrinsically fair and are substantially similar to those that would be obtained in a comparable arm's-length transaction with an unrelated third party, and (ii) in connection with this Agreement;

(ee)     has not had and shall not have any obligation to indemnify, and has not indemnified and shall not indemnify, its partners, officers, directors or members, as the case may be, in each case unless such an obligation or indemnification is fully subordinated to the Debt and shall not constitute a claim against it in the event that its cash flow is insufficient to pay the Debt;

(ff)     if such entity is a corporation, shall consider the interests of its creditors in connection with all corporate actions;

(gg)     does not and will not have any of its obligations guaranteed by any Affiliate except as provided in the Loan Documents (or documents evidencing prior loans secured by the Property, each of which has been repaid in full) including, without limitation, the Guaranty;

(hh)     has complied and will comply with all of the terms and provisions contained in its organizational documents and has caused and will cause statements of facts contained in its organizational documents to be and to remain true and correct; and

(ii)     has not permitted and shall not permit any Affiliate or constituent party independent access to its bank accounts except as permitted under the Loan Documents.

"**Spread**" shall mean 6.35% per annum.

"**State**" shall mean the State or Commonwealth in which the Property or any part thereof is located.

"**Stated Maturity Date**" shall mean August 9, 2027.

"**Subaccounts**" shall have the meaning set forth in Section 2.7.2(a) hereof.

"**Substitute Index**" shall mean a floating rate index selected by Lender in connection with the conversion of the Loan to a Substitute Rate Loan that is either (1) (a) commonly accepted by market participants in commercial real estate loans, institutional warehouse or repurchase facilities or securitizations as a floating rate index, as determined by Lender in its sole but good faith discretion and (b) publicly selected, endorsed, recommended or recognized by the Relevant Government Body or by ISDA, or (2) a floating rate index other than Term SOFR that is then being used (A) by any institutional warehouse or repurchase lender that is not an Affiliate of Lender providing financing or (B) to determine the interest rate payable to investors with respect to an applicable Securitization, in either such case, backed in whole or in part by an interest in the Loan.

"**Substitute Rate**" shall mean, with respect to each Interest Period for which interest is calculated using the Substitute Rate pursuant to Section 2.2 hereof, the per annum rate of interest of the Substitute Index, determined as of the Interest Determination Date applicable to such Interest Period.

"**Substitute Rate Adjustment**" shall mean, with respect to any Substitute Index, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive value or zero), that has been selected by Lender, in its sole but good faith discretion, in connection with the conversion of the Loan to a Substitute Rate Loan to approximate the differences in the amount and character of Term SOFR compared to such Substitute Index giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Government Body, (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for Term SOFR for U.S. dollar-denominated commercial mortgage loans at such time or (C) the applicable spread adjustment with respect to such Substitute Index that is then being used (1) by any institutional warehouse or repurchase lender that is not an Affiliate of Lender providing financing or (2) to determine the interest rate payable to investors with respect to a Securitization, in either such case, backed in whole or in part by an interest in the Loan.

"**Substitute Rate Floor**" shall mean 4.50%.

"**Substitute Rate Loan**" shall mean the Loan at such time as interest thereon accrues at a rate of interest based upon a Substitute Rate in accordance with the terms of this Agreement.

35

"**Survey**" shall mean one or more survey(s) of the Property prepared by a surveyor licensed in the State and satisfactory to Lender and the Title Company and containing a certification of such surveyor satisfactory to Lender and the Title Company.

"**Tax and Insurance Escrow Account**" shall have the meaning set forth in Section 7.1.1 hereof.

"**Tax and Insurance Escrow Funds**" shall have the meaning set forth in Section 7.1.1 hereof.

"**Taxes**" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto. In no event shall any PACE Loan be considered Taxes for purposes of this Agreement.

"**Tenant**" shall mean the lessee of all or any portion of the Property under a Lease.

"**Term SOFR**" shall mean the Term SOFR Reference Rate for a tenor of one month on the Interest Determination Date (rounded upwards, if necessary, to the nearest 1/1,000 of 1%), as such rate is published by the Term SOFR Administrator, provided that if as of 5:00 p.m. (New York City time) on any applicable Interest Determination Date the Term SOFR Reference Rate for a tenor of one month has not been published by the Term SOFR Administrator and a Term SOFR Transition Event or Term SOFR Market Event has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first U.S. Government Securities Business Day preceding such Interest Determination Date for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Interest Determination Date. Notwithstanding the foregoing, if any setting of Term SOFR for any Interest Determination Date would be less zero, such setting shall instead be deemed to be zero.

"**Term SOFR Administrator**" shall mean CME Group Benchmark Administration Limited, or a successor administrator of the Term SOFR Reference Rate selected by Lender in its reasonable discretion.

"**Term SOFR Floor**" shall mean 4.50%.

"**Term SOFR Loan**" shall mean the Loan at such time as interest thereon accrues at a rate of interest based upon Term SOFR in accordance with the terms of this Agreement.

"**Term SOFR Market Event**" shall mean the occurrence of the following at any time that the Loan is a Term SOFR Loan:

(a)  a determination by Lender, in its reasonable discretion, that

(i)  a floating rate index other than Term SOFR has become commonly accepted by market participants in commercial real estate loans, institutional warehouse or repurchase facilities or securitizations;

36

(ii)    Term SOFR no longer fairly and adequately reflects the costs to Lender of making or maintaining the Loan; or

(iii)    a floating rate index other than Term SOFR is then being used (A) by any institutional warehouse or repurchase lender that is not an Affiliate of Lender providing financing or (B) to determine the interest rate payable to investors with respect to an applicable Securitization, in either such case, backed in whole or in part by an interest in the Loan; and

(b) the election by Lender to declare that a Term SOFR Market Event has occurred and the provision by Lender of written notice of such election to Borrower.

"**Term SOFR Rate**" shall mean with respect to each Interest Period, an interest rate per annum equal to the sum of (a) the greater of (i) Term SOFR, determined as of the Interest Determination Date applicable to such Interest Period, and (ii) the Term SOFR Floor, plus (b) the Spread.

"**Term SOFR Reference Rate**" shall mean the forward-looking term per annum rate based on SOFR.

"**Term SOFR Transition Event**" shall mean the occurrence of the following at any time that the Loan is a Term SOFR Loan:

(a) a determination by Lender, in its reasonable discretion, that any of the following has occurred:

(i)    a public statement or publication of information by or on behalf of the Term SOFR Administrator announcing that such administrator has ceased or will cease to provide Term SOFR, permanently or indefinitely, <u>provided</u> that, at the time of such statement or publication, there is no successor administrator that will continue to provide Term SOFR;

(ii)    a public statement or publication of information by the regulatory supervisor for the Term SOFR Administrator, the U.S. Federal Reserve System, an insolvency official with jurisdiction over the Term SOFR Administrator, a resolution authority with jurisdiction over the Term SOFR Administrator or a court or an entity with similar insolvency or resolution authority over Term SOFR Administrator, which states that the Term SOFR Administrator has ceased or will cease to provide Term SOFR permanently or indefinitely, <u>provided</u> that, at the time of such statement or publication, there is no successor administrator that will continue to provide Term SOFR; or

(iii)    a public statement or publication of information by or on behalf of the Term SOFR Administrator or the regulatory supervisor for the Term SOFR Administrator announcing that Term SOFR is not, or as of a specified future date will not be, representative or in compliance with or aligned with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks; and

37

(b) the election by Lender to declare that a Term SOFR Transition Event has occurred and the provision by Lender of written notice of such election to Borrower.

"**Threshold Amount**" shall have the meaning set forth in Section 5.1.22 hereof.

"**Title Company**" shall mean the title insurance company which issued the Title Insurance Policy.

"**Title Insurance Policy**" shall mean a Texas standard form title insurance policy in a form acceptable to Lender with respect to the Property and insuring the lien of the Security Instrument encumbering the Property.

"**Transfer**" shall have the meaning set forth in Section 5.2.10(b) hereof.

"**Unit**" or "**Units**" shall mean each individual condominium unit (including any residential, commercial, restaurant, storage, or retail unit and any appurtenant interest in the common elements) on the Land (as defined in the Security Instrument) and the Improvements created by the submission of the Property to the provisions of the Condominium Act in accordance with the Condominium Documents.

"**Uniform System of Accounts for Hotels**" shall mean  the accounting standards printed in the then most recently revised edition of A Uniform System of Accounts for Hotels, as adopted by the Hotel Association of New York City, Inc. and the American Hotel and Motel Association, as amended or changed from time to time by the Hotel Association of New York City, Inc. and the American Hotel and Motel Association (or other appropriate board or committee of both Associations); except that any accounting principle or practice required or permitted to be changed by the Hotel Association of New York City, Inc. and the American Hotel and Motel Association (or other appropriate board or committee of both Associations) in order to continue as an accounting standard or practice may be so changed only so long as such required or permitted change shall not have the effect of permitting Borrower's and Guarantor's compliance with any financial covenants or performance tests contained in this Agreement when without such change, such parties would not so comply.

"**U.S. Government Securities Business Day**" shall mean any day except for (a) a Saturday, (b) a Sunday, or (c) a day on which the Securities Industry and Financial Markets Association, or any successor thereto, recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"**U.S. Person**" *shall mean any Person that is a "United States person" as defined in Section 7701(a)(30) of the Code.*

"**UCC**" shall mean the Uniform Commercial Code as in effect on the date hereof in the State in which the Property or any portion thereof is located; provided, however, that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection or priority of the security interest in any item or portion of the collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State in which the Property is located ("**Other UCC State**"), "UCC" means the Uniform Commercial Code as in effect in such Other

Case 1:26-cv-04240-RA   Document 1-1   Filed 05/20/26   Page 68 of 316

UCC State for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or priority.

"**Write-Down and Conversion Powers**" means in relation to any Bail-In Legislation described in the EU Bail-In Legislation Schedule from time to time, the powers described as such in relation to that Bail-In Legislation in the EU Bail-In Legislation.

Section 1.2    Principles of Construction.  All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified.  All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

## ARTICLE II

## GENERAL TERMS

Section 2.1    Loan Commitment; Disbursement to Borrower.

2.1.1    Agreement to Lend and Borrow.  Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make, and Borrower hereby agrees to borrow, the Loan on the Closing Date.

2.1.2    Initial and Future Disbursements to Borrower.  Lender is making an initial advance of the Loan to Borrower in the amount of $38,500,000.00 (the "**Initial Advance**") on the date hereof.  Subject to and upon the terms and conditions set forth herein, including without limitation, the conditions set forth in Section 2.5 hereof, Borrower shall be entitled to request, and Lender will make after the date hereof, (i) one or more future advances (each a "**Future Interest Shortfall Advance**") up to an aggregate amount of $3,500,000.00 (the "**Future Interest Shortfall Advance Amount**") for Interest Shortfalls from time to time in accordance with the terms and conditions set forth in this Agreement, and (ii) one or more future advances (each a "**Earnout Advance**") up to an aggregate amount of $2,000,000.00 (the "**Earnout Advance Amount**") from time to time in accordance with the terms and conditions set forth in this Agreement.  Any amount borrowed and repaid hereunder in respect of the Loan may not be re-borrowed.

2.1.3    The Note, Security Instrument and Loan Documents.  The Loan shall be evidenced by the Note and secured by the Security Instrument, the Assignment of Leases and the other Loan Documents, as applicable.

2.1.4    Use of Proceeds.  Borrower shall use the proceeds of the Loan to (a) refinance and discharge any existing loans relating to the Property, (b) pay all past-due Basic Carrying Costs, if any, with respect to the Property, (c) make deposits into the Reserve Funds on the Closing Date in the amounts provided herein, (d) pay costs and expenses incurred in connection

39

with the closing of the Loan, as approved by Lender, (e) fund any working capital requirements of the Property, and (f) pay Interest Shortfalls in accordance with Section 2.1.2, and shall use the balance, if any, for Borrower's business purposes.

2.1.5    Intentionally omitted.

Section 2.2    Interest Rate.

2.2.1    Interest Rate.  Subject to the terms and conditions of this Article II, interest on the Outstanding Principal Balance shall accrue from the Closing Date to but excluding the Maturity Date at the Interest Rate.

2.2.2    Interest Calculation.  With respect to any applicable period, interest on the Outstanding Principal Balance shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate based on the Interest Rate and a three hundred sixty (360) day year by (c) the Outstanding Principal Balance during the applicable period as calculated by Lender.

2.2.3    Determination of Interest Rate.

(a)    The Interest Rate with respect to the Loan shall be:  (i) the Term SOFR Rate with respect to the applicable Interest Period for a Term SOFR Loan, (ii) if the Loan is converted to a Prime Rate Loan pursuant to the provisions hereof, (A) the greater of (x) the Prime Rate and (y) the Prime Rate Floor, plus (B) the Spread, (iii) if the Loan is converted to a Substitute Rate Loan pursuant to the provisions hereof, (A) the greater of (x)(1) the Substitute Rate plus (2) the Substitute Rate Adjustment and (y) the Substitute Rate Floor, plus (B) the Spread, or (iv) when applicable pursuant to this Agreement, the Default Rate, provided that in no event shall the Interest Rate calculated pursuant to clauses (ii) or (iii) above be less than the Coupon Floor. Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to convert (w) a Term SOFR Loan to a Prime Rate Loan or a Substitute Rate Loan, (x) a Prime Rate Loan to a Term SOFR Loan or a Substitute Rate Loan or (y) a Substitute Rate Loan to a Term SOFR Loan or a Prime Rate Loan.

(b)    Subject to the terms and conditions hereof, the Loan shall be a Term SOFR Loan and Borrower shall pay interest on the Outstanding Principal Balance at the Term SOFR Rate for the applicable Interest Period.  Any change in the rate of interest hereunder due to a change in the Interest Rate shall become effective as of the opening of business on the first day on which such change in the Interest Rate shall become effective.  Each determination by Lender of the Interest Rate shall be conclusive and binding for all purposes, absent manifest error.

(c)    Conversion of Loan.

(i)    In the event that Lender shall have determined in good faith that adequate and reasonable means do not exist for ascertaining Term SOFR as provided herein (including if Term SOFR is unable to be determined after giving effect to the proviso in the definition thereof) and the Loan has not been converted to a Substitute Rate Loan as provided in clause (ii) below, then Lender shall forthwith give notice by telephone of such determination, confirmed in writing, to

40

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 70 of 316

Borrower at least one (1) Business Day prior to the last day of the related Interest Period. If such notice is given, then the Term SOFR Loan shall be converted, in its entirety, on the last day of the then current Interest Period, to a Prime Rate Loan.

(ii)    If at any time the Loan is outstanding as a Term SOFR Loan and a Term SOFR Transition Event or Term SOFR Market Event occurs and the Benchmark Replacement Condition is satisfied (or waived by Lender in its sole discretion), then Lender shall forthwith give notice by telephone of such Term SOFR Transition Event or Term SOFR Market Event, as applicable, confirmed in writing, to Borrower at least one (1) day Business Day prior to the last day of the related Interest Period. If such notice is given, then the Term SOFR Loan shall be converted, in its entirety, on the last day of the then current Interest Period, to a Substitute Rate Loan.

(iii)    If, pursuant to the terms hereof, the Loan has been converted to a Prime Rate Loan and thereafter, Lender shall determine in its sole but good faith discretion that the event(s) or circumstance(s) which resulted in such conversion shall no longer be applicable and Term SOFR or the Substitute Index, as applicable, can again be ascertained, then Lender shall give notice by telephone of such determination, confirmed in writing, to Borrower at least one (1) Business Day prior to the last day of the related Interest Period. If such notice is given, then the Prime Rate Loan shall be converted to a Term SOFR Loan or a Substitute Rate Loan, as applicable, on the last day of the then current Interest Period.

(iv)    If, pursuant to the terms hereof, the Loan has been converted to a Substitute Rate Loan and thereafter, Lender shall determine (which determination shall be conclusive and binding upon Borrower absent manifest error) that that the event(s) or circumstance(s) which resulted in such conversion shall no longer be applicable and the Substitute Index is not ascertainable, then Lender shall give notice by telephone of such determination, confirmed in writing, to Borrower at least one (1) Business Day prior to the last day of the related Interest Period. If such notice is given, then the Substitute Rate Loan shall be converted to a Prime Rate Loan on the last day of the then current Interest Period.

(v)    If, pursuant to the terms hereof, the Loan has been converted to a Prime Rate Loan and thereafter, Lender shall determine (which determination shall be conclusive and binding upon Borrower absent manifest error) that a Term SOFR Transition Event or Term SOFR Market Event has occurred, then Lender shall give notice by telephone of such determination, confirmed in writing, to Borrower at least one (1) Business Day prior to the last day of the related Interest Period.  If such notice is given, the Prime Rate Loan shall be converted to a Substitute Rate Loan, as applicable, on the last day of the then current Interest Period.

(vi)    If, pursuant to the terms hereof, the Loan has been converted to a Substitute Rate Loan and thereafter, Lender shall determine (which determination shall be conclusive and binding upon Borrower absent manifest error) that a different floating rate index has become generally accepted by market participants

41

for commercial real estate loans, institutional warehouse or repurchase facilities or securitizations, then Lender shall give notice by telephone of such determination, confirmed in writing, to Borrower at least one (1) Business Day prior to the last day of the related Interest Period. If such notice is given, the Substitute Rate Loan shall be converted to a Substitute Rate Loan utilizing such different floating rate index and the new applicable Substitute Rate Adjustment on the last day of the then current Interest Period.

(vii)     In any case, (A) immediately and automatically and upon any such notice, the references to "Term SOFR" in the definition of "Term SOFR Rate" and "Term SOFR Loan" shall be deemed to be references to the "Prime Rate" and "Prime Rate Loan," respectively, or the "Substitute Index," "Substitute Rate" and "Substitute Rate Loan," respectively, as applicable, and (B) in connection with any conversion of the Loan to a Substitute Rate Loan or a Prime Rate Loan, as applicable, Lender may make such other technical, administrative or operational adjustments to this Agreement and the other Loan Documents (including, without limitation, changes to the definitions of "Business Day", "Interest Determination Date", "Interest Period", "Payment Date" and "U.S. Government Securities Business Day", the timing and frequency of determining rates and making payments of interest, the determination of amounts owed in connection with prepayments of the loan, preceding and succeeding business day conventions and other administrative matters) that Lender decides may be appropriate to reflect the adoption and implementation of the Substitute Rate or Prime Rate, as applicable, and to permit the administration thereof by Lender in a manner substantially consistent with market practice for floating rate commercial mortgage loans (or, if Lender decides that adoption of any portion of such market practice is not administratively feasible or if Lender determines that no market practice for the administration of the Substitute Rate or Prime Rate exists, in such other manner of administration as Lender decides is reasonably necessary in connection with the administration of the Loan and this Agreement). Borrower shall cooperate with Lender, at Borrower's sole cost and expense, to document the adjustments as set forth in the preceding sentence, although such failure to cooperate will not vitiate the effectiveness of such adjustments.

(d)     If any requirement of law or any change therein or in the interpretation or application thereof shall hereafter make it unlawful for Lender to make or maintain a Term SOFR Loan as contemplated hereunder, then (i) the obligation of Lender hereunder to make a Term SOFR Loan or to convert a Prime Rate Loan to a Term SOFR Loan shall be canceled forthwith and (ii) any outstanding Term SOFR Loan shall be converted automatically at the election of Lender (in its sole discretion), to either a Substitute Rate Loan or a Prime Rate Loan on the last day of the then current Interest Period or within such earlier period as may be required by law. Borrower hereby agrees to promptly pay to Lender, upon demand, any additional amounts necessary to compensate Lender for any costs incurred by Lender in making any conversion in accordance with this Agreement, including, without limitation, any interest or fees payable by Lender to lenders of funds obtained by it in order to make or maintain the Term SOFR Loan hereunder. Lender's notice of such costs, as certified to Borrower, shall be conclusive absent manifest error.

(e)     Borrower agrees to pay any Breakage Costs in connection with the conversion (for any reason whatsoever, whether voluntary or involuntary) of the Interest Rate from the Term SOFR Rate to the Substitute Rate or the Prime Rate with respect to any portion of the Outstanding Principal Balance then bearing interest at the Term SOFR Rate on a date other than the last day of an Interest Period.

2.2.4   Default Rate.  In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the Outstanding Principal Balance and, to the extent permitted by law, all accrued and unpaid interest in respect thereof and any other amounts due pursuant to the Loan Documents, shall accrue interest at the Default Rate, calculated from the date such payment was due without regard to any grace or cure periods contained herein.

2.2.5   Usury Savings.  This Agreement, the Note and the other Loan Documents are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate.  If, by the terms of this Agreement, the Note or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

2.2.6   Breakage Indemnity.  Borrower shall indemnify Lender against any loss or expense which Lender may actually sustain or incur in liquidating or redeploying deposits from third parties acquired to effect or maintain the Loan or any part thereof as a consequence of (a) any payment or prepayment of the Loan or any portion thereof made on a date other than a Payment Date and (b) any default in payment or prepayment of the Outstanding Principal Balance or any part thereof or interest accrued thereon, as and when due and payable (at the date thereof or otherwise, and whether by acceleration or otherwise) (collectively, "**Breakage Costs**").  Lender shall deliver to Borrower a statement for any such sums which it is entitled to receive pursuant to this Section 2.2.6, which statement shall be binding and conclusive absent manifest error.

Section 2.3   Debt Service Payments.

2.3.1   Payments Generally.  For purposes of making payments hereunder, but not for purposes of calculating Interest Periods, if the date on which any such payment is due is not a Business Day, then amounts due on such date shall be due on the immediately preceding Business Day.  All amounts due pursuant to this Agreement and the other Loan Documents shall be payable without setoff, counterclaim, defense or any other deduction whatsoever.

43

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 73 of 316

2.3.2    <u>Monthly Debt Service Payment</u>.  On the Closing Date, Borrower shall make a payment of interest only for the period commencing on and including the Closing Date through and including August 8, 2024.  On September 9, 2024 (or, if such date is not a Business Day, the immediately preceding Business Day) (the "**First Payment Date**") and each subsequent Payment Date up to and including the Maturity Date, Borrower shall make a payment to Lender of interest on the Outstanding Principal Balance for the Interest Period ending on the calendar day immediately preceding such Payment Date (the "**Monthly Debt Service Payment Amount**"). Lender shall have the right from time to time, in its sole discretion, upon not less than ten (10) days prior written notice to Borrower, to change (a) the Payment Date to a different calendar day and/or (b) the calendar days upon which the Interest Period shall commence (in a particular calendar month) and end (in the immediately succeeding calendar month), with a corresponding change in  the Interest Determination Date and, if requested by Lender, Borrower shall promptly execute an amendment to this Agreement to evidence all such changes, but the failure of Borrower to execute such amendment shall not affect the effectiveness of any change for which Lender has so notified Borrower.

2.3.3    <u>Payment on Maturity Date</u>. Borrower shall pay to Lender not later than 4:00 p.m., New York City time, on the Maturity Date the Outstanding Principal Balance, all accrued and unpaid interest and all other amounts due hereunder and under the Note, the Security Instrument and the other Loan Documents.

2.3.4    <u>Late Payment Charge</u>.  If any principal, interest or any other sums due under the Loan Documents (other than the payment of principal due on the Maturity Date) is not paid by Borrower on or prior to the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of (a) five percent (5%) of such unpaid sum, and (b) the Maximum Legal Rate, in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. Any such amount shall be secured by the Security Instrument and the other Loan Documents to the extent permitted by applicable law.

2.3.5    <u>Method and Place of Payment</u>.  Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Note shall be made to Lender not later than 4:00 p.m., New York City time, on the date when due and shall be made in Dollars in immediately available funds at Lender's office or as otherwise directed by Lender, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day.  Any prepayments required to be made hereunder or under the Cash Management Agreement by Lender or Servicer out of the Cash Management Account shall be deemed to have been timely made for purposes of this <u>Section 2.3.5</u>.

Section 2.4    <u>Prepayments</u>.

2.4.1    <u>Voluntary Prepayments</u>.

(a)    Except as otherwise provided herein, Borrower shall not have the right to prepay the Loan in whole or in part prior to the Maturity Date.

(b)    <u>Permitted Prepayment</u>.

44

(i)       On any Payment Date so long as no Event of Default has occurred and is continuing, Borrower may, at its option and upon not more than ninety (90) and not less than thirty (30) days prior written notice to Lender, and subject to compliance with the provisions of this Section 2.4.1, prepay the entire Outstanding Principal Balance, provided that such prepayment is accompanied by (i) all accrued and unpaid interest on the Outstanding Principal Balance prepaid and (ii) all other amounts due under the Note, this Agreement, or any of the other Loan Documents (including, without limitation, any Breakage Costs). A prepayment notice may be revoked by written notice of revocation to Lender on or prior to the date of prepayment specified in any such prepayment notice, provided that Borrower shall pay Lender upon demand for all of Lender's out-of-pocket costs and expenses (including reasonable fees and disbursements of Lender's counsel) incurred in connection with such anticipated prepayment and any sums that would have been payable for any Breakage Costs due if the prepayment was made on the date specified in any such prepayment notice.

(c)       Prepayment/Repayment Conditions. On the date on which a prepayment is made, Borrower shall pay to Lender:

(i)       all accrued and unpaid interest calculated at the Interest Rate on the amount of principal being prepaid through and including the Repayment Date together with an amount equal to the interest that would have accrued at the Interest Rate on the amount of principal being prepaid through the end of the Interest Period in which such prepayment occurs, notwithstanding that such Interest Period extends beyond the date of prepayment;

(ii)       if such prepayment is made on any date other than a Payment Date, Breakage Costs, if any, without duplication of any sums paid pursuant to the preceding subparagraph (i); and

(iii)       all other sums then due under the Note, this Agreement, the Security Instrument, and the other Loan Documents.

2.4.2    Mandatory Prepayments.  Following any Casualty or Condemnation, on the next occurring Payment Date following the date on which Lender actually receives any Net Proceeds, if Lender is not obligated to make such Net Proceeds available to Borrower for Restoration, Borrower shall prepay, or authorize Lender to apply such Net Proceeds as a prepayment of, the Outstanding Principal Balance of the Note, in an amount equal to one hundred percent (100%) of such Net Proceeds; provided, however, that if an Event of Default has occurred and is continuing, Lender may apply such Net Proceeds to the Debt (until paid in full) in any order or priority in its sole discretion.  Any partial prepayment under this Section 2.4.2 shall be applied to the last payments of principal due under the Loan.

2.4.3    Prepayments Made While an Event of Default Exists.  If, following the occurrence and during the continuance of an Event of Default, payment of all or any part of the Debt is tendered by Borrower for any reason or otherwise recovered by Lender (including, without limitation, through acceleration or the application of any Reserve Funds or Net Proceeds), then

45

Borrower shall pay, as part of the Debt, (a) all accrued interest calculated at the Interest Rate on the amount of principal being prepaid through and including the date of such prepayment together with an amount equal to the interest that would have accrued at the Interest Rate on the amount of principal being prepaid through the end of the Interest Period in which such prepayment occurs, notwithstanding that such Interest Period extends beyond the date of prepayment, (b) the Interest Shortfall, if applicable with respect to the amount prepaid, and (c) the Breakage Costs, if any, without duplication of any sums paid pursuant to the preceding clause (a).

Section 2.5    Future Advances.

2.5.1    Future Interest Shortfall Advances.  Subject to the terms of this Section 2.5.1, Lender shall make one or more Future Interest Shortfall Advances to Borrower for Interest Shortfalls in an amount not to exceed the unfunded portion of the Future Interest Shortfall Advance Amount, which Future Interest Shortfall Advance shall be deposited into the Interest Shortfall Reserve Account upon satisfaction by Borrower of each of the following conditions with respect to such Future Interest Shortfall Advance.

(a)    Deliveries.  The following items or documents shall have been delivered to Lender:

(i)    Lender's standard form of draw request for payment not less than ten (10) Business Days prior to the date on which Borrower requests such advance is to be made; and

(ii)    a title search for the Property indicating that the Property is free and clear from all Liens, claims and other encumbrances not previously approved by Lender (other than Permitted Encumbrances), and a T-3 P-9b(4) R-11c endorsement to the Title Insurance Policy.

(b)    Performance; No Default.  On the date of such Future Interest Shortfall Advance, no Default or Event of Default shall have occurred and be continuing.

(c)    Representations and Warranties.  The representations and warranties made by Borrower and Guarantor in the Loan Documents or in any certificate or instrument delivered in connection with the Loan Documents shall have been true and correct in all material respects on the date made and shall also be true and correct in all material respects as if remade on the date of the Future Interest Shortfall Advance, except for such changes in facts and circumstances as shall have occurred in the ordinary course of business and which do not otherwise give rise to or constitute a Default or Event of Default.

(d)    Cap on Future Interest Shortfall Advance.  In no event shall Lender have any obligation to make a Future Interest Shortfall Advance in excess of the Future Interest Shortfall Advance Amount.

(e)    Fees and Expenses.  All fees and expenses payable to Lender shall have been (or contemporaneously are being) paid in full, and all title premiums and other title and survey charges shall have been (or contemporaneously are being) paid in full, if applicable.

46

2.5.2    Earnout Advances.  Subject to the terms of this Section 2.5.2, Lender shall make one or more Earnout Advances to Borrower in an amount not to exceed (in the aggregate) the unfunded portion of the Earnout Advance Amount upon satisfaction by Borrower of each of the following conditions with respect to each such Earnout Advance:

(a)    Deliverables. The following items or documents shall have been delivered to Lender:

(i)    Not less than ten (10) Business Days prior to the date on which Borrower requests such Earnout Advance be made, which request shall specify the amount of the Earnout Advance requested and evidence that all conditions thereto have been satisfied, together with an Officer's Certificate certifying as to same; and

(ii)    A title search for the Property indicating that the Property is free and clear from all Liens, claims and other encumbrances not previously approved by Lender (other than Permitted Encumbrances);

(b)    Debt Yield. The Debt Yield, after taking into account the applicable Earnout Advance then remaining undisbursed, shall be equal to or greater than nine percent (9.00%) for one (1) calendar year;

(c)    Performance; No Default. On the date such Earnout Advance is requested and on the date of such Earnout Advance, there shall exist no monetary Default, material nonmonetary Default, or Event of Default;

(d)    Earnout Funding Fee. Upon the funding of each Earnout Advance, Borrower shall pay to Lender the Earnout Funding Fee;

(e)    Representations and Warranties. The representations and warranties made by Borrower, Pledgor and Guarantor in the Loan Documents or in any certificate or instrument delivered in connection with the Loan Documents shall have been true and correct on the date in all material respects on which made and shall also be true and correct in all material respects as if remade on the date of the Earnout Advance, except for such changes in facts and circumstances as shall have occurred in the ordinary course of business and which do not otherwise give rise to or constitute a Default or Event of Default; and

(f)    Cap on Earnout Advances. In no event shall Lender have any obligation to make Earnout Advances in excess of, in the aggregate, the Earnout Advance Amount.

Section 2.6    Release of Property.  Lender shall, upon the written request and at the expense of Borrower, upon payment in full of the Debt in accordance with the terms of this Agreement and the other Loan Documents, release the Lien of the Security Instrument.  Except as set forth in the foregoing sentence, no repayment or prepayment of all or any portion of the Note shall cause, give rise to a right to require, or otherwise result in, the release of the Lien of the Security Instrument.

47

Section 2.7    Cash Management.

2.7.1    Clearing Account.

(a)    Borrower shall establish and maintain a segregated Eligible Account with respect to the Property (the "**Clearing Account**") with the Clearing Bank in trust for the benefit of Lender, which Clearing Account shall be under the sole dominion and control of Lender.  The Clearing Account shall entitled "**LEX AVENUE HOTEL, LLC"** or such other name as required by Lender from time to time.  Borrower (i) hereby grants to Lender a first priority security interest in the Clearing Account and all deposits at any time contained therein and the proceeds thereof, and (ii) will take all actions necessary to maintain in favor of Lender a perfected first priority security interest in the Clearing Account, including, without limitation, the execution of any account control agreement required by Lender and filing or authorizing Lender to file UCC-1 financing statements and continuations thereof.  Such financing statements may describe as the collateral covered thereby "all assets of the debtor, whether now owned or hereafter acquired" or words to that effect.  Borrower will not in any way alter, modify or close the Clearing Account and will notify Lender of the account number thereof.  Except as may be expressly permitted in this Agreement and the Clearing Account Agreement, Lender and Servicer shall have the sole right to make withdrawals from the Clearing Account and all costs and expenses for establishing and maintaining the Clearing Account shall be paid by Borrower.  All monies now or hereafter deposited into the Clearing Account shall be deemed additional security for the Obligations.

(b)    Subject to the terms of Section 8 of the Hotel Management SNDA as applicable, Borrower shall, and shall cause Manager to, (1) during any Cash Trap Period deliver written instructions to (i) all Tenants under Leases to deliver all Rents payable thereunder and (ii) all issuers of credit cards accepted at the Property or with which either Borrower or Manager has entered into merchant's agreements, to cause all credit card receipts and other sums payable by such issuers to be transmitted directly to the Clearing Account, and (2) deposit into the Clearing Account within one (1) Business Day after receipt, all amounts received by Borrower or Manager constituting Rents, other Gross Income from Operations, or other amounts related to the use, ownership or operation of the Property.  The Clearing Account Agreement and Clearing Account shall remain in effect until the Debt has been indefeasibly repaid in full.

(c)    During any Cash Trap Period, Borrower shall cause the Clearing Bank to transfer to the Cash Management Account in immediately available funds by federal wire transfer all amounts on deposit in the Clearing Account once every Business Day (less any required minimum balance pursuant to the terms of the Clearing Account Agreement).  If no Cash Trap Period is then continuing, funds in the Clearing Account (less any required minimum balance pursuant to the terms of the Clearing Account Agreement) shall be disbursed to Borrower's Operating Account on each Business Day.

(d)    Upon the occurrence of an Event of Default, Lender may, in addition to any and all other rights and remedies available to Lender, direct the Clearing Bank to immediately pay over all funds on deposit in the Clearing Account to Lender and apply any such funds to the payment of the Debt in any order in its sole discretion.

(e)        Funds deposited into the Clearing Account shall not be commingled with other monies held by Borrower, Manager or the Clearing Bank.

(f)        Borrower shall not further pledge, assign or grant any security interest in the Clearing Account or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 financing statements, except those naming Lender as the secured party, to be filed with respect thereto.

(g)        Borrower shall indemnify Lender and the Clearing Bank and hold Lender and the Clearing Bank harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including litigation costs and reasonable attorneys' fees and expenses) arising from or in any way connected with the Clearing Account, the Clearing Account Agreement or the performance of the obligations for which the Clearing Account was established (unless arising from the gross negligence or willful misconduct of Lender or the Clearing Bank, as applicable).

2.7.2    <u>Cash Management Account</u>.

(a)        Upon the occurrence of a Cash Trap Event, Lender shall establish and maintain a segregated Eligible Account (the "**Cash Management Account**") to be held by the Deposit Bank in trust for the benefit of Lender, which Cash Management Account shall be under the sole dominion and control of Lender.   Lender will also establish subaccounts of the Cash Management Account which shall at all times be Eligible Accounts (and may be ledger or book entry accounts and not actual accounts) (such subaccounts are referred to herein as "**Subaccounts**").  Borrower (i) hereby grants to Lender a first priority security interest in the Cash Management Account and the Subaccounts and all deposits at any time contained therein and the proceeds thereof, and (ii) will take all actions necessary to maintain in favor of Lender a perfected first priority security interest in the Cash Management Account and the Subaccounts, including, without limitation, filing or authorizing Lender to file UCC-1 financing statements and continuations thereof.  Such financing statements may describe as the collateral covered thereby "all assets of the debtor, whether now owned or hereafter acquired" or words to that effect. Borrower will not in any way alter, modify or close the Cash Management Account and will notify Lender of the account number thereof.  Lender and Servicer shall have the sole right to make withdrawals from the Cash Management Account and the Subaccounts and all costs and expenses for establishing and maintaining the Cash Management Account and the Subaccounts shall be paid by Borrower.  All monies now or hereafter deposited into the Cash Management Account and the Subaccounts shall be deemed additional security for the Obligations.

(b)        Provided no Event of Default shall have occurred and be continuing and subject to the terms of <u>Section 8</u> of the Hotel Management SNDA as applicable, on each Payment Date (or, if such Payment Date is not a Business Day, on the immediately preceding Business Day) during a Cash Trap Period all funds on deposit in the Cash Management Account shall be applied by Lender (or by the Deposit Bank at Lender's direction) to the payment of the following items in the order indicated:

(i)        First, payment to Lender (for deposit in the Tax and Insurance Escrow Account) in respect of the Tax and Insurance Escrow Funds in accordance

with the terms and conditions of Section 7.1 hereof, to be disbursed as set forth in this Agreement;

(ii)     Second, payment to the Clearing Bank and the Deposit Bank of the fees and expenses of the Clearing Bank and the Deposit Bank then due and payable pursuant to the Clearing Account Agreement and the Cash Management Agreement, as applicable;

(iii)    Third, payment to Borrower in an amount equal to the sum of (A) operating expenses due and payable by Borrower during the succeeding month as set forth in the Approved Annual Budget, (B) Extraordinary Expenses, if any, approved by Lender, less (C) any amounts which were previously disbursed to Borrower pursuant to this Section 2.7.2(b)(iii) and which were not used by Borrower to pay operating expenses or Extraordinary Expenses; provided, however, that Lender shall have no obligation to disburse any funds to Borrower under this Section 2.7.2(b)(iii) unless Borrower has delivered to Lender not less than five (5) Business Days prior to the disbursement date an Officer's Certificate in form and substance reasonably acceptable to Lender certifying to Lender: (x) a list in reasonable detail of the operating expenses which are due and payable by Borrower during the succeeding month as set forth in the Approved Annual Budget, and (y) a reconciliation showing all operating expenses and Extraordinary Expenses actually paid by Borrower for the prior quarter and all amounts distributed to Borrower under this Section 2.7.2(b)(iii);

(iv)     Fourth, payment to Lender of the Monthly Debt Service Payment Amount;

(v)      Fifth, to the extent required under Section 7.2 hereof, payment to Lender for deposit in the FF&E Reserve Account, in respect of the FF&E Reserve Monthly Deposit in accordance with, and subject to, the terms and conditions of Section 7.2 hereof;

(vi)     Sixth, payment to Lender and/or Servicer of any other amounts then due and payable under the Loan Documents; and

(vii)    Seventh, payment of all amounts then remaining after payment of items (i) through (vi) (all amounts then remaining after payment of items (i) through (vi) being hereinafter referred to as "**Excess Cash**") to the Excess Cash Reserve Account in accordance with the terms and conditions of Section 7.6 hereof.

(c)      The insufficiency of funds on deposit in the Cash Management Account shall not relieve Borrower of the obligation to make any payments, as and when due pursuant to this Agreement and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever.

(d)      Notwithstanding anything to the contrary contained in this Section 2.7.2, following the occurrence of an Event of Default and during the continuance thereof, all funds on

50

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 80 of 316

deposit in the Cash Management Account may be applied by Lender in such order and priority as Lender shall determine in its sole discretion until the Debt has been indefeasibly paid in full.

(e)    Borrower hereby agrees to reasonably cooperate with Lender with respect to any requested modifications to the Cash Management Agreement for the purpose of establishing additional sub-accounts in connection with any payments otherwise required under this Agreement and the other Loan Documents.

(f)    Borrower shall indemnify Lender and the Deposit Bank and hold Lender and the Deposit Bank harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including litigation costs and reasonable attorneys' fees and expenses) arising from or in any way connected with the Cash Management Account, the Cash Management Agreement or the performance of the obligations for which the Cash Management Account was established (unless arising from the gross negligence or willful misconduct of Lender or the Deposit Bank, as applicable).

(g)    Pursuant and subject to the terms hereof and of the other Loan Documents, Borrower agrees that the Clearing Bank shall at all times be entitled to comply with all instructions originated by Lender, without further consent by Borrower, directing disposition of the Clearing Account and all sums at any time held, deposited or invested therein, together with any interest or other earnings thereon, and all proceeds thereof (including proceeds of sales and other dispositions), whether accounts, general intangibles, chattel paper, deposit accounts, instruments, documents or securities.

(h)    The Clearing Account and Cash Management Account shall not, at any time, be held in the name of any Person other than Borrower, as pledgor, for the benefit of Lender, as secured party.

Section 2.8    Intentionally omitted.

Section 2.9    Extension Options.

2.9.1    Extension Options.  Subject to the provisions of this Section 2.9, Borrower shall have the option (the "**First Extension Option**"), by written notice (the "**First Extension Notice**") delivered to Lender no earlier than one hundred twenty (120) days prior to, nor later than sixty (60) days prior to, the Stated Maturity Date, to extend the Maturity Date to February 9, 2028 (the "**First Extended Maturity Date**").  If the Maturity Date shall have been timely and properly extended to the First Extended Maturity Date, then Borrower shall have the option (the "**Second Extension Option**"), by written notice (the "**Second Extension Notice**") delivered to Lender no earlier than one hundred twenty (120) days prior to, nor later than sixty (60) days prior to, the First Extended Maturity Date, to extend the Maturity Date to August 9, 2028 the ("**Second Extended Maturity Date**").  If Borrower revokes an Extension Notice prior to the applicable Maturity Date, then Borrower shall be responsible for all of Lender's costs and expenses incurred in connection with such Extension Notice and Borrower's revocation of same.  Borrower's right to so extend the Maturity Date to the First Extended Maturity Date and the Second Extended Maturity Date shall be subject to the satisfaction of the following conditions precedent prior to each extension hereunder (and each such condition shall be satisfied in connection with the exercise of each

51

Extension Option unless such condition is otherwise expressly specified to apply solely to the First Extension Option or the Second Extension Option):

(a)    No Default or Event of Default shall have occurred and be continuing on the date Borrower delivers the First Extension Notice or the Second Extension Notice, as applicable, and no Default or Event of Default shall have occurred and be continuing on the Stated Maturity Date or the First Extended Maturity Date, as applicable;

(b)    all amounts due and payable to Lender pursuant to this Agreement or the other Loan Documents as of the Stated Maturity Date or the First Extended Maturity Date, as applicable, and all costs and expenses of Lender, including fees and expenses of Lender's counsel, in connection with the Loan and/or the applicable extension of the term shall have been paid in full;

(c)    on the Stated Maturity Date or the First Extended Maturity Date, as applicable, Borrower shall pay to Lender the Extension Fee;

(d)    intentionally omitted;

(e)    intentionally omitted; and

(f)    Borrower shall pay to Lender for deposit into the Interest Shortfall Reserve Account the then applicable Projected Interest Shortfall, measured through the then applicable extended Maturity Date.

if Borrower is unable to satisfy all of the foregoing conditions within the applicable time frames for each, Lender shall have no obligation to extend the Maturity Date hereunder.

2.9.2    Extension Documentation.  As soon as practicable following an extension of the Maturity Date pursuant to this Section 2.9, Borrower shall, if requested by Lender, execute and deliver an amendment of and/or restatement of the Note and shall, if requested by Lender, enter into such amendments to the related Loan Documents as may be necessary or appropriate to evidence the extension of the Maturity Date as provided in this Section 2.9; provided, however, that no failure by Borrower to enter into any such amendments and/or restatements shall affect the rights or obligations of Borrower or Lender with respect to the extension of the Maturity Date.

Section 2.10    Change in Law; Taxes.

2.10.1    Increased Costs.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)    subject any Lender to any Taxes (other than (A) Indemnified Taxes and (B) Taxes described in clause (b) of the definition of Excluded Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to increase the cost to such Lender, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

2.10.2  Other Taxes.  Borrower agrees to pay any and all present or future gross receipts, stamp, court or documentary, intangible, recording, filing or similar taxes or other excise or property taxes, charges, or similar levies which arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement, the other Loan Documents, or the Loan (hereinafter referred to as "**Other Taxes**").

Section 2.11    Taxes.

(a)    Payments Free of Taxes.  Any and all payments by or on account of any obligation of Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of both Borrower and Lender after consultation with each other) requires the deduction or withholding of any Tax from any such payment by Borrower, then Borrower shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by Borrower shall be increased as necessary so that after all deductions or withholdings have been made (including all deductions and withholdings applicable to additional sums payable under this Section), the applicable Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    Payment of Other Taxes by Borrower.  Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of Lender timely reimburse it for the payment of, any Other Taxes.

(c)    Indemnification by Borrower.  Borrower shall indemnify Lender, within ten (10) days after demand therefor, for the full amount of any Taxes indemnified under this Section 2.11(c) (including Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by Lender or required to be withheld or deducted from a payment to Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to Borrower by Lender shall be conclusive absent manifest error.

(d)    Evidence of Payments.  As soon as practicable after any payment of Taxes by or on account of Borrower to a Governmental Authority pursuant to this Section, Borrower

53

shall deliver to Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Lender.

(e)     Status of Lenders.  If Lender is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document, Lender shall deliver to Borrower, promptly following the time or times reasonably requested by Borrower, such properly completed and executed documentation reasonably requested by Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding (provided that the completion, execution and submission of such documentation shall not be required if in Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender), including:

(i)     if Lender is a U.S. Person, executed copies of IRS Form W-9 certifying that Lender is exempt from U.S. federal backup withholding tax;

(ii)     if Lender is a Foreign Lender, executed copies of IRS Form W-8BEN or W-8BEN-E, W-8ECI or W-8IMY, as applicable, together with all supporting documentation required under applicable law, including in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, a certificate substantially in the form of **Schedule VII** to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code; and

(iii)     any documentation required to be provided by a Lender as prescribed under Sections 1471 through 1474 of the Code and the applicable Treasury regulations thereunder and official interpretations thereof.

(f)     Changes in Tax, Debt, Credit and Documentary Stamp Laws.

(i)     If any law is enacted or adopted or amended after the date of this Agreement which deducts the Loan from the value of the Property for the purpose of taxation and which imposes a tax, either directly or indirectly, on Lender's interest in the Loan or Lender's interest in the Property, Borrower will pay the tax, with interest and penalties thereon, if any.  If Lender is advised by counsel chosen by it that the payment of tax by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury then Lender shall have the option by written notice of not less than one hundred eighty (180) days to declare the Loan immediately due and payable.

(ii)     Borrower will not claim or demand or be entitled to any credit or credits on account of the Loan for any part of the Property Taxes or Other Charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for

54

real estate tax purposes by reason of the Security Instrument or the Loan. If such claim, credit or deduction shall be required by applicable law and such claim, credit or deduction results in a tax, either directly or indirectly on Lender's interest in the Loan or Lender's interest in the Property, Lender shall have the option, by written notice of not less than one hundred eighty (180) days, to declare the Debt immediately due and payable.

(iii)    If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, the Security Instrument, or any of the other Loan Documents or impose any other similar tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.

Section 2.12    OID. Lender shall receive the Closing Payment on the Closing Date, which shall be reflected as a dollar for dollar reduction in the proceeds of the Loan advanced on the Closing Date. Borrower acknowledges that the Closing Payment will constitute original issue discount (the "**OID**") and, as such, is not being advanced to Borrower, provided that such OID will constitute a portion of the Outstanding Principal Balance, and, accordingly, interest will accrue thereon in the same manner as interest accrues on all other portions of the Outstanding Principal Balance from and after the date hereof.

Section 2.13    Survival. Each party's obligations under Sections 2.10 and 2.11 shall survive any assignment of rights by, or the replacement of, a Lender, the termination of the commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

## ARTICLE III

## EXCULPATION

Section 3.1    Exculpation.

(a)    Subject to the qualifications below, Lender shall not enforce the liabilities and obligations of Borrower to perform and observe the obligations contained in the Note, this Agreement, the Security Instrument or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement, the Security Instrument and the other Loan Documents, or in the Property, the Rents, or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender, and Lender, by accepting the Note, this Agreement, the Security Instrument and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding under, or by reason of, or in connection with, the Note, this Agreement, the Security Instrument or the other Loan Documents. The provisions of this Section 3.1 shall not, however, (a) constitute a waiver, release

55

or impairment of any obligation evidenced or secured by any of the Loan Documents; (b) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Security Instrument; (c) affect the validity or enforceability of the Environmental Indemnity or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; (d) impair the right of Lender to obtain the appointment of a receiver; (e) impair the enforcement of the Assignment of Leases; or (f) constitute a prohibition against Lender seeking a deficiency judgment against Borrower in order to fully realize the security granted by the Security Instrument or commencing any other appropriate action or proceeding in order for Lender to exercise its remedies against the Property or any other Collateral.

(b)      Nothing contained herein shall in any manner or way release, affect or impair the right of Lender to recover, and Borrower shall be fully and personally liable and subject to legal action, for any losses, damages (including, without limitation, punitive or exemplary damages), costs, expenses, liabilities (including, without limitation, strict liability), claims, obligations, settlement payments, penalties, fines, assessments, citations, litigation, demands, defenses, judgments, suits, proceedings or other expenses of any kind whatsoever incurred or suffered by Lender (including reasonable attorneys' fees and expenses and court costs) (collectively, "Losses") arising out of or in connection with the following:

(i)      fraud or intentional misrepresentation by or on behalf of Borrower, Guarantor or any Affiliate of any of them in connection with the Loan or the Property;

(ii)      gross negligence or willful misconduct of Borrower, Guarantor or any Affiliate of any of them in connection with the Loan or the Property;

(iii)      breach of any representation, warranty, covenant or indemnification provision in the Loan Agreement, the Environmental Indemnity or the Security Instrument concerning Environmental Statutes or Hazardous Substances;

(iv)      material physical waste of the Property or any portion thereof;

(v)      intentional removal or disposal of any portion of the Property after an Event of Default;

(vi)      breach of any Legal Requirement (including RICO) mandating the forfeiture by Borrower of the Property, or any portion thereof, because of the conduct or purported conduct of criminal activity by Borrower, Guarantor or any Restricted Party or any Affiliate of any of them in connection therewith;

(vii)      any intentional misrepresentation, or any materially misleading or incorrect certification contained in this Agreement or any other Loan Document or in any document executed in connection therewith, that was made to induce Lender to make the Loan, or any advance thereof, or to release monies from any account held by Lender (including any reserve or escrow) or to take other action with respect to the Property and/or the Collateral;

56

(viii)   misapplication, misappropriation or conversion by or on behalf of Borrower, Guarantor or any Affiliate of any of them (including Pledgor) of (A) any Insurance Proceeds, (B) any Awards, (C) any Rents or other Gross Income from Operations (including, without limitation, any Rents paid more than one (1) month in advance), (D) intentionally omitted, (E) any Loan proceeds; or (F) any other monetary collateral for the Loan;

(ix)   failure to pay charges for Taxes, Other Charges, labor or materials or judgments that can create Liens on any portion of the Property, unless such charges are the subject of a bona fide dispute in which Borrower is contesting the amount or validity thereof in accordance with Section 5.1.2, in a manner which prevents any interest or penalties from accruing, or any Lien from attaching;

(x)   failure to deliver to Lender any security deposits, advance deposits or any other deposits held by or on behalf of Borrower with respect to the Property upon a foreclosure of the Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof;

(xi)   an act or omission of any of Borrower, Pledgor or Guarantor, or any Affiliate of any of them, which hinders, delays or interferes with Lender's enforcement of its rights under any Loan Document or the realization of the collateral;

(xii)   failure by Borrower to obtain and maintain, from time to time, the fully paid for insurance policies in accordance with the terms hereof;

(xiii)   Borrower's indemnifications of Lender set forth in Section 9.2 of this Agreement;

(xiv)   any actual or threatened litigation relating to the termination or dissolution of the Master Condominium, the Master Condominium Board, the Master Condominium Association or any other association relating thereto;

(xv)   Borrower's failure to comply with the terms and provisions of the Master Condominium Documents after the expiration of any applicable notice and cure period;

(xvi)   any modification, amendment or termination of the (a) Management Agreement or any Replacement Management Agreement, or (b) Management Agreement (Parking) or any Replacement Management Agreement (Parking), in each case, by Borrower in violation of this Agreement;

(xvii)   the Ground Lease is terminated, cancelled or otherwise ceases to exist and the Fee Owner has not entered a new ground lease with Lender (or Lender's designee) on the same or substantially similar terms and conditions as the Ground Lease;

57

(xviii) any obligation of Lender or any successor owner of the Property to pay or reimburse Manager (or any Replacement Manager) for any unamortized Key Money for the benefit of, or paid to, Borrower, due to the termination of the Management Agreement (or any replacement Management Agreement); or

(xix) following a Casualty, the inability, as a result of the legal nonconformity of the Property prior to such Casualty, to rebuild, replace or restore the Improvements at the Property in compliance with all Legal Requirements for the same use and in a manner such that the fair market value of the Property following such Casualty is not less than the estimated fair market value of the Property immediately prior to such Casualty as reasonably determined by Lender.

(c)     Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Debt secured by the Security Instrument or to require that all collateral shall continue to secure all of the Obligations in accordance with the Loan Documents, and (B) Borrower shall be personally liable for the payment of the entire amount of the Debt in the event of:

(i)     Borrower, Pledgor or Guarantor filing a voluntary petition under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law;

(ii)     the filing of an involuntary petition against Borrower, Pledgor or Guarantor under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law, by any Person that is an Affiliate of Borrower, Pledgor or Guarantor;

(iii)     Borrower, Pledgor, Guarantor or any Affiliate of any of them consenting to or otherwise or joining in an any involuntary petition filed against Borrower or Guarantor, by any other Person under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law;

(iv)     Borrower, Pledgor, Guarantor or any Affiliate of any of them consenting to or otherwise or joining in an application for the appointment of a custodian, receiver, trustee or examiner for Borrower or any portion of the Property (other than an application by Lender in connection with the enforcement of Lender's remedies under the Loan Documents);

(v)     Borrower, Pledgor or Guarantor or any Affiliate of any of them soliciting or colluding with, or causing to be solicited or colluded with, petitioning creditors or any other Person for any involuntary petition against Borrower, Pledgor or Guarantor by any Person (other than by Lender in connection with the exercise of Lender's remedies under the Loan Documents);

(vi)     Borrower, Pledgor or Guarantor making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due (other than merely

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 88 of 316

Borrower's inability to repay or as a result of Borrower's mere failure to repay, in either case, the Debt on the Maturity Date);

(vii)    Borrower or Pledgor failing to obtain Lender's prior written consent to any subordinate financing;

(viii)    Borrower encumbers the Property, the Collateral or any portion thereof or Pledgor encumbers the Pledged Collateral with a voluntary Lien, in each instance, other than in accordance with the terms of the Loan Documents;

(ix)    Borrower or Pledgor failing to obtain Lender's prior written consent to any Transfer other than a Permitted Transfer;

(x)    an act or omission of any of Borrower, Pledgor or Guarantor, or any Affiliate of any of them, which hinders, delays or interferes with Lender's enforcement of its rights under any Loan Document or the realization of the collateral, including the assertion by Borrower, Pledgor or Guarantor, or any Affiliate of any of them of defenses or counterclaims other than good faith defenses and compulsory counterclaims (it being acknowledged and agreed that to the extent Borrower, Pledgor or Guarantor, or any Affiliate of any of them, asserts that any exercise of rights by, or any compliance or attempted compliance by, either party to the Pledge Agreement is in violation of the Pledge Agreement or applicable law, the same shall be deemed to be an action that triggers liability under this clause (x));

(xi)    Borrower causes, consents to, or fails to object to (to the extent such objection would have resulted in the rejection of) any amendment, modification, cancellation or termination of the Master Condominium Documents or Residential Condominium Documents (but only to the extent that the consent of the Master Association is required) without Lender's prior written consent, which consent shall not be unreasonably conditioned, withheld or delayed; or

(xii)    Borrower or Pledgor failing to comply with any representation, warranty or covenant set forth in Section 4.1.30 hereof or failing to maintain its status as a Special Purpose Entity, as required by, and in accordance with, the terms and provisions of this Agreement or the Security Instrument, including, without limitation, the breach of the covenant in Section 5.2.12 to provide thirty (30) days' prior written notice prior to the removal of an Independent Director, or the breach of any Backward-Looking Special Purpose Entity Representations and Warranties set forth in Section 4.1.30.

**ARTICLE IV**

**REPRESENTATIONS AND WARRANTIES**

Section 4.1    <u>Borrower Representations</u>.  Borrower represents and warrants as of the date hereof that:

4.1.1    Organization.  Borrower has been duly organized and is validly existing and in good standing with requisite power and authority to own its properties and to transact the business in which it is now engaged.  Borrower is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, businesses and operations.  Borrower possesses all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own its properties and to transact the businesses in which it is now engaged, and the sole business of Borrower is the ownership, management and operation of the Property.  The ownership interests of Borrower are as set forth on the organizational chart attached hereto as **Schedule III** and, other than as specifically identified and disclosed on such chart, no Person owns ten percent (10%) or more of the direct or indirect ownership interest in Borrower. Borrower (a) has complied in all respects with its certificate of incorporation, bylaws, limited partnership agreement, articles of organization and limited liability company operating agreement, as applicable; (b) has maintained complete books and records and bank accounts separate from those of its Affiliates; (c) has obeyed all formalities required to maintain its status as, and at all times has held itself out to the public as, a legal entity separate and distinct from any other entity (including, but not limited to, any Affiliate thereof); and (d) has all requisite power and authority to conduct its business and to own its property, as now conducted or owned, and as contemplated by this Agreement, including, without limitation, the power and authority to do business in the state in which the Property is located.  The signatory hereto has all requisite power, authority and legal right to execute this Agreement, the Note and the other Loan Documents on Borrower's behalf to which Borrower is a party.  Guarantor has the necessary power, authority and legal right to execute, deliver and perform its obligations under the Guaranty and the Environmental Indemnity.

4.1.2    Proceedings.  Borrower has taken all necessary limited liability company action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents.  This Agreement and the other Loan Documents have been duly executed and delivered by or on behalf of Borrower and constitute the legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

4.1.3    No Conflicts.  The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower Pledgor and/or Guarantor, as applicable, will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of Borrower pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, partnership agreement, management agreement or other agreement or instrument to which Borrower is a party or by which any of Borrower's property or assets is subject, nor will such action result in any violation of the provisions of any Legal Requirements of any Governmental Authority having jurisdiction over Borrower or any of Borrower's property or assets, and any consent, approval, authorization, order, registration or qualification of or with any court or any such Governmental Authority required for the execution, delivery and performance by Borrower and/or Guarantor, as applicable, of this Agreement or any other Loan Documents has been obtained and is in full force and effect.

60

4.1.4    Litigation.  There are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or threatened against or affecting Borrower, Pledgor, Guarantor or the Property or any portion thereof, which actions, suits or proceedings, if determined against Borrower, Pledgor, Guarantor or the Property or such portion thereof, might materially adversely affect the condition (financial or otherwise) or business of Borrower, Pledgor, Guarantor or the condition or ownership of the Property or any portion thereof.

4.1.5    Agreements.  Borrower is not a party to any agreement or instrument or subject to any restriction that might materially and adversely affect Borrower or the Property or any portion thereof, or Borrower's business, property or assets, operations or condition, financial or otherwise.  Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party or by which Borrower or the Property are bound.  Borrower has no material financial obligation under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Borrower is a party or by which Borrower or the Property is otherwise bound, other than (a) any obligations incurred in the ordinary course of the operation of the Property as permitted pursuant to clause (s) of the definition of "Special Purpose Entity" set forth in Section 1.1 hereof, and (b) the obligations under the Loan Documents.

4.1.6    Title.    Borrower has good, marketable and insurable fee simple and leasehold title, as applicable to the real property comprising part of the Property and good title to the balance of the Property, free and clear of all Liens whatsoever, except the Permitted Encumbrances, such other Liens as are expressly permitted pursuant to the Loan Documents and the Liens created by the Loan Documents.  The Permitted Encumbrances, in the aggregate, do not materially and adversely affect the value, operation or use of the Property or any portion thereof (as currently used) or Borrower's ability to repay the Loan.  The Security Instrument and the Assignment of Leases, when properly recorded in the appropriate records, together with any UCC-1 financing statements required to be filed in connection therewith, will create (a) a valid, perfected first priority lien on the Property, subject only to Permitted Encumbrances and the Liens created by the Loan Documents, and (b) perfected security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances, such other Liens as are expressly permitted pursuant to the Loan Documents and the Liens created by the Loan Documents.  There are no claims for payment for work, labor or materials affecting the Property or any portion thereof that are or may become a Lien prior to, or of equal priority with, the Liens created by the Loan Documents. There are no PACE Loans with respect to the Property. The UCC-1 financing statements required to be filed in connection with the Pledge Agreement, when properly filed in the appropriate records, will create a valid, perfected first priority lien on the Pledged Collateral (the "**Pledgor UCC-1**").

4.1.7    Solvency.  Borrower has (a) not entered into the transactions contemplated by this Agreement or executed the Note, this Agreement or any other Loan Document with the actual intent to hinder, delay or defraud any creditor and (b) received reasonably equivalent value in exchange for its Obligations under the Loan Documents.  After giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities.  The fair saleable value of Borrower's assets is

and will, immediately following the making of the Loan, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured. Borrower's assets do not and, immediately following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts and liabilities as they mature (taking into account the timing and amount of cash to be received by Borrower and the amount to be payable on or in respect of the obligations of Borrower). No Bankruptcy Action exists against Borrower, Pledgor or Guarantor and neither of Borrower, Pledgor or Guarantor has ever been a party to a Bankruptcy Action. Neither Borrower, Pledgor nor Guarantor is contemplating either a Bankruptcy Action or the liquidation of all or a major portion of Borrower's assets or property, and Borrower has no knowledge of any Person contemplating the filing of any petition against it or Pledgor.

4.1.8   Full and Accurate Disclosure.  No statement of fact made by or on behalf of Borrower in this Agreement or in any of the other Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading. There is no material fact presently known to Borrower that has not been disclosed to Lender that adversely affects, nor as far as Borrower can foresee, might adversely affect, the Property (or any portion thereof) or the business, operations or condition (financial or otherwise) of Borrower or Guarantor.

4.1.9   No Plan Assets.  Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA which is subject to Title I of ERISA or a "plan" as defined in and subject to the provisions of Section 4975 of the Code, and none of the assets of Borrower constitutes or will constitute "plan assets" of one or more such plans for purposes of ERISA or the Code. In addition, (a) Borrower is not a "governmental plan" within the meaning of Section 3(32) of ERISA or an entity whose assets constitute "plan assets" of a governmental plan or plans, (b) transactions by or with Borrower are not subject to any state statute or regulation regulating investments of, or fiduciary obligations with respect to, governmental plans (within the meaning of Section 3(32) of ERISA), in any case, which is similar to the provisions of Section 406 of ERISA or Section 4975 of the Code currently in effect, which would prohibit or otherwise restrict the transactions contemplated by this Agreement, and (c) none of Borrower, Guarantor or their ERISA Affiliates is at the date hereof, or has been at any time within the five (5) years preceding the date hereof, required to contribute to any Multiemployer Plan or any Pension Plan, or a "contributing sponsor" (as such term is defined in Section 4001 of ERISA) in any Multiemployer Plan or Pension Plan; and none of Borrower, Guarantor or any ERISA Affiliate has any contingent liability with respect to any post-retirement "employee welfare benefit plan" (as such term is defined in Section 3(1) of ERISA), except as disclosed to Lender in writing.

4.1.10  Compliance.  Borrower and the Property (including the use thereof) comply in all material respects with all applicable Legal Requirements, including, without limitation, building and zoning ordinances and codes and the Condominium Documents. To Borrower's knowledge, Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority. To Borrower's knowledge, there has not been committed by Borrower, or any other Person in occupancy of or involved with the operation or use of the Property or any portion thereof, any act or omission affording any Governmental Authority the right of

62

forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's Obligations under any of the Loan Documents. Neither the Improvements as constructed, nor the use of the Property by Tenants under the Leases and the contemplated accessory uses, will violate (a) any Legal Requirements (including subdivision, zoning, building, environmental protection and wetland protection Legal Requirements), or (b) any building permits, restrictions or records, or agreements affecting the Property or any part thereof. Neither the zoning authorizations, approvals or variances nor any other right to construct or to use the Property is to any extent dependent upon or related to any real estate other than the Property.

4.1.11 <u>Financial Information</u>. All financial data with respect to the Property and Guarantor, including, without limitation, the statements of cash flow and income and operating expenses that have been delivered to Lender in connection with the Loan (a) are true, complete and correct in all material respects, (b) accurately represent the financial condition of the Property and Guarantor as of the date of such reports, and (c) to the extent prepared or audited by an independent certified public accounting firm, have been prepared in accordance with GAAP and the Uniform System of Accounts for Hotels (or such other accounting basis consistently applied and reasonably acceptable to Lender) throughout the periods covered, except as disclosed therein. Except for Permitted Encumbrances, Borrower does not have any contingent liabilities, liabilities for Taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a material adverse effect on the Property or any portion thereof or the operation thereof as a hotel property and its other intended uses, except as referred to or reflected in said financial statements. Since the date of such financial statements, there has been no Material Adverse Change in the financial condition, operation or business of Borrower or Guarantor from that set forth in said financial statements.

4.1.12 <u>Condemnation</u>. No Condemnation or other similar proceeding has been commenced or, to Borrower's knowledge, is threatened or contemplated with respect to all or any portion of the Property or for the relocation of any roadway providing access to the Property.

4.1.13 <u>Federal Reserve Regulations</u>. No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose that would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by any Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

4.1.14 <u>Utilities and Public Access</u>. The Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its intended uses. All public utilities necessary or convenient to the full use and enjoyment of the Property are located either in the public right-of-way abutting the Property (which are connected so as to serve the Property without passing over other property) or in recorded easements serving the Property and such easements are set forth in and insured by the Title Insurance Policy. All roads necessary for the use of the Property for its current purpose have been completed and dedicated to public use and accepted by all applicable Governmental Authorities. There is no on-site sewage disposal system and the Property is served by a sewer system maintained by a Governmental Authority or property owners' association.

4.1.15 <u>Not a Foreign Person</u>. Borrower and, if Borrower is a Disregarded Entity for U.S. federal income tax purposes, the Person treated as owning the assets owned by Borrower for federal income tax purposes, is not a "foreign person" within the meaning of §1445(f)(3) or of §7701 of the Code.

4.1.16 <u>Separate Lots</u>. The Property is comprised of one (1) or more parcels, which constitute a separate tax lot or lots and does not constitute a portion of any other tax lot not a part of the Property.

4.1.17 <u>Assessments</u>. There are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor, to Borrower's knowledge, are there any contemplated improvements to the Property that might result in such special or other assessments.

4.1.18 <u>Enforceability</u>. The Loan Documents are enforceable by Lender (or any subsequent holder thereof) in accordance with their respective terms, subject to principles of equity and bankruptcy, insolvency and other laws generally applicable to creditors' rights and the enforcement of debtors' obligations. The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower, Pledgor or Guarantor, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable (subject to principles of equity and bankruptcy, insolvency and other laws generally affecting creditors' rights and the enforcement of debtors' obligations), and neither Borrower, Pledgor nor Guarantor has asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

4.1.19 <u>No Prior Assignment</u>. There are no prior assignments of the Leases or any portion of the Rents due and payable or to become due and payable that are presently outstanding.

4.1.20 <u>Insurance</u>. Borrower has obtained and has delivered to Lender certified copies of all Policies, with all premiums paid thereunder, reflecting the insurance coverages, amounts and other requirements set forth in this Agreement. No claims have been made or are currently pending, outstanding or otherwise remain unsatisfied under any such Policies, and no Person, including Borrower, has done, by act or omission, anything which would impair the coverage of any such Policies.

4.1.21 <u>Use of Property</u>. The Property (and each portion thereof) is used exclusively as a hotel property and other appurtenant and related uses.

4.1.22 <u>Certificate of Occupancy; Licenses</u>. All certifications, permits, licenses and approvals, including, without limitation, certificates of completion and occupancy permits required for the legal use, occupancy and operation of the Property and each portion thereof for its intended uses and otherwise as a hotel (collectively, the "**Licenses**"), have been obtained and are in full force and effect. The use being made of the Property and each portion thereof is in conformity with the certificate of occupancy issued for the Property and any portion thereof.

4.1.23 <u>Flood Zone</u>. None of the Improvements on the Property are located in an area identified by the Federal Emergency Management Agency as an area having special flood

hazards or, if so located, the flood insurance required pursuant to <u>Section 6.1(a)(i)</u> hereof is in full force and effect with respect to the Property.

4.1.24 <u>Physical Condition</u>.  The Property, including, without limitation, all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components are in good condition, order and repair in all material respects. Other than potential defects related to the ventilation systems in connection with the hotel's restaurants (of which Lender has been notified), there exists no structural or other material defects or damages in or on the Property, whether latent or otherwise, and Borrower has not received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.

4.1.25 <u>Boundaries</u>.  All of the Improvements which were included in determining the appraised value of any portion of the Property lie wholly within the boundaries and building restriction lines of such portion of the Property, and no improvements on adjoining properties encroach upon any portion of the Property, and no easements or other encumbrances upon the Property or any portion thereof encroach upon any of the Improvements, so as to adversely affect the value or marketability of the Property, except those easements or other encumbrances with respect to which the Title Insurance Policy insures against any losses resulting therefrom.

4.1.26 <u>Leases</u>.  No portion of the Property is subject to any Leases other than the Leases described on the rent roll for the Property attached at **Schedule I**.  Borrower is the owner and lessor of landlord's interest in the Leases.  No Person has any possessory interest in the Property or any portion thereof or right to occupy the same, except under and pursuant to the provisions of the Leases.  The current Leases are in full force and effect and there are no defaults thereunder by either party and there are no conditions that, with the passage of time or the giving of notice, or both, would constitute defaults thereunder.  The copies of the Leases and any related guaranty (including all amendments thereto) delivered to Lender are accurate, true and complete, and there are no oral agreements with respect thereto.  No Rents (other than security deposits, if any, listed on **Schedule I**) have been paid more than one (1) month in advance of their due date. All work to be performed by the landlord under each Lease has been performed as required in such Lease and has been accepted by the applicable Tenant, and any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by the landlord under such Lease to any Tenant has already been received by such Tenant.  There has been no prior sale, transfer or assignment, hypothecation or pledge of any Lease or of the Rents received therein which is still in effect.  Except as listed on **Schedule I**, no Tenant has assigned its Lease or sublet all or any portion of the premises demised thereby, no such Tenant holds its leased premises under assignment or sublease, nor does anyone, except such Tenant and its employees occupy such leased premises.  No Tenant under any Lease has a right or option pursuant to such Lease or otherwise to purchase all or any part of the Property.  No Tenant under any Lease has any right or option for additional space in the Improvements.

4.1.27 <u>Survey</u>.  The Survey for the Property (and each portion thereof) delivered to Lender in connection with this Agreement has been prepared by a professional and properly

65

licensed land surveyor in accordance with the Accuracy Standards for ALTA/NSPS Land Title Surveys as adopted by ALTA, and the National Society of Professional Surveyors in 2021. The Survey reflects the same legal description contained in the Title Insurance Policy. The surveyor's seal is affixed to the Survey and the surveyor provided a certification for the Survey in form and substance acceptable to Lender, which does not fail to reflect any material matter affecting the Property or the title thereto.

4.1.28    Principal Place of Business; State of Organization.    Borrower's principal place of business as of the date hereof is the address set forth in the introductory paragraph of this Agreement. Borrower is organized under the laws of the State of Delaware and its organizational identification number is 6616673.

4.1.29    Filing and Recording Taxes.    All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes (including all Other Taxes) required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the transfer of the Property to Borrower have been paid. All mortgage, mortgage recording, stamp, intangible or other similar tax (including all Other Taxes) required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Security Instrument, have been paid or are being paid simultaneously herewith.

4.1.30    Special Purpose Entity/Separateness.

(a)    Until the Obligations have been paid and performed in full, Borrower hereby represents, warrants and covenants that (i) Borrower is, shall be and shall continue to be a Special Purpose Entity and (ii) Pledgor is, shall be and shall continue to be a Special Purpose Entity.

(b)    The representations, warranties and covenants set forth in Section 4.1.30(a) shall survive for so long as any amount remains payable to Lender under this Agreement or any other Loan Document.

(c)    Intentionally omitted.

(d)    In addition to the foregoing, Borrower hereby represents, warrants and agrees that (the following being hereinafter referred to, collectively, as the "**Backward-Looking Special Purpose Entity Representations and Warranties**") prior to the Closing Date:

(i)    Borrower has always been (A) since the date of its formation in Delaware, duly formed, validly existing and in good standing under the laws of the state of Delaware, and (B) duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with the Property and its business and operations, with requisite power and authority, and all rights, licenses, permits and authorizations, governmental or otherwise, necessary to own the Property and to transact the business in which it has been engaged.

66

(ii)     Pledgor has always been (A) since the date of its formation in Delaware, duly formed, validly existing and in good standing under the laws of the state of Delaware, and (B) duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with the Property and its business and operations, with requisite power and authority, and all rights, licenses, permits and authorizations, governmental or otherwise, necessary to indirectly own the Property and to transact the business in which it has been engaged.

(iii)    neither Borrower nor Pledgor has ever had any judgments or liens of any nature against them except for tax liens not yet delinquent and Permitted Encumbrances.

(iv)    to Borrower's knowledge, Borrower has always been in material compliance with all laws, regulations, and orders applicable to it and has always had all permits necessary for it to operate.

(v)     to Borrower's knowledge, Borrower and Pledgor have always been in material compliance with all laws, regulations, and orders applicable to them and have always had, all permits necessary for them to operate.

(vi)    neither Borrower nor Pledgor is aware of any pending or threatened litigation in writing, nor have they ever been a party to any material lawsuit, arbitration, summons, or other material legal proceeding except as disclosed in writing to Lender.

(vii)   Borrower and Pledgor have not been, except as disclosed in writing to Lender or in connection with protesting ad valorem taxes in the ordinary course of business, nor are involved in, any dispute with any taxing authority, and Borrower and Pledgor have paid all taxes due to any taxing authority before the delinquency thereof.

(viii)  to the extent financial statements of Borrower or Pledgor have been provided to Lender by or on behalf of Borrower or Pledgor in connection with the Loan, to Borrower's knowledge, the latest set of each such financial statements fairly and accurately reflects the current financial condition of the subject of such statement, as of the date of such statement, in all material respects.

(ix)    neither Borrower nor Pledgor has ever owned any real property other than the Property and has ever engaged in any business except the ownership and operation of such Property.

(x)     Borrower and Pledgor have no material contingent or actual obligations unrelated to the Property.

4.1.31  Management Agreement.  The Management Agreement and Management Agreement (Parking) are in full force and effect and, in each case, to Borrower's knowledge, there are no defaults thereunder by any party thereto and no event has occurred that, with the passage of

time and/or the giving of notice would constitute a default thereunder.  Neither the execution and delivery of the Loan Documents nor Borrower's performance thereunder will adversely affect Borrower's rights under the Management Agreement or Management Agreement (Parking).

The Management Agreement represents the full and complete terms and provisions of the hotel franchise and license contracts entered into between Manager and the Borrower which are in effect as of the date hereof and there are no other amendments, modifications or other agreements relating thereto which have not been delivered to Lender.  There are no franchise or similar agreements affecting the Property other than the Management Agreement and there are no other fee or payment arrangements in connection with the franchise rights with respect to Manager except as set forth in the Management Agreement.  The amount of unamortized Key Money under the Management Agreement as of the Closing Date is $2,177,083.33.  There are no quality assurance programs or property improvement plans in place with respect to the Property other than the Replacement Reserve required under the Management Agreement.

4.1.32  Illegal Activity.  No portion of the Property has been or will be purchased with proceeds of any illegal activity.

4.1.33  No Change in Facts or Circumstances; Disclosure.  All information submitted by Borrower to Lender including, but not limited to, all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower in this Agreement or in any other Loan Document, are accurate, complete and correct in all material respects.  There has been no Material Adverse Change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects or might materially and adversely affect the use, operation or value of the Property or any portion thereof or the business operations and/or the financial condition of Borrower or Guarantor.  Borrower and Guarantor have disclosed to Lender all material facts and have not failed to disclose any material fact that could cause any Provided Information or representation or warranty made herein to be materially misleading.

4.1.34  Investment Company Act.  Borrower is not (a) an "investment company" or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 2005, as amended; or (c) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

4.1.35  Embargoed Person.  As of the date hereof, (a) none of the funds or other assets of Borrower, Pledgor or Guarantor constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person; (b) no Embargoed Person has any interest of any nature whatsoever in Borrower, Pledgor or Guarantor, as applicable, with the result that the investment in Borrower, Pledgor or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law; and (c) none of the funds of Borrower, Pledgor or Guarantor, as applicable, has been derived from any unlawful activity with the result that the investment in

Borrower, Pledgor or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law.

4.1.36   Clearing Account and Cash Management Account.

(a)     This Agreement, together with the other Loan Documents, creates a valid and continuing security interest (as defined in the UCC) in the Clearing Account and Cash Management Account in favor of Lender, as and when each such account may be established, which security interest is prior to all other Liens, other than Permitted Encumbrances, and is enforceable as such against creditors of and purchasers from Borrower.  Other than in connection with the Loan Documents and except for Permitted Encumbrances, Borrower has not sold, pledged, transferred or otherwise conveyed its interest in the Clearing Account and Cash Management Account.

(b)     Each of the Clearing Account and Cash Management Account shall constitute a "deposit account" within the meaning of the UCC.

(c)     Pursuant and subject to the terms hereof and of the other Loan Documents, Borrower agrees that it shall instruct the Clearing Bank and Deposit Bank to comply with all instructions originated by Lender, without further consent by Borrower or any other Person, directing disposition of the Clearing Account and Cash Management Account and all sums at any time held, deposited or invested therein, together with any interest or other earnings thereon, and all proceeds thereof (including proceeds of sales and other dispositions), whether accounts, general intangibles, chattel paper, deposit accounts, instruments, documents or securities.

(d)     The Clearing Account and Cash Management Account shall not be held in the name of any Person other than Borrower, as pledgor, for the benefit of Lender, as secured party.

(e)     The Property is not subject to any cash management system (other than pursuant to the Loan Documents and the Management Agreement), and any and all existing tenant instruction letters issued in connection with any previous financing have been duly terminated prior to the date hereof.

4.1.37   Filing of Returns; Payment of Taxes.  Borrower's federal tax identification number is set forth on **Schedule V**.  Borrower has at all times been properly treated for federal income tax purposes either as a Disregarded Entity or as a partnership.   All Taxes relating to the Property are current and are not delinquent.  Each of Borrower and Guarantor has filed, or caused to be filed, all federal, state, local and foreign Tax returns, reports and other Tax-related documents required to be filed by it and has paid all Taxes payable by it that have become due, other than those not yet delinquent and except for those being contested in accordance with Section 5.1.2. Each of Borrower and Guarantor has established on its books such charges, accruals and reserves in respect of Taxes for all fiscal periods as are required by sound accounting principles consistently applied.  Neither Borrower nor Guarantor knows of any proposed assessment for additional Taxes for any period, or of any basis therefor, that, individually or in the aggregate, taking into account such charges, accruals and reserves in respect thereof as such Person has made, could reasonably

Case 1:26-cv-04240-RA Document 1-1 Filed 05/20/26 Page 99 of 316

be expected to cause a Material Adverse Change with respect to Borrower, Guarantor or the Property.

4.1.38 <u>REA</u>. The REA is in full force and effect and neither Borrower nor, to the best of Borrower's knowledge, any other party to the REA, is in default thereunder, and to the best of Borrower's knowledge after due inquiry, there are no conditions which, with the passage of time or the giving of notice, or both, would constitute a default thereunder. Except as set forth on **Schedule VI**, the REA has not been modified, amended or supplemented.

4.1.39 <u>Environmental Representations</u>. Except as otherwise disclosed by that certain Phase I environmental report (or Phase II environmental report, if required by Lender) with respect to the Property delivered to Lender by Borrower on or prior to the date hereof (hereinafter referred to as the "**Environmental Reports**") and based upon Borrower's actual knowledge, (A) there are no Hazardous Substances or underground storage tanks in, on, or under the Property, except those that are both (i) in compliance with all Environmental Statutes and with permits issued pursuant thereto and (ii) fully disclosed to Lender in writing pursuant to the Environmental Report(s); (B) there are no past, present or threatened Releases of Hazardous Substances in, on, under or from the Property which have not been fully remediated in accordance with Environmental Statute; (C) there is no past or present non-compliance with Environmental Statutes, or with permits issued pursuant thereto, in connection with the Property which has not been fully remediated in accordance with Environmental Statutes; (D) Borrower does not know of, and has not received, any written or oral notice or other communication from any Person (including, but not limited to, a Governmental Authority) relating to the threat of any Release of Hazardous Substances migrating to the Property; (E) Borrower does not know of, and has not received, any written or oral notice or other communication from any Person (including, but not limited to, a Governmental Authority) relating to Hazardous Substances or Remediation thereof, of possible liability of any Person pursuant to any Environmental Statute, any other environmental conditions in connection with the Property, or any actual or potential administrative or judicial proceedings in connection with any of the foregoing; (G) Borrower has truthfully and fully delivered to Lender, in writing, any and all information relating to conditions in, on, under or from the Property that is known to Borrower and all information that is contained in the files and records of Borrower, including, but not limited to, any reports relating to Hazardous Substances in, on, under or from the Property and/or to the environmental condition of the Property; and (H) no Mold (as defined below) is present in the indoor air of the Property at concentrations exceeding ambient air levels and no visible Mold is present on any building materials or surfaces at the Property for which any Governmental Authority recommends or requires removal thereof by remediation professionals, and Borrower is not aware of any conditions at the Property that are likely to result in the presence of Mold in the indoor air at concentrations that exceed ambient air levels or on building materials or surfaces that would require such removal.

4.1.40 <u>Labor Matters</u>. There are no collective bargaining agreements or similar agreements in effect with respect to Borrower or the Property. Borrower does not have any employees.

4.1.41 <u>Condominium Documents.</u>

(a)      Borrower has delivered or caused to be delivered to Lender true, correct and complete copies of each of the Master Condominium Documents and the Residential Condominium Documents known to Borrower.

(b)      The Master Condominium Declaration is in full force and effect and has not been amended or revised other than as recorded as of the date hereof.

(c)      Other than in connection with any previous financing secured by the Borrower, which have been refinanced or are being refinanced by this Loan, Borrower has not made any assignments of, or granted any security interests in the Master Condominium Declaration or in its rights, benefits or privileges thereunder to anyone other than Lender pursuant to the Loan Documents.

(d)      The interest of Borrower as Master Declarant (as defined in the Master Condominium Declaration) under the Master Condominium Declaration is not subject to any claim, setoff, lien, deduction or encumbrance of any nature other than in connection with any previous financing secured by the Borrower, which have been refinanced or are being refinanced by this Loan.

(e)      Borrower is not presently in default in the performance of any of its obligations under the Condominium Declaration or any other Condominium Document, and Borrower has no knowledge of any act, omission, occurrence or circumstance which, with the giving of notice or the passage of time or both, would result in such a default.

(f)      The Borrower, the tenants under Leases at the Property, and the Property each have access to all Master Common Elements (as defined in the Master Condominium Declaration).

(g)      The Condominium Property is subject to the Master Condominium Documents.

### 4.1.42   Ground Lease Representations.

(a)      (i) The Ground Lease is in full force and effect and has not been modified or amended in any manner whatsoever, (ii) there are no defaults under the Ground Lease by Borrower, or, to the best of Borrower's knowledge, Fee Owner, and, to the best of Borrower's knowledge, no event has occurred which but for the passage of time, or notice, or both would constitute a default under the Ground Lease, (iii) all rents, additional rents and other sums due and payable under the Ground Lease have been paid in full, (iv) neither Borrower nor Fee Owner has commenced any action or given or received any notice for the purpose of terminating the Ground Lease, (v) to Borrower's knowledge, the Fee Owner, as debtor in possession or by a trustee for the Fee Owner, has not given any notice of, and Borrower has not consented to, any attempt to transfer the Fee Estate free and clear of the Ground Lease under section 363(f) of the Bankruptcy Code, and (vi) the Fee Owner is not subject to any voluntary or involuntary bankruptcy, reorganization or insolvency proceeding and the Fee Estate is not an asset in any voluntary or involuntary bankruptcy, reorganization or insolvency proceeding;

(b)     The Ground Lease or a memorandum thereof has been duly recorded, the Ground Lease permits the interest of the lessee thereunder to be encumbered by the Security Instrument and does not restrict the use of the Property by such lessee, its successors or assigns in a manner that would adversely affect the security provided by the Security Instrument and there have not been any modifications, amendments or other changes in the terms of the Ground Lease since its recordation;

(c)     Except as indicated in the Title Insurance Policy, Borrower's interest in the Ground Lease is not subject to any Lien superior to, or of equal priority with, the Security Instrument;

(d)     The Ground Lease itself provides and/or the Fee Owner has agreed in a writing for the benefit of Lender, its successors and assigns that the Ground Lease may not be amended, modified, canceled, surrendered or terminated without the prior written consent of Lender and that any such action without such consent is not binding on Lender, its successors or assigns;

(e)     The Ground Lease does not place commercially unreasonable restrictions on the identity of Lender and Borrower's interest in the Ground Lease is assignable upon notice to, but without the consent of, the Fee Owner and, in the event that it is so assigned, it is further assignable upon notice to, but without the need to obtain the consent of, the Fee Owner;

(f)     To the extent the Fee Owner has been provided notice of the existence and identity of Lender, the Ground Lease requires the Fee Owner to give notice of any default by Borrower to Lender;

(g)     Lender is permitted a reasonable opportunity (including, where necessary, sufficient time to gain possession of the interest of Borrower under the Ground Lease) to cure any default under the Ground Lease, which is curable after the receipt of notice of any default before the Fee Owner may terminate the Ground Lease;

(h)     The Ground Lease has a term which extends not less than twenty (20) years beyond the Maturity Date;

(i)     The Ground Lease requires the Fee Owner to enter into a new lease with Lender upon termination of the Ground Lease for any reason and/or upon rejection of such Ground Lease in a bankruptcy proceeding;

(j)     Under the terms of the Ground Lease and the applicable Loan Documents, taken together, any Net Proceeds will be applied either to the Restoration of all or part of the Property, with Lender or a trustee appointed by Lender having the right to hold and disburse such Net Proceeds as the Restoration progresses, or to the payment of the outstanding principal balance of the Loan together with any accrued interest thereon; and

(k)     The Ground Lease does not impose restrictions on subletting that would be viewed as commercially unreasonable by a prudent commercial mortgage lender.

4.1.43  <u>Survival of Representations</u>.  Borrower agrees that all of the representations and warranties of Borrower set forth in <u>Section 4.1</u> and elsewhere in this Agreement and in the other Loan Documents shall survive for so long as any amount remains owing to Lender under this Agreement or any of the other Loan Documents by Borrower.  All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

## ARTICLE V

## BORROWER COVENANTS

Section 5.1  <u>Affirmative Covenants</u>.  From the date hereof and until payment and performance in full of all Obligations, Borrower hereby covenants and agrees with Lender that:

5.1.1  <u>Existence; Compliance with Legal Requirements</u>.  Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises necessary for the conduct of its business and comply with all Legal Requirements applicable to Borrower, the Property (or any portion thereof) and the Master Condominium.  There shall never be committed by Borrower, and Borrower shall not knowingly permit any other Person in occupancy of or involved with the operation or use of the Property or any portion thereof to commit, any act or omission affording any Governmental Authority the right of forfeiture against the Property or any part thereof or any monies paid in performance of Borrower's Obligations under any of the Loan Documents.  Borrower shall not commit, permit or suffer to exist any act or omission affording such right of forfeiture.  Borrower shall at all times maintain, preserve and protect all franchises and trade names, preserve all the remainder of its property used or useful in the conduct of its business, and shall keep the Property in good working order and repair, and from time to time make, or cause to be made, all reasonably necessary repairs, renewals, replacements, betterments and improvements thereto, all as more fully provided in the Security Instrument.  Borrower shall keep the Property insured at all times by financially sound and reputable insurers, to such extent and against such risks, and maintain liability and such other insurance, as is more fully provided in this Agreement.  After prior notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding promptly initiated and conducted in good faith and with due diligence, the validity of any Legal Requirement, the applicability of any Legal Requirement to Borrower or the Property (or portion thereof) or any alleged violation of any Legal Requirement; provided, that: (a) no Default or Event of Default has occurred and remains uncured; (b) such proceeding shall be permitted under, and be conducted in accordance with, the provisions of any instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable statutes, laws and ordinances; (c) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (d) Borrower shall, upon final determination thereof, promptly comply with any such Legal Requirement determined to be valid or applicable or cure any violation of any Legal Requirement; (e) such proceeding shall suspend the enforcement of the contested Legal Requirement against Borrower and the Property; and (f) Borrower shall furnish such security as may be required in the proceeding, or as may be requested by Lender, to insure compliance with such Legal Requirement, together with all interest and penalties payable in connection therewith.  Lender may apply any

73

such security, as necessary to cause compliance with such Legal Requirement at any time when, in the reasonable judgment of Lender, the validity, applicability or violation of such Legal Requirement is finally established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost.

    5.1.2 <u>Taxes and Other Charges</u>.  Borrower and Guarantor shall timely file (taking into account any effective extensions for filing) all federal, state and local tax returns and all other material tax returns, domestic and foreign, required to be filed by them and shall pay prior to being delinquent all Taxes (except to the extent the same are being contested in accordance with this <u>Section 5.1.2</u>) charges and assessments payable by them that become due.  Borrower shall maintain its status as a Disregarded Entity and Borrower (and its owner for U.S. federal income tax purposes) shall maintain its status as a person that is not a "foreign person" within the meaning of Section 1445(f)(3) or of Section 7701 of the Code. Borrower shall pay, or shall cause its Tenant(s) to pay (to the extent any Tenant is obligated to make such payments under its Lease) all Property Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property, or any part thereof, as the same become due and payable (and with respect to Property Taxes, prior to the date the same become delinquent).  Borrower will deliver to Lender receipts for payment or other evidence satisfactory to Lender that the Property Taxes and Other Charges have been so paid or are not then delinquent no later than ten (10) days prior to the date on which the Property Taxes and/or Other Charges would otherwise be delinquent if not paid; <u>provided</u>, <u>however</u>, Borrower is not required to furnish such receipts for payment of Property Taxes in the event that such Property Taxes have been paid by Lender pursuant to <u>Section 7.1</u> hereof.  Subject to the terms of this <u>Section 5.1.2</u> and <u>Section 5.2.2</u>, Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien or charge whatsoever, which may be or become a Lien or charge against the Property or any portion thereof (other than Permitted Encumbrances), and shall promptly pay for all utility services provided to the Property.  After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Property Taxes or Other Charges, provided that (a) no Default or Event of Default has occurred and is continuing; (b) such proceeding shall be permitted under, and be conducted in accordance with, the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable statutes, laws and ordinances; (c) neither the Property nor any part thereof nor interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (d) Borrower shall promptly upon final determination thereof pay the amount of any such Property Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (e) such proceeding shall suspend the collection of such contested Property Taxes or Other Charges from the Property (except that if such Property Taxes or Other Charges must be paid sooner in order to avoid being delinquent, then Borrower shall cause the same to be paid prior to delinquency, and upon making such payment prior to delinquency Borrower may continue such contest); (f) Borrower shall furnish such security as may be required in the proceeding, or as may be required by Lender, to insure the payment of any such Property Taxes or Other Charges, together with all interest and penalties thereon; and (g) to the extent that any Lien has been filed with respect to such Property Taxes or Other Charges, such Lien has been fully bonded over to the satisfaction of Lender and discharged of record.  Lender may pay over any such cash deposit or part thereof held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established or the Property (or part thereof or interest

74

therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien of the Security Instrument being primed by any related Lien.

5.1.3 <u>Litigation</u>. Borrower shall give prompt written notice to Lender of any litigation or proceedings by any Governmental Authority pending or threatened against Borrower, Pledgor and/or Guarantor which might materially adversely affect Borrower's, Pledgor's or Guarantor's condition (financial or otherwise) or business or the Property or any portion thereof.

5.1.4 <u>Access to Property</u>. Borrower shall permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice (which may be given verbally).

5.1.5 <u>Notice of Default</u>. Borrower shall promptly advise Lender of (i) any Material Adverse Change in Borrower's, Pledgor's or Guarantor's condition, financial or otherwise, of which Borrower has knowledge, (ii) the occurrence of any default under the Management Agreement and the Management Agreement (Parking) of which Borrower has knowledge, (iii) the occurrence of any event which, but for the giving of notice or passage of time, or both, would be a default under the Management Agreement and the Management Agreement (Parking) of which Borrower has knowledge, or (iii) thre occurrence of any Event of Default of which Borrower has knowledge of.

5.1.6 <u>Cooperate in Legal Proceedings</u>. Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority which may in any way affect the rights of Lender hereunder or any rights obtained by Lender under any of the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

5.1.7 <u>Perform Loan Documents</u>. Borrower shall observe, perform and satisfy all the terms, provisions, covenants and conditions of, and shall pay when due all costs, fees and expenses to the extent required under the Loan Documents executed and delivered by, or applicable to, Borrower and shall cause the Pledgor to observe, perform and satisfy all the terms, provisions, covenants and conditions of and shall promptly pay when due all costs, fees and expenses to the extent required under the Loan Documents executed and delivered by, or applicable to, the Pledgor. Payment of the costs and expenses associated with any of the foregoing shall be in accordance with the terms and provisions of this Agreement, including, without limitation, the provisions of <u>Section 10.13</u> hereof.

5.1.8 <u>Award and Insurance Benefits</u>. Borrower shall cooperate with Lender in obtaining for Lender the benefits of any Awards or Insurance Proceeds lawfully or equitably payable in connection with the Property or any portion thereof in accordance with the terms of Article VI below, and Lender shall be reimbursed for any expenses incurred in connection therewith (including attorneys' fees and disbursements, and the payment by Borrower of the expenses of an appraisal on behalf of Lender in the case of Casualty or Condemnation affecting the Property or any part thereof) out of such Insurance Proceeds.

5.1.9 <u>Further Assurances</u>. Borrower shall, at Borrower's sole cost and expense (and, where applicable, shall cause the Pledgor to):

75

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 105 of 316

(a)     furnish to Lender all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, and each and every other document, certificate, agreement and instrument required to be furnished by Borrower or the Pledgor pursuant to the terms of the Loan Documents or which are reasonably requested by Lender in connection therewith;

(b)     execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the Collateral at any time securing or intended to secure the Obligations under the Loan Documents, as Lender may reasonably require; and

(c)     do and execute all such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time. In furtherance hereof, Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of protecting, perfecting, preserving and realizing upon the interests granted pursuant to this Agreement and to effect the intent hereof, all as fully and effectually as Borrower might or could do; and Borrower hereby ratifies all that Lender shall lawfully do or cause to be done by virtue hereof.  Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note or any other Loan Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or other applicable Loan Document, Borrower will issue, in lieu thereof, a replacement Note or other applicable Loan Document, dated the date of such lost, stolen, destroyed or mutilated Note or other Loan Document in the same principal amount thereof and otherwise of like tenor.

5.1.10  <u>Mortgage Taxes</u>.  Borrower shall simultaneously herewith pay all state, county and municipal mortgage, recording, stamp, intangible and all Other Taxes imposed upon the execution and recordation of the Security Instrument.

5.1.11  <u>Financial Reporting</u>.

(a)     Borrower will keep and maintain or will cause to be kept and maintained on a Fiscal Year basis in accordance with GAAP and the Uniform System of Accounts for Hotels (or such other accounting basis selected by Borrower, consistently applied and reasonably acceptable to Lender), and the requirements of Regulation AB, proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense in connection with the operation of the Property.  Lender shall have the right from time to time at all times during normal business hours upon reasonable notice (which may be verbal) to examine such books, records and accounts at the office of Borrower or any other Person maintaining such books, records and accounts and to make such copies or extracts thereof as Lender shall desire.  After the occurrence of an Event of Default, Borrower shall pay any reasonable costs and expenses incurred by Lender to examine Borrower's accounting records with respect to the Property as Lender shall reasonably determine to be necessary or appropriate in the protection of Lender's interest.  Upon Lender's reasonable request, Borrower shall furnish to Lender such other information reasonably necessary and sufficient to fairly represent the financial condition of Borrower and the Property.

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 106 of 316

(b)  Borrower will furnish to Lender annually, within ninety (90) days following the end of each Fiscal Year of Borrower, a complete copy of Borrower's and Guarantor's annual financial statements certified as true and correct by the party providing such statements prepared by a "Big Four" accounting firm or other independent certified public accountant acceptable to Lender in accordance with GAAP and the Uniform System of Accounts for Hotels (or such other accounting basis consistently applied and reasonably acceptable to Lender) covering the Property for such Fiscal Year and containing statements of profit and loss for Borrower, Guarantor and the Property and a balance sheet for Borrower and Guarantor. Such statements of Borrower shall set forth the financial condition and the results of operations for the Property for such Fiscal Year, and shall include, but not be limited to, amounts representing annual net cash flow, Net Operating Income, Gross Income from Operations and Operating Expenses. Borrower's annual financial statements shall be accompanied by (i) a comparison of the budgeted income and expenses and the actual income and expenses for the prior Fiscal Year in Excel spreadsheet form if requested by Lender and (ii) an Officer's Certificate certifying that each annual financial statement fairly presents the financial condition and the results of operations of Borrower and the Property subject to such reporting, and that such financial statements have been prepared in accordance with GAAP and the Uniform System of Accounts for Hotels and as of the date thereof whether there exists an event or circumstance which constitutes a Default or Event of Default under the Loan Documents executed and delivered by, or applicable to, Borrower, and if such Default or Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to remedy the same. Guarantor's annual financial statements shall be accompanied by (a) a statement of his Net Worth and Liquidity (as such terms are defined in the Recourse Guaranty) within such ninety (90) day period described above and (b) intentionally omitted.

(c)  Officer's Certificate. Borrower will furnish, or cause to be furnished, to Lender on or before the date that is twenty (20) days after the end of each calendar month the following items, accompanied by an Officer's Certificate stating that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower and the Property (subject to normal year-end adjustments) as applicable: (i) a rent roll for the subject month or quarter; (ii) a leasing status report in form and substance reasonably acceptable to Lender; (iii) monthly, quarterly and year-to-date operating statements (including Capital Expenditures) prepared for each calendar month or quarter, as applicable, noting Net Operating Income, Gross Income from Operations, and Operating Expenses (not including any contributions to the FF&E Reserve Account), and, upon Lender's request, other information necessary and sufficient to fairly represent the financial position and results of operation of the Property during such calendar month or quarter, as applicable, and containing a comparison of budgeted income and expenses and the actual income and expenses together with a detailed explanation of any variances of five percent (5%) or more between budgeted and actual amounts for such periods, all in form satisfactory to Lender; (iv) inspection reports and/or quality assurance evaluations received with respect to the Management Agreement, (v) a calculation reflecting the Debt Service Coverage Ratio and Debt Yield as of the last day of such month or quarter, as applicable; (vi) STR Reports and PACE Reports for the most recently completed calendar quarter, reflecting market penetration and relevant hotel properties competing with the Property, (vii) evidence of payment of the ground rent due under the Ground Lease for the preceding month and (viii) a trailing-twelve month operating statement in the Uniform System of Accounts for Hotels format, presented on a month-by-month basis and in the aggregate for operations reported through

77

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 107 of 316

the last month of the given calendar quarter.  In addition, such Officer's Certificate shall also state that the representations and warranties of Borrower set forth in Section 4.1.30 are true and correct as of the date of such certificate and that there are no trade payables outstanding for more than sixty (60) days.

(d)    Borrower shall provide to Lender within thirty (30) days of the end of each calendar month the financial reports that Borrower receives from (i) Manager pursuant to the terms and provisions of the Management Agreement and (ii) Manager (Parking) pursuant to the terms and provisions of the Management Agreement (Parking).  Borrower shall furnish to Lender, promptly following receipt thereof, any notices received under each of the Management Agreement and Management Agreement (Parking).

(e)    Borrower shall provide or cause Guarantor to provide within thirty (30) days of the end of each quarter a statement of Guarantor's Net Worth and Liquidity (as such terms are defined in the Guaranty).

(f)    For the partial year period commencing on the date hereof, and for each Fiscal Year thereafter, Borrower shall submit to Lender an Annual Budget not later than sixty (60) days prior to the commencement of such period or Fiscal Year, as applicable, in form reasonably satisfactory to Lender.  The Annual Budget shall be subject to Lender's approval (each such Annual Budget, an "**Approved Annual Budget**").  In the event that Lender objects to a proposed Annual Budget submitted by Borrower which requires the approval of Lender hereunder, Lender shall advise Borrower of such objections within fifteen (15) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise such Annual Budget and resubmit the same to Lender.  Lender shall advise Borrower of any objections to such revised Annual Budget within ten (10) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise the same in accordance with the process described in this subsection until Lender approves the Annual Budget.  Until such time that Lender approves a proposed Annual Budget that requires the approval of Lender hereunder, the most recently Approved Annual Budget shall apply, provided that such Approved Annual Budget shall be adjusted to reflect actual increases or decreases in Taxes, Insurance Premiums and Other Charges.

(g)    In the event that Borrower must incur an extraordinary Operating Expense or Capital Expenditure not set forth in the Approved Annual Budget (each an "**Extraordinary Expense**"), then Borrower shall promptly deliver to Lender a reasonably detailed explanation of such proposed Extraordinary Expense for Lender's approval.

(h)    Intentionally omitted..

(i)    Intentionally omitted.

(j)    Borrower shall furnish to Lender, within ten (10) Business Days after request (or as soon thereafter as may be reasonably possible), such further detailed information with respect to the operation of the Property and the financial affairs of Borrower as may be reasonably requested by Lender.

(k)      If requested by Lender, Borrower shall provide Lender, promptly upon request, a list of Tenants (including all affiliates of such Tenants) that in the aggregate (i) occupy ten percent (10%) or more (but less than twenty percent (20%)) of the total floor area of the Improvements or represent ten percent (10%) or more (but less than twenty percent (20%)) of aggregate base rent, and (ii) occupy twenty percent (20%) or more of the total floor area of the Improvements or of any particular building located on the Property or represent twenty percent (20%) or more of aggregate base rent attributable to the Property or of any particular building located on the Property.

(l)      All monthly and other operating statements to be delivered by or on behalf of Borrower hereunder shall be (and all accompanying Officer's Certificates shall state that they have been) prepared based upon the Uniform System of Accounts for Hotels, provided the form of statements and information supplied by Manager under the Management Agreement shall be deemed to satisfy the foregoing requirements.

(m)      Any reports, statements or other information required to be delivered under this Agreement shall be delivered in electronic form and prepared using Excel®.  Borrower agrees that Lender may disclose information regarding the Property and Borrower that is provided to Lender pursuant to this Section 5.1.11 in connection with any Securitization to such parties requesting such information in connection with such Securitization.

(n)      Breach. If Borrower fails to provide to Lender or its designee any of the financial statements, certificates, reports or information (the "**Required Records**") required by this Section 5.1.11 within the applicable time periods set forth in this Section 5.1.11, Lender shall have the option, upon fifteen (15) days' notice to Borrower, to gain access to Borrower's books and records and prepare or have prepared at Borrower's expense, any Required Records not delivered by Borrower.  In addition, it shall be an Event of Default if any of the following shall occur: (i) any failure of Borrower to provide to Lender any of the Required Records within the applicable time periods set forth in this Section 5.1.11, if such failure continues for fifteen (15) days after written notice thereof, or (ii) in the event any Required Records shall be materially inaccurate or false, or (iii) in the event of the failure of Borrower to permit Lender or its representatives to inspect said books, records and accounts upon request of Lender as required by this Section 5.1.11.

5.1.12 Business and Operations.   Borrower  will  continue  to  engage  in  the businesses presently conducted by it as and to the extent the same are necessary for the ownership, maintenance, management and operation of the Property.  Borrower will qualify to do business and will remain in good standing under the laws of each jurisdiction as and to the extent the same are required for the ownership, maintenance, management and operation of the Property.  Borrower, Guarantor  and Pledgor, as applicable, shall keep and maintain all Licenses necessary for the operation of the Property and each portion thereof for its intended uses and otherwise as a hotel property.  Borrower shall not (and shall not permit Manager or any other Person) to operate the Property (or any portion thereof) for any use other than as a hotel property and other appurtenant and related uses.

5.1.13 Title to the Property.  Borrower will warrant and defend (a) the title to the Property and every part thereof, subject only to Permitted Encumbrances, and (b) the validity and

79

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 109 of 316

priority of the Lien of the Security Instrument and the Assignment of Leases, subject only to Permitted Encumbrances, in each case against the claims of all Persons whomsoever. Borrower shall reimburse Lender for any Losses incurred by Lender if an interest in the Property, other than as permitted hereunder, is claimed by another Person.

5.1.14 <u>Costs of Enforcement</u>. In the event (a) that the Security Instrument is foreclosed in whole or in part or that the Security Instrument is put into the hands of an attorney for collection, suit, action or foreclosure, (b) of the foreclosure of any mortgage (or pledge) prior to or subsequent to the Security Instrument (or any direct or indirect ownership interests in Pledgor's ownership interest in Pledgee) in which proceeding Lender is made a party, (c) the Pledge Agreement encumbering the Pledged Collateral is foreclosed in whole or in part or the Pledge Agreement is put into the hands of an attorney for collection, suit, action or foreclosure, or (d) of a Bankruptcy Action related to Borrower or Pledgor or an assignment by Borrower or Pledgor for the benefit of its creditors, Borrower, on behalf of itself and its successors and assigns, agrees that it/they shall be chargeable with and shall pay all costs of collection and defense, including attorneys' fees and expenses, and court costs, incurred by Lender or Borrower in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, together with all required service or use Taxes.

5.1.15 <u>Estoppel Statement</u>.

(a) After request by Lender, Borrower shall within ten (10) days furnish Lender with a statement, duly acknowledged and certified, setting forth (i) the original principal amount of the Loan, (ii) the Outstanding Principal Balance, (iii) the Interest Rate of the Loan, (iv) the date installments of interest and/or principal were last paid, (v) any offsets or defenses to the performance of the Obligations, if any, and (vi) that the Note, this Agreement, the Security Instrument and the other Loan Documents are valid, legal and binding obligations of Borrower and have not been modified or if modified, giving particulars of such modification.

(b) Borrower shall deliver to Lender upon request, tenant estoppel certificates from each commercial Tenant leasing space at the Property in form and substance reasonably satisfactory to Lender, provided that Borrower shall not be required to deliver such certificates more frequently than two (2) times in any calendar year.

(c) Borrower shall deliver to Lender upon request, duly executed estoppel certificates from (i) the Condominium Board attesting to such facts regarding the Condominium as Lender may require and (ii) each commercial tenant leasing space at the Property in form and substance reasonably satisfactory to Lender.

(d) Borrower shall, upon request by Lender, use commercially reasonable efforts to cause Manager to replace and/or re-issue any tri-party agreement delivered in connection with the Loan.

(e) Borrower shall deliver to Lender upon request, an estoppel certificate from the Fee Owner with respect to the Ground Lease, in form and substance acceptable to Lender.

5.1.16 <u>Estoppel Certificates</u>. Borrower shall deliver to Lender, upon request, estoppel certificates from each party under the REA, provided that such certificates may be subject to the terms and in the form required under the REA.

5.1.17 <u>Loan Proceeds</u>. Borrower shall use the proceeds of the Loan received by it on the Closing Date only for the purposes set forth in <u>Section 2.1.4</u>.

5.1.18 <u>Performance by Borrower</u>. Borrower shall (and shall cause the Pledgor) in a timely manner observe, perform and fulfill each and every covenant, term and provision of each Loan Document executed and delivered by, or applicable to, Borrower (or the Pledgor).

5.1.19 <u>Confirmation of Representations</u>. Borrower shall deliver, in connection with any Securitization, (a) one or more Officer's Certificates certifying the accuracy of all representations made by Borrower in the Loan Documents as of the date of the closing of such Securitization in all relevant jurisdictions, and (b) certificates of the relevant Governmental Authorities in all relevant jurisdictions indicating the good standing and qualification of Borrower as of the date of the Securitization.

5.1.20 <u>No Joint Assessment</u>. Borrower shall not suffer, permit or initiate the joint assessment of the Property or any portion thereof (a) with any other real property constituting a tax lot separate from the Property, and (b) which constitutes real property with any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the Lien of any Taxes which may be levied against such personal property shall be assessed or levied or charged to such real property portion of the Property.

5.1.21 <u>Leasing Matters</u>.

(a)     Other than Hotel Transactions, Borrower shall not enter into any Lease or renewals, amendments or modifications of the Lease) without Lender's prior consent.

(b)     Intentionally omitted.

(c)     Borrower shall not permit or consent to any assignment or sublease of any Lease without Lender's prior written approval.

(d)     Borrower (i) shall observe and timely perform all obligations imposed upon the lessor under the Leases in a commercially reasonable manner; (ii) shall enforce the terms, covenants and conditions contained in the Leases upon the part of the Tenant thereunder to be observed or performed in a commercially reasonable manner and in a manner not to impair the value of the Property involved, except that Borrower shall not terminate, or accept the surrender by a Tenant of, any Lease unless by reason of a Tenant default and then only in a commercially reasonable manner to preserve and protect the Property; (iii) shall not collect any of the Rents more than one (1) month in advance (other than security deposits required pursuant to such Lease); (iv) shall not execute any other assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents); (v) shall not alter, modify or change the terms of the Leases in a manner inconsistent with the provisions of the Loan Documents; and (vi) shall execute and deliver at the request of Lender all such further assurances, confirmations and assignments in connection with the Leases as Lender shall from time to time reasonably require. Notwithstanding

81

anything to the contrary contained herein, Borrower shall not enter into a Lease of all or substantially all of the Property or all or substantially all of any building located on the Property without Lender's prior written consent. Lender shall have the right to require each new Tenant to execute and deliver to Lender a subordination, non-disturbance of possession and attornment agreement in form, content and manner of execution reasonably acceptable to Lender.

(e)     Borrower shall furnish Lender with true, correct and complete copies of all Leases, amendments thereof and any related agreements promptly following execution thereof.

(f)     Borrower shall promptly notify Lender, in writing, of any defaults by any tenant or lease guarantor under any Lease after Borrower becomes aware of the same.

5.1.22 <u>Alterations</u>.  Borrower shall obtain Lender's prior written consent to any alterations to any Improvements, which consent shall not be unreasonably withheld, except with respect to any alterations to any Improvements which may have a material adverse effect on Borrower's financial condition, the value of the Property or any portion thereof or the Net Operating Income.  Notwithstanding the foregoing, Lender's consent shall not be required in connection with any alterations that will not have a material adverse effect on Borrower's financial condition, the value of the Property or any portion thereof or the Net Operating Income, provided that such alterations (a)(i) are either work performed pursuant to the terms of any Lease approved or deemed approved in accordance with the terms hereof, or the costs for such alterations are adequately covered in the current Approved Annual Budget, (ii) do not adversely affect any structural component of any Improvements, any utility or HVAC system contained in any Improvements or the exterior of any building constituting a part of any Improvements and (iii) the aggregate cost thereof does not exceed Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) (the "**Threshold Amount**"), or (b) are performed in connection with (1) the terms and conditions of this Agreement, or (2) Restoration after the occurrence of a Casualty in accordance with the terms and provisions of this Agreement.

5.1.23 <u>Operation of Property</u>.

(a)     Borrower shall cause the Property to be operated, in all material respects, in accordance with the Management Agreement or Replacement Management Agreement, as applicable.  In the event that the Management Agreement expires or is terminated (without limiting any obligation of Borrower to obtain Lender's consent to any termination or modification of the Management Agreement in accordance with the terms and provisions of this Agreement), Borrower shall promptly enter into a Replacement Management Agreement with Manager or another Replacement Manager, as applicable.   In the event that Borrower enters into (i) any agreement separate from the Management Agreement regarding the leasing of the Property or (ii) any agreement providing for the services of a developer or general contractor in connection with any improvements to the Property, Borrower (x) shall enter into an assignment of such leasing agreement, development agreement or general contractor's agreement, assigning Borrower's rights under such agreement to Lender in each case in a form reasonably acceptable to Lender, (y) shall use commercially reasonable efforts to cause such counter-party to agree to such form of assignment, and (z) shall ensure that such counter-party's agreement to such assignment becomes effective at the same time as such agreement.  Borrower shall cause the asset management fee for

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 112 of 316

the manager to not exceed the then prevailing market rates (and in any event not to exceed, in the aggregate with any asset management fees $5,000 per month.

(b)     Intentionally omitted.

(c)     If (i) an Event of Default occurs and is continuing, (ii) Manager shall be the subject of a Bankruptcy Action or become insolvent, (iii) a material default occurs under any Management Agreement beyond any applicable grace and cure periods or (iv) fifty percent (50%) or more of the direct or indirect ownership interest in Manager has changed or Control of Manager has changed, in each event from what it was on the Closing Date, Borrower shall, at the request of Lender, terminate the Management Agreement and replace the Manager with a manager approved by Lender on terms and conditions satisfactory to Lender, it being understood and agreed that (x) the management fee for such replacement manager shall not exceed the then prevailing market rates, and (y) Lender shall not be liable for or obligated to pay any termination fee or other penalty in connection with such termination.

(d)     Borrower shall:  (i) promptly perform and/or observe in all material respects all of the covenants and agreements required to be performed and observed by it under the Management Agreement (Parking) and do all things necessary to preserve and to keep unimpaired its material rights thereunder; (ii) promptly notify Lender of any material default under the Management Agreement (Parking) of which it is aware; (iii) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, notice, report and estimate received by it under the Management Agreement (Parking); and (iv) enforce the performance and observance of all of the covenants and agreements required to be performed and/or observed by Manager (Parking) under the Management Agreement (Parking), in a commercially reasonable manner.

(e)     Intentionally omitted.

(f)     Intentionally omitted.

(g)     All Material Agreements (and all modifications, amendments, supplements and terminations thereof) shall be subject to the prior review and approval, not to be unreasonably withheld, of Lender.

5.1.24 No Credits on Account of the Obligations.  Borrower will not claim or demand or be entitled to any credit or credits on account of the Obligations for any payment of Property Taxes assessed against the Property and no deduction shall otherwise be made or claimed from the assessed value of the Property for real estate Tax purposes because of the Loan Documents or the Obligations.  If Legal Requirements or other laws, orders, requirements or regulations require such claim, credit or deduction, Lender may, by written notice to Borrower of not less than ninety (90) days, declare the Obligations immediately due and payable.

5.1.25 Personal Property.  Borrower shall cause all of its personal property, fixtures, attachments and equipment delivered upon, attached to or used in connection with the operation of the Property to always be located at the Property and shall be kept free and clear of all Liens, encumbrances and security interests, except Permitted Encumbrances.

Case 1:26-cv-04240-RA   Document 1-1   Filed 05/20/26   Page 113 of 316

5.1.26  <u>Appraisals</u>.  Lender shall have the right to obtain a new or updated appraisal of the Property (and/or any portions thereof) from time to time; <u>provided</u>, <u>however</u>, so long as no Event of Default has occurred, and other than appraisals obtained pursuant to Section 2.9 or Section 6.4 hereof or in connection with a Securitization, Lender shall do so with respect to the same portion of the Property not more often than once in every twelve (12) month period. Borrower shall cooperate with Lender in this regard.  If the appraisal is obtained to comply with this Agreement or any applicable law or regulatory requirement, or bank or lender policy promulgated to comply therewith, or if an Event of Default exists, Borrower shall pay for any such appraisal upon Lender's request.

5.1.27  <u>Financing Statements</u>.  Borrower, at its sole cost and expense, shall at all times cause the Security Instrument and the Assignment of Leases, together with any UCC-1 financing statements required to be filed in connection therewith and any UCC-1 financing statements required to be filed in connection with the Pledge Agreement, to be recorded, registered or filed in the appropriate public records, and any amendments or supplements hereto and thereto, and, if requested by Lender, any instruments of assignment hereof or thereof, to be recorded, registered and filed, as applicable, and to be kept recorded, registered and filed, in such manner and in such places, shall pay all recording, registration and filing fees and taxes and other charges, including any recording, transfer or intangible personal property tax or similar imposition, with respect thereto, and shall comply with all applicable Legal Requirements in order fully and effectively to establish, preserve, perfect and protect Lender's first priority security interest in the Property, the Collateral and the Pledged Collateral, subject only to Permitted Encumbrances and the Liens created by the Loan Documents.   Borrower hereby authorizes Lender to file UCC-1 financing and continuation statements with respect to the Property, the Collateral and the Pledged Collateral.

5.1.28  <u>Intentionally omitted.</u>

5.1.29  <u>ERISA</u>. Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as may be requested by Lender in its sole discretion that (i) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, a "plan" as defined in and subject to the provisions of Section 4975 of the Code an entity whose assets are treated as "plan assets" for purposes of ERISA or the Code or a "governmental plan" within the meaning of Section 3(32) of ERISA or any entity whose assets are treated as "plan assets" of a governmental plan or plans; (ii) Borrower is not subject to any state statute regulating investments of, or fiduciary obligations with respect to, governmental plans, in either case, subjecting Lender to liability for a violation of ERISA, the Code, a state statute or regulation or a similar law; and (iii) one or more of the following circumstances is true:

(a)    equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. §2510.3–101(b)(2);

(b)    less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower is held by "benefit plan investors" within the meaning of Section 3(42) of ERISA;

84

Case 1:26-cv-04240-RA     Document 1-1     Filed 05/20/26     Page 114 of 316

(c)     Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. §2510.3-101(c) or (e); or

(d)     the Loan meets the requirements of PTE 95-60, 91-38, 90-1, 84-14 or similar exemption.

### 5.1.30 Condominium.

(a)     Borrower will not, and will not permit the Master Condominium Board to, record or file any modifications or amendments to the Master Condominium Documents without Lender's prior written consent, which shall not be unreasonably conditioned, withheld or delayed, and Borrower shall, and shall cause the Master Condominium Board, to comply with all Legal Requirements of any Governmental Authorities, including securities laws and regulations, which may apply to the formation and operation of the Master Condominium or to the sale of units and furnish such evidence of compliance therewith as Lender may reasonably request;

(b)     Borrower shall not transfer the portion of the Property which is a part of the Master Condominium or any part thereof and not make any assignment or grant any security interest in Borrower's rights as the Master Declarant (as defined in the Master Condominium Declaration) under the Master Condominium Declaration or in its rights, benefits or privileges thereunder to anyone other than Lender without the prior written consent of Lender;

(c)     Borrower shall not (i) intentionally omitted and (ii) appoint or elect the Condominium Board under any of the Condominium Documents without the prior written approval of Lender, which may be conditioned upon Lender's receipt of proxies and conditional resignations of all members of the applicable Condominium Board;

(d)     Borrower shall not amend, modify or supplement or terminate or consent to any amendment, modification or supplement or termination of the Master Condominium Declaration for the Master Condominium, the by-laws of the Master Condominium Association or any other Master Condominium Documents without the prior written consent of Lender, nor shall Borrower waive or consent to the waiver of any enforcement of the provisions of any of the foregoing Condominium Documents with respect to any other owner of a condominium unit, if any, that is subject to the Condominium Declaration if such waiver, consent or waiver of enforcement is reasonably likely to adversely affect Lender's rights or remedies hereunder;

(e)     Borrower shall not impose any Common Charges, other than as provided for under the Condominium Documents, without the prior written consent of Lender, which shall not be unreasonably conditioned, withheld or delayed, and shall timely pay any and all such Common Charges and expenses made against the Property then owned by Borrower pursuant to the Condominium Documents before the same become delinquent.  In the event that Borrower fails to make such payments as the same become due and payable, Lender may from time to time at its option, but without any obligation to do so, make any such payments, and the same shall be added to the Debt secured by the Loan Documents, and shall bear interest until repaid at the Default Rate;

(f)     Borrower shall comply (and use its best efforts to cause compliance by the Master Condominium Association) in all respects with all of the terms, covenants and conditions

on Borrower's part (and the Condominium Association's part (if any)) to be complied with pursuant to the Condominium Declaration for the Condominium, the by-laws of the Condominium Association, any rules and regulations that may be adopted for the Condominium, any other Condominium Documents, the Condominium Act and all rules and regulations promulgated thereunder by any Governmental Authority, and all other applicable Legal Requirements, as the same may apply to the Property or the Condominium Association or to Borrower from time to time as the same shall be in force and effect from time to time;

(g)     Borrower shall take all actions as may be necessary from time to time to preserve and maintain the Property in accordance with the securities and condominium laws of the State of Texas and the rules and regulations pertaining thereto;

(h)     Borrower shall not, without the prior written consent of Lender, take (and Borrower hereby assigns to Lender any right it may have to take) any action to abandon or terminate the Condominium, withdraw the Property from the Condominium Act and the rules and regulations pertaining thereto, or subdivide or cause a partition of the Property;

(i)     Borrower shall not, without the prior written consent of Lender, exercise any right it may have to vote for (i) the expenditure of any insurance proceeds or condemnation awards for the Restoration of the Condominium Property, (ii) any material alterations to the Common Elements (as defined in each respective Condominium Declaration) of the Condominium, or (iii) any borrowing on behalf of the Condominium Association;

(j)     Borrower shall seek Lender's review and obtain Lender's prior written approval of any vote of Borrower in its capacity as an owner of a Unit, or any vote of its designees on the Condominium Board, to any engagement of or change of managing agent and any amendment to the management agreement for the operation of the Condominium or any Units comprising the Property, as well as the original and any revision of any operating and/or capital budgets (provided that any Manager of the Property approved by Lender shall be deemed to be approved for this purpose);

(k)     Borrower shall promptly deliver to Lender a true and full copy of each and every written notice of default or notice requiring the performance of any act by Borrower received by Borrower with respect to any obligation of Borrower under the provisions of the Condominium Documents;

(l)     Borrower shall provide Lender such information and documentation relating to the Condominium as Lender shall reasonably request;

(m)     Borrower shall not (i) sell, subdivide and/or transfer any of the condominium units that make up the Property, (ii) create separate condominiums within any of the condominium units that make up the Property and/or (iii) consent to, or fail to object to (to the extent such objection would have resulted in the rejection of) any amendment, modification, cancellation or termination of the Condominium Documents, in each case, without Lender's prior written consent;

86

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 116 of 316

(n)     Borrower shall deliver or cause to be delivered to Lender true, correct and complete copies of any modifications or amendments to the Condominium Documents entered into after the date hereof; and

(o)     Borrower shall cause the Master Condominium Association to allow Lender to examine the books, records and receipts of Master Condominium Association.

5.1.31 <u>Condominium Obligations.</u>  In the event of the failure of Borrower to perform any of its obligations relating to the Property under the Condominium Documents within a period of ten (10) Business Days (unless the Condominium Board requires sooner performance) after notice from the Condominium Board or from Lender, or in the case of any such default which cannot with due diligence be cured or remedied within such period, if Borrower fails to proceed promptly after such notice to cure or remedy the same with due diligence, then in any such case, Lender may from time to time at its option, but without any obligation so to do, cure or remedy any such default of Borrower (Borrower hereby authorizing Lender to enter upon the Property as may be necessary for such purposes), and all sums expended by Lender for such purposes, including reasonable counsel fees, shall be added to the Obligations secured by the Loan Documents, shall become due and payable and shall bear interest until repaid at the Default Rate and shall be added to the Obligations.

5.1.32 <u>Resignation of Condominium Board Members.</u>  In accordance with this <u>Section 5.1.32</u>, subject to any applicable Legal Requirements, during the continuance of an Event of Default, Lender shall have the right to require that any members (or representatives) of the Master Condominium Board or any other condominium or owners association created under the Condominium Documents and any officers thereof, that are in each case elected (or appointed) by Borrower to tender their written resignation and Lender shall have the right to replace such member or representative with a person elected or appointed by Lender.  Lender may submit such written resignations to the Master Condominium Association at any time during the occurrence of an Event of Default, whereupon said resignations shall be valid and afforded full recognition and effect.  Further, Borrower shall cooperate with Lender in all respects to replace said directors and officers affiliated with Borrower with reasonably qualified directors and officers of Lender's choosing.  In addition, from and after the occurrence and during the continuance of an Event of Default, Lender shall have the right to exercise all of the rights and privileges provided to Lender by this Agreement and the other Loan Documents with respect to an Event of Default including, without limiting the generality of the foregoing, the right to exercise all voting rights accruing to an owner of a condominium unit that is subject to the Master Condominium Declaration and all other rights accruing to an owner of a condominium unit that is subject to the Master Condominium Declaration. While any such Event of Default continues, Borrower hereby nominates and appoints Lender irrevocably as Borrower's proxy and attorney in fact to vote and, as Borrower's agent, to act with respect to all such rights.  Written notice of any such Event of Default from Lender to the Master Condominium Board shall be deemed conclusive as to such right of Lender to vote and to exercise all such rights.

5.1.33 <u>Condominium Voting.</u>  If Borrower fails to pay any amounts due under the Master Condominium Declaration, Bylaws (as defined in the Master Condominium Declaration) or any other Master Condominium Document, or is otherwise in default of the Master Condominium Declaration, Bylaws, or any other Master Condominium Document, or upon the

87

occurrence of an Event of Default, then Lender shall be entitled to vote in lieu of Borrower on all matters or actions to be decided upon by the Unit Owner (as defined in the Master Condominium Declaration) (as if the Lender were Borrower), (ii) in the event that the Master Condominium Board is appointed and/or elected at the Master Condominium Properties, the Lender shall be entitled to immediately name substitute members to act on the Master Condominium Board (in lieu of any members of the Master Condominium Board elected by Borrower and without regard to the unexpired term of such member's tenure) and (iii) in the event that the Master Condominium Board is appointed and/or elected at the Master Condominium Property, the Master Condominium Board shall rely (and be entitled to rely) on the votes of or actions taken by the Lender (or by any member of the Master Condominium Board elected by the Lender) in determining the appropriateness of any action to be taken. Notwithstanding the foregoing, in the event that the Master Condominium Board is appointed and/or elected at the Master Condominium Property, Borrower shall not increase the number of members to act on the Master Condominium Board or make any change to the composition of members to act on the Master Condominium Board without Lender's consent.

5.1.34 <u>The Ground Lease.</u>  Without limitation of the other provisions herein, Borrower makes the following covenants with respect to the Ground Lease:

(a)    Borrower shall (i) pay (or cause to be paid) all rents, additional rents and other sums required to be paid by Borrower, as tenant under and pursuant to the provisions of the Ground Lease, (ii) diligently perform and observe (or cause to be performed and observed) all of the terms, covenants and conditions of the Ground Lease on the part of Borrower, as tenant thereunder, (iii) promptly notify Lender of the giving of any notice by the Fee Owner under the Ground Lease to Borrower of any default by Borrower and deliver to Lender a true copy of each such notice within two (2) Business Days of receipt and (iv) promptly notify Lender of any bankruptcy, reorganization or insolvency of the Fee Owner under the Ground Lease or of any notice thereof, and deliver to Lender a true copy of such notice within two (2) Business Days of Borrower's receipt, together with copies of all notices, pleadings, schedules and similar matters received by Borrower in connection with such bankruptcy, reorganization or insolvency within two (2) Business Days after receipt.

(b)    Borrower shall not, without the prior written consent of Lender, surrender the leasehold estate created by the Ground Lease or terminate or cancel the Ground Lease or modify, change, supplement, alter or amend the Ground Lease, either orally or in writing, and if Borrower shall default in the performance or observance of any term, covenant or condition of the Ground Lease on the part of Borrower and shall fail to cure the same prior to the expiration of any applicable cure period provided thereunder, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all of the terms, covenants and conditions of the Ground Lease on the part of Borrower to be performed or observed on behalf of Borrower, to the end that the rights of Borrower in, to and under the Ground Lease shall be kept unimpaired and free from default.  If the Fee Owner under the Ground Lease shall deliver to Lender a copy of any notice of default under the Ground Lease, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender, in good faith, in reliance thereon.

(c)    Intentionally omitted.

88

(d)    Notwithstanding anything contained in the Ground Lease to the contrary, Borrower shall not further sublet any portion of the Property without the prior written consent of Lender.  Each sublease hereafter made shall provide that, (a) in the event of the termination of the Ground Lease, the sublease shall not terminate or be terminable by the lessee thereunder; (b) in the event of any action for the foreclosure of the Security Instrument, the sublease shall not terminate or be terminable by the lessee thereunder by reason of the foreclosure of the Security Instrument unless such lessee is specifically named and joined in any such action and unless a judgment is obtained therein against such lessee; (c) in the event that the Ground Lease is terminated as aforesaid, the lessee under the sublease shall attorn to the Fee Owner under the Ground Lease or to the purchaser at the sale of the Property on such foreclosure, as the case may be.

5.1.35   Hotel Covenants

(a)    Borrower shall cause the hotel located on the Property to be operated pursuant to the Management Agreement.

(b)    Borrower shall (i) promptly perform and/or observe all of the covenants and agreements to be performed and observed by it under the Management Agreement and do all things necessary to preserve and to keep unimpaired its material rights thereunder, (ii) promptly notify Lender of any default under the Agreement of which it is aware, (iii) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditure, notice, report and estimate received by it under the Management Agreement and (iv) promptly enforce the performance and observance of all of the covenants and agreements required to be performed and/or observed by the Manager under the Management Agreement.

(c)    Borrower shall not, without Lender's prior written consent (i) surrender, terminate or cancel the Management Agreement, (ii) reduce or consent to the reduction of the term of the Management Agreement, (iii) increase or consent to the increase of the amount of any charges under the Management Agreement, (iv) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under the Management Agreement or (v) replace the Manager or enter into any Replacement Management Agreement.

(d)    In connection with Borrower's request for approval of any new Management Agreement with a Replacement Manager (each, as approved by Lender in Lender's sole discretion, a "Replacement Management Agreement"), upon Lender's written request Borrower shall: (i) deliver a Rating Agency Confirmation from each applicable rating agency as to such Replacement Management Agreement, (ii) intentionally omitted, (iii) obtain any new or amended License as may be required in connection with the Replacement Management Agreement and (iv) deliver to Lender a comfort letter or tri-party agreement from the Manager in which Manager shall agree (A) that Lender shall have the right, but not the obligation, to cure any defaults under the Replacement Management Agreement, (B) to give Lender written notice of, and a reasonable time to cure, any default of Borrower under the Replacement Management Agreement, (C) not to assert against Lender any defaults which by their nature are personal to Borrower and not curable by Lender, (D) to allow Lender to change managers of the hotel operated at the Property, (E) that, if Lender or its Affiliate shall acquire title to the Property, Lender or its Affiliate shall have an option to succeed to the interest of Borrower under the Replacement Management

89

Agreement (or to be granted a new license agreement on the same terms as the Management Agreement) without payment of any fees to Manager, (F) that the Replacement Management Agreement will remain in effect during any foreclosure proceedings by Lender provided Lender cures all monetary defaults under the Replacement Management Agreement, (G) not to modify, cancel, surrender or otherwise terminate the Replacement Management Agreement during the term of the Loan without the consent of Lender, and (H) that if Lender or its Affiliate succeeds to Borrower's interest under the Replacement Management Agreement, Lender may assign its rights therein to any entity which acquires the Property from Lender or its Affiliate (subject to Manager's reasonable approval).

(e)     Without in any way limiting the covenants set forth in the Loan Documents, Borrower shall: (i) cause the hotel located on the Property to be operated, repaired and maintained as a well-maintained "first-class hotel" which shall mean a hotel providing amenities, services and facilities substantially equivalent or superior to hotels of similar average room rate and targeted market segment from time to time operating in the same or comparable geographic area of the Property, taking into consideration the age and location of the hotel located on the Property and (ii) maintain Inventory in amounts sufficient to meet the hotel industry standard for hotels comparable to the hotel located on the Property and at levels sufficient for the operation of the hotel located on the Property at full occupancy levels.

(f)     If Borrower shall be in default under the Management Agreement, then, without limiting the generality of the other provisions of this Agreement, and without waiving or releasing Borrower from any of its obligations hereunder, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all the terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed or observed.  Lender and any Person designated by Lender shall have, and are hereby granted, the right to enter upon the Property at any reasonable time and from time to time for the purpose of taking any such action as may be reasonably required to cure such default under the Management Agreement.  If the Manager shall deliver to Lender a copy of any notice sent to Borrower and/or Manager concerning a default under the Management Agreement, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender in good faith, in reliance thereon.  Any sums expended by Lender pursuant to this Section 5.1.35(f) after shall bear interest at the Default Rate from the date such cost is incurred to the date of payment to Lender, shall be deemed to constitute a portion of the Debt, shall be secured by the Lien of the Mortgage and the other Loan Documents, and shall be immediately due and payable upon demand by Lender therefor.

Section 5.2     Negative Covenants.  From the date hereof until payment and performance in full of the Obligations, Borrower covenants and agrees with Lender that it will not do, directly or indirectly, any of the following:

5.2.1     Operation of Property.

(a)     Borrower shall not, without Lender's prior written consent (which consent shall not be unreasonably withheld): (i)  surrender, terminate or cancel the Management Agreement, provided that Borrower may, without Lender's consent, replace Manager so long as the replacement manager is a Replacement Manager pursuant to a Replacement Management

90

Case 1:26-cv-04240-RA   Document 1-1   Filed 05/20/26   Page 120 of 316

Agreement; (ii) reduce or consent to the reduction of the term of the Management Agreement or Management Agreement (Parking); (iii) increase or consent to the increase of the amount of any charges or fees under the Management Agreement or Management Agreement (Parking); or (iv) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Management Agreement or Management Agreement (Parking) in any material respect. In the event that the Management Agreement or Management Agreement (Parking) expires or is terminated (without limiting any obligation of Borrower to obtain Lender's consent to any termination or modification of the Management Agreement or Management Agreement (Parking), as applicable, in accordance with the terms and provisions of this Agreement), Borrower shall promptly enter into a Replacement Management Agreement with Manager or another Replacement Manager or Replacement Management Agreement (Parking) with Manager (Parking) or another Replacement Manager (Parking), in each case, as applicable.

(b) Following the occurrence and during the continuance of an Event of Default, Borrower shall not exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Management Agreement or Management Agreement (Parking) without the prior written consent of Lender, which consent may be granted, conditioned or withheld in Lender's sole discretion.

(c) Borrower shall not enter into, terminate, amend or otherwise modify any Material Agreement without the prior written consent of Lender.

5.2.2   Liens.  Borrower shall not create, incur, assume or suffer to exist any Lien on any portion of the Property or permit any such action to be taken, except for Permitted Encumbrances; provided, however, after prior notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any mechanic's or materialmen's liens; provided that (a) no Default or Event of Default has occurred and is continuing; (b) such proceeding shall be permitted under, and be conducted in accordance with, the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable statutes, laws and ordinances; (c) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (d) Borrower shall promptly upon final determination thereof pay the amount of any claim resulting in such Lien, together with all costs, interest and penalties which may be payable in connection therewith; (e) such proceeding shall suspend the collection of any claims resulting in such contested Lien; and (f) Borrower shall furnish such security as may be required in the proceeding, or as may be reasonably required by Lender, to insure the payment of any claim resulting in such contested Lien, together with all interest and penalties thereon.

5.2.3   Dissolution.  Borrower shall not (a) engage in any dissolution, liquidation, consolidation, division or merger with or into any other business entity, (b) engage in any business activity not related to the ownership and operation of the Property, (c) transfer, lease or sell, in one transaction or any combination of transactions, the assets or all or substantially all of the property or assets of Borrower except to the extent permitted by the Loan Documents (unless such transfer or sale will result in the indefeasible repayment in full of the Debt), (d) modify, amend, waive or terminate its organizational documents or its qualification and good standing in any jurisdiction or

91

(e) cause or allow Pledgor to (i) dissolve, divide, windup or liquidate or take any action, or omit to take any action, as a result of which Pledgor would be dissolved, divided, wound up or liquidated in whole or in part, or (ii) amend, modify, waive or terminate the certificate of incorporation or bylaws of Pledgor, in each case, without obtaining the prior consent of Lender.

5.2.4    Change in Business.  Borrower shall not enter into any line of business other than the ownership and operation of the Property, or make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business.

5.2.5    Debt Cancellation.  Borrower shall not cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance herewith) owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

5.2.6    Zoning.  Borrower shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance, or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, in each case, without the prior written consent of Lender.

5.2.7    No Joint Assessment.  Borrower shall not suffer, permit or initiate the joint assessment of all or any portion of the Property with (a) any other real property constituting a tax lot separate from the Property, or (b) any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the Lien of any Taxes that may be levied against such personal property shall be assessed or levied or charged to the Property.

5.2.8    Principal Place of Business and Organization.  Borrower shall not change its principal place of business set forth in the introductory paragraph of this Agreement without first giving Lender at least thirty (30) days' prior notice.  Borrower shall not change the place of its organization as set forth in Section 4.1.28 without the consent of Lender, which consent shall not be unreasonably withheld.  Upon Lender's request, Borrower shall execute and deliver additional financing statements (which such financing statements may describe as the collateral covered thereby "all assets of the debtor, whether now owned or hereafter acquired" or words to that effect), security agreements and other instruments which may be necessary to effectively evidence or perfect Lender's security interest in the Property as a result of such change of principal place of business or place of organization.

5.2.9    ERISA.  Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, this Agreement or the other Loan Documents) to be a Prohibited Transaction.

5.2.10   Transfers.

(a)    Borrower acknowledges that Lender has examined and relied on the experience of Borrower and its general partners, members, principals and (if Borrower is a trust) beneficial owners, as applicable, in owning and operating properties such as the Property in

92

agreeing to make the Loan, and will continue to rely on Borrower's ownership of the Property as a means of maintaining the value of the Property as security for repayment of the Debt and the performance of the Other Obligations. Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the repayment of the Debt or the performance of the Other Obligations contained in the Loan Documents, Lender can recover the Debt by a sale of the Property.

(b)     Without the prior written consent of Lender and except to the extent otherwise expressly permitted by this Section 5.2.10, Borrower shall not, and shall not permit any Restricted Party to, (i) sell, convey, mortgage, grant, bargain, encumber, permit a change in control of (in each case, directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) the Property or the Pledged Collateral or in each case any part thereof or any legal or beneficial interest therein, directly or indirectly, at any tier of ownership, except with respect to (x) the transient occupancy of guest rooms at the Property by hotel guests in the ordinary course of Borrower's business and (y) any Transfers with respect to Leases otherwise expressly permitted under this Agreement, (ii) permit a Sale or Pledge of any interest in any Restricted Party, directly or indirectly, at any tier of ownership(any of the actions in the foregoing clauses (i) or (ii), a "**Transfer**"), or (iii) suffer or permit any such Transfer described in this Section 5.2.10 to occur by or in a Restricted Party, directly or indirectly, at any tier of ownership, in each case, other than (A) the leasing of space in the Improvements to Tenants pursuant to Leases entered into in accordance with the provisions of Section 5.1.21 hereof and any Hotel Transactions, (B) Permitted Transfers, (C) Permitted Encumbrances, and (D) any Transfer by Borrower to Lender or its designee or other Transfer resulting from the exercise by Lender of its rights and remedies under the Loan Documents.

(c)     A Transfer shall include, but not be limited to, (i) an installment sales agreement wherein Borrower agrees to sell the Property, or any part thereof, for a price to be paid in installments; (ii) an agreement by Borrower leasing all or substantially all of the Property or all or substantially all of a building located on the Property for other than actual occupancy by a space tenant thereunder, or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iii) if a Restricted Party is a corporation, any merger, division, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger, division or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general partner or any profits or proceeds relating to such partnership interest, or the Sale or Pledge of limited partnership interests or any profits or proceeds relating to such limited partnership interest or the creation or issuance of new limited partnership interests; (v) if a Restricted Party is a limited liability company, any merger, division or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of a managing member (or if no managing member, any member) or any profits or proceeds relating to such membership interest, or the Sale or Pledge of non-managing membership interests or the creation or issuance of new non-managing membership interests; (vi) if a Restricted Party is a trust or nominee trust, any merger, division, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests; or (vii) the removal

93

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 123 of 316

or the resignation of Manager (including, without limitation, an Affiliated Manager) other than in accordance with Section 5.1.23 hereof.

(d)    Notwithstanding the provisions of Sections 5.2.10(a)-(c), Lender's consent shall not be required under this Section 5.2.10 in connection with one or a series of Transfers of (but not encumbrances of): (i) not more than forty-nine percent (49%), in the aggregate, of the indirect stock, general partnership interests, limited partnership interests, managing member interests or non-managing membership interests (as the case may be) in Borrower; (ii) the sale, transfer or issuance of stock in any Restricted Party so long as such stock is listed on the New York Stock Exchange or another nationally recognized stock exchange; or (iii) direct or indirect interests in Borrower pursuant to transfers by individual persons for estate planning purposes by any Person to the spouse, child, parent, grandparent, grandchild, niece, nephew, aunt or uncle of such Person, or to a trust for the benefit of such Person or for the benefit of the spouse, child, parent, grandparent, grandchild, niece, nephew, aunt or uncle of such Person; provided, however, that with respect to each Transfer described in clauses (i) – (iii) hereof, such Transfer will only be permitted without Lender's consent if, (I) following such Transfer, Guarantor directly or indirectly Controls Borrower and directly or indirectly owns more than Twenty-Two percent (22%) of Borrower, (II) intentionally omitted (III) as a condition precedent to each such Transfer (other than a Transfer pursuant to (ii) above), Lender shall receive not less than thirty (30) days' prior notice of such proposed Transfer, (IV) intentionally omitted, (V) no transferee shall have been convicted of any crime (other than a misdemeanor not involving moral turpitude), or be the subject of any ongoing criminal proceeding, (VI) neither such transferee nor any of such transferee's direct and indirect beneficial owners are an Embargoed Person, (VII) such transferees shall not have filed for bankruptcy (or other similar insolvency proceedings) within the seven (7) year period prior to such Transfer (in the case of this clause (VII), if such transferee will, by virtue of any such transfer, have or obtain direct or indirect Control of Borrower or Guarantor), (VIII) such Transfer shall not cause any violation of Section 4.1.30 or Section 5.2.12 of this Agreement, and (IX) to the extent a transferee shall own ten percent (10%) or more of the direct or indirect ownership interests in Borrower immediately following such Transfer (provided such transferee owned less than ten percent (10%) of the direct or indirect ownership interests in Borrower as of the date hereof) Lender shall conduct (and Borrower shall be responsible for any reasonable out-of-pocket costs and expenses in connection therewith), customary searches (including credit, judgment, lien, litigation, bankruptcy, criminal and OFAC) the results of which are reasonably acceptable to Lender with respect to such transferee. Borrower shall pay any and all reasonable costs and expenses of Lender incurred in connection with a Transfer permitted under this Section 5.2.10(d) (including, without limitation, reasonable attorneys' fees and expenses). Upon request from Lender, Borrower shall promptly provide Lender a revised version of the organizational chart delivered to Lender in connection with the closing of the Loan reflecting any Transfer consummated in accordance with this Section 5.2.10(d). Notwithstanding anything to the contrary contained in this Agreement, no Transfer of any direct ownership interests by Pledgor in Pledgee shall be permitted without Lender's prior written consent, in its sole discretion.

(e)    Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Transfer prohibited hereunder without Lender's consent. This provision shall apply to every Transfer prohibited hereunder regardless of whether voluntary or not, or whether or not Lender has consented to any previous Transfer.

94

5.2.11  REA.  Neither Borrower nor its Affiliates shall, without the prior written consent of Lender, modify the REA.

5.2.12  Special Purpose Entity/Separateness.

(a)  Each of Borrower and Pledgor are and shall continue to be a Special Purpose Entity.

(b)  Borrower shall provide Lender with thirty (30) days' written notice prior to the removal of an Independent Director of Borrower and Borrower shall not permit or suffer to exist the removal of any Independent Director (nor the appointment of any Independent Director) without Lender's consent.

5.2.13  Embargoed Person; OFAC.  As of the date hereof and at all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Borrower, Pledgor and Guarantor constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person; (b) no Embargoed Person has any interest of any nature whatsoever in Borrower, Pledgor or Guarantor, as applicable, with the result that the investment in Borrower, Pledgor or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law; and (c) none of the funds of Borrower, Pledgor or Guarantor, as applicable, have been derived from any unlawful activity with the result that the investment in Borrower, Pledgor or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law.  Neither Borrower, Pledgor, Guarantor nor any Affiliated Manager is (or will be) a Person with whom Lender is restricted from doing business under OFAC regulations (including those persons named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including the September 24, 2001 #13224 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and shall not engage in any dealings or transactions or otherwise be associated with such Persons.  In addition, to help the U.S. Government fight the funding of terrorism and money laundering activities, the U.S.A. Patriot Act (and the regulations thereunder) requires Lender to obtain, verify and record information that identifies its customers.  Borrower shall provide Lender with any additional information that Lender deems necessary from time to time in order to ensure compliance with the U.S.A. Patriot Act and any other applicable Legal Requirements concerning money laundering and similar activities.

Section 5.3    Intentionally omitted.

Section 5.4    Environmental Covenants.  Borrower covenants and agrees that: (A) all uses and operations on or of the Property, whether by Borrower or any other Person, shall be in compliance with all Environmental Statutes and permits issued pursuant thereto; (B) there shall be no Releases of Hazardous Substances in, on, under or from the Property, except those that are in compliance with all Environmental Statutes and with permits issued pursuant thereto; (C) there shall be no Hazardous Substances in, on, or under the Property, except those that are both (i) in compliance with all Environmental Statutes and with permits issued pursuant thereto and (ii) fully disclosed to Lender in writing; (D) Borrower shall keep the Property free and clear of all liens and

95

other encumbrances imposed pursuant to any Environmental Statute, whether due to any act or omission of Borrower or any other Person; (E) Borrower shall, at its sole cost and expense, perform any environmental site assessment or other investigation of environmental conditions in connection with the Property, by an environmental consultant approved by Lender pursuant to any reasonable written request of Lender (including, but not limited to, sampling, testing and analysis of soil, water, air, building materials, and other materials and substances whether solid, liquid or gas), and share with Lender the reports and other results thereof, and Lender shall be entitled to rely on such reports and other results thereof; (F) Borrower shall, at its sole cost and expense, comply with all reasonable written requests of Lender to (i) effectuate Remediation or obtain a no further action letter for any condition (including, but not limited to, a Release of any Hazardous Substances) in, on, under or from the Property, in full compliance of Environmental Statutes or reasonably required by Lender based upon recommendations and observations of an independent environmental consultant approved by Lender, (ii) comply with any Environmental Statute, (iii) comply with any directive from any Governmental Authority, and (iv) take any other reasonable action necessary or appropriate for protection of human health or the environment; (G) Borrower shall not do, or allow any Tenant or other user of the Property to do, any act that materially increases the dangers to human health or the environment, poses an unreasonable risk of harm to any Person (whether on or off the Property), impairs or may impair the value of the Property, is contrary to any requirement of any insurer, constitutes a public or private nuisance, constitutes waste, or violates any covenant, condition, agreement or easement applicable to the Property; (H) Borrower shall use commercially reasonable efforts to enforce the applicable provisions of the Leases in order to prevent Tenants or other users of the Property from taking any action that violates any applicable Environmental Statute, impairs or may impair the value of the Property, constitutes a public or private nuisance, constitutes waste or violates any covenant, condition, agreement or easement applicable to the Property; and (I) Borrower shall immediately notify Lender in writing of (i) any presence or Release or threatened Release of Hazardous Substances in, on, under, from or migrating towards the Property, (ii) any non-compliance with any Environmental Statutes related in any way to the Property, (iii) any actual or potential imposition of a lien or other encumbrances against the Property imposed pursuant to any Environmental Statute, (iv) any required or proposed Remediation of environmental conditions relating to the Property, and/or (v) any written or oral notice or other communication of which any Borrower becomes aware from any source whatsoever (including, but not limited to, a Governmental Authority) relating in any way to Hazardous Substances or Remediation thereof, possible liability of any Person pursuant to any Environmental Statute, other environmental conditions in connection with the Property, the discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property or any actual or potential administrative or judicial proceedings in connection with anything referred to in this Section 5.4.

Section 5.5    Labor Matters.    Borrower shall (i) not enter into or otherwise permit the Property to be affected by any collective bargaining agreements without the prior written consent of Lender, not to be unreasonably withheld, and (ii) not consent to enter into any collective bargaining agreements unless required by applicable law.  Neither Borrower nor Manager shall take any action that would trigger a withdrawal liability to any Multiemployer Plan or any Pension Plan.

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 126 of 316

## ARTICLE VI

### INSURANCE; CASUALTY; CONDEMNATION

Section 6.1    <u>Insurance</u>.

(a)    Borrower shall obtain and maintain, or cause to be obtained and maintained, (including, without limitation, causing the Master Condominium Association to obtain and maintain, as applicable) insurance for Borrower and the Property providing at least the following coverages:

(i)    comprehensive "All Risk" or "Special Form" insurance on the Improvements and the Personal Property (A) in an amount equal to or greater than the "**Full Replacement Cost**" which for purposes of this Agreement shall mean actual replacement value with no waiver of depreciation; and for the avoidance of doubt, (1) such insurance shall be satisfied through a combination of Borrower's Commercial Property policy covering the Units and the Master Condominium Association's Commercial Property policy covering the remainder of the Property, and (2) the combined values insured pursuant to the policies described in the immediately foregoing clause (1) shall equal an amount approved by Lender not less than the full Replacement Cost plus the cost of any renovations; (B) containing an agreed amount endorsement with respect to the Improvements and Personal Property waiving all co-insurance provisions, or confirmation that co-insurance does not apply; (C) providing for no deductible in excess of Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00), provided that, if the Property is located in a high hazard windstorm county, then with respect solely to Windstorm/Hail (including Named Storm) coverage, the maximum deductible shall not be in excess of five percent (5%) of the Full Replacement Cost;  (D) coverage for Windstorm/Hail (including Named Storm) (which may be provided by a separate Windstorm/Hail or DIC policy, in either case for the Full Replacement Cost); (E) containing "Ordinance or Law Coverage" for loss to the undamaged portion of the building (with a limit equal to the Full Replacement Cost), the cost of demolition and the increased costs of construction, each in amounts as required by Lender;  and (F) flood coverage at limits not less than Two Million Five Hundred Thousand ($2,500,000) and BI/EE/RV limits subject to a maximum deductible of $500,000, which limits can be provided by a Commercial Property Policy (private flood insurance) meeting the following requirements: (1) such policy is issued by an authorized insurer that is licensed, admitted, or not disapproved by a state insurance regulator, (2) such policy covers both the mortgagor(s) and the mortgagee(s) as loss payees, except in the case of a policy that is provided, and for which the premium is paid, by a condominium association, cooperative, homeowners association, or other applicable group, and (3) such policy provides sufficient protection of the Loan, consistent with general safety and soundness principles, and the institution documents in writing its conclusion regarding sufficiency of the protection of the Loan. If Borrower carries a flood policy through the National Flood Insurance Program in addition to a Commercial Property Policy (private flood insurance), then Lender must be named as "Loss Payee" thereunder;

97

Case 1:26-cv-04240-RA   Document 1-1   Filed 05/20/26   Page 127 of 316

and, if required by Lender, earthquake coverage for properties located in Seismic Zones 3 and 4 is required in the amount of the Full Replacement Cost, with maximum deductibles of five percent (5%) of the Full Replacement Cost at each location;

(ii)      commercial general liability insurance, including coverage against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on an "occurrence" form with a combined limit of not less than Two Million and No/100 Dollars ($2,000,000.00) in the general aggregate and One Million and No/100 Dollars ($1,000,000.00) per occurrence (and, if on a blanket policy, containing an "Aggregate Per Location" endorsement) and $2,000,000 products/completed operations aggregate subject to a deductible not in excess of $10,000 (B) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; (C) add Lender as an additional insured in accordance with CG 20 18 ISO form or equivalent; on a primary, non-contributory basis; and (D) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) blanket contractual liability for all insured contracts; and (5) contractual liability covering the indemnities contained in Article VIII of the Security Instrument to the extent the same is available;

(iii)      rental loss and/or business income interruption insurance (A) with assignment to Lender; (B) covering all risks required to be covered by the insurance provided for in subsection (i) above and subsections (vi) and (xi) below; (C) covering a period of restoration of eighteen (18) months and containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and Personal Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of  twelve (12) months from the date that the Property is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period; and (D) in an amount equal to one hundred percent (100%) of the projected Gross Income from Operations for a period of eighteen (18) months from the date of such Casualty (assuming such Casualty had not occurred) and notwithstanding that the policy may expire at the end of such period.  The amount of such rental loss/business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate of the Gross Income from Operations.  Notwithstanding anything to the contrary in Section 2.7 hereof, all proceeds payable to Lender pursuant to this subsection shall be held by Lender and shall be  applied at Lender's sole discretion to (I) the Debt, or (II) Operating Expenses approved by Lender in its sole discretion; provided, however, nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the Debt, except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

98

Case 1:26-cv-04240-RA   Document 1-1   Filed 05/20/26   Page 128 of 316

(iv)     at all times during which structural construction, repairs or alterations are being made with respect to the Improvements, and only if the property or liability coverage forms do not otherwise apply (A) commercial general liability and umbrella liability insurance covering claims related to the construction, repair or alterations being made which are not covered by or under the terms or provisions of the commercial general liability and umbrella liability insurance policies required herein this Section 6.1(a); and (B) the insurance provided for in subsection (i) above written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to subsection (i) above, (3) including permission to occupy the Property, and (4) with an agreed amount endorsement waiving co-insurance provision, or confirmation that co-insurance does not apply;

(v)     workers compensation insurance with respect to any employees of Borrower, at the statutory limits in states of operations and employers' liability at minimum limits of $1,000,000/$1,000,000/$1,000,000, as may be required by any Governmental Authority or Legal Requirement (if applicable);

(vi)     comprehensive boiler and machinery/equipment breakdown insurance, if applicable, in amounts as shall be reasonably required by Lender on terms consistent with the commercial property insurance policy required under subsection (i) above;

(vii)     motor vehicle liability coverage for all owned, if any, and hired and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence of not less than One Million and No/100 Dollars ($1,000,000.00) (if applicable);

(viii)     umbrella insurance in an amount not less than Twenty Million and No/100 Dollars ($20,000,000.00) per occurrence and Twenty Million and No/100 Dollars ($20,000,000.00) in the aggregate on terms consistent with the commercial general liability insurance policy required under subsection (ii) above;

(ix)     pollution and remediation coverage in an amount of not less than $1,000,000.00 per occurrence with an aggregate limit of not less than $1,000,000.00;

(x)     if applicable, liquor liability coverage containing minimum limits of $1,000,000.00 per occurrence;

(xi)     the property insurance policy (including rental loss/business income insurance), commercial general liability and umbrella or excess liability insurance required under Sections 6.1(a)(i), (ii), (iii), (iv), and (viii)above shall cover perils of terrorism and acts of terrorism and Borrower shall maintain property insurance, rental loss/business income, commercial general liability and umbrella liability insurance for loss resulting from perils and acts of terrorism on terms (including amounts) consistent with those required under Sections 6.1(a)(i), (ii), (iii), (iv), and

99

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 129 of 316

(viii) above at all times during the term of the Loan. For so long as the Terrorism Risk Insurance Program Reauthorization Act of 2015 or subsequent statute, reauthorization, extension thereof ("**TRIPRA**") is in effect and continues to cover both foreign and domestic acts, Lender shall accept terrorism insurance with coverage against acts which are "certified" within the meaning of TRIPRA; and

(xii)    upon sixty (60) days' notice, such other reasonable insurance and in such reasonable amounts as Lender from time to time may reasonably request against such other insurable hazards, which at the time are commonly insured against for properties similar to the Property located in or around the region in which the Property is located.

(b)    If, at any time and from time to time during the Loan, the insurance policies maintained by the Master Condominium Association on the entire building, of which the collateral is a part, do not fully comply with the requirements set forth in this Section 6.1, then Borrower shall promptly notify Lender in writing and Borrower shall promptly, at its sole cost and expense, either procure and maintain or cause the Master Condominium Association to procure and maintain either (x) "primary" insurance coverage in the event that the Master Condominium Association does not provide the applicable insurance coverage required in this Section 6.1 or (y) "excess and contingent" insurance coverage over and above any other valid and collectible coverage then in existence, in the event that the Master Condominium Association does not have the sufficient insurance coverage required under Section 6.1, as shall be necessary to bring such insurance coverage into full compliance with all of the terms and conditions of this Section 6.1.

(c)    All insurance provided for in Section 6.1(a) shall be obtained under valid and enforceable policies (collectively, the "**Policies**" or in the singular, the "**Policy**"), and shall be subject to the approval of Lender as to form and substance, including insurance companies, amounts, deductibles, loss payees and insureds.  The Policies shall be issued by financially sound and responsible insurance companies authorized or licensed to do business in the state and having a claims paying ability rating of "A- VIII" or better by A.M. Best and "A-" or better by S&P. Not less than five (5) Business Days prior to the expiration of the Policies theretofore furnished to Lender, certificates of insurance evidencing the Policies (and, upon the written request of Lender, copies of such Policies) accompanied by evidence satisfactory to Lender of payment of all premiums due thereunder (the "**Insurance Premiums**") shall be delivered by Borrower to Lender.

(d)    Any blanket insurance Policy shall be subject to Lender's approval and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 6.1(a).

(e)    All Policies provided for or contemplated by Section 6.1(a), shall name Borrower as a named insured and, with respect to Policies of liability insurance, except for the Policies referenced in Sections 6.1(a)(v) and (vii), shall name Lender (and its successors and assigns) as additional insured, as its interests may appear, and in the case of property insurance, including but not limited to special form/all risk, windstorm (including named storms), rental loss/business income, terrorism, boiler and machinery, flood and earthquake insurance, shall contain a Lender's Loss Payable Clause CP 12 18 or equivalent or a standard non-contributing mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender.

(f)	All Policies provided for in this Section 6.1 shall contain clauses or endorsements to the effect that, or otherwise provide that:  (i) no act or negligence of Borrower, or anyone acting for Borrower, or of any tenant or other occupant, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned; (ii) the Policies shall not be canceled without at least thirty (30) days' notice to Lender, except for non-payment of premium which shall be ten (10) days; and (ii) Lender shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

(g)	Policies shall be required to be provided to Lender upon request. If at any time Lender is not in receipt of written evidence that all Policies are in full force and effect, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate.  All premiums incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and, until paid, shall be secured by the Security Instrument and shall bear interest at the Default Rate.

Section 6.2	Casualty.  If the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (each, a "**Casualty**"), Borrower shall (a) give prompt notice of such damage to Lender, and (b) promptly commence and diligently prosecute the completion of Restoration so that the Property resembles, as nearly as possible, the condition the Property was in immediately prior to such Casualty, with such alterations as may be reasonably approved by Lender and otherwise in accordance with Section 6.4.  Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance.  Lender may, but shall not be obligated to make proof of loss if not made promptly by Borrower.  In addition, Lender may participate in (and have approval rights over) any settlement discussions with any insurance companies with respect to any Casualty in which the Net Proceeds or the costs of completing Restoration are equal to or greater than Five Hundred Thousand and No/100 Dollars ($500,000.00) (the "**Casualty Threshold**") and Borrower shall deliver to Lender all instruments required by Lender to permit such participation.

Section 6.3	Condemnation.

(a)	Borrower shall promptly give Lender notice of the actual or threatened commencement of any proceeding in respect of Condemnation, and shall deliver to Lender copies of any and all papers served in connection with such proceedings.  Lender may participate in any such proceedings, and Borrower shall from time to time deliver to Lender all instruments requested by Lender to permit such participation.  Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings.  Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to perform the Obligations at the time and in the manner provided in this Agreement and the other Loan Documents and the Outstanding Principal Balance shall not be reduced until any Award shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Obligations.  Lender shall not be limited to the

101

interest paid on the Award by the applicable Governmental Authority, but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note. If the Property or any portion thereof is taken by a Governmental Authority, Borrower shall promptly commence and diligently prosecute Restoration and otherwise comply with the provisions of Section 6.4. If the Property or any portion thereof is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.

(b)     Notwithstanding the foregoing provisions of Section 6.2, Section 6.3(a), and Section 6.4 hereof, if the Loan or any portion thereof is included in a REMIC Trust and, immediately following a release of any portion of the Lien of the Security Instrument in connection with a Casualty or Condemnation (but taking into account any proposed Restoration on the remaining portion of the Property), the Loan to Value Ratio is greater than one hundred twenty-five percent (125%) (such value to be determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust), the principal balance of the Loan must be paid down by a "qualified amount" as that term is defined in the IRS Revenue Procedure 2010-30, as the same may be amended, replaced, supplemented or modified from time to time, unless Lender receives an opinion of counsel that if such amount is not paid, the Securitization will not fail to maintain its status as a REMIC Trust and will not be subject to a prohibited transactions tax as a result of the related release of such portion of the Lien of the Security Instrument.

Section 6.4     Restoration. The following provisions shall apply in connection with any Restoration:

(a)     If the Net Proceeds shall be less than the Casualty Threshold and the costs of completing Restoration shall be less than the Casualty Threshold, the Net Proceeds will be disbursed by Lender to Borrower upon receipt, provided that all of the conditions set forth in Section 6.4(b) are met and Borrower delivers to Lender a written undertaking to expeditiously commence and to satisfactorily complete with due diligence Restoration in accordance with the terms of this Agreement.

(b)     If the Net Proceeds are equal to or greater than the Casualty Threshold, but less than twenty percent (20%) of Outstanding Principal Balance or the costs of completing Restoration is equal to or greater than the Casualty Threshold, but less than twenty percent (20%) of the Outstanding Principal Balance, then the Net Proceeds will be held by Lender and Lender shall make the Net Proceeds available for Restoration in accordance with the provisions of this Section 6.4. The term "**Net Proceeds**" for purposes of this Section 6.4 shall mean: (i) the net amount of all insurance proceeds received by Lender pursuant to Section 6.1 (a)(i), (iv), (vi), (ix) and (x) as a result of such damage or destruction, after deduction of Lender's reasonable costs and expenses (including, but not limited to, reasonable counsel costs and fees), if any, in collecting same ("**Insurance Proceeds**"), or (ii) the net amount of the Award, after deduction of Lender's reasonable costs and expenses (including, but not limited to, reasonable counsel costs and fees), if any, in collecting same ("**Condemnation Proceeds**"), whichever the case may be.

(i)     If the Net Proceeds are eligible to be made available to Borrower in accordance with the foregoing provisions of this Section 6.4, then such Net

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 132 of 316

Proceeds shall be made available to Borrower for Restoration upon Lender's determination in its sole discretion that the following conditions have been met:

(A)    no Default or Event of Default shall have occurred and be continuing;

(B)    (1)  in the event the Net Proceeds are Insurance Proceeds, less than twenty-five percent (25%) of the total floor area of the affected building has been damaged, destroyed or rendered unusable as a result of such Casualty, or (2) in the event the Net Proceeds are Condemnation Proceeds, less than ten percent (10%) of the land constituting the parcel that is taken, and such land is located along the perimeter or periphery of such parcel, and no portion of the Improvements is located on such land;

(C)    Leases demising in the aggregate a percentage amount equal to or greater than ninety percent (90%) of the total rentable space in the building which has been demised under executed and delivered Leases in effect as of the date of the occurrence of such Casualty or Condemnation, whichever the case may be, shall remain in full force and effect during and after the completion of Restoration, notwithstanding the occurrence of any such Casualty or Condemnation, whichever the case may be, and will make all necessary repairs and restorations thereto at their sole cost and expense;

(D)    Borrower shall commence Restoration as soon as reasonably practicable (but in no event later than sixty (60) days after such Casualty or Condemnation, whichever the case may be, occurs) and shall diligently pursue the same to satisfactory completion.  For purposes hereof, "commence Restoration" means Borrower has engaged an architect or engineer in connection with the Restoration;

(E)    Lender shall be satisfied that any operating deficits, including all scheduled payments of principal and interest under the Note, which will be incurred with respect to the Property as a result of the occurrence of any such Casualty or Condemnation, whichever the case may be, will be covered out of (1) the Net Proceeds, (2) the insurance coverage referred to in Section 6.1(a)(iii), if applicable, or (3) by other funds of Borrower;

(F)    Lender shall be satisfied that Restoration will be completed on or before the earliest to occur of (1) six (6) months prior to the then applicable Maturity Date, (2) the earliest date required for such completion under the terms of any Leases, (3) such time as may be required under all applicable Legal Requirements in order to repair and restore the Property to the condition it was in immediately prior to such Casualty or to as nearly as possible the condition it was in immediately prior to such Condemnation, as applicable, or (4) twelve (12) months after the date of such Casualty or Condemnation;

103

Case 1:26-cv-04240-RA   Document 1-1   Filed 05/20/26   Page 133 of 316

(G)     the Property and the use thereof after Restoration will be in compliance with and permitted under all applicable Legal Requirements;

(H)     Restoration shall be done and completed by Borrower in an expeditious and diligent fashion and in compliance with all applicable Legal Requirements;

(I)     such Casualty or Condemnation, as applicable, does not result in the loss of access to any portion of the Property or the related Improvements that cannot be restored as part of the Restoration;

(J)     the Debt Yield and the Debt Service Coverage Ratio for the affected Property, after giving effect to Restoration, shall be equal to or greater than the (i) Debt Yield or the Debt Service Coverage Ratio, as applicable, on the Closing Date and (ii) the Debt Yield or the Debt Service Coverage Ratio, as applicable, on the date immediately preceding such Casualty or Condemnation;

(K)     the Loan to Value Ratio after giving effect to Restoration, shall be equal to or less than the lesser of the Loan to Value Ratio on the Closing Date and the date immediately preceding such Casualty or Condemnation;

(L)     Borrower shall deliver, or cause to be delivered, to Lender a signed detailed budget approved in writing by Borrower's architect or engineer stating the entire estimated cost of completing Restoration, which budget shall be acceptable to Lender;

(M)     Lender shall be satisfied that the Restoration will be completed in accordance with any requirements under the Management Agreement; and

(N)     the Net Proceeds together with any cash or cash equivalent deposited by Borrower with Lender are sufficient in Lender's discretion to cover the cost of Restoration.

(ii)     The Net Proceeds shall be paid directly to Lender for deposit in an interest-bearing account (the "**Net Proceeds Account**") and, until disbursed in accordance with the provisions of this Section 6.4(b), shall constitute additional security for the Obligations.  The Net Proceeds shall be disbursed by Lender to, or as directed by, Borrower from time to time during the course of Restoration, upon receipt of evidence satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with Restoration have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialmen's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on the Property or any portion thereof which (1) have not either been fully bonded to the satisfaction of Lender and

104

Case 1:26-cv-04240-RA   Document 1-1   Filed 05/20/26   Page 134 of 316

discharged of record or in the alternative fully insured to the satisfaction of Lender by the Title Company, or (2) are not being contested in accordance with the terms of Section 5.2.2 hereof.

(iii)     All plans and specifications required in connection with Restoration shall be subject to prior review and acceptance in all respects by Lender and by an independent consulting engineer selected by Lender (the "**Casualty Consultant**"). Lender shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with Restoration.  The identity of the contractors, subcontractors and materialmen engaged in Restoration, as well as the contracts under which they have been engaged, shall be subject to prior review and acceptance by Lender and the Casualty Consultant.  All costs and expenses incurred by Lender in connection with making the Net Proceeds available for Restoration including, without limitation, reasonable counsel fees and disbursements and the Casualty Consultant's fees, shall be paid by Borrower.

(iv)     In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of Restoration, as certified by the Casualty Consultant, minus the Retention Amount.  The term "**Retention Amount**" shall mean, as to each contractor, subcontractor or materialman engaged in Restoration, an amount equal to ten percent (10%) of the costs actually incurred for work in place as part of Restoration, as certified by the Casualty Consultant, until Restoration has been completed.  The Retention Amount shall in no event, and notwithstanding anything to the contrary set forth above in this Section 6.4(b), be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in Restoration.  The Retention Amount shall not be released until the Casualty Consultant certifies to Lender that Restoration has been completed in accordance with the provisions of this Section 6.4(b) and that all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate Governmental Authorities, and Lender receives evidence satisfactory to Lender that the costs of Restoration have been paid in full or will be paid in full out of the Retention Amount; provided, however, Lender will release the portion of the Retention Amount being held with respect to any contractor, subcontractor or materialman engaged in Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialmen's contract, the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender or by the Title Company issuing the Title Insurance Policy, and Lender receives an endorsement to the Title Insurance Policy insuring the continued priority of the lien of the related Security Instrument and evidence of payment of any premium payable for such endorsement.  If required by Lender, the release of any such portion of the Retention Amount shall be approved by the surety company,

105

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 135 of 316

if any, which has issued a payment or performance bond with respect to the applicable contractor, subcontractor or materialman.

(v)      Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(vi)      If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the opinion of Lender in consultation with the Casualty Consultant, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of Restoration, Borrower shall deposit the deficiency (the "**Net Proceeds Deficiency**") with Lender before any further disbursement of the Net Proceeds shall be made.  The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 6.4(b) shall constitute additional security for the Debt and the Other Obligations.

(vii)      The excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after the Casualty Consultant certifies to Lender that Restoration has been completed in accordance with the provisions of this Section 6.4(b), and the receipt by Lender of evidence satisfactory to Lender that all costs incurred in connection with Restoration have been paid in full, shall be remitted by Lender to Borrower, provided no Event of Default shall have occurred and shall be continuing.

(c)      If Net Proceeds are (i) equal to or greater than twenty percent (20%) of the original principal amount of the Loan, or (ii) not required to be made available for Restoration (due to Borrower's inability to satisfy the conditions set forth in Section 6.4(b)(i) or otherwise), then in any such event all Net Proceeds may be retained and applied by Lender in accordance with Section 2.4.2 hereof toward reduction of the Outstanding Principal Balance whether or not then due and payable in such order, priority and proportions as Lender in its sole discretion shall deem proper, or, in the sole discretion of Lender, the same may be paid, either in whole or in part, to Borrower for such purposes as Lender shall approve, in its sole discretion.

(d)      In the event of foreclosure of the Security Instrument, or other transfer of title to the Property in extinguishment in whole or in part of the Debt all right, title and interest of Borrower in and to the Policies that are not blanket Policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other Transfer of title.

## ARTICLE VII

## RESERVE FUNDS

Section 7.1     Tax and Insurance Escrow.

7.1.1     Tax and Insurance Escrow Funds.  On the date hereof, Borrower shall deposit with Lender the Initial Tax Deposit on account of the Property Taxes next coming due and the Initial Insurance Premiums Deposit on account of the Insurance Premiums next coming due. Additionally, Borrower shall pay to Lender on each Payment Date (a) one-twelfth (1/12) of the Property Taxes that Lender estimates will be payable during the next ensuing twelve (12) months in order to accumulate with Lender sufficient funds to pay all such Property Taxes at least thirty (30) days prior to their respective due dates, and (b) one-twelfth (1/12) of the Insurance Premiums that Lender estimates will be payable for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies (the foregoing amounts so deposited with Lender are hereinafter called the "**Tax and Insurance Escrow Funds**" and the account in which such amounts are held shall hereinafter be referred to as the "**Tax and Insurance Escrow Account**"). At Lender's option, the Tax and Insurance Escrow Account shall be maintained as a Subaccount of the Cash Management Account or be an account maintained by Servicer either at Servicer or at an Eligible Institution.

7.1.2     Disbursements from Tax and Insurance Escrow Funds.  Provided no Default or Event of Default has occurred and is continuing, Lender will apply the Tax and Insurance Escrow Funds to payments of Property Taxes and Insurance Premiums required to be made by Borrower pursuant to Section 5.1.2 hereof and under the Security Instrument.  In making any payment relating to the Tax and Insurance Escrow Funds, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Property Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any Tax, assessment, sale, forfeiture, Tax lien or title or claim thereof.  If the amount of the Tax and Insurance Escrow Funds shall exceed the amounts due for Property Taxes and Insurance Premiums pursuant to Section 5.1.2 hereof, Lender shall, in its sole discretion, return any excess to Borrower or credit such excess against future payments to be made to the Tax and Insurance Escrow Account.  Any amount remaining in the Tax and Insurance Escrow Account after the Debt has been indefeasibly paid in full shall be returned to Borrower.  In allocating such excess, Lender may deal with the Person shown on the records of Lender to be the owner of the Property.  If at any time Lender reasonably determines that the Tax and Insurance Escrow Funds are not or will not be sufficient to pay Property Taxes and Insurance Premiums by the due dates thereof, Lender shall notify Borrower of such determination and Borrower shall increase its monthly payments to Lender by the amount that Lender estimates is sufficient to make up the deficiency at least thirty (30) days prior to the due date of the Property Taxes and/or thirty (30) days prior to the expiration of the Policies, as the case may be.

Section 7.2    FF&E Reserve.

7.2.1    FF&E Reserve Funds. Borrower shall deposit with or on behalf of Lender on each Payment Date an amount equal to the greater of (i) four percent (4.0%) of the Gross Income from Operations for the Property for the prior month ("the **FF&E Reserve Monthly Deposit")** and (ii) the amount required for such month under the Management Agreement, for the repair and replacement of the FF&E (the "**FF&E Work**") that may be incurred following the date hereof, which amounts shall be transferred into an Account established (the "**FF&E Reserve Account**"). On the Closing Date, Borrower shall deposit $617,771.30 into the FF&E Reserve Account. Amounts deposited from time to time into the FF&E Reserve Account pursuant to this Section 7.2.1 shall hereinafter be referred to as the "**FF&E Reserve Funds**". At Lender's option, the FF&E Reserve Account shall be maintained as a Subaccount of the Cash Management Account or be an account maintained by Servicer either at Servicer or at an Eligible Institution.

7.2.2    Release of FF&E Reserve Funds. Lender shall make disbursements from the FF&E Reserve Funds for the cost of Approved FF&E Expenditures incurred by Borrower upon satisfaction by Borrower of each of the following conditions with respect to each such disbursement: (a) Borrower shall submit Lender's standard form of draw request for payment to Lender at least ten (10) Business Days prior to the date on which Borrower requests such payment be made, which request shall specify the Approved FF&E Expenditures to be paid and shall be accompanied by copies of paid invoices for the amounts requested; (b) on the date such request is received by Lender and on the date such payment is to be made, no Default or Event of Default shall exist and remain uncured; and (c) Lender shall have received (i) an Officer's Certificate from Borrower (A) stating that the items to be funded by the requested disbursement for Approved FF&E Expenditures, and a description thereof, (B) stating that all Approved FF&E Expenditures to be funded by the requested disbursement have been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, (C) identifying each Person that supplied materials or labor in connection with the Approved FF&E Expenditures to be funded by the requested disbursement, (D) stating that each such Person has been paid in full or will be paid in full upon such disbursement, (E) stating that the Approved FF&E Expenditures to be funded have not been the subject of a previous disbursement, (F) stating that all previous disbursements of FF&E Reserve Funds have been used to pay the previously identified Approved FF&E Expenditures, and (G) stating that all outstanding trade payables relating to the Approved FF&E Expenditures (other than those to be paid from the requested disbursement) have been paid in full; (ii) a copy of any license, permit or other approval by any Governmental Authority required in connection with the Approved FF&E Expenditures and not previously delivered to Lender; (iii) if required by Lender for requests in excess of Ten Thousand and No/100 Dollars ($10,000.00) for a single item, lien waivers or other evidence of payment satisfactory to Lender and releases from all parties furnishing materials and/or services in connection with the requested payment; (iv) at Lender's option, a title search for the Property indicating that the Property is free from all Liens, claims and other encumbrances not previously approved by Lender; and (v) such other evidence as Lender shall reasonably request to demonstrate that the Approved FF&E Expenditures to be funded by the requested disbursement has been completed and paid for or will be paid upon such disbursement to Borrower. Lender shall make disbursements as requested by Borrower on a monthly basis in increments of no less than Twenty-Five Thousand and No/100 Dollars ($25,000.00) per disbursement. Lender may require an inspection of the Property or any portion thereof at Borrower's expense prior to making a monthly disbursement in order to verify

completion of improvements in excess of Twenty-Five Thousand and No/100 Dollars ($25,000.00) for which reimbursement is sought.

7.2.3    Balance in the FF&E Reserve Account. The insufficiency of any balance in the FF&E Reserve Account shall not relieve Borrower from its obligation to fulfill all preservation and maintenance covenants in the Loan Documents.  Notwithstanding anything to the contrary contained herein, any withdrawals by Borrower from the FF&E Reserve Account shall be subject to the satisfaction of the conditions set forth in Section 7.2.2 (and Borrower shall deliver to Lender copies of all documents delivered to Manager in connection any request for any such withdrawal prior to such withdrawal).

7.2.4    Interest Shortfall Reserve Funds

(a)    Lender will establish and maintain an Eligible Account for the purpose of reserving amounts in respect of Interest Shortfalls and depositing any Future Interest Shortfall Advance that is funded pursuant to Section 2.5.1 hereof (the "**Interest Shortfall Reserve Account**").  Any and all funds deposited by Borrower pursuant to  Section 7.3 hereof shall be held by Lender for Interest Shortfalls and as additional security for the Obligations (amounts so held shall be hereinafter referred to as the "**Interest Shortfall Reserve Funds**".  If, at any time, Lender determines that a Projected Interest Shortfall exists, Lender may deliver notice to Borrower of the amount of such Projected Interest Shortfall and Borrower shall, within ten (10) Business Days following the date of such notice, deposit into the Interest Shortfall Reserve Account from non-borrowed cash equity an amount equal to such Projected Interest Shortfall.  Failure to make such deposit shall be an immediate Event of Default. Lender shall have no obligation to make any further disbursements from any Reserve Account until an amount equal to the Projected Interest Shortfall is deposited into the Interest Shortfall Reserve Account.  For the avoidance of doubt, a Projected Interest Shortfall may exist whether or not Lender delivers notice to Borrower.

(b)    At Lender's option, the Interest Shortfall Reserve Account shall be maintained as a Subaccount of the Cash Management Account or be an account maintained by Servicer either at Servicer or at an Eligible Institution.  Borrower (i) hereby grants to Lender a first priority security interest in the Interest Shortfall Reserve Account and all deposits at any time contained therein and the proceeds thereof, and (ii) will take all actions reasonably necessary to maintain in favor of Lender a perfected first priority security interest in the Interest Shortfall Reserve Account, including, without limitation, the execution of any account control agreement required by Lender.  Borrower will not in any way alter, modify or close the Interest Shortfall Reserve Account and will notify Lender of the account number thereof.  All monies now or hereafter deposited into the Interest Shortfall Reserve Account shall be deemed additional security for the Obligations.

(c)    On each Payment Date when the Interest Shortfall Reserve Account has a balance greater than zero, Borrower shall have the right to submit a written request to Lender at least ten (10) Business Days in advance (but not more frequently than one time every thirty (30) days) requesting a disbursement from the Interest Shortfall Reserve Account for payment of Interest Shortfalls, and provided, (i) no Default or Event of Default shall be continuing, and (ii) the representations and warranties made by Borrower and Guarantor in the Loan Documents or in any certificate or instrument delivered in connection with the Loan Documents shall have been

true and correct in all material respects on the date made and shall also be true and correct in all material respects as if remade on the date of disbursement from the Interest Shortfall Reserve Account, except for such changes in facts and circumstances as shall have occurred in the ordinary course of business and which do not otherwise give rise to or constitute a Default or Event of Default, Lender shall apply Interest Shortfall Reserve Funds to the Monthly Debt Service Payment Amount for such Payment Date. Notwithstanding the foregoing, if it is anticipated that on any Payment Date an Interest Shortfall will exist, so long as no Default or Event of Default has occurred and is continuing, Lender may, at its sole discretion, and Borrower hereby authorizes Lender to, apply Interest Shortfall Reserve Funds to the Monthly Debt Service Payment Amount for such Payment Date, regardless of whether or not Borrower has submitted a written request in accordance with the foregoing sentence.

(d)     The insufficiency of any balance in the Interest Shortfall Reserve Account shall not relieve Borrower from its obligation to pay any Monthly Debt Service Payment Amount or any other amount due under the Loan Documents.

Section 7.3     Required Repair Funds.

7.3.1     Deposits.  Borrower shall perform the repairs at the Property as more particularly set forth on **Schedule II** hereto (such repairs hereinafter collectively referred to as "**Required Repairs**").  Borrower shall complete the Required Repairs on or before the required deadline for each Required Repair as set forth on **Schedule II** hereto.  It shall be an Event of Default if (a) Borrower does not complete the Required Repairs by the required deadline for each Required Repair as set forth on **Schedule II**, or (b) Borrower does not satisfy each condition contained in Section 7.5.2 hereof.  Upon the occurrence of such an Event of Default, Lender, at its option, may withdraw all Required Repair Funds from the Required Repair Account and Lender may apply such funds either to completion of the Required Repairs or toward reduction of the Outstanding Principal Balance in such order, proportion and priority as Lender may determine in its sole discretion.  Lender's right to withdraw and apply Required Repair Funds shall be in addition to all other rights and remedies provided to Lender under this Agreement and the other Loan Documents.  On the Closing Date, Borrower shall deposit with Lender the Required Repairs Amount for payment of the cost of the Required Repairs.  Amounts so deposited with Lender shall be held by Lender in accordance with Section 7.6 hereof.  Amounts so deposited shall hereinafter be referred to as the "**Required Repair Funds**" and the account in which such amounts are held shall hereinafter be referred to as the "**Required Repair Account**".

7.3.2     Disbursements of Required Repair Funds.

(a)     Lender shall disburse to Borrower the Required Repair Funds from the Required Repair Account from time to time, but not more frequently than once in any thirty (30) day period, upon satisfaction by Borrower of each of the following conditions with respect to each disbursement:  (i) Borrower shall submit a written request for payment to Lender (with a copy to the Title Company) at least ten (10) Business Days prior to the date on which Borrower requests such payment be made, which request specifies the Required Repairs to be paid, (ii) on the date such request is received by Lender and on the date such payment is to be made, no Default or Event of Default shall exist and remain uncured, (iii) Lender shall have received an Officer's Certificate (A) stating that all Required Repairs to be funded by the requested disbursement have

110

been completed in a good and workmanlike manner and in accordance with all applicable Federal, state and local laws, rules and regulations, such Officer's Certificate to be accompanied by a copy of any license, permit or other approval by any Governmental Authority required to commence and/or complete the Required Repairs, (B) identifying each Person that supplied materials or labor in connection with the Required Repairs to be funded by the requested disbursement, and (C) stating that each such Person has been paid in full or will be paid in full upon such disbursement, for work completed and/or materials furnished to date, such Officer's Certificate to be accompanied by lien waivers or other evidence of payment satisfactory to Lender, (iv) Lender shall have received a title search indicating that the Property is free from all liens, claims and other encumbrances not previously approved by Lender, and (v) Lender shall have received such other evidence as Lender shall reasonably request that the Required Repairs to be funded by the requested disbursement have been completed and are paid for or will be paid upon such disbursement to Borrower.  Lender shall not be required to make disbursements from the Required Repair Account unless such requested disbursement is in an amount greater than $5,000 (or a lesser amount if the total amount in the Required Repair Account is less than $5,000, in which case only one disbursement of the amount remaining in the account shall be made) and such disbursement shall be made only upon satisfaction of each condition contained in this Section 7.3.2.

(b)      Nothing in this Section 7.3.2 shall (i) make Lender responsible for performing or completing any Required Repairs; (ii) require Lender to expend funds in addition to the Required Repairs Funds to complete any Required Repairs; (iii) obligate Lender to proceed with any Required Repairs; or (iv) obligate Lender to demand from Borrower additional sums to complete any Required Repairs.

(c)      Borrower shall permit Lender and Lender's agents and representatives (including Lender's engineer, architect or inspector) or third parties to enter onto the Property during normal business hours (subject to the rights of Tenants under their Leases) to inspect the progress of any Required Repairs and all materials being used in connection therewith and to examine all plans and shop drawings relating to such Required Repairs.  Borrower shall cause all contractors and subcontractors to cooperate with Lender or Lender's representatives or such other Persons described above in connection with inspections described in this Section 7.3.2(c).

(d)      If a disbursement will exceed $25,000.00, Lender may require an inspection of the Property at Borrower's expense prior to making a disbursement of Required Repairs Funds in order to verify completion of the Required Repairs for which reimbursement is sought.  Lender may require that such inspection be conducted by an appropriate independent qualified professional selected by Lender and may require a certificate of completion by an independent qualified professional architect acceptable to Lender prior to the disbursement of Required Repairs Funds.  Borrower shall pay the expense of the inspection as required hereunder, whether such inspection is conducted by Lender or by an independent qualified professional architect.

7.3.3   Balance in Required Repair Account.  The insufficiency of any balance in the Required Repair Account shall not relieve Borrower from its obligation to perform the Required Repairs in a good and workmanlike manner and in accordance with all Legal Requirements.

Section 7.4      Excess Cash Reserve Funds.

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 141 of 316

Upon the occurrence and during the continuance of a Cash Trap Period, all Excess Cash shall be collected by Lender and all such amounts shall be held by Lender as additional security for the Obligations (amounts so held shall be hereinafter referred to as the "**Excess Cash Reserve Funds**" and the account in which such amounts are held shall hereinafter be referred to as the "**Excess Cash Reserve Account**").  At Lender's option, the Excess Cash Reserve Account shall be maintained as a Subaccount of the Cash Management Account or be an account maintained by Servicer either at Servicer or at an Eligible Institution.  At such time as any Cash Trap Period shall end, any funds then held in the Excess Cash Reserve Account shall be returned to Borrower.

Section 7.5     Reserve Funds, Generally.

(a)     Borrower (i) hereby grants to Lender a first priority security interest in all of the Reserve Funds and any and all monies now or hereafter deposited in each Reserve Account as additional security for payment and performance of the Obligations and (ii) will take all actions necessary to maintain in favor of Lender a perfected first priority security interest in the Reserve Funds, including, without limitation, filing or authorizing Lender to file UCC-1 financing statements and continuations thereof.  Until expended or applied in accordance herewith, the Reserve Funds shall constitute additional security for the Obligations.

(b)     Upon the occurrence and during the continuance of an Event of Default, Lender may, in addition to any and all other rights and remedies available to Lender, apply any sums then present in any or all of the Reserve Accounts to the reduction of the Outstanding Principal Balance in any order in its sole discretion.

(c)     Borrower shall not further pledge, assign or grant any security interest in any Reserve Fund or the monies deposited in any Reserve Account or permit any Lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 financing statements, except those naming Lender as the secured party, to be filed with respect thereto.

(d)     The Reserve Funds shall not constitute trust funds and may be commingled with other monies held by Lender.  No earnings or interest on the Reserve Funds shall be payable to Borrower. Neither Lender nor any Servicer that at any time holds or maintains the Reserve Funds shall have any obligation to keep or maintain such Reserve Funds or any funds deposited therein in interest bearing accounts. If Lender or any Servicer elects in its sole and absolute discretion to keep or maintain any Reserve Funds or any funds deposited therein in an interest bearing account, (i) such funds shall not be invested except in Permitted Investments, and (ii) all interest earned or accrued thereon shall be for the benefit of Borrower and credited to the Cash Management Account.  Lender shall not be responsible and shall have no liability whatsoever for the rate of return earned or losses incurred on the investment of any Reserve Funds in Permitted Investments.

(e)     Borrower shall indemnify Lender and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including litigation costs and reasonable attorneys' fees and expenses) arising from or in any way connected with the Reserve Funds or the performance of the obligations for which the Reserve Funds were established.  Borrower shall assign to Lender all rights and claims Borrower may have against all Persons supplying labor, materials or other services which are to

112

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 142 of 316

be paid from or secured by the Reserve Funds; provided, however, Lender may not pursue any such right or claim, unless an Event of Default has occurred and remains uncured.

## ARTICLE VIII

## DEFAULTS

Section 8.1    Event of Default.

(a)    Each of the following events shall constitute an event of default hereunder (an "**Event of Default**"):

(i)    if any portion of the Debt is not paid when due (including, without limitation, the failure of Borrower to repay the entire outstanding principal balance of the Note in full on the Maturity Date) or any other amount under Section 2.7.2(b)(i) through (vii) is not paid in full on each Payment Date (unless during any Cash Trap Period sufficient funds are available in the relevant subaccount on the applicable date); provided, however, Borrower shall have a five (5) day grace period following the date when due for all payments that are not due on a Payment Date;

(ii)    if any of the Property Taxes or Other Charges are not paid when the same are due and payable (unless Lender is paying such Property Taxes pursuant to Section 7.1), subject to the provisions of Section 2.7.2 and Section 5.1.2 hereof;

(iii)    if the Policies are not kept in full force and effect, or if copies of the certificates evidencing the Policies (or certified copies of the Policies if requested by Lender) are not delivered to Lender within thirty (30) days after written request therefor; provided, however, there shall be no Event of Default under this Section 8.1(a)(iii) if: (x) sufficient funds exist in the Tax and Insurance Escrow Account to pay all premiums and any other amounts owing with respect to such Policies, and (y) in violation of this Agreement, Lender fails to release such funds in order to pay same;

(iv)    if Borrower or Pledgor, as applicable, Transfers or otherwise encumbers any portion of the Property, the Collateral or the Pledged Collateral in violation of the provisions of this Agreement, or Article 6 (Due on Sale/Encumbrance) of the Security Instrument or any Transfer is made in violation of the provisions of Section 5.2.10 hereof;

(v)    if any representation or warranty made by Borrower herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false or misleading in any material respect as of the date the representation or warranty was made or deemed remade; provided that in the event that Borrower did not know that such representation or warranty was untrue, and such untrue representations or warranties, when taken together, would not be deemed a Material Adverse Change, then Borrower shall have the right to cure such breach by conforming the facts to

113

those stated in the applicable representation or warranty, within ten (10) days after the earlier to occur of (y) obtaining actual knowledge of such inaccuracy of such representation or warranty, and (z) receipt of written notice from Lender of the inaccuracy of such representation or warranty;

(vi)     if the representation and warranty contained in <u>Section 4.1.37</u> regarding the tax classification of each of Borrower and Guarantor as either a Disregarded Entity or a partnership is false or misleading at any time;

(vii)     if Borrower, Pledgor or Guarantor shall (i) make an assignment for the benefit of creditors or (ii) generally not be paying its debts as they become due;

(viii)     if a receiver, liquidator or trustee shall be appointed for Borrower or Pledgor (other than a receiver by Lender in connection with the enforcement of Lender's remedies under the Loan Documents) or if Borrower or Pledgor shall be adjudicated bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower or Pledgor or if any proceeding for the dissolution or liquidation of Borrower or Pledgor, as applicable, shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower or Pledgor, as applicable, upon the same not being discharged, stayed or dismissed within thirty (30) days;

(ix)     if Guarantor or any guarantor or indemnitor under any guaranty or indemnity issued in connection with the Loan shall make an assignment for the benefit of creditors or if a receiver, liquidator or trustee shall be appointed for Guarantor or any guarantor or indemnitor under any guarantee or indemnity issued in connection with the Loan or if Guarantor or such other guarantor or indemnitor shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Guarantor or such other guarantor or indemnitor, or if any proceeding for the dissolution or liquidation of Guarantor or such other guarantor or indemnitor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Guarantor or such other guarantor or indemnitor, upon the same not being discharged, stayed or dismissed within thirty (30) days;

(x)     if Borrower attempts to assign its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(xi)     if Borrower breaches any representation, warranty or covenant contained in <u>Sections 4.1.30</u> or <u>5.4</u> or any of its respective negative covenants contained in <u>Section 5.2</u> or any covenant contained in <u>Section 5.1.11</u> hereof and

114

such breach cannot otherwise be cured by Borrower within thirty (30) days after receipt of written notice thereof;

(xii)     with respect to any term, covenant or provision set forth herein which specifically contains a notice requirement or grace period, if Borrower shall be in default under such term, covenant or condition after the giving of such notice or the expiration of such grace period;

(xiii)    intentionally omitted;

(xiv)    if a material default has occurred and continues beyond any applicable cure period under the Management Agreement (or any Replacement Management Agreement) and if such default permits Borrower or Manager to terminate or cancel the Management Agreement and Borrower fails to comply with Section 5.1.23 or Section 5.1.35 hereof;

(xv)     if a material default has occurred and continues beyond any applicable cure period under the Management Agreement (Parking) (or any Replacement Management Agreement (Parking)) and if such default permits Borrower or Manager (Parking) to terminate or cancel the Management Agreement (Parking) and Borrower fails to comply with Section 5.1.23 or Section 5.1.35 hereof;

(xvi)    if Borrower shall fail to pay the ground rent or any additional rent or other charge mentioned in or made payable by the Ground Lease when said rent or other charge is due and payable and such failure continues after the expiration of any applicable notice and cure period;

(xvii)   if there shall occur any default by Borrower, as tenant under the Ground Lease, in the observance or performance of any term, covenant or condition of the Ground Lease on the part of Borrower to be observed or performed and said default is not cured following the expiration of any applicable grace and notice periods therein provided, or if the leasehold estate created by the Ground Lease shall be surrendered or if the Ground Lease shall cease to be in full force and effect or the Ground Lease shall be terminated or canceled for any reason or under any circumstances whatsoever, or if any of the terms, covenants or conditions of the Ground Lease shall in any manner be modified, changed, supplemented, altered, or amended without the consent of Lender;

(xviii)  if Borrower ceases to operate a hotel on the Property or terminates such business for any reason whatsoever (other than temporary cessation in connection with any renovations to the Property or restoration of the Property after Casualty or Condemnation;

(xix)    if Borrower shall continue to be in Default under any of the terms, covenants or conditions of Section 9.1 hereof, or fails to cooperate with Lender in connection with a Securitization pursuant to the provisions of Section 9.1 hereof, for three (3) days after written notice to Borrower from Lender;

115

(xx)     If Guarantor breaches any of the covenants specified in Section 5.2 of the Recourse Guaranty or Section 13(b) of the Environmental Indemnity;

(xxi)     if Borrower shall fail to pay any Common Charges when due or shall fail to perform any of its obligations, beyond any applicable notice and cure periods, with respect to the Master Condominium Board, the Master Condominium or the Master Condominium Documents as set forth herein or if for any reason the Master Condominium Property is withdrawn from condominium ownership; or if by reason of damage or destruction of all or any portion of the Improvements which are part of the Master Condominium, the Master Condominium Association does not duly and promptly proceed with the repair or restoration of such Improvements; or if by reason of the failure of Borrower to perform any act, as for example notification to the Board under the Master Condominium Documents, Lender shall not be entitled to the protective provisions under the Master Condominium Documents;

(xxii)   if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement not specified in subsections (i) through (xxii) above, for ten (10) days after notice to Borrower from Lender, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other Default; provided, however, that if such non-monetary Default is susceptible of cure, but cannot reasonably be cured within such thirty (30) day period and provided further that Borrower shall have commenced to cure such Default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed ninety (90) days; or

(xxiii)  if there shall be a default under any of the other Loan Documents not specified in clauses (i) through (xxii) above, beyond any applicable cure periods contained in such documents, if any, whether as to Borrower, Guarantor, Pledgor, any Restricted Party, the Property or any other Person, or if any other such event shall occur or condition shall exist, if the effect of such default, event or condition is to accelerate the maturity of any portion of the Debt or to permit Lender to accelerate the maturity of all or any portion of the Debt in accordance with the Loan Documents.

(b)     Upon the occurrence of an Event of Default (other than an Event of Default described in clauses (a)(vii), (a)(viii) or (a)(ix) above) and at any time thereafter, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, Lender may take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, without limitation, declaring the Obligations to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and the Property, including, without limitation, all rights or remedies available at law or

116

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 146 of 316

in equity; and upon any Event of Default described in clauses (a)(vii), (a)(viii) or (a)(ix) above, the Debt and all Other Obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

Section 8.2    Remedies.

(a)    Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singularly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents.  Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing (i) Lender shall not be subject to any "one action" or "election of remedies" law or rule, and (ii) all liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property and the Security Instrument has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Obligations have been paid in full.

(b)    With respect to Borrower and the Property, nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to the Property for the satisfaction of any of the Debt in any preference or priority, and Lender may seek satisfaction out of the Property, or any part thereof, in its absolute discretion in respect of the Debt.  In addition, Lender shall have the right from time to time to partially foreclose the Security Instrument in any manner and for any amounts secured by the Security Instrument then due and payable as determined by Lender in its sole discretion, including the following circumstances: (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and/or interest, Lender may foreclose the Security Instrument to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire Outstanding Principal Balance, Lender may foreclose the Security Instrument to recover so much of the Debt as Lender may accelerate and such other sums secured by the Security Instrument as Lender may elect.  Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Security Instrument to secure payment of sums secured by the Security Instrument and not previously recovered.

(c)    Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents (the "**Severed Loan Documents**") in such denominations as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder. Borrower shall execute and deliver to Lender from time to time, promptly after the request of

Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender. Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that its said attorney shall do by virtue thereof.

(d)      Any amounts recovered from the Property or any other collateral for the Loan after an Event of Default may be applied by Lender toward the payment of any interest and/or principal of the Loan and/or any other amounts due under the Loan Documents in such order, priority and proportions as Lender in its sole discretion shall determine.

(e)      If an Event of Default exists, Lender may (directly or by its agents, employees, contractors, engineers, architects, nominees, attorneys or other representatives), but without any obligation to do so and without notice to Borrower and without releasing Borrower from any obligation hereunder, cure the Event of Default in such manner and to such extent as Lender may deem necessary to protect the security hereof. Subject to Tenants' rights under the Leases, Lender (and its agents, employees, contractors, engineers, architects, nominees, attorneys or other representatives) is authorized to enter upon the Property to cure such Event of Default, and Lender is authorized to appear in, defend, or bring any action or proceeding reasonably necessary to maintain, secure or otherwise protect the Property or any portion thereof or the priority of the Lien granted by the Security Instrument.

(f)      Lender may appear in and defend any action or proceeding brought with respect to the Property or any portion thereof and may bring any action or proceeding, in the name and on behalf of Borrower, which Lender, in its sole discretion, decides should be brought to protect its interest in the Property. Lender shall, at its option, be subrogated to the Lien of any mortgage or other security instrument discharged in whole or in part by the Obligations, and any such subrogation rights shall constitute additional security for the payment of the Obligations.

(g)      As used in this Section 8.2, a "foreclosure" shall include, without limitation, a power of sale.

Section 8.3    Remedies Cumulative; Waivers

The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement or the other Loan Documents or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

## ARTICLE IX

## SPECIAL PROVISIONS

Section 9.1    Transfer of Loan.

(a)    Lender may, at any time, sell, transfer or assign the Loan or any portion thereof (including, without limitation, this Agreement, the Note, the Security Instrument and the other Loan Documents, and any or all servicing rights with respect thereto), or grant participations therein or issue mortgage pass-through certificates or other securities (the "**Securities**") evidencing a beneficial interest in a rated or unrated public offering or private placement (such sales, transfers, assignments, participations, offerings and/or placements, collectively, a "**Securitization**"). At Lender's election, each note and/or component comprising the Loan may be subject to one or more securitizations. Lender may forward to each purchaser, transferee, assignee, servicer, participant or investor in such participations or Securities (collectively, the "**Investor**") or any Rating Agency rating such Securities, each prospective Investor, and any organization maintaining databases on the underwriting and performance of commercial mortgage loans, all documents and information which Lender now has or may hereafter acquire relating to the Loan or to Borrower, any Guarantor or the Property, whether furnished by Borrower, any Guarantor or otherwise, as Lender determines necessary or desirable, including, without limitation, financial statements relating to Borrower, Guarantor, the Property and any Tenant at the Property.  Borrower irrevocably waives any and all rights it may have under law or in equity to prohibit such disclosure, including but not limited to any right of privacy.  Any assignee shall be treated as a Lender for all purposes hereunder.  Any purchaser of a participation interest shall be entitled to the benefits of Section 2.10.1 and Section 2.11 as if it were a Lender hereunder (subject to the requirements and limitations therein), including the requirements under Section 2.11(e) (it being understood that the documentation required under Section 2.11(e) shall be delivered to the participating Lender).

(b)    Register.  Lender, acting solely for this purpose as an agent of Borrower, shall maintain at its office a register for the recordation of the names and addresses of any party to whom it assigns a portion of the Loan (for purposes of this Section 9.1(b) and Section 9.1(c), each a "**Lender**" and collectively, the "**Lenders**"), and principal amounts (and stated interest) of the portion of the Loan owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  Notwithstanding anything in the Loan Documents to the contrary, the entries in the Register shall be conclusive absent manifest error, and Borrower and Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(c)    Participant Register.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under the Loan Documents (the "**Participant Register**"), provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment,

119

loan, or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury regulations. Notwithstanding anything in the Loan Documents to the contrary, the entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

Section 9.2    Cooperation.    Borrower agrees (and agrees to cause Guarantor) to reasonably to cooperate with Lender (and agrees to cause their respective officers and representatives to cooperate) in connection with any transfer made or any Securities created pursuant to this Article IX, the delivery of an estoppel certificate required in accordance with Section 5.1.15 hereof and such other documents as may be reasonably requested by Lender, and the execution of amendments to this Agreement, the Note, the Security Instrument and other Loan Documents and Borrower's organizational documents as reasonably requested by Lender, provided that (i) Borrower shall pay all of its own costs and expenses in connection with its obligations under this Section 9.2 and Lender's costs and expenses under this Section 9.2 and (ii) no changes to the Loan Documents shall be required which will result in an increase in the Debt or Monthly Debt Service Payment Amount. Borrower shall also furnish and Borrower and Guarantor consent to Lender furnishing to such Investors or prospective Investors or any Rating Agency any and all information concerning the Property, the Leases, the financial condition of Borrower and Guarantor as may be requested by Lender, any Investor, any prospective Investor or any Rating Agency in connection with any sale, transfer or participations or Securities and shall indemnify the Indemnified Parties against, and hold the Indemnified Parties harmless from, any losses, claims, damages or liabilities (collectively, the "**Liabilities**") to which any such Indemnified Parties may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or allegedly untrue statement of any material fact contained in a Disclosure Document or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated in the Disclosure Document or necessary in order to make the statements in the Disclosure Document, in light of the circumstances under which they were made, not misleading and agreeing to reimburse the Indemnified Parties for any legal or other expenses reasonably incurred by each of them in connection with investigating or defending the Liabilities; provided, however, Borrower will be liable in any such case under this Section 9.2 only to the extent that any such loss, claim, damage or liability arises out of or is based upon any such untrue statement or omission made therein in reliance upon and in conformity with information furnished to Lender by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including, without limitation, financial statements of Borrower, operating statements and rent rolls with respect to the Property.  This indemnity agreement will be in addition to any liability which Borrower may otherwise have and shall survive the termination of the Security Instrument and the satisfaction and discharge of the Debt.

Section 9.3    Servicer.  At the option of Lender, the Loan may be serviced by a master servicer, primary servicer, special servicer and/or trustee (any such master servicer, primary servicer, special servicer, and/or trustee, together with its agents, nominees or designees, are collectively referred to as "Servicer") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to Servicer pursuant to a pooling and servicing agreement, servicing agreement, special servicing agreement or other agreement providing for the servicing of one or more mortgage loans (collectively, the

120

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 150 of 316

"**Servicing Agreement**") between Lender and Servicer. Borrower shall be responsible for any reasonable set up fees or any other initial costs relating to or arising under the Servicing Agreement, and for payment of the regular monthly master servicing fee or trustee fee due to Servicer under the Servicing Agreement or any fees or expenses required to be borne by, and not reimbursable to, Servicer. In addition, Borrower shall promptly reimburse Lender on demand for (a) interest payable on advances made by Servicer with respect to delinquent debt service payments (to the extent interest at the Default Rate actually paid by Borrower in respect of such payments are insufficient to pay the same) or expenses paid by Servicer or trustee in respect of the protection and preservation of the Property or any portion thereof (including, without limitation, on account of Basic Carrying Costs), (b) all costs and expenses, liquidation fees, workout fees, special servicing fees, operating advisor fees or any other similar fees payable by Lender to Servicer which may be due and payable under the Servicing Agreement (whether on a periodic or a continuing basis) as a result of an Event of Default under the Loan, the Loan becoming specially serviced, the commencement or continuance of any enforcement action of any kind with respect to the Loan or any of the Loan Documents, a refinancing or a restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" of the Loan Documents, or any Bankruptcy Action involving Borrower, Pledgor, Guarantor or any of their respective principals or Affiliates, (c) all costs and expenses of any Property inspections and/or appraisals (or any updates to any existing inspection or appraisal) that Servicer or the trustee may be required to obtain (other than the cost of regular annual inspections required to be borne by Servicer under the Servicing Agreement), and (d) all costs and expenses relating to or arising from any special requests made by Borrower or Guarantor during the term of the Loan including, without limitation, in connection with a prepayment, defeasance, assumption or modification of the Loan.

Section 9.4    Restructuring of Loan.

(a)    Lender, without in any way limiting Lender's other rights hereunder, in its sole and absolute discretion, shall have the right at any time to require Borrower to restructure the Loan into additional multiple notes (the "**New Notes**") (which may include component notes and/or senior and junior notes), to re-allocate principal among component notes and/or senior and junior notes and/or to create participation interests in the Loan, and/or to resize the relative amounts of any such interests, which restructuring may include the restructuring of a portion of the Loan to one or more of the foregoing or to one or more mezzanine loans (a "**New Mezzanine Loan**") to the direct or indirect owners of the equity interests in Borrower, secured by a pledge of such interests, the establishment of different interest rates and debt service payments for the Loan, and the New Mezzanine Loan and the payment of the Loan, and the New Mezzanine Loan in such order of priority as may be designated by Lender, provided that (i) the total principal amounts of the Loan (including any component notes), and the New Mezzanine Loan shall equal the total principal amount of the Loan immediately prior to the restructuring, (ii) except in the case of the occurrence of an Event of Default or a default beyond all notice and cure periods under the New Mezzanine Loan or the New Notes, as applicable, or of a Casualty or Condemnation that results in the payment of principal under the Loan and/or the New Mezzanine Loan or the New Notes, as applicable, the weighted average interest rate of the Loan and the New Mezzanine Loan or the New Notes, as applicable, if any, shall, in the aggregate, equal the Interest Rate, and (iii) except in the case of the occurrence of an Event of Default and/or a default beyond all notice and cure periods under the New Mezzanine Loan or the New Notes, as applicable, or of a Casualty or Condemnation that results in the payment of principal under the Loan and/or the New Mezzanine Loan or the

121

New Notes, as applicable, the aggregate debt service payments on the Loan and the New Mezzanine Loan shall equal the aggregate debt service payments which would have been payable under the Loan had the restructuring not occurred.

(b)	Borrower shall cooperate with all reasonable requests of Lender in order to restructure the Note, the Loan and/or to create a New Mezzanine Loan, if applicable, and shall, upon ten (10) Business Days' written notice from Lender, which notice shall include the forms of documents for which Lender is requesting execution and delivery, (i) execute and deliver such documents, including, without limitation, in the case of any New Mezzanine Loan, a mezzanine note, a mezzanine loan agreement, a pledge and security agreement and a mezzanine deposit account agreement, (ii) cause Borrower's counsel to deliver such legal opinions, and (iii) create such a bankruptcy remote borrower under the New Mezzanine Loan as, in each of the cases of clauses (i), (ii) and (iii) above, shall be reasonably required by Lender and required by any Rating Agency in connection therewith, all in form and substance reasonably satisfactory to Lender, including, without limitation, the severance of this Agreement, the Security Instrument and the other Loan Documents if requested; provided, however, following any such amendments required by Lender (A) the total principal amounts of the Loan (including any component notes), and the New Mezzanine Loan shall equal the total principal amount of the Loan immediately prior to the restructuring, (B) except in the case of the occurrence of an Event of Default or a default beyond all notice and cure periods under the New Mezzanine Loan, or of a Casualty or Condemnation that results in the payment of principal under the Loan and/or the New Mezzanine Loan, the weighted average interest rate of the Loan and the New Mezzanine Loan, if any, shall, in the aggregate, equal the Interest Rate, and (C) except in the case of the occurrence of an Event of Default and/or a default beyond all notice and cure periods under the New Mezzanine Loan, or of a Casualty or Condemnation that results in the payment of principal under the Loan and/or the New Mezzanine Loan, the aggregate debt service payments on the Loan and the New Mezzanine Loan shall equal the aggregate debt service payments which would have been payable under the Loan had the restructuring not occurred.

(c)	Borrower shall pay all of its own costs and expenses incurred in connection with its compliance with this Section 9.4 and Lender shall pay all of its own costs and expenses in connection with the restructuring transactions contemplated by this Section 9.4.

(d)	In the event Borrower fails to execute and deliver such documents described in this Section 9.4 to Lender within ten (10) Business Days' following such written notice by Lender, and Lender sends a second notice to Borrower with respect to the delivery of such documents containing a legend clearly marked in not less than fourteen (14) point bold face type, underlined, in all capital letters "POWER OF ATTORNEY IN FAVOR OF LENDER DEEMED EFFECTIVE FOR EXECUTION AND DELIVERY OF DOCUMENTS IF NO RESPONSE WITHIN 10 BUSINESS DAYS", Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such transactions, Borrower ratifying all that such attorney shall do by virtue thereof, if Borrower fails to execute and deliver such documents within ten (10) Business Days of delivery of such second notice.  It shall be an Event of Default if Borrower fails to comply with any of the terms, covenants or conditions of this Section 9.4 after the expiration of ten (10) Business Days after delivery of the second notice thereof.

122

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 152 of 316

# ARTICLE X

## MISCELLANEOUS

Section 10.1    <u>Survival</u>.  This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Obligations are outstanding and unpaid, unless a longer period is expressly set forth herein or in the other Loan Documents.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party.  All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

Section 10.2    <u>Lender's Discretion</u>.    Whenever pursuant to this Agreement, Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive.

Section 10.3    <u>Governing Law</u>.

(a)    **THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER  IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES IRREVOCABLY AND UNCONDITIONALLY AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, EACH AND ALL OF THIS AGREEMENT, THE NOTE, THE OTHER LOAN DOCUMENTS, AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE ATTACHMENT, CREATION, PERFECTION, AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED UNDER THE SECURITY INSTRUMENT AND THE ASSIGNMENT OF LEASES IN FAVOR OF LENDER IN RESPECT OF RENTS, REAL PROPERTY AND/OR PERSONAL PROPERTY SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH SUCH REAL PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF THIS AGREEMENT, THE NOTE AND THE LOAN AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER.  TO THE**

123

Case 1:26-cv-04240-RA   Document 1-1   Filed 05/20/26   Page 153 of 316

**FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND/OR THE LOAN, AND THIS AGREEMENT, THE NOTE AND THE LOAN SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.**

(b)  ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE NOTE, ANY OTHER LOAN DOCUMENT OR THE ATTACHMENT, CREATION, PERFECTION, OR ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED UNDER THE SECURITY INSTRUMENT AND THE ASSIGNMENT OF LEASES MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT LOCATED IN NEW YORK OR STATE IN WHICH THE PROPERTY IS LOCATED, INCLUDING WITHOUT LIMITATION, ANY STATE OR FEDERAL COURT LOCATED IN THE COUNTY OF NEW YORK AND/OR IN THE COUNTY IN WHICH THE REAL PROPERTY ENCUMBERED BY THE SECURITY INSTRUMENT IS LOCATED AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.  BORROWER DOES HEREBY DESIGNATE AND APPOINT:

C T CORPORATION SYSTEM
28 LIBERTY STREET, 42ND FLOOR
NY, NY 10005

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING INCLUDING WITHOUT LIMITATION THOSE IN THE STATE OF NEW YORK.  BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.  NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST BORROWER IN ANY JURISDICTION.

124

Section 10.4    Modification, Waiver in Writing.  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, or of the Note, or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective, unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

Section 10.5    Delay Not a Waiver.  Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

Section 10.6    Notices.  All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document shall be given in writing and shall be effective for all purposes if delivered (a) by hand, (b) by expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, or (c) by electronic transmission (email), so long as such notice is also sent via one of the methods set forth in (a) or (b) above within one (1) Business Day of such electronic transmission, addressed as follows (or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a notice to the other parties hereto in the manner provided for in this Section 10.6):

If to Lender:    Southern Realty Trust Holdings LLC
c/o Southern Realty Trust Inc.,
2 Wisconsin Circle #700,
Chevy Chase, Maryland  20815
Attention: General Counsel

Sunrise Realty Trust, Inc.
525 Okeechobee Blvd., Suite 1650,
West Palm Beach, FL 33401
Attention: Stuart Swann

Akerman, LLP
999 Peachtree Street, Suite 1700
Atlanta, GA 3.309
Attn: Anne Marie Garavaglia, Esq.

125

| Borrower: | Lex Avenue Hotel, LLC |
| | c/o DC Partners Management |
| | 2506 W. Main, 5th Floor |
| | Houston, Texas 77098 |
| | Attention: Roberto Contreras |
| | |
| and to: | Andrews Myers, P.C. |
| | 1885 St. James Place, 15th Floor |
| | Houston, Texas 77056 |
| | Attention: Patrick Hayes |

A notice shall be deemed to have been given: (a) in the case of hand delivery, at the time of delivery; (b) in the case of expedited prepaid delivery, upon the first attempted delivery on a Business Day; and (c) in the case of electronic transmission, as of the date that delivery of any of the methods of delivery set forth in clauses (a) or (b) above is deemed to have been given pursuant to the foregoing. Any failure to deliver a notice by reason of a change of address not given in accordance with this Section 10.6, or any refusal to accept a notice, shall be deemed to have been given when delivery was attempted. Any notice required or permitted to be given by any party hereunder or under any other Loan Document may be given by its respective counsel. Additionally, any notice required or permitted to be given by Lender hereunder or under any other Loan Document may also be given by the Servicer.

Section 10.7 <u>Trial by Jury</u>. BORROWER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER.

Section 10.8 <u>Headings</u>. The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 10.9 <u>Severability</u>. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 10.10 <u>Preferences</u>. Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the Debt. To the extent Borrower makes a payment or payments to Lender, which payment or proceeds or any part thereof

126

are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

Section 10.11 <u>Waiver of Notice</u>. Borrower hereby expressly waives, and shall not be entitled to, any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.

Section 10.12 <u>Remedies of Borrower</u>. In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where by law or under this Agreement or the other Loan Documents Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment. Further, it is agreed Lender shall not be in default under this Agreement, or under any other Loan Document, unless a written notice specifically setting forth the claim of Borrower shall have been given to Lender within thirty (30) days after Borrower first had knowledge of the occurrence of the event which Borrower alleges gave rise to such claim and Lender does not remedy or cure the default, if any there be, promptly thereafter. Failure to give such notice shall constitute a waiver of such claim.

Section 10.13 <u>Expenses; Indemnity</u>.

(a)     Borrower covenants and agrees to pay or, if Borrower fails to pay, to reimburse, Lender upon receipt of notice from Lender for all costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with (i) the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for Borrower (including without limitation any opinions requested by Lender as to any legal matters arising under this Agreement or the other Loan Documents with respect to the Property or any portion thereof); (ii) Borrower's ongoing performance of and compliance with Borrower's respective agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date, including, without limitation, confirming compliance with environmental and insurance requirements; (iii) Lender's ongoing performance and compliance with all agreements and conditions contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date; (iv) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Lender; (v) securing Borrower's compliance with any requests made pursuant to the provisions of this Agreement; (vi) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions,

127

and other similar expenses incurred in creating and perfecting the Liens in favor of Lender pursuant to this Agreement and the other Loan Documents; (vii) enforcing or preserving any rights, either in response to third-party claims or in prosecuting or defending any action or proceeding or other litigation, in each case against, under or affecting Borrower, this Agreement, the other Loan Documents, the Property or any portion thereof, or any other security given for the Loan; and (viii) enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents or with respect to the Property or any portion thereof (including any fees and expenses reasonably incurred by or payable to Servicer or a trustee in connection with the transfer of the Loan to a special servicer upon Servicer's anticipation of a Default or Event of Default, liquidation fees, workout fees, special servicing fees, operating advisor fees or any other similar fees and interest payable on advances made by the Servicer with respect to delinquent debt service payments or expenses of curing Borrower's defaults under the Loan Documents), or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings or any other amounts required under Section 9.3; provided, however, Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of Lender's willful, material breach of this Agreement or the gross negligence, illegal acts, fraud or willful misconduct of Lender.  Any cost and expenses due and payable to Lender may be paid from any amounts in the Clearing Account or the Cash Management Account, as applicable.

(b)     Borrower shall indemnify, defend and hold harmless the Indemnified Parties from and against any and all Losses that may be imposed on, incurred by, or asserted against any Indemnified Party in any manner relating to or arising out of (i) any breach by Borrower of its Obligations under, or any material misrepresentation by Borrower contained in, this Agreement or the other Loan Documents, or (ii) the use or intended use of the proceeds of the Loan (the liabilities, losses, costs, expenses and other matters described in this subparagraph (b), collectively, the "**Indemnified Liabilities**"); provided, however, Borrower shall not have any obligation to an Indemnified Party hereunder to the extent that such Indemnified Liabilities arise from Lender's willful, material breach of this Agreement or the gross negligence, illegal acts, fraud or willful misconduct of such Indemnified Party.  To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnified Parties.

(c)     Borrower covenants and agrees to pay or, if Borrower fails to pay, to reimburse Lender for, any fees and expenses incurred by any Rating Agency in connection with any Rating Agency review of the Loan, the Loan Documents or any transaction contemplated thereby or any consent, approval, waiver or confirmation obtained from such Rating Agency pursuant to the terms and conditions of this Agreement or any other Loan Document and Lender shall be entitled to require payment of such fees and expenses as a condition precedent to the obtaining of any such consent, approval, waiver or confirmation.

(d)     Borrower shall indemnify, defend and hold harmless each Indemnified Party against any Losses to which each such Indemnified Party may become subject (i) in connection with any indemnification to the Rating Agencies in connection with issuing, monitoring or maintaining the Securities and (ii) insofar as such Losses so incurred arise out of or

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 158 of 316

are based upon any untrue statement of any material fact in any information provided by or on behalf of Borrower or Guarantor to the Rating Agencies, if any (the "**Covered Rating Agency Information**") or arise out of or are based upon the omission to state a material fact in the Covered Rating Agency Information required to be stated therein or necessary in order to make the statements in the Covered Rating Agency Information, in light of the circumstances under which they were made, not misleading.

Section 10.14 <u>Schedules Incorporated</u>.   The Schedules annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

Section 10.15 <u>Offsets, Counterclaims and Defenses</u>.  Any assignee of Lender's interest in and to this Agreement, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses, which are unrelated to such documents that Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents, and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

Section 10.16 <u>No Joint Venture or Partnership; No Third Party Beneficiaries</u>.

(a)     Borrower and Lender intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender.  Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

(b)     This Agreement and the other Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the Obligations contained herein or therein.  All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

Section 10.17 <u>Publicity</u>.  All news releases, publicity or advertising by Borrower or its Affiliates through any media intended to reach the general public that refers to the Loan Documents or the financing evidenced by the Loan Documents, to Lender or any of its Affiliates, shall be subject to the prior approval of Lender.

Section 10.18 <u>Waiver of Marshalling of Assets</u>.  To the fullest extent permitted by law, Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets

129

of Borrower, Borrower's partners and others with interests in Borrower, and of the Property, or to a sale in inverse order of alienation in the event of foreclosure of the Security Instrument, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Property for the collection of the Debt without any prior or different resort for collection or of the right of Lender to the payment of the Debt out of the net proceeds of the Property in preference to every other claimant whatsoever.

Section 10.19  <u>Waiver of Counterclaim</u>.  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents.

Section 10.20  <u>Conflict; Construction of Documents; Reliance</u>.  In the event of any conflict between the provisions of this Agreement and those of any of the other Loan Documents, the provisions of this Agreement shall control.  The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party that drafted same.  Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any Affiliate of Lender.  Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments that govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies.  Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments that may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

Section 10.21  <u>Brokers and Financial Advisors</u>.  Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement.  Borrower hereby agrees to indemnify, defend and hold Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind (including Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by Broker, any financial advisors, brokers, underwriters, placement agents, agents, finders or any other Person that such Person acted on behalf of Borrower or any of its Affiliates or Lender in connection with the transactions contemplated herein.  The provisions of this <u>Section 10.21</u> shall survive the expiration and termination of this Agreement and the payment of the Debt.

Section 10.22  <u>Prior Agreements</u>.  This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements, understandings and negotiations among or between (or on behalf of) such parties, whether oral or written, including, without limitation, the non-binding term sheet dated May 29, 2024 between **SRT Agent LLC**, a Delaware limited liability

company, as Agent for Southern Realty Trust (an Affiliate of Lender) and **Thompson San Antonio Investor LP** (an Affiliate of Borrower) are superseded by the terms of this Agreement and the other Loan Documents.

Section 10.23 <u>Cumulative Rights</u>.  All of the rights of Lender under this Agreement and under each of the other Loan Documents, and any other agreement now or hereafter executed in connection herewith or therewith, shall be cumulative and may be exercised singly, together, or in such combination as Lender may determine in its sole judgment.

Section 10.24 <u>Counterparts</u>.  This Agreement may be executed in several counterparts, each of which when executed and delivered is an original, but all of which together shall constitute one instrument.  In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart that is executed by the party against whom enforcement of this Agreement is sought.

Section 10.25 <u>Time Is of the Essence</u>.  Time is of the essence with respect to each provision of this Agreement and the other Loan Documents.

Section 10.26 <u>Consent of Holder</u>.  Wherever this Agreement refers to Lender's consent or discretion or other rights, such references to Lender shall be deemed to refer to any holder of the Loan.  Any holder of the Loan may from time to time appoint a trustee or Servicer, and Borrower shall be entitled to rely upon written instructions executed by a purported officer of the holder of the Loan as to the extent of authority delegated to any such trustee or Servicer from time to time and determinations made by such trustee or Servicer to the extent identified as within the delegated authority of such trustee or Servicer, unless and until such instructions are superseded by further written instructions from the holder of the Loan.

Section 10.27 <u>Successor Laws</u>.  Any reference in this Agreement to any statute or regulation shall be deemed to include any successor statute or regulation.

Section 10.28 <u>Performance by Borrower and Lender; Reliance on Third Parties</u>.  Lender may perform any of its responsibilities hereunder through one or more agents, attorneys or independent contractors.  In addition, Lender may conclusively rely upon the advice or determinations of any such agents, attorneys or independent contractors in performing any discretionary function under the terms of this Agreement.   Wherever this Agreement refers to Borrower's obligation to cause action by Guarantor or Manager regarding the observance, performance or satisfaction of any term, provision, covenant or condition contained herein, such obligation with respect to Borrower shall be interpreted to mean that Borrower shall not suffer or permit such party to fail to observe, perform or satisfy any such term, provision or covenant contained herein.

Section 10.29 <u>Intentionally omitted</u>.

Section 10.30 <u>Intentionally omitted</u>.

Section 10.31 <u>Intentionally omitted</u>.

Section 10.32 <u>Negation of Implied Right to Cure Events of Default</u>.  Notwithstanding anything contained in this Agreement or any of the other Loan Documents providing that certain rights, remedies or privileges are only available to Lender during the "continuance" of an Event of Default (or words of similar import), Borrower expressly acknowledges and agrees that it does not have the right to cure an Event of Default once the same has occurred under this Agreement or any other Loan Document without the consent of Lender, which consent may be withheld, delayed or denied by Lender in its sole and absolute discretion.

Section 10.33 <u>Acknowledgment and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

Section 10.34 <u>Lead Lender</u>. Notwithstanding anything to the contrary contained in this Agreement or any of the other Loan Documents, if at any time there is more than one Lender hereunder, each such Lender shall deliver a written notice to Borrower designating one lender or an affiliate thereof as the "Lead Lender" (such Lender, at all times thereafter and until resignation or replacement of such Lender by written notice to Borrower, the "**Lead Lender**"). As of the Closing Date, the initial Lead Lender is **Southern Realty Trust Holdings LLC**, a Delaware limited liability company. Each Lender hereby appoints Lead Lender to serve as non-fiduciary administrative agent and collateral agent for each Lender and hereby agrees that Lead Lender shall be the sole party authorized to grant or withhold consents or approvals hereunder on behalf of each Lenders (subject, in each case, to appointment of a servicer to receive such notices, requests and other communications and/or to grant or withhold consents or approvals, as the case may be). No Lender shall have any liabilities or responsibilities to any Borrower on account of the failure of any other Lender to perform its obligations hereunder or to any Lender on account of the failure

of any Borrower to perform its obligations hereunder or under any other Loan Document. Each Borrower hereby acknowledges and agrees that any one or more co-lender agreements may at any time be entered into between Lenders (each, a "**Co-Lender Agreement**") pursuant to which, among other things, Lenders shall agree upon rights of Lenders as among themselves and the manner in which Lead Lender shall administer the Loan. Any Co-Lender Agreement will be solely for the benefit of Lenders, and none of Borrower, Guarantor, any Affiliate of Borrower or Guarantor or any other Person shall be a third-party beneficiary of any of the provisions therein, or have any rights thereunder or be entitled to rely on any of the provisions contained therein. No Lender shall have any obligation to disclose to any of Borrower, Guarantor and any Affiliate of Borrower and/or Guarantor the contents of any Co-Lender Agreement. The obligations of Borrower, Guarantor and any Affiliate of Borrower and/or Guarantor under the Loan Documents are and will be independent of any Co-Lender Agreement and shall remain unmodified by the provisions thereof (although Borrower acknowledges that with respect to certain approvals, calculations and other decisions hereunder, any Co-Lender Agreement may require Lead Lender to consult with or receive the approval of one or more Lenders prior to providing its own approval or determination regarding the same).

[THE REMAINDER OF THE PAGE IS INTENTIONALLY BLANK]

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 163 of 316

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER**:

**LEX AVENUE HOTEL, LLC,**
a Delaware limited liability company

By: _____
Name: Acho Azuike
Title:   Vice President

[signatures continue on the following page]

[signature page to Loan Agreement – Thompson Hotel]

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 164 of 316

**LENDER**:

**SOUTHERN REALTY TRUST HOLDINGS LLC**,
a Delaware limited liability company

By: Southern Realty Trust Inc., its Sole Member

  By: _____
  Name: Brian Sedrish
  Title: Chief Executive Officer


**SUNRISE REALTY TRUST INC.**,
a Maryland corporation

By: _____
 Name: Brandon Hetzel
 Title: Chief Financial Officer


[signature page to Loan Agreement – Thompson Hotel]

Case 1:26-cv-04240-RA     Document 1-1     Filed 05/20/26     Page 165 of 316

## SCHEDULE I
### Rent Roll/List of Leases


N/A

**SCHEDULE II**

REQUIRED REPAIRS/DEADLINES FOR COMPLETION

None.

## SCHEDULE III
### BORROWER ORGANIZATIONAL CHART



**Property:** Thompson Hotel & Residences
**Address:** 101 Lexington Avenue, San Antonio, Texas 78205

*No person or entity owns more than 10% of Lex Avenue Hotel, LLC (Borrower) except as shown hereon.*

## SCHEDULE IV
DEPOSIT AMOUNTS

Required Repairs Amount: $0.00

Initial Tax Deposit: $300,000.00

Initial Insurance Premiums Deposit: $0.00

## SCHEDULE V
### FEDERAL TAX IDENTIFICATION NUMBERS

1. Borrower: 88-0687421

## SCHEDULE VI
### REAs

1. Condominium Declaration for SCH San Antonio Master Condominium dated January 25, 2018 and recorded March 11, 2020 as Document No. 20200052830 in the Official Records.

2. Declaration of the Arts Residences, a Condominium dated March 5, 2020 and recorded March 11, 2020 as Document No. 20200053063 in the Official Records.

3. Amended and Restated Declaration of The Arts Residences, a Condominium effective January 25, 2018 and recorded October 30, 2020 as Document No. 20200262722 in the Official Records.

4. Amended and Restated Condominium Declaration for SCH San Antonio Master Condominium dated October 30, 2018 and recorded October 30, 2020 as Document No. 20200262732 in the Official Records.

5. Certified Resolution of the Board of Directors of the SCH San Antonio Master Condominium Association Adopting Document Retention Policy dated August 25, 2021 and recorded November 3, 2021 as Document No. 20210308650 in the Official Records.

6. Certified Resolution of the Board of Directors of the SCH San Antonio Master Condominium Association Adopting Records Production and Copying Policy dated August 25, 2021 and recorded November 3, 2021 as Document No. 20210308651 in the Official Records.

7. First Amendment to the Amended and Restated Bylaws of the Arts Condominium Owners Association dated November 11, 2021 and recorded November 23, 2021 as Document No. 20210328109 in the Official Records.

8. First Amendment to the Amended and Restated Declaration of The Arts Residences, a Condominium dated December 14, 2021 and recorded December 22, 2021 as Document No. 20210355549 in the Official Records.

9. First Amendment to the Amended and Restated Condominium Declaration for SCH San Antonio Master Condominium dated December 14, 2021 and recorded December 22, 2021 as Document No. 20210355555 in the Official Records.

10. Certified Resolution of the Board of Directors of the Arts Condominium Owners Association Ratifying and Approving the Leasing Rules for the Arts Residences, a Condominium dated September 26, 2022 and recorded October 28, 2022 as Document No. 20220257166 in the Official Records.

11. Assignment of Master Declarant's Rights dated February 23, 2022 and recorded February 25, 2022 as Document No. 20220047574 in the Official Records.

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 171 of 316

## SCHEDULE VII

FORM OF U.S. TAX COMPLIANCE CERTIFICATE

Reference is hereby made to the Loan Agreement dated as of ____ (as amended, supplemented or otherwise modified from time to time, the "Agreement"), among _____, and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.11(e) of the Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has provided Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform Borrower, and (2) upon Borrower's request the undersigned shall furnish Borrower with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Agreement and used herein shall have the meanings given to them in the Agreement.

_____

By:_____
     Name:

     Title:

Date: _____ _____, 20___

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 172 of 316

# EXHIBIT C

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 173 of 316

## PLEDGE AND SECURITY AGREEMENT

**THIS PLEDGE AND SECURITY AGREEMENT** (this "Agreement"), dated as of the July 31, 2024 (the "Effective Date"), by **LEXAV OWNER, LLC**, a Delaware limited liability company, having its principal place of business at 2506 W. Main, 5th Floor, Houston, Texas 77098 (together with its successors and assigns, "Pledgor"), for the benefit of **SOUTHERN REALTY TRUST HOLDINGS LLC**, a Delaware limited liability company, having its principal place of business at c/o Southern Realty Trust Inc., 2 Wisconsin Circle #700, Chevy Chase, Maryland 20815 ("SRH"), and **SUNRISE REALTY TRUST, INC.**, a Maryland corporation, having its principal place of business at 525 Okeechobee Blvd., Suite 1650, West Palm Beach, FL 33401 ("SRT"; SRT and SRH, individually and/or collectively as the context may require, together with their respective successors and assigns, "Lender").

## RECITALS

WHEREAS, Lex Avenue Hotel, LLC, a Delaware limited liability company ("Borrower") is entering into that certain Loan Agreement, dated as of the Effective Date (as the same may hereafter be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Loan Agreement"), with Lender, pursuant to which Lender is concurrently making a loan to Borrower in the original principal amount of **Forty-Four Million and No/100 Dollars ($44,000,000.00)** (the "Loan"), evidenced by that certain Promissory Note, dated as of the Effective Date (as the same may hereafter be amended, restated, replaced, extended, renewed, supplemented, severed, split, or otherwise modified from time to time, the "Note"), made by Borrower payable to the order of Lender;

WHEREAS, Pledgor is the legal and beneficial owner of 100% of the issued and outstanding limited liability company interests of Borrower ("Issuer"), and it is a condition precedent to the obligation of Lender to make the Loan to Borrower that Pledgor shall have executed and delivered this Agreement to Lender.

NOW, THEREFORE, in consideration of the premises and to induce Lender to make the Loan and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Pledgor hereby agrees with Lender as follows:

1.        Recitals Incorporated; Defined Terms. The recitals set forth above in this Agreement are hereby incorporated into this Agreement as if fully set forth herein. As used in this Agreement, the following terms have the meanings set forth in or incorporated by reference below. All other capitalized terms used herein but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Loan Agreement or, if they are not defined in the Loan Agreement, such terms shall have the respective meanings ascribed to them in the UCC (as hereinafter defined). For purposes of this Agreement, (i) the words "hereof", "herein", "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, subsection, schedule and exhibit references are to this Agreement unless otherwise specified, and (ii) the word "including" when used in this Agreement shall be deemed to be followed by the words "but not limited to."

"Agreement" is defined in the Preamble.

"Article 8 Matter" shall mean any action, decision, determination or election by Issuer, the Pledgor or its members that their limited liability company interests or other equity interests, or any of them, be, or cease to be, a "security" as defined in and governed by Article 8 of the UCC, and all other matters related to any such action, decision, determination or election.

"Borrower" is defined in the Recitals.

"Collateral" is defined in Section 2.

"Effective Date" is defined in the Preamble.

"Issuer" is defined in the Recitals.

"Issuer Operating Agreement" shall mean the Limited Liability Company Agreement of the Borrower adopted and made effective on February 18, 2022, as may be amended, supplemented, restated or otherwise modified from time to time.

"Lender" is defined in the Preamble.

"Loan" is defined in the Recitals.

"Loan Agreement" is defined in the Recitals.

"Note" is defined in the Recitals.

"Pledged Interests" shall mean, with respect to Pledgor, all limited liability company interests, capital stock or other equity interests of, and all other right, title and interest now owned or hereafter acquired by Pledgor in and to Issuer as the same is described on Schedule I attached hereto, together with (a) all additional ownership interests, capital stock or other equity interests in Issuer and options, warrants, and other rights now or hereafter acquired by Pledgor in respect of such capital stock or other equity interests (whether in connection with any capital increase, recapitalization, reclassification, or reorganization of Issuer or otherwise) and all other property, rights or instruments of any description at any time issued or issuable as an addition to, or in substitution for, such ownership interests, capital stock or other equity interests; (b) all issued stock certificates, certificates, instruments, or other writings representing or evidencing interests in Issuer, and all accounts and general intangibles arising out of, or in connection with, the interests in Issuer; (c) any and all moneys or property due and to become due to Pledgor now or in the future in respect of the interests in Issuer, or to which Pledgor may now or in the future be entitled in its capacity as a member, partner, shareholder or other equity holder of Issuer, whether by way of a dividend, distribution, return of capital or otherwise; (d) all other claims which Pledgor now has or may in the future acquire in Pledgor's capacity as a member, partner, shareholder or other equity holder of Issuer; and (e) all rights of Pledgor under the Issuer Operating Agreement (and all other agreements, if any, to which Pledgor is a party from time to time which relate to Pledgor's ownership of the interests in Issuer), including, without limitation, all voting and consent rights of Pledgor arising thereunder or otherwise in connection with Pledgor's ownership of the interests in Issuer.

"Proceeds" shall mean (i) Pledgor's share, right, title and interest in and to all distributions, monies, fees, payments, compensations and proceeds now or hereafter becoming due and payable to Pledgor by Issuer with respect to the Pledged Interests whether payable as profits, distributions, promote interest payments, asset distributions, repayment of loans or capital or otherwise and including all "proceeds" as such term is defined in Section 9-102(a)(64) of the UCC; (ii) all contract rights, general intangibles, claims, powers, privileges, benefits and remedies of Pledgor relating to the foregoing; and (iii) all cash or non-cash proceeds of any of the foregoing.

"Pledgor" is defined in the Recitals.

"SEC" is defined in Section 10(d).

"Special Damages" is defined in Section 16(j).

"UCC" shall mean the Uniform Commercial Code as in effect in the State of New York, or in effect in each other applicable jurisdiction, as the case may be.

2.      Pledge; Grant of Security Interest. Pledgor hereby pledges and grants to Lender, as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Debt, a first priority security interest in all of Pledgor's right, title and interest to the following (the "Collateral"):

(i)      all Pledged Interests;

(ii)     all right, title and interest of Pledgor in, to and under any policy of insurance payable by reason of loss or damage to the Pledged Interests and any other Collateral;

(iii)    all "accounts", "general intangibles", "payment intangibles", "instruments" and "investment property" (in each case as defined in the UCC) constituting or relating to the foregoing; and

(iv)     to the extent not otherwise part of the Pledged Interests, all Proceeds, income and profits thereof and all property received in exchange or substitution thereof, of any of the foregoing property of Pledgor.

Issuer has evidenced their acknowledgement and consent to the pledge and grant given hereby, by execution and delivery of a Recognition Agreement in the form attached hereto as Exhibit A.

3.      Reserved.

4.      Representations and Warranties. Pledgor represents and warrants as of the Effective Date that:

(a)      no authorization, consent of or notice to any other Person (including, without limitation, any member, partner, manager, shareholder or creditor of Pledgor) that has not been obtained, is required in connection with the execution, delivery, performance, validity or enforceability of this Agreement, including, without limitation, the assignment and transfer by Pledgor of any of the Collateral to Lender or the subsequent transfer thereof by Lender pursuant to the terms hereof; nothing prohibits or restricts the right or ability of Pledgor to close the transaction contemplated under this Agreement, and to carry out the terms hereof.

(b)      the Pledged Interests constitute all of the issued and outstanding equity interests in Issuer;

(c)      Pledgor is the sole record and beneficial owner of, and has good and marketable title to, the Pledged Interests free of any and all Liens or options in favor of, or claims of, any other Person, except the Lien created by this Agreement and the Pledged Interests are not otherwise subject to any outstanding assignment, sale, transfer, conveyance, pledge or encumbrance (except pursuant to this Agreement);

(d)      upon the filing of the UCC-1 financing statement referred to in Section 12 with the Secretary of State of the State of Delaware, and the delivery of the certificate representing the Pledged Interests, the Lien granted pursuant to this Agreement will constitute a valid, perfected Lien on the Collateral and related Proceeds in such jurisdiction, enforceable against all creditors of Pledgor and any Persons purporting to purchase any Collateral and related Proceeds from Pledgor;

(e)     the principal place of business and chief executive office of Pledgor is located at Pledgor's address set forth in the <u>Preamble</u>;

(f)     the exact legal name of Pledgor is as set forth in the <u>Preamble</u>;

(g)     Pledgor is organized under the laws of the State of Delaware and Pledgor's organizational File Number is 6616673;

(h)     Pledgor shall deliver all certificates, instruments representing the Pledged Interests and/or writings to Lender, together with powers duly executed in blank by Pledgor in the form attached hereto as <u>Schedule II</u>;

(i)     the limited liability company equity interests held by Pledgor in Issuer have been validly issued and fully paid for as provided in the Issuer Operating Agreement;

(j)     there are no options, warrants or other agreements relating to Pledgor's Pledged Interests (other than the Issuer Operating Agreement).

5.     <u>Covenants</u>. Pledgor covenants and agrees with Lender that, from and after the Effective Date until the Debt (exclusive of any indemnification or other obligations which are expressly stated in this Agreement or any of the other Loan Documents to survive satisfaction of the Loan) is paid in full:

(a)     If Pledgor shall, as a result of its ownership of the Pledged Interests, become entitled to receive or shall receive a stock or limited liability company certificate (including, without limitation, any certificate representing a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in connection with any reorganization), option or rights, whether in addition to, in substitution of, as a conversion of, or in exchange for any of the Pledged Interests, or otherwise in respect thereof, Pledgor shall accept the same as Lender's agent, hold the same in trust for Lender and deliver the same forthwith to Lender in the exact form received, duly endorsed by Pledgor to Lender, if required, together with an undated stock or limited liability company interest power in the form attached hereto as <u>Schedule II</u>, covering such certificate duly executed in blank and with, if Lender so requests, signature guaranteed, to be held by Lender hereunder as additional security for the Debt. Any sums paid upon or in respect of the Pledged Interests upon the liquidation or dissolution of Issuer shall be paid over to Lender to be held by it hereunder as additional security for the Debt, and in case any distribution of capital shall be made on or in respect of the Pledged Interests or any property shall be distributed upon or with respect to the Pledged Interests pursuant to the recapitalization or reclassification of the capital of Issuer or pursuant to the reorganization thereof, the property so distributed shall be delivered to Lender to be held by it, subject to the terms hereof, as additional security for the Debt. If any sums of money or property so paid or distributed in respect of the Pledged Interests shall be received by Pledgor, Pledgor shall, until such money or property is paid or delivered to Lender, hold such money or property in trust for Lender, segregated from other funds of Pledgor, as additional security for the Debt.

(b)     Without the prior written consent of Lender, Pledgor shall not, directly or indirectly (i) except as permitted in the Loan Agreement, vote to enable, or take any other action to permit Issuer to issue any shares of stock or equity interests or to issue any other securities convertible into or granting the right to purchase or exchange for any equity interests in Issuer, (ii) except as permitted by the Loan Agreement, sell, assign, transfer, exchange or otherwise dispose of, or grant any option with respect to, the Collateral, or (iii) except as permitted in the Loan Agreement, create, incur, authorize or permit to exist any Lien or option in favor of, or any claim of any Person with respect to, any of the Collateral, or any interest therein, except for the Lien provided for by this Agreement. Pledgor shall defend the right, title and interest of Lender in, to and under the Collateral against the claims and demands of all Persons whomsoever.

(c)    At any time and from time to time, upon the written request of Lender, and at the sole expense of Pledgor, Pledgor shall promptly and duly give, execute, deliver, file and/or record such further instruments and documents and take such further actions as Lender may reasonably request (other than certificating the Pledged Interests and delivering the same) for the purposes of obtaining, creating, perfecting, validating or preserving the full benefits of this Agreement and of the rights and powers herein granted, including, without limitation, filing UCC financing statements or continuation statements, provided that the amount of the Debt shall not be increased thereby. Pledgor hereby authorizes Lender to file any such financing statement or continuation statement without the signature of Pledgor to the extent permitted by law. If any amount payable under, or in connection with, any of the Collateral shall be or become evidenced by any promissory note, other instrument or chattel paper, such promissory note, instrument or chattel paper shall be promptly delivered to Lender, duly endorsed in a manner satisfactory to Lender, to be held as Collateral pursuant to this Agreement.

(d)    Pledgor shall not amend or modify the Issuer Operating Agreement in any respect other than in accordance with the Loan Agreement or except as required by law, in which case (x) Pledgor shall provide advanced written notice to Lender of any such requirement by law to amend or modify the Issuer Operating Agreement which notice shall describe the required amendment or modification and (y) Pledgor shall concurrently with the execution thereof provide Lender with a copy of the amended or modified Issuer Operating Agreement.

(e)    Pledgor will furnish to Lender from time to time statements and schedules further identifying and describing the Pledged Interests and such other reports in connection with the Pledged Interests as Lender may reasonably request, all in reasonable detail.

(f)    Pledgor will not (A) change the location of its residence, chief executive office, or principal place of business from that specified in the Preamble, (B) change its name, identity, or structure, as applicable, or (C) reorganize under the laws of another jurisdiction, if applicable, unless (i) Pledgor shall have given twenty (20) business days' prior written notice to such effect to Lender, and (ii) all action reasonably necessary or advisable, in Lender's opinion, to protect and perfect the Liens and security interests intended to be created hereunder with respect to the Pledged Interests shall have been taken.

(g)    Pledgor shall pay, and save Lender harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other taxes which may be payable or determined to be payable with respect to any of the Collateral or in connection with any of the transactions contemplated by this Agreement.

(h)    Intentionally deleted.

(i)    Pledgor shall not enter into any agreement (other than this Agreement and the Issuer Operating Agreement) whereby it transfers or cedes its voting rights in Issuer or otherwise restricts its voting rights in any way whatsoever.

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 178 of 316

6.    Certain Understandings of Parties; Registration of Pledge; Control of Pledged Collateral, Etc.

(a)    Pledgor acknowledges and agrees that the Pledged Interests is a "security" (as defined in Section 8-102(a) and Section 8-103 of the UCC). Pledgor further acknowledges and agrees that the Pledged Interests are not and will not be investment securities within the meaning of Section 8103 of the UCC.

(b)    Recognition of Pledge; Control of Collateral. Notwithstanding the foregoing, to better assure the perfection of the security interest of Lender in the Pledged Interests concurrently with the execution and delivery of this Agreement, Pledgor shall execute, and shall cause Issuer to execute, the Recognition Agreement in the form of Exhibit A attached hereto. Notwithstanding anything in this paragraph, the Recognition Agreement shall not be construed as expanding the rights of Lender to give instructions with respect to the Collateral beyond such rights set forth in this Agreement or any other Loan Document.

(c)    In the event that Lender assigns its interest in the Loan in accordance with the Loan Agreement, upon Lender's written request therefor, Pledgor will promptly execute and deliver or cause Issuer to execute and deliver, as applicable, revised versions of the Recognition Agreement attached as Exhibit A in favor of the assignee thereof.

(d)    Irrevocable Proxy. Solely with respect to Article 8 Matters, upon and during the continuance of an Event of Default. Pledgor hereby irrevocably grants and appoints Lender, from the Effective Date until the termination of this Agreement in accordance with its terms, as Pledgor's true and lawful proxy, for and in Pledgor's name, place and stead to vote the Pledged Interests in Issuer by Pledgor, whether directly or indirectly, beneficially or of record, now owned or hereafter acquired, with respect to such Article 8 Matters. The proxy granted and appointed in this Section 6(d) shall include the right to sign Pledgor's name (as a member of Issuer) to any consent, certificate or other document relating to an Article 8 Matter and the Pledged Interests that applicable law may permit or require, to cause the Pledged Interests to be voted in accordance with the preceding sentence. Pledgor hereby represents and warrants that there are no other outstanding proxies and powers of attorney with respect to an Article 8 Matter and the Pledged Interests that Pledgor may have granted or appointed. Pledgor will not give a subsequent proxy or power of attorney or enter into any other voting agreement with respect to the Pledged Interests with respect to any Article 8 Matter and any attempt to do so with respect to an Article 8 Matter shall be null and void *ab initio* and of no force and effect.

The proxies and powers granted by Pledgor pursuant to this Agreement are coupled with an interest and are given to secure the performance of Borrower's obligations and are irrevocable until the Debt is paid in full (exclusive of provisions which shall survive full payment).

7.    Cash Dividends; Voting Rights. Unless (i) an Event of Default shall have occurred and be continuing and (ii) Lender has delivered to Pledgor written notice of such Event of Default, Pledgor shall be permitted to receive all profits, losses, income, surplus, return on capital and equity interest distributions paid in the normal course of business of Issuer and to exercise all voting, consent, administration, management and other powers, rights and remedies of Pledgor with respect to the Pledged Interests, provided that no vote shall be cast or right exercised or other action taken which, in Lender's reasonable judgment, would impair the Collateral or which would be inconsistent with, or result in, any violation of any provision of the Loan Agreement, this Agreement or any other Loan Documents.

8.    Rights of Lender.

(a)      If an Event of Default shall occur and be continuing, Lender shall have the right to receive any and all income, distributions, proceeds or other property received or paid in respect of the Pledged Interests or other Collateral and make application thereof to the Debt, in such order as Lender, in its sole discretion, may elect, in accordance with the Loan Documents. If an Event of Default shall occur and be continuing, then Lender shall provide written notice to Pledgor of such Event of Default and shall direct Pledgor to change the name of the record holder of all such Pledged Interests to Lender or its nominee (if not already so registered), and Lender or its nominee may thereafter exercise (i) all voting and all equity and other rights pertaining to the Pledged Interests and (ii) any and all rights of conversion, exchange, and subscription and any other rights, privileges or options pertaining to such Pledged Interests as if it were the absolute owner thereof (including, without limitation, (a) the right to exchange at its discretion any and all of the Pledged Interests upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the organizational structure of Issuer or upon the exercise by Pledgor or Lender of any right, privilege or option pertaining to such Pledged Interests, and in connection therewith, the right to deposit and deliver any and all of the Pledged Interests with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as it may determine and (b) the right to suspend the rights, powers and authorities of any manager of the Issuer until the termination or completion of foreclosure proceedings related to the Pledged Interests, except for any rights, power and authorities that such managers are required to take pursuant to (x) applicable law or (y) the prior written instructions and consent of the Lender), all without liability except to account for property actually received by it and except to the extent arising of Lender's gross negligence or willful misconduct, but Lender shall have no duty whatsoever to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.

(b)      The rights of Lender under this Agreement shall not be conditioned or contingent upon the pursuit by Lender of any right or remedy against Pledgor or against any other Person which may be or become liable in respect of all or any part of the Debt or against any other security therefor, guarantee thereof or right of offset with respect thereto. Lender shall not be liable for any failure to demand, collect or realize upon all or any part of the Collateral or for any delay in doing so, nor shall it be under any obligation to sell or otherwise dispose of any Collateral upon the request of Pledgor or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof.

(c)      Upon satisfaction in full of the Debt and payment of all amounts owed on the Loan, Lender's rights under this Agreement shall terminate and Lender shall (i) execute and deliver to Pledgor UCC-3 termination statements or similar documents and agreements to terminate all of Lender's rights under this Agreement and all other Loan Documents and (ii) return the certificates pledged pursuant to the terms hereof and in the possession of Lender, if any.

(d)      Pledgor also authorizes Lender, at any time and from time to time, to execute, in connection with the sale provided for in Section 9 or Section 10 hereof, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral in compliance with said Section 9 or Section 10.

(e)      The powers conferred on Lender hereunder are solely to protect Lender's interest in the Collateral and shall not impose any duty upon Lender to exercise any such powers. Lender shall be accountable only for amounts that Lender actually receives as a result of the exercise of such powers, and neither Lender nor any Indemnified Parties, shall be responsible to Pledgor or any other Person for any act or failure to act hereunder, except for its or their gross negligence or willful misconduct.

(f)      If Pledgor fails to perform or comply with any of Pledgor's agreements contained herein and Lender, as provided for by the terms of this Agreement, shall itself perform or comply, or otherwise cause performance or compliance, with such agreement, the reasonable expenses of Lender

Case 1:26-cv-04240-RA     Document 1-1     Filed 05/20/26     Page 180 of 316

incurred in connection with such performance or compliance, together with interest at the Default Rate if such expenses are not paid within five (5) Business Days of demand, shall be payable by Pledgor to Lender on demand and shall constitute obligations secured hereby.

9.     Remedies. If an Event of Default shall occur and continues, Lender may exercise, in addition to all other rights and remedies granted in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Debt:

(a)     All rights and remedies of a secured party under the UCC in effect in each applicable jurisdiction and such additional rights and remedies to which a secured party is entitled at law, in equity or otherwise, including, without limitation, the right, to the maximum extent permitted by law, to exercise all voting, consensual and other powers of ownership pertaining to the Collateral as if Lender were the sole and absolute owner thereof (and Pledgor agrees to take all such actions as may be reasonably appropriate to give effect to such right).

(b)     Lender may make any reasonable compromise or settlement deemed desirable by Lender in its discretion provided the same is commercially reasonable with respect to any of the Collateral and may extend the time of payment, arrange for payment in installments, or otherwise modify the terms of, any of the Collateral.

(c)     Lender in its sole and absolute discretion may, in Lender's name or in the name of Pledgor or otherwise, demand, sue for, collect, direct payment of or receive any money or property at any time payable or receivable on account of or in exchange for any of the Collateral, but shall be under no obligation whatsoever to do so.

(d)     Without limiting the generality of the foregoing, Lender, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind or nature whatsoever (except any notice required by law referred to below or otherwise required by the Loan Documents) to or upon Issuer, Pledgor or any other Person (all and each of which demands, presentments, protests, advertisements and notices, or other defenses, are hereby waived to the fullest extent permitted under applicable law), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, assign, give option or options to purchase or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, in the over-the-counter market, at any exchange, broker's board or office of Lender or elsewhere upon such terms and conditions as Lender may deem advisable and at such prices as it may deem best, provided the same is done in a commercially reasonable manner, for cash or on credit or for future delivery without assumption of any credit risk. Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right, without notice or publication, to adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for such sale, and any such sale may be made at any time or place to which the same may be adjourned without further notice. Lender shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption of Pledgor, which right or equity of redemption is hereby waived and/or released by Pledgor. If Pledgor pays the Loan in full prior to any such sale, then such payoff will halt the sale and Pledgor shall have such right or equity of redemption. Lender shall apply any Proceeds from time to time held by it and the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale, after deducting all reasonable costs and expenses of every kind and nature incurred therein or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of Lender hereunder, including, without limitation, reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Debt, in such order as specified in Section 9-615 of the UCC, and only after such application and after the payment by Lender of any other amount required by any provision of law,

including, without limitation, Section 9-610 and Section 9-615 of the UCC, need Lender account for the surplus, if any, to Pledgor. To the extent permitted by applicable law, Pledgor waives all claims, damages and demands it may acquire against Lender arising out of the exercise by Lender of any of its rights hereunder, except for any claims, damages and demands it may have against Lender arising from the willful misconduct, bad faith or gross negligence of Lender or its affiliates, or any agents or employees of the foregoing. If any notice of a proposed sale or other disposition of Collateral shall be required by applicable law, such notice shall be deemed reasonable and proper if given at least ten (10) days before such sale or other disposition.

(e) The rights, powers, privileges and remedies of Lender under this Agreement are: (i) cumulative, (ii) shall be in addition to all rights, powers, privileges and remedies now or hereafter existing available to Lender at law, in equity or otherwise and (iii) may be exercised successively or concurrently without in any way whatsoever impairing the rights of Lender hereunder.

10. <u>Private Sales</u>. (a) Pledgor recognizes that Lender may be unable to effect a public sale of any or all of the Pledged Interests, by reason of certain prohibitions contained in the Securities Act of 1933, as amended, and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers which will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof. Pledgor acknowledges and agrees that any such private sale may result in prices and other terms less favorable to Lender than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of being a private sale. Lender shall be under no obligation to delay a sale of any of the Pledged Interests for the period of time necessary to permit Issuer or Pledgor to register such securities for public sale under the Securities Act of 1933, as amended, or under applicable state securities laws or otherwise, even if Issuer or Pledgor would agree to do so.

(b) During the continuance of an Event of Default, Pledgor further shall use its commercially reasonable efforts to do or cause to be done all such other acts as may be reasonably necessary to make any sale or sales of all or any portion of the Pledged Interests pursuant to this <u>Section 10</u> valid and binding and in compliance with any and all other requirements of applicable law. Pledgor further agrees that a breach of any of the covenants contained in this <u>Section 10</u> will cause irreparable injury to Lender, that Lender has no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this <u>Section 10</u> shall be specifically enforceable against Pledgor.

(c) Lender shall not incur any liability as a result of the sale of any Collateral, or any part thereof, at any private sale conducted in a commercially reasonable manner, it being agreed that some or all of the Collateral is, or may be, of one or more types that threaten to decline speedily in value and that are not customarily sold in a recognized market.

(d) Section 9-610 of the UCC states that Lender is able to purchase the Pledged Interests only if they are sold at a public sale. U.S. Securities and Exchange Commission ("<u>SEC</u>") staff personnel have issued various No-Action Letters describing procedures which, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Article 9 of the UCC, yet not public for purposes of Section 4(2) of the Securities Act of 1933. The UCC permits Pledgor to agree on the standards for determining whether Lender has complied with Lender's obligations under Article 9 of the UCC. Pursuant to the UCC, Pledgor specifically agrees (x) that it shall not raise any objection to Lender's purchase of the Pledged Interests (through bidding on the obligations or otherwise) and (y) that a foreclosure sale conducted in conformity with the principles set forth in the No-Action Letters (i) shall be considered to be a "public" sale for purposes of the UCC; (ii) will be considered commercially reasonable notwithstanding that Lender, has not registered or sought to register the Pledged Interests under securities

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 182 of 316

laws, even if Pledgor or Issuer agrees to pay all costs of the registration process; and (iii) shall be considered to be commercially reasonable notwithstanding that Lender purchases the Pledged Interests at such a sale.

(e) Pledgor agrees that Lender shall not have any general duty or obligation to make any effort to obtain or pay any particular price for any Pledged Interests or other Collateral sold by Lender pursuant to this Agreement. Lender, may, in its sole and absolute discretion, among other things, accept the first offer received, or decide to approach or not to approach any potential purchasers. Without in any way limiting Lender's right to conduct a foreclosure sale in any manner which is considered commercially reasonable, Pledgor hereby agrees that any foreclosure sale conducted with respect to any of the Pledged Interests in accordance with and under the UCC for the exercising of such rights and remedies as may be provided to a secured party by the UCC shall be considered a commercially reasonable sale.

11. __Limitation on Duties Regarding the Collateral__. Lender's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the UCC or otherwise, shall be to use reasonable care. Pledgor hereby agrees that Lender shall be deemed to have used reasonable care with respect to the Collateral in its possession if it deals with such Collateral in the same manner as Lender deals with similar securities and property for its own account. Neither Lender nor any Indemnified Parties shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation whatsoever to sell or otherwise dispose of any Collateral upon the request of Pledgor or otherwise; provided that Lender's actions of failure to act do not amount to gross negligence or willful misconduct.

12. __Financing Statements__. On the Effective Date, Pledgor hereby authorizes Lender to file UCC-1 financing statements with respect to the Collateral.

13. __Attorney-in-Fact__. Without limiting any rights or powers granted by this Agreement to Lender, upon an Event of Default which continues, Lender is hereby appointed, which appointment as attorney-in-fact is irrevocable and coupled with an interest, the attorney-in-fact of Pledgor for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instruments which Lender may deem reasonably necessary or advisable to accomplish the purposes hereof, including, without limitation:

(a) to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due, and to become due, under or in respect of any of the Collateral;

(b) to receive, endorse and collect any drafts or other instruments, documents and chattel papers in connection with clause (a) above;

(c) to file any claims, take any action or institute any proceedings that Lender may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of Lender, with respect to any of the Collateral;

(d) to execute, in connection with the sale provided for in Section 9 or Section 10, any endorsement, assignments, or other instruments of conveyance or transfer with respect to the Collateral, including, without limitation, to transfer or cause the transfer of the Collateral, or any part thereof, on the books of Issuer or such other entity issuing such Collateral, to the name of Lender or any nominee of Lender; and

(e)    to affix to any certificates and documents representing the Collateral the powers delivered with respect thereto.

Lender hereby agrees only to exercise the power of attorney powers set forth in the immediately preceding sentence upon the occurrence and continuation of an Event of Default.

If so requested by Lender, Pledgor shall ratify and confirm any such sale or transfer by executing and delivering to Lender, at Pledgor's expense, all proper deeds, bills of sale, instruments of assignment, conveyance or transfer and releases as may be designated in any such request.

14.    Reserved.

15.    Reserved.

16.    Miscellaneous.

(a)    Severability. Any provision of this Agreement which is prohibited or unenforceable in any applicable jurisdiction shall, as to such jurisdiction only, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any such jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(b)    Headings. The headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

(c)    No Waiver; Cumulative Remedies. Lender shall not by any act (except by a written instrument pursuant to Section 16(d)), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any default or in any breach of any of the terms, provisions and conditions hereof. No failure to exercise, nor any delay in exercising, on the part of Lender, any right, power or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by Lender of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which Lender would otherwise have on any future occasion. The rights, remedies, powers and privileges herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any rights, remedies, powers or privileges provided by law.

(d)    Waivers and Amendments; Successors and Assigns. None of the terms, conditions or provisions of this Agreement may be waived, amended, or otherwise modified except by a written instrument executed by the party against which enforcement of such waiver, amendment, or modification is sought. This Agreement shall be binding upon and shall inure to the benefit of Pledgor and the respective successors and assigns of Pledgor and shall inure to the benefit of Lender and Lender's successors and assigns; provided, however, Pledgor shall have no right to assign its rights hereunder. The rights of Lender under this Agreement shall automatically be transferred to any permitted transferee to which Lender transfers the Note and the Loan Agreement.

(e)    Notices. All notices or other written communications hereunder shall be given in the manner and to the addresses set forth in the Loan Agreement with respect to Borrower and Lender, and to the address set forth above with respect to Pledgor. Any such notices shall be deemed to have been properly given (i) upon delivery, if delivered in person, (ii) one (1) Business Day after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

(f)     Governing Law.

(i)     **THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY PLEDGOR AND ACCEPTED BY LENDER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE SECURED HEREBY WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, PLEDGOR HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT AND THE NOTE, AND THIS AGREEMENT AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 51401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.**

(ii)     **LENDER CONSENTS TO THE NON-EXCLUSIVE JURISDICTION AND VENUE OF THE STATE AND FEDERAL COURTS LOCATED IN NEW YORK, NEW YORK, FOR THE ADJUDICATION OF ANY LITIGATION RELATING TO THIS AGREEMENT OR ANY OF THE INVESTMENT DOCUMENTS. LENDER WAIVES ANY CLAIM THAT SUCH COURTS ARE NOT A CONVENIENT FORUM FOR ADJUDICATING SUCH LITIGATION.**

(g)     Agents. Lender may employ agents and attorneys-in-fact in connection herewith and shall not be responsible for their actions except for the gross negligence or willful misconduct of any such agents or attorneys-in-fact selected by Lender in good faith.

(h)     Irrevocable Authorization and Instruction to Issuer. Pledgor hereby authorizes and instructs Issuer and any servicer of the Loan to comply with any instruction received by it from Lender in writing that is in accordance with the terms of this Agreement, without any other or further authorizations or instructions from Pledgor, and Pledgor agrees that Issuer and any servicer of the Loan shall be fully protected in so complying, absent gross negligence or willful misconduct.

(i)     Counterparts. This Agreement may be executed in any number of counterparts and all the counterparts taken together shall be deemed to constitute one and the same instrument.

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 185 of 316

**(j)** **WAIVER OF JURY TRIAL, DAMAGES, JURISDICTION. LENDER HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN EVIDENCED BY THE NOTE, THE LOAN AGREEMENT, THIS SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS OR ANY ACTS OR OMISSIONS OF PLEDGOR, ITS OFFICERS, EMPLOYEES, DIRECTORS OR AGENTS IN CONNECTION THEREWITH.**

No claim may be made by Pledgor against Lender, any Indemnified Parties or any of its or their attorneys for any special, speculative, indirect, exemplary, punitive or consequential damages ("Special Damages") in respect of any breach or wrongful conduct (whether the claim therefor is based on contract, tort or duty imposed by law) in connection with, arising out of, or in any way related to the transactions contemplated or relationship established by this Agreement, or any act, omission or event occurring in connection herewith or therewith; and to the fullest extent permitted by law Pledgor hereby waives, releases and agrees not to sue upon any such claim for Special Damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(k)      Schedules and Exhibits Incorporated. The Schedules and Exhibit attached hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

**[NO FURTHER TEXT ON THIS PAGE]**

14

NYSCEF DOC. NO. 6

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the Effective Date.

**PLEDGOR:**

**LEXAV OWNER, LLC,**
a Delaware limited liability company

By: _____
Name: Acho Azuike
Title: Vice President

[signature page to Pledge and Security Agreement – Thompson Hotel]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the Effective Date.

**PLEDGOR:**

**LEXAV OWNER, LLC,**
a Delaware limited liability company

By: _____
Name: Acho Azuike
Title:  Vice President

**LENDER:**

**SOUTHERN REALTY TRUST HOLDINGS LLC,**
a Delaware limited liability company

By:      Southern Realty Trust Inc., its Sole
         Member

By: _____
     Name: Brian Sedrish
     Title:   Chief Executive Officer

**SUNRISE REALTY TRUST INC.,**
a Maryland corporation

By: _____
     Name: Brandon Hetzel
     Title:   Chief Financial Officer

[signature page to Pledge and Security Agreement – Thompson Hotel]

## EXHIBIT A

## RECOGNITION AGREEMENT

THIS RECOGNITION AGREEMENT (this "Agreement") is executed and delivered as of July 31, 2024 by **LEXAV OWNER, LLC**, a Delaware limited liability company ("Pledgor") and **LEX AVENUE HOTEL, LLC**, a Delaware limited liability company ("Issuer"). Issuer hereby acknowledges receipt of a copy of that certain Pledge and Security Agreement (the "Pledge Agreement"), dated as of the date hereof, granted by Pledgor, in favor of **SOUTHERN REALTY TRUST HOLDINGS LLC**, a Delaware limited liability company, having its principal place of business at c/o Southern Realty Trust Inc., 2 Wisconsin Circle #700, Chevy Chase, Maryland  20815 ("SRH"), and **SUNRISE REALTY TRUST, INC.**, a Maryland corporation, having its principal place of business at 525 Okeechobee Blvd., Suite 1650, West Palm Beach, FL 33401 ("SRT"; SRT and SRH, individually and/or collectively as the context may require, together with their respective successors and assigns, "Lender"), and acknowledges that Pledgor is bound thereby. Issuer agrees to notify Lender promptly in writing of the occurrence of any of the events described in Section 5(a), Section 5(b) or Section 5(d) of the Pledge Agreement.

Issuer hereby recognizes and consents to Lender's security interest in the Collateral pursuant to the Pledge Agreement. Issuer, as issuer of the Pledged Interests, agrees to comply with any "instructions" (as said term is defined in Section 8-102(12) of the Code) originated by Lender without further consent of Pledgor, including, without limitation, instructions regarding the transfer, redemption or other disposition of the Collateral and any distributions with respect thereto. Issuer agrees, following Lender's written notification to Issuer of an Event of Default that is then continuing, to comply with any and all instructions of Lender regarding any exercise of remedies by Lender with respect to the Collateral and to recognize any and all rights (including without limitation the registration of Lender as the owner of the Collateral on Issuer's ledger, books and records) belonging to the holder of the Collateral, all without further consent of Pledgor or any other person. The foregoing provision is intended to, and shall, provide Lender with "control" over the Collateral within the meaning of Articles 8 and 9 of the Code.

In the event of a transfer of all or any portion of the Collateral to Lender, whether pursuant to foreclosure of Lender's security interest or otherwise, Issuer agrees that: (a) Lender (or its affiliate or nominee) shall, with respect to any transferred portion, upon the date of such transfer, and shall thereafter continue to be entitled to, all of the rights and benefits of Pledgor as the holder of 100% of the Pledged Interests, (b) Issuer shall, with respect to any transferred portion, recognize Lender (or its affiliate or nominee) as the successor in interest to Pledgor and as sole member of Issuer, and (c) notwithstanding any provisions to the contrary in the Issuer Operating Agreement, Lender shall not be required to pay any fees or other consideration of any type, or execute any documents, or be limited by any requirements or conditions whatsoever (regarding distributions receivable by Lender from Issuer, Lender's financial condition or otherwise), other than any such requirements, if any, that are expressly set forth in the Loan Agreement. Issuer agrees to promptly confirm the existence of this Agreement and the Pledge Agreement and the security interests in favor of Lender to any person inquiring about the same or about the Collateral.

After the occurrence and during the continuation of an Event of Default and upon notice by Lender setting forth the existence of such Event of Default and referring to this Agreement, Issuer will forward all cash payments and distributions which it distributes to Pledgor under the Issuer Operating Agreement by

federal wire transfer of immediately available funds to an account specified by Lender in a written direction, or to such other account as Lender may specify by notice to Issuer. Pledgor hereby confirms that Issuer is authorized to send such payments to the account specified by Lender. Issuer agrees with Lender that it shall comply with instructions relating to the Collateral originated by Lender without further authorization or consent from Pledgor, the intention of such covenant being to comply with Section 8-106(c)(2) of the Code. All capitalized terms used in this Agreement and not otherwise defined herein shall have the respective meanings ascribed to such terms in the Pledge Agreement.

Dated: <u>JULY</u>   <u>31</u>, 2024

**PLEDGOR:**

**LEXAV OWNER, LLC,**
a Delaware limited liability company

By: _____
Name: Acho Azuike
Title:   Vice President

**ISSUER:**

**LEX AVENUE HOTEL, LLC,**
a Delaware limited liability company

By: _____
Name: Acho Azuike
Title:   Vice President

[signature page to Recognition Agreement – Thompson Hotel]

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 191 of 316

## SCHEDULE I

| ISSUER | OWNER | OWNERSHIP INTEREST | PERCENTAGE OF OWNERSHIP INTEREST |
|---|---|---|---|
| Lex Avenue Hotel, LLC, a Delaware limited liability company | LexAv Owner, LLC, a Delaware limited liability company | Limited Liability Company Interest in Issuer evidenced by Certificate No. 2 dated July 31, 2024 | 100% |

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 192 of 316

## SCHEDULE II

### MEMBERSHIP INTEREST POWER

FOR VALUE RECEIVED, LexAv Owner, LLC, a Delaware limited liability company ("Pledgor"), hereby sells, assigns, conveys and transfers unto _____, in accordance with the provisions of the Pledge and Security Agreement, effective as of the date hereof, all of the outstanding and issued limited liability company interests of Lex Avenue Hotel, LLC, a Delaware limited liability company ("Issuer"), standing in the name of Pledgor on the books of Issuer represented by Certificate No. 2 and does hereby irrevocably constitute and appoint Lender and its officers, as attorney-in-fact, to transfer the same on the books and records of Issuer, with full power of substitution in the premises.

Dated: July 31, 2024

**PLEDGOR:**

**LEXAV OWNER, LLC**,
a Delaware limited liability company

By: ___SEE SIGNATURE ATTACHED___
Name:  Acho Azuike
Title:   Vice President

In the presence of:

___SEE SIGNATURE ATTACHED___

Name:

Dated: July 31, 2024

**PLEDGOR:**

**LEXAV OWNER, LLC,**
a Delaware limited liability company

By: _____
Name: Acho Azuike
Title:   Vice President

In the presence of:

Name:

[signature page to Membership Interest Power – Thompson Hotel]

# EXHIBIT D

Doc# 20240224751 12/03/2024 12:24 PM Page 1 of 7 Lucy Adame Clark, Bexar County Clerk
Case 1:23-cv-04240-RA Document 1-17 Filed 05/20/26 Page 195 of 316

This document was prepared
by and after recording should
be returned to:

Akerman LLP
999 Peachtree Street NE, Suite 1700
Atlanta, Georgia 30309
Attention: Anne Marie Garavaglia, Esq.

---

**SUNRISE REALTY TRUST, INC.**, a Maryland corporation
(Assignor)

To

**SUNRISE REALTY TRUST HOLDINGS I LLC**, a Delaware limited liability company
(Assignee)

---

**ASSIGNMENT OF FEE AND LEASEHOLD DEED OF TRUST, SECURITY
AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING**

---

Dated: As of November 26, 2024

Property Location:  115 Lexington Avenue, San Antonio, TX 78205
County: Bexar County

Doc# 20240222151 12/03/2024 12:24 PM Page 2 of 7 Lucy Adame Clark, Bexar County Clerk

This **ASSIGNMENT OF FEE AND LEASEHOLD DEED OF TRUST, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING** (this "**Assignment**"), is made as of November 26, 2024, by **SUNRISE REALTY TRUST, INC.**, a Maryland corporation ("**Assignor**"), having an address at c/o SOUTHERN REALTY TRUST HOLDINGS LLC., 525 Okeechobee Blvd., Suite 1650, West Palm Beach, FL 33401, to **SUNRISE REALTY TRUST HOLDINGS I LLC**, a Delaware limited liability company ("**Assignee**"), having an address at c/o SOUTHERN REALTY TRUST HOLDINGS LLC., 525 Okeechobee Blvd., Suite 1650, West Palm Beach, FL 33401.

KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt whereof is hereby acknowledged, Assignor has granted, bargained, sold, assigned, transferred and set over, and by these presents does grant, bargain, sell, assign, transfer and set over unto Assignee:

Assignor's right, title and interest in, to and under that certain **FEE AND LEASEHOLD DEED OF TRUST, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING** (the "**Deed of Trust**") given by **LEX AVENUE HOTEL, LLC,** a Delaware limited liability company ("**Borrower**"), as borrower, to **JOHN HAMMOND**, an individual ("**Trustee**"), as trustee, for the benefit of **SOUTHERN REALTY TRUST HOLDINGS LLC**, a Delaware limited liability company ("**SRH Lender**") and Assignor, as lender, dated as of July 31, 2024, and recorded in the Official Records of Bexar County, Texas on August 1, 2024 as Document Number: 20240139213.

Prior to the execution hereof, Assignor has not sold, transferred, assigned, conveyed, pledged or endorsed, any right, title or interest in and to the Deed of Trust, and Assignor has full right, power and authority to sell and assign its right, title and interest in the Deed of Trust to Assignee. For the avoidance of doubt, SRH Lender is not selling or assigning its right, title or interest in and to the Deed of Trust to Assignee and shall remain a lender under the Deed of Trust.

TOGETHER WITH the note or notes described or referred to in the Deed of Trust, the money due and to become due thereon with interest, and all rights accrued or to accrue under the Deed of Trust.

This Assignment is made by Assignor without recourse, representation or warranty (express or implied).

TO HAVE AND TO HOLD the same unto Assignee, its successors and assigns forever.

The Deed of Trust encumbers, among other things, the property described on Exhibit A annexed hereto and made a part hereof, together with the buildings and improvements erected thereon.

**[SIGNATURE PAGE FOLLOWS]**

2

Doc# 20240222151 12/03/2024 12:24 PM Page 3 of 7 Lucy Adame-Clark, Bexar County Clerk
Case 1:23-cv-04240-ELR Document 11-7 Filed 05/30/26 Page 197 of 316

IN WITNESS WHEREOF, Assignor has caused these presents to be duly executed as of the day and year first written above.

ASSIGNOR:

**SUNRISE REALTY TRUST, INC.,**
a Maryland corporation

By: _____

Name: Brandon Hetzel
Title: Chief Financial Officer

ACKNOWLEDGEMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of FL
County of Palm Beach ss.

On the 26th day of November, 2024, before me, Nicole Bambaech . Notary Public, personally appeared Brandon Hetzel who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Florida that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Signature                                      (Seal)

NICOLE ANN BAMBACH
MY COMMISSION #HH348143
EXPIRES: JAN 10, 2027
Bonded through 1st State Insurance

[SIGNATURE PAGE TO ASSIGNMENT OF DOT (THOMPSON SAN ANTONIO)]

FILED: NEW YORK COUNTY CLERK 04/17/2026 04:35 PM   INDEX NO. 652311/2026
NYSCEF DOC. NO. 21   Doc# 20240222451 12/03/2024 12:24 PM Page 4 of 7 Lucy Adame-Clark, Bexar County Clerk RECEIVED NYSCEF: 04/17/2026

Case 1:23-cv-04240-RA Document 11-7 Filed 05/20/26 Page 198 of 316

**Acknowledged by SRH Lender:**

**SOUTHERN REALTY TRUST HOLDINGS
LLC**, a Delaware limited liability company

By: Southern Realty Trust Inc., its Sole Member

By: _____

Name: Brandon Hetzel
Title: Chief Financial Officer

ACKNOWLEDGEMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of __FL__
County of __PalmBeach__ ss.

On the 26th day of November 2024, before me, __Nicole Bambach__ , Notary Public, personally appeared Brandon Hetzel who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of __Florida__ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Signature                                                          (Seal)

NICOLE ANN BAMBACH
MY COMMISSION #HH348143
EXPIRES: JAN 10, 2027
Bonded through 1st State Insurance

[SIGNATURE PAGE TO ASSIGNMENT OF DOT (THOMPSON SAN ANTONIO)]

Doc# 20240222451 12/03/2024 12:24 PM Page 5 of 7 Lucy Adame Clark, Bexar County Clerk

EXHIBIT A

Description of the Property

Fee interest in the Hotel Unit of SCH San Antonio Master Condominium, a condominium project created pursuant to the Amended and Restated Condominium Declaration for SCH San Antonio Master Condominium, recorded October 30, 2020 as Document No. 20200262732 of the Official Public Records of Bexar County, Texas, as amended by that certain First Amendment to the Amended and Restated Condominium Declaration for SCH San Antonio Master Condominium, recorded December 22, 2021 as Document 20210355555 of the Official Public Records of Bexar County, Texas, as amended, by covering buildings built on certain real property located in Bexar County, Texas, as described in therein, together with an undivided interest, appurtenant to the Unit, in and to the Common Elements.

Non-exclusive easements for use and enjoyment of the Building, Common Elements adjacent to a Unit, Limited Common Elements and Amenities, construction, maintenance, utilities and minor encroachments upon the terms and conditions contained in that certain Amended and Restated Condominium Declaration for SCH San Antonio Master Condominium, recorded as Document No. 20200262732 of the Official Public Records of Bexar County, Texas, as amended.

and

Leasehold interest as created by that certain Lease dated January 25, 2018, executed by Edmund S. Beck and Jutta A. Beck, as lessor, and 101 Lexington Tower, LLC, a Delaware limited liability company as lessee, as referenced in the document entitled Amended and Restated Ground Lease, which was recorded January 26, 2018 at Volume 18959, Page 2166, Real Property Records, Bexar County, Texas, and assigned to Lex Avenue Hotel, LLC, a Delaware limited liability company, pursuant to that certain Assignment, Assumption, and Amendment of Amended and Restated Ground Lease filed for record February 25, 2022 in County Clerk's File No. 20220047573 of the Official Public Records of Bexar County, Texas, for the following property:

A 0.6149 OF AN ACRE (26,788 SQUARE FEET) TRACT OF LAND OUT OF BLOCK 31', NEW CITY BLOCK 802, IN THE CITY OF SAN ANTONIO, BEXAR COUNTY, TEXAS COMPRISED OF A 0.3413 OF AN ACRE TRACT KNOWN AS "FIRST TRACT" NOW DESIGNATED AS LOT 7, BLOCK 31, NEW CITY BLOCK 802 AND A 0.2734 OF AN ACRE TRACT KNOWN AS "SECOND TRACT" BEING DESIGNATED AS THE REMAINDER OF OR THE NORTHWEST 170 FEET OF LOT 1, BLOCK 31, NCB 802 BEING THE SAME LAND AS DESCRIBED BY DEEDS RECORDED IN VOLUME 7173, PAGE 335, VOLUME 7173, PAGE 337, DEED RECORDS OF BEXAR COUNTY, TEXAS AND VOLUME 6621, PAGE 548, OFFICIAL PUBLIC RECORDS OF BEXAR COUNTY, TEXAS, BEING MORE PARTICULARLY DESCRIBED IN A CLOCKWISE MANNER AS FOLLOWS:

BEGINNING: At a set "x" in concrete at the intersection of the southwest right-of-way line of Lexington Avenue and the southeast right-of-way line of St. Mary's St. at the northernmost corner of this tract;

THENCE: S 33°12'56" E, 267.40 feet along and with the southwest right-of-way line of said Lexington Avenue to a set 1/2" iron rod and cap "MBC"; THENCE: S 54°56'14" E, 104.51 feet to a set "x" in concrete on the north bank of the San Antonio River and southeast corner of this tract;

THENCE: S 58°13'47" W, 69.80 feet along and with the north bank of the San Antonio River to a set 'x' in concrete;

THENCE: N 87°15'18" W, 48.56 feet along and with the north bank of the San Antonio River to a set 1/2" iron rod and cap "MBC" at the southeast corner of Lot 2, Block 31 as recorded in Volume 7092, Page 2073 of the Official Public Records of Real Property of Bexar County, Texas at the Southwest corner of this tract;

Doc# 20240222451 12/03/2024 12:24 PM Page 6 of 7 Lucy Adame-Clark, Bexar County Clerk
Case 1:26-cv-04240-RA Document 1-17 Filed 05/20/26 Page 200 of 316

THENCE: N 33°06'20" W, 164.81 feet leaving the north bank of the San Antonio River, along and with the northeast line of said Lot 2, to a set "x" in concrete;

THENCE: N 33°12'56" W, 169.92 feet along and with the northeast line of said Lot 2 to a set 'A" iron rod and cap "MBC" at the northernmost corner of said Lot 2 and in the southeast right-of-way line of said St. Mary's St.;

THENCE: N 57°12'37" E, 70.09 feet along and with the southeast right-of-way line of said St. Mary's St. to the POINT OF BEGINNING of this 0.6149 of an acre tract.

Accommodation recording only;
document not reviewed,
and no insurance provided.

**File Information**

**eFILED IN THE OFFICIAL PUBLIC eRECORDS OF BEXAR COUNTY
LUCY ADAME-CLARK, BEXAR COUNTY CLERK**

| | |
|---|---|
| **Document Number:** | 20240222151 |
| **Recorded Date:** | December 03, 2024 |
| **Recorded Time:** | 12:24 PM |
| **Total Pages:** | 7 |
| **Total Fees:** | $45.00 |

**\*\* THIS PAGE IS PART OF THE DOCUMENT \*\***

**\*\* Do Not Remove \*\***

Any provision herein which restricts the sale or use of the described real property because of race is invalid and unenforceable under Federal law

STATE OF TEXAS, COUNTY OF BEXAR

I hereby Certify that this instrument was eFILED in File Number Sequence on this date and at the time stamped hereon by me and was duly eRECORDED in the Official Public Record of Bexar County, Texas on: 12/3/2024 12:24 PM

*Lucy Adame-Clark*
**Lucy Adame-Clark**
**Bexar County Clerk**

Doc# 2024022452 12/03/2024 12:24 PM Page 1 of 7 Lucy Adame Clark, Bexar County Clerk
NYSCEF DOC. NO. 24
RECEIVED NYSCEF: 04/17/2026

This document was prepared
by and after recording should
be returned to:

Akerman LLP
999 Peachtree Street NE, Suite 1700
Atlanta, Georgia 30309
Attention: Anne Marie Garavaglia, Esq.

---

**SUNRISE REALTY TRUST, INC.**, a Maryland corporation
(Assignor)

To

**SUNRISE REALTY TRUST HOLDINGS I LLC**, a Delaware limited liability company
(Assignee)

---

## ASSIGNMENT OF ASSIGNMENT OF LEASES AND RENTS

---

Dated: As of November 26, 2024

Property Location: 115 Lexington Avenue, San Antonio, TX 78205
County: Bexar County

FILED: NEW YORK COUNTY CLERK 04/17/2026 04:35 PM

INDEX NO. 652311/2026

NYSCEF DOC. NO. 152

RECEIVED NYSCEF: 04/17/2026

THIS **ASSIGNMENT OF ASSIGNMENT OF LEASES AND RENTS** (the "**Assignment**") is made as of November 26, 2024 by **SUNRISE REALTY TRUST, INC.**, a Maryland corporation ("**Assignor**"), having an address at c/o SOUTHERN REALTY TRUST HOLDINGS LLC., 525 Okeechobee Blvd., Suite 1650, West Palm Beach, FL 33401, to **SUNRISE REALTY TRUST HOLDINGS I LLC**, a Delaware limited liability company ("**Assignee**"), having an address at c/o SOUTHERN REALTY TRUST HOLDINGS LLC., 525 Okeechobee Blvd., Suite 1650, West Palm Beach, FL 33401.

For good and sufficient consideration the receipt and sufficiency of which are hereby acknowledged by Assignor, Assignor hereby sells, assigns, transfers, and endorses to Assignee, its successors and assigns, without recourse, representation or warranty (express or implied), all its right, title and interest in and to that certain Assignment of Leases and Rents, dated as of July 31, 2024, made by **LEX AVENUE HOTEL, LLC,** a Delaware limited liability company ("**Borrower**") to **SOUTHERN REALTY TRUST HOLDINGS LLC**, a Delaware limited liability company ("**SRH Lender**") and Assignor, and recorded on August 1, 2024 in the Official Records of Bexar County, Texas, as Document Number: 20240139214 (the "**Assignment of Leases**"), which Assignment of Leases was delivered with respect to that certain real property described on Exhibit A attached hereto and made a part hereof.

Prior to the execution hereof, Assignor has not sold, transferred, assigned, conveyed, pledged or endorsed, any right, title or interest in and to the Assignment of Leases, and Assignor has full right, power and authority to sell and assign its right, title and interest in the Assignment of Leases to Assignee. For the avoidance of doubt, SRH Lender is not selling or assigning its right, title or interest in and to the Assignment of Leases to Assignee and shall remain an assignee under the Assignment of Leases.

TO HAVE AND TO HOLD the same unto Assignee and to the successors and assigns of Assignee forever.

**[SIGNATURE PAGE FOLLOWS]**

2

Doc# 20240222152 12/03/2024 12:24 PM Page 3 of 7 Lucy Adame-Clark, Bexar County Clerk

IN WITNESS WHEREOF, Assignor has caused these presents to be duly executed as of the day and year first written above.

**ASSIGNOR:**

**SUNRISE REALTY TRUST, INC.,**
a Maryland corporation

By: _____
    Name: Brandon Hetzel
    Title:  Chief Financial Officer

ACKNOWLEDGEMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of _FL_____
County of _Palm Beach___ss.

On the _26th_ day of _November_ 2024, before me, _Nicole Bambach_____, Notary Public, personally appeared Brandon Hetzel who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _Florida_____ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Signature                                    (Seal)

NICOLE ANN BAMBACH
MY COMMISSION #HH348143
EXPIRES: JAN 10, 2027
Bonded through 1st State Insurance

[SIGNATURE PAGE TO ASSIGNMENT OF DOT (THOMPSON SAN ANTONIO)]

Doc# 20240222452 12/03/2024 12:24 PM Page 4 of 7 Lucy Adame-Clark, Bexar County Clerk

**Acknowledged by SRH Lender:**

**SOUTHERN REALTY TRUST HOLDINGS**
**LLC**, a Delaware limited liability company

By: Southern Realty Trust Inc., its Sole Member

By: _____

Name: Brandon Hetzel
Title: Chief Financial Officer

ACKNOWLEDGEMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of _FL_
County of _Palm Beach_ ss.

On the _26th_ day of _November_ 2024, before me, _Nicole Bambach_. Notary Public, personally appeared Brandon Hetzel who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _Florida_ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Signature

(Seal)

NICOLE ANN BAMBACH
MY COMMISSION #HH348143
EXPIRES: JAN 10, 2027
Bonded through 1st State Insurance

Doc# 20240229152 12/03/2024 12:24 PM Page 5 of 7 Lucy Adame-Clark, Bexar County Clerk

EXHIBIT A

Description of the Property

Fee interest in the Hotel Unit of SCH San Antonio Master Condominium, a condominium project created pursuant to the Amended and Restated Condominium Declaration for SCH San Antonio Master Condominium, recorded October 30, 2020 as Document No. 20200262732 of the Official Public Records of Bexar County, Texas, as amended by that certain First Amendment to the Amended and Restated Condominium Declaration for SCH San Antonio Master Condominium, recorded December 22, 2021 as Document 20210355555 of the Official Public Records of Bexar County, Texas, as amended, by covering buildings built on certain real property located in Bexar County, Texas, as described in therein, together with an undivided interest, appurtenant to the Unit, in and to the Common Elements.

Non-exclusive easements for use and enjoyment of the Building, Common Elements adjacent to a Unit, Limited Common Elements and Amenities, construction, maintenance, utilities and minor encroachments upon the terms and conditions contained in that certain Amended and Restated Condominium Declaration for SCH San Antonio Master Condominium, recorded as Document No. 20200262732 of the Official Public Records of Bexar County, Texas, as amended.

and

Leasehold interest as created by that certain Lease dated January 25, 2018, executed by Edmund S. Beck and Jutta A. Beck, as lessor, and 101 Lexington Tower, LLC, a Delaware limited liability company as lessee, as referenced in the document entitled Amended and Restated Ground Lease, which was recorded January 26, 2018 at Volume 18959, Page 2166, Real Property Records, Bexar County, Texas, and assigned to Lex Avenue Hotel, LLC, a Delaware limited liability company, pursuant to that certain Assignment, Assumption, and Amendment of Amended and Restated Ground Lease filed for record February 25, 2022 in County Clerk's File No. 20220047573 of the Official Public Records of Bexar County, Texas, for the following property:

A 0.6149 OF AN ACRE (26,788 SQUARE FEET) TRACT OF LAND OUT OF BLOCK 31', NEW CITY BLOCK 802, IN THE CITY OF SAN ANTONIO, BEXAR COUNTY, TEXAS COMPRISED OF A 0.3413 OF AN ACRE TRACT KNOWN AS "FIRST TRACT" NOW DESIGNATED AS LOT 7, BLOCK 31, NEW CITY BLOCK 802 AND A 0.2734 OF AN ACRE TRACT KNOWN AS "SECOND TRACT" BEING DESIGNATED AS THE REMAINDER OF OR THE NORTHWEST 170 FEET OF LOT 1, BLOCK 31, NCB 802 BEING THE SAME LAND AS DESCRIBED BY DEEDS RECORDED IN VOLUME 7173, PAGE 335, VOLUME 7173, PAGE 337, DEED RECORDS OF BEXAR COUNTY, TEXAS AND VOLUME 6621, PAGE 548, OFFICIAL PUBLIC RECORDS OF BEXAR COUNTY, TEXAS, BEING MORE PARTICULARLY DESCRIBED IN A CLOCKWISE MANNER AS FOLLOWS:

BEGINNING: At a set "x" in concrete at the intersection of the southwest right-of-way line of Lexington Avenue and the southeast right-of-way line of St. Mary's St. at the northernmost corner of this tract;

THENCE: S 33°12'56" E, 267.40 feet along and with the southwest right-of-way line of said Lexington Avenue to a set 1/2" iron rod and cap "MBC"; THENCE: S 54°56'14" E, 104.51 feet to a set "x" in concrete on the north bank of the San Antonio River and southeast corner of this tract;

THENCE: S 58°13'47" W, 69.80 feet along and with the north bank of the San Antonio River to a set 'x' in concrete;

THENCE: N 87°15'18" W, 48.56 feet along and with the north bank of the San Antonio River to a set 1/2" iron rod and cap "MBC" at the southeast corner of Lot 2, Block 31 as recorded in Volume 7092, Page 2073 of the Official Public Records of Real Property of Bexar County, Texas at the Southwest corner of this tract;

Doc# 20240222452 12/03/2024 12:24 PM Page 6 of 7 Lucy Adame-Clark, Bexar County Clerk
Case 1:20-cv-04240-EA Document 1-17 Filed 03/20/26 Page 207 of 316

THENCE: N 33°06'20" W, 164.81 feet leaving the north bank of the San Antonio River, along and with the northeast line of said Lot 2, to a set "x" in concrete;

THENCE: N 33°12'56" W, 169.92 feet along and with the northeast line of said Lot 2 to a set 'A" iron rod and cap "MBC" at the northernmost corner of said Lot 2 and in the southeast right-of-way line of said St. Mary's St.;

THENCE: N 57°12'37" E, 70.09 feet along and with the southeast right-of-way line of said St. Mary's St. to the POINT OF BEGINNING of this 0.6149 of an acre tract.

Accommodation recording only;
document not reviewed,
and no insurance provided.

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 208 of 316

## File Information

### eFILED IN THE OFFICIAL PUBLIC eRECORDS OF BEXAR COUNTY
### LUCY ADAME-CLARK, BEXAR COUNTY CLERK

| | |
|---|---|
| **Document Number:** | 20240222152 |
| **Recorded Date:** | December 03, 2024 |
| **Recorded Time:** | 12:24 PM |
| **Total Pages:** | 7 |
| **Total Fees:** | $45.00 |

### ** THIS PAGE IS PART OF THE DOCUMENT **

### ** Do Not Remove **

Any provision herein which restricts the sale or use of the described real property because of race is invalid and unenforceable under Federal law

STATE OF TEXAS, COUNTY OF BEXAR

I hereby Certify that this instrument was eFILED in File Number Sequence on this date and at the time stamped hereon by me and was duly eRECORDED in the Official Public Record of Bexar County, Texas on: 12/3/2024 12:24 PM

*Lucy Adame-Clark*
**Lucy Adame-Clark**
**Bexar County Clerk**

# UCC FINANCING STATEMENT **AMENDMENT**

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
**Anne Marie Garavaglia, Esq.**

B. E-MAIL CONTACT AT FILER (optional)
**annemarie.garavaglia@akerman.com**

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

**Anne Marie Garavaglia, Esq.**
**Akerman LLP**
**999 Peachtree Street NE, Suite 1700**
**Atlanta, Georgia 30309**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
**20240139215 filed on 08/01/2024**

1b. [✓] This FINANCING STATEMENT AMENDMENT is to be filed [for record]
(or recorded) in the REAL ESTATE RECORDS
Filer: <u>attach</u> Amendment Addendum (Form UCC3Ad) <u>and</u> provide Debtor's name in item 13

2. [ ] **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. [✓] **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, <u>and</u> address of Assignee in item 7c <u>and</u> name of Assignor in item 9
For partial assignment, complete items 7 and 9 <u>and</u> also indicate affected collateral in item 8

4. [ ] **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. [ ] **PARTY INFORMATION CHANGE:**

Check <u>one</u> of these two boxes:                 AND Check <u>one</u> of these three boxes to:

This Change affects [ ] Debtor <u>or</u> [ ] Secured Party of record

[ ] CHANGE name and/or address: Complete item 6a or 6b; <u>and</u> item 7a or 7b <u>and</u> item 7c
[ ] ADD name: Complete item 7a or 7b, <u>and</u> item 7c
[ ] DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only <u>one</u> name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only <u>one</u> name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME |
|---|
| **SUNRISE REALTY TRUST HOLDINGS I LLC** |

OR 7b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)          SUFFIX

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **525 Okeechobee Blvd., Suite 1650** | **West Palm Beach** | **FL** | **33401** | **USA** |

8. [ ] COLLATERAL CHANGE: Also check <u>one</u> of these four boxes: [ ] ADD collateral [ ] DELETE collateral [ ] RESTATE covered collateral [ ] ASSIGN collateral

Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only <u>one</u> name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here [ ] and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME |
|---|
| **SUNRISE REALTY TRUST, INC.** |

OR 9b. INDIVIDUAL'S SURNAME          FIRST PERSONAL NAME          ADDITIONAL NAME(S)/INITIAL(S)          SUFFIX

10. OPTIONAL FILER REFERENCE DATA:
**to be filed in: Bexar County, Texas - County Filing; LEX AVENUE HOTEL, LLC**

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

Doc# 20240222493 Page 2 of 9

Lucy Adame-Clark, Bexar County Clerk

# UCC FINANCING STATEMENT **AMENDMENT ADDENDUM**
FOLLOW INSTRUCTIONS

**11. INITIAL FINANCING STATEMENT FILE NUMBER:** Same as item 1a on Amendment form
**20240139215**

**12. NAME** OF PARTY AUTHORIZING THIS AMENDMENT: Same as item 9 on Amendment form

| | 12a. ORGANIZATION'S NAME |
|---|---|
| OR | **SUNRISE REALTY TRUST, INC.** |
| | 12b. INDIVIDUAL'S SURNAME |
| | FIRST PERSONAL NAME |
| | ADDITIONAL NAME(S)/INITIAL(S) / SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**13. Name of DEBTOR on related financing statement** (Name of a current Debtor of record required for indexing purposes only in some filing offices - see Instruction item 13): Provide only one Debtor name (13a or 13b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); see Instructions if name does not fit

| | 13a. ORGANIZATION'S NAME |
|---|---|
| OR | **LEX AVENUE HOTEL, LLC** |

| 13b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

**14. ADDITIONAL SPACE FOR ITEM 8 (Collateral):**

**15. This FINANCING STATEMENT AMENDMENT:**
☐ covers timber to be cut ☐ covers as-extracted collateral ☑ is filed as a fixture filing

**16. Name and address of a RECORD OWNER of real estate described in item 17**
(if Debtor does not have a record interest):

**17. Description of real estate:**

**Property: 115 Lexington Avenue, San Antonio, Texas 78205, as further described in Exhibits A and B attached hereto and incorporated herein by reference.**

**18. MISCELLANEOUS:**
 to be filed in: Bexar County, Texas - County Filing; LEX AVENUE HOTEL, LLC

International Association of Commercial Administrators (IACA)
FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT ADDENDUM (Form UCC3Ad) (Rev. 04/20/11)

Case 1:26-cv-04240-RA     Document 1-1     Filed 05/20/26     Page 211 of 316

Doc# 20240222493

Lucy Adame-Clark, Bexar County Clerk

<u>EXHIBIT A</u>

**to UCC FINANCING STATEMENT**

between

**LEX AVENUE HOTEL, LLC,**
a Delaware limited liability company , as trustor
(Borrower), as debtor

to

**JOHN HAMMOND**, an individual,  as trustee
(Trustee)

for the benefit of

**SOUTHERN REALTY TRUST HOLDINGS LLC**, a Delaware limited liability company and
**SUNRISE REALTY TRUST HOLDINGS I LLC**, a Delaware limited liability company (as successor-
in-interest to **SUNRISE REALTY TRUST INC.**, a Maryland corporation), as beneficiary
(Lender), as secured party

This UCC Financing Statement is filed in connection with that certain Fee and Leasehold Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing (as the same may be amended, restated, replaced, supplemented, other otherwise modified, the "**Security Instrument**"), securing the principal sum of up to $44,000,000.00, given for the benefit of Lender, covering the estate of Borrower in the Property. Terms used but not defined herein shall have the same defined meaning set forth in the Security Instrument.

This UCC Financing Statement covers the following property, rights, interests and estates now owned, or hereafter acquired by Borrower (collectively, the "**Property**"):

(a) <u>Land.</u> All of Borrower's right, title and interest in and to the land described in <u>Exhibit B</u> annexed hereto and incorporated herein by this reference (the "**Land**");

(b) <u>Ground Lease</u>.  All of Borrower's right, title and interest under the Ground Lease and all of Borrower's leasehold estate in and to the Land, more fully described in <u>Exhibit A</u> (the "**Leasehold Interest**");

(c) <u>Condominium</u>. That certain condominium unit (the "**Unit**"), more fully described in <u>Exhibit A</u>, of the condominium regime of The SCH San Antonio Master Condominium Owners Association, Inc., a Texas nonprofit corporation (the "**Condominium Regime**") according to the Condominium Declaration and the Common Elements (as such term is defined in the Condominium Declaration) benefitting the Unit, all assignment rights with respect to all land and improvements now or hereafter located thereon, including, without limitation, all other rights, titles and hereditaments attributable to the Unit, which are as more particularly described on <u>Exhibit A</u>, together with all of the easements, rights, privileges, franchises, tenements, hereditaments and appurtenances now or hereafter thereunto belonging or in any way appertaining and all of the estate, right, title, interest, claim and demand whatsoever of Borrower therein or thereto, either at law or in

Case 1:26-cv-04240-RA   Document 1-4   Filed 05/20/26   Page 212 of 316
Doc# 20240222493   Page 4 of 9
RECEIVED NYSCEF: 04/17/2026
Lucy Adame-Clark, Bexar County Clerk

equity, in possession or in expectancy, now or hereafter acquired (collectively, the "**Condominium Unit**");

(d) <u>Additional Land</u>.  All additional lands, estates and development rights hereafter acquired by Borrower for use in connection with the Land or the Leasehold Interest and the development of the Land or Leasehold Interest and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise be expressly made subject to the lien of this Security Instrument and all rights of Borrower as a unit owner under the Condominium Declaration or condominium association applicable to all or any portion of the Land including, without limitation, all rights of Borrower as unit owner under any Condominium Document;

(e) <u>Improvements</u>.  The buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land or Leasehold Interest (collectively, the "**Improvements**");

(f) <u>Easements</u>.  All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, permits, licenses, rights of way and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land, Leasehold Interest and the Improvements and the reversions and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land or Leasehold Interest, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Land, Leasehold Interest and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(g) <u>Equipment</u>.  All "equipment," as such term is defined in <u>Article 9</u> of the Uniform Commercial Code (as hereinafter defined), now owned or hereafter acquired by Borrower, which is used at or in connection with the Improvements, Land or the Leasehold Interest or is located thereon or therein (including, but not limited to, all machinery, equipment, heating, ventilation or air conditioning equipment, garbage equipment and apparatus, incinerators, boilers, furnaces, motors, furnishings, and electronic data-processing and other office equipment now owned or hereafter acquired by Borrower and any and all additions, substitutions and replacements of any of the foregoing), together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto (collectively, the "**Equipment**").  Notwithstanding the foregoing, Equipment shall not include any property belonging to Manager, the property managers employed by Borrower for the management and operation of the property, or any other property manager of the Property or tenants under leases except to the extent that Borrower shall have any right or interest therein;

(h) <u>Fixtures</u>.  All Equipment now owned, or the ownership of which is hereafter acquired, by Borrower which is so related to the Land, Leasehold Interest and Improvements forming part of the Property that it is deemed fixtures or real property under the law of the particular state in which the Equipment is located, including, without limitation, all building or construction materials intended for construction, reconstruction, alteration or repair of or installation on the Property, construction equipment, appliances, machinery, plant equipment, fittings, apparatuses, fixtures and other items now or hereafter

Case 1:26-cv-04240-RA   Document 1-4   Filed 05/19/26   Page 213 of 316

Doc# 20240222493   12/08/2024 12:34 PM   Page 5 of 9
Lucy Adame-Clark, Bexar County Clerk

attached to, installed in or used in connection with (temporarily or permanently) any of the Improvements, Land or the Leasehold Interest, including, but not limited to, engines, devices for the operation of pumps, pipes, plumbing, cleaning, call and sprinkler systems, fire extinguishing apparatuses and equipment, heating, ventilating, plumbing, laundry incinerating, electrical, air conditioning and air cooling equipment and systems, gas and electric machinery, appurtenances and equipment, pollution control equipment, security systems, disposals, dishwashers, refrigerators and ranges, recreational equipment and facilities of all kinds, and water, gas, electrical, storm and sanitary sewer facilities, utility lines and equipment (whether owned individually or jointly with others, and, if owned jointly, to the extent of Borrower's interest therein) and all other utilities whether or not situated in easements, all water tanks, water supply, water power sites, fuel stations, fuel tanks, fuel supply, and all other structures, together with all accessions, appurtenances, additions, replacements, betterments and substitutions for any of the foregoing and the proceeds thereof (collectively, the "**Fixtures**"). Notwithstanding the foregoing, "Fixtures" shall not include any property which tenants are entitled to remove pursuant to leases except to the extent that Borrower shall have any right or interest therein;

(i) Personal Property. All furniture, furnishings, objects of art, machinery, goods, tools, supplies, appliances, general intangibles, contract rights, accounts, accounts receivable, franchises, licenses, certificates and permits, and all other personal property of any kind or character whatsoever as defined in and subject to the provisions of the Uniform Commercial Code, whether tangible or intangible, other than Fixtures, which are now or hereafter owned by Borrower, together with all accessories, replacements and substitutions thereto or therefor and the proceeds thereof (collectively, the "**Personal Property**"), and the right, title and interest of Borrower in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the state or states where any of the Property is located (as amended from time to time, the "**Uniform Commercial Code**"), superior in lien to the lien of this Security Instrument and all proceeds and products of the above;

(j) Leases and Rents. All leases (including, without limitation, ground leases, subleases or subsubleases), lettings, licenses, concessions or other agreements (whether written or oral) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of the Land, Leasehold Interest and the Improvements, and every modification, amendment or other agreement relating to such leases, subleases, subsubleases, or other agreements entered into in connection with such leases, subleases, subsubleases, or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, heretofore or hereafter entered into (collectively, the "**Leases**"), whether before or after the filing by or against Borrower of any petition for relief under 11 U.S.C. §101 et seq., as the same may be amended from time to time (the "**Bankruptcy Code**") and all right, title and interest of Borrower, its successors and assigns therein and thereunder, including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, rent equivalents, tenant termination and contraction fees, moneys payable as damages or in lieu of rent or rent equivalents, additional rents, revenues, issues and profits (including all oil and gas or other mineral royalties and bonuses), income, fees, receivables, deposits (including, without limitation, security, utility and other deposits) accounts and receipts from the Land, Leasehold Interest and the Improvements whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code (collectively,

Case 1:26-cv-04240-RA     Document 1-4     Filed 05/19/26     Page 214 of 316

Doc# 20240222493      12/03/2024 12:24 PM     Page 6 of 9
Lucy Adame-Clark, Bexar County Clerk

the "**Rents**") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt and the performance of the Other Obligations;

(k) <u>Condemnation Awards</u>. All Awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to all or any portion of the Property, whether from the exercise of the right of eminent domain (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such right), or for a change of grade, or for any other injury to or decrease in the value of the Property including, without limitation, any award or awards, or settlements or payments, hereafter made resulting from (i) condemnation proceedings or the taking of all or any portion of the Improvements, the Equipment, the Fixtures, the Leases or the Personal Property, or any part thereof, under the power of eminent domain; or (ii) the alteration of grade or the location or the discontinuance of any street adjoining the Property or any portion thereof; and Borrower hereby agrees to execute and deliver from time to time such further instruments as may be requested by Trustee or Lender to confirm such assignment to Lender of any such award, damage, payment or other compensation;

(l) <u>Insurance Proceeds</u>. All Insurance Proceeds in respect of the Property under any Policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any Policies, judgments, or settlements made in lieu thereof, in connection with a Casualty to the Property;

(m) <u>Tax Certiorari</u>. All refunds, rebates or credits in connection with any reduction in Taxes or Other Charges charged against the Property, including, without limitation, as a result of tax certiorari or any applications or proceedings for reduction;

(n) <u>Conversion</u>. All proceeds of the conversion, voluntary or involuntary, of any of the foregoing including, without limitation, Insurance Proceeds and Awards, into cash or liquidation claims;

(o) <u>Rights</u>. The right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property;

(p) <u>Agreements</u>. All agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land, Leasehold Interest and any part thereof and any Improvements or any business or activity conducted on the Land or Leasehold Interest and any part thereof including, without limitation, the Ground Lease, Hotel Management Agreement and the Parking Management Agreement, and all right, title and interest of Borrower therein and thereunder, including, without limitation, the right, upon the happening of any default hereunder, to receive and collect any sums payable to Borrower thereunder;

(q) <u>Intellectual Property</u>. All intellectual property, including without limitation, all tradenames, trademarks, servicemarks, logos, copyrights, websites, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Property;

Case 1:26-cv-04240-RA Document 1 Filed 05/20/26 Page 215 of 316
DOC# 20240222153 12/03/2024 12:24 PM Page 7 of 9
Lucy Adame-Clark, Bexar County Clerk

(r) <u>Accounts</u>. All reserves, escrows and deposit accounts maintained by Borrower with respect to the Property, including, without limitation, (i) all accounts and sub-accounts now or hereafter established or maintained pursuant to the Loan Agreement, the Clearing Account Agreement, Cash Management Agreement or any other Loan Documents, (ii) all other accounts and sub-accounts maintained by Borrower, and (iii) any account in which moneys, proceeds, receivables or other items of deposit are held for the benefit of Borrower; together with all deposits or wire transfers made to such accounts and all cash, checks, drafts, certificates, securities, investment property, financial assets, instruments and other property held therein from time to time and all proceeds, products, distributions or dividends or substitutions thereon and thereof; and

(s) <u>Interest Rate Cap Agreement</u>. The Interest Rate Cap Agreement and any replacements, amendments or supplements thereto, including, but not limited to, all "accounts", "chattel paper", "general intangibles" and "investment property" (as such terms are defined in the Uniform Commercial Code as from time to time in effect) constituting or relating to the foregoing, and all claims of Borrower for breach by the counterparty thereunder of any covenant, agreement, representation or warranty contained in the Interest Rate Cap Agreement; and all products and proceeds of any of the foregoing;

(t) <u>Deposits</u>. All deposits or security deposits paid by or assigned to Borrower or an Affiliate of Borrower under the Ground Lease;

(u) <u>Borrower's Rights Under Condominium Documents</u>. All rights of Borrower under the Condominium Documents;

(v) <u>Proceeds</u>. All proceeds of any of the foregoing; and

(w) <u>Other Rights</u>. All other or greater rights and interests of every nature in the Real Property (as hereinafter defined) and in the possession or use thereof and income therefrom, whether now owned or hereafter acquired by Borrower (including, without limitation, any and all other rights of Borrower in and to the items set forth in <u>Subsections (a)</u> through <u>(r)</u> above).

**EXHIBIT "B"**
Legal Description

**Fee interest in the Hotel Unit of SCH San Antonio Master Condominium, a condominium project created pursuant to the Amended and Restated Condominium Declaration for SCH San Antonio Master Condominium, recorded October 30, 2020 as Document No. 20200262732 of the Official Public Records of Bexar County, Texas, as amended by that certain First Amendment to the Amended and Restated Condominium Declaration for SCH San Antonio Master Condominium, recorded December 22, 2021 as Document 20210355555 of the Official Public Records of Bexar County, Texas, as amended, by covering buildings built on certain real property located in Bexar County, Texas, as described in therein, together with an undivided interest, appurtenant to the Unit, in and to the Common Elements.**

**Non-exclusive easements for use and enjoyment of the Building, Common Elements adjacent to a Unit, Limited Common Elements and Amenities, construction, maintenance, utilities and minor encroachments upon the terms and conditions contained in that certain Amended and Restated Condominium Declaration for SCH San Antonio Master Condominium, recorded as Document No. 20200262732 of the Official Public Records of Bexar County, Texas, as amended.**

and

Leasehold interest as created by that certain Lease dated January 25, 2018, executed by Edmund S. Beck and Jutta A. Beck, as lessor, and 101 Lexington Tower, LLC, a Delaware limited liability company as lessee, as referenced in the document entitled Amended and Restated Ground Lease, which was recorded January 26, 2018 at Volume 18959, Page 2166, Real Property Records, Bexar County, Texas, and assigned to Lex Avenue Hotel, LLC, a Delaware limited liability company, pursuant to that certain Assignment, Assumption, and Amendment of Amended and Restated Ground Lease filed for record February 25, 2022 in County Clerk's File No. 20220047573 of the Official Public Records of Bexar County, Texas, for the following property:

A 0.6149 OF AN ACRE (26,788 SQUARE FEET) TRACT OF LAND OUT OF BLOCK 31', NEW CITY BLOCK 802, IN THE CITY OF SAN ANTONIO, BEXAR COUNTY, TEXAS COMPRISED OF A 0.3413 OF AN ACRE TRACT KNOWN AS "FIRST TRACT" NOW DESIGNATED AS LOT 7, BLOCK 31, NEW CITY BLOCK 802 AND A 0.2734 OF AN ACRE TRACT KNOWN AS "SECOND TRACT" BEING DESIGNATED AS THE REMAINDER OF OR THE NORTHWEST 170 FEET OF LOT 1, BLOCK 31, NCB 802 BEING THE SAME LAND AS DESCRIBED BY DEEDS RECORDED IN VOLUME 7173, PAGE 335, VOLUME 7173, PAGE 337, DEED RECORDS OF BEXAR COUNTY, TEXAS AND VOLUME 6621, PAGE 548, OFFICIAL PUBLIC RECORDS OF BEXAR COUNTY, TEXAS, BEING MORE PARTICULARLY DESCRIBED IN A CLOCKWISE MANNER AS FOLLOWS:

BEGINNING: At a set "x" in concrete at the intersection of the southwest right-of-way line of Lexington Avenue and the southeast right-of-way line of St. Mary's St. at the northernmost corner of this tract;

THENCE: S 33°12'56" E, 267.40 feet along and with the southwest right-of-way line of said Lexington Avenue to a set 1/2" iron rod and cap "MBC"; THENCE: S 54°56'14" E, 104.51 feet to a set "x" in concrete on the north bank of the San Antonio River and southeast corner of this tract;

THENCE: S 58°13'47" W, 69.80 feet along and with the north bank of the San Antonio River to a set 'x' in concrete;

THENCE: N 87°15'18" W, 48.56 feet along and with the north bank of the San Antonio River to a set 1/2" iron rod and cap "MBC" at the southeast corner of Lot 2, Block 31 as recorded in Volume 7092, Page 2073 of the Official Public Records of Real Property of Bexar County, Texas at the Southwest corner of this tract;

THENCE: N 33°06'20" W, 164.81 feet leaving the north bank of the San Antonio River, along and with the northeast line of said Lot 2, to a set "x" in concrete;

THENCE: N 33°12'56" W, 169.92 feet along and with the northeast line of said Lot 2 to a set 'A" iron rod and cap "MBC" at the northernmost corner of said Lot 2 and in the southeast right-of-way line of said St. Mary's St.;

THENCE: N 57°12'37" E, 70.09 feet along and with the southeast right-of-way line of said St. Mary's St. to the POINT OF BEGINNING of this 0.6149 of an acre tract.

**File Information**

**eFILED IN THE OFFICIAL PUBLIC eRECORDS OF BEXAR COUNTY**
**LUCY ADAME-CLARK, BEXAR COUNTY CLERK**

**Document Number:**          20240222153

**Recorded Date:**            December 03, 2024

**Recorded Time:**            12:24 PM

**Total Pages:**              9

**Total Fees:**               $53.00

**\*\* THIS PAGE IS PART OF THE DOCUMENT \*\***

**\*\* Do Not Remove \*\***

Any provision herein which restricts the sale or use of the described real property because of race is invalid and unenforceable under Federal law

STATE OF TEXAS, COUNTY OF BEXAR

I hereby Certify that this instrument was eFILED in File Number Sequence on this date and at the time stamped hereon by me and was duly eRECORDED in the Official Public Record of Bexar County, Texas on: 12/3/2024 12:24 PM

*Lucy Adame-Clark*
**Lucy Adame-Clark**
**Bexar County Clerk**

# EXHIBIT E

Case 1:26-cv-04240-RA     Document 1-1     Filed 05/20/26     Page 219 of 316

## GUARANTY OF INTEREST AND CARRY COSTS

THIS GUARANTY OF INTEREST AND CARRY COSTS (this "**Guaranty**") is made, jointly and severally, as of July 31, 2024, by **ROBERTO CASTRO CONTRERAS**, an individual, having an address at 2506 W. Main, 5th Floor, Houston, Texas 77098 ("**Guarantor**") for the benefit of **SOUTHERN REALTY TRUST HOLDINGS LLC**, a Delaware limited liability company ("**SRH**"), having an address c/o Southern Realty Trust Inc., 2 Wisconsin Circle #700, Chevy Chase, Maryland  20815 and **SUNRISE REALTY TRUST, INC.**, a Maryland corporation ("**SRT**") having an address at c/o SOUTHERN REALTY TRUST HOLDINGS LLC., 525 Okeechobee Blvd., Suite 1650, West Palm Beach, FL  33401, whereas SRT and SRH, individually and/or collectively as the context may require, together with their respective successors and assigns, the "**Lender**").

### RECITALS:

A.      Pursuant to that certain Promissory Note, dated of even date herewith, executed by **LEX AVENUE HOTEL, LLC**, a Delaware limited liability company (together with its permitted successors and assigns, "**Borrower**") and payable to the order of Lender in the maximum principal amount of up to **Forty Million and No/100 Dollars ($40,000,000.00)** (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Note**"), Borrower has become indebted, and may from time to time be further indebted, to Lender with respect to a loan ("**Loan**") made pursuant to that certain Loan Agreement, of even date herewith between Borrower and Lender (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"), which Loan is secured by, among other things, that certain Fee and Leasehold Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing of even date herewith, made by Borrower for the benefit of Lender (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Security Instrument**"), encumbering the land and improvements thereon described on Exhibit A to the Security Instrument (the "**Property**"), and is further evidenced, secured or governed by other instruments and documents executed in connection with the Loan (together with the Note, the Loan Agreement and Security Instrument, collectively, the "**Loan Documents**").

B.      Lender is not willing to make the Loan, or otherwise extend credit, to Borrower unless Guarantor unconditionally guarantees payment and performance to Lender of the Guaranteed Obligations (as herein defined).

C.      Guarantor is the owner of a direct or indirect interest in Borrower, and Guarantor will directly benefit from Lender's making the Loan to Borrower.

D.      All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

NOW, THEREFORE, as an inducement to Lender to make the Loan to Borrower, and to extend such additional credit as Lender may from time to time extend under the Loan Documents, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

Case 1:26-cv-04240-RA   Document 1-1   Filed 05/20/26   Page 220 of 316

# ARTICLE 1

## NATURE AND SCOPE OF GUARANTY

Section 1.1 **Guaranty of Guaranteed Obligations**. Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise. Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

Section 1.2 **Definition of Guaranteed Obligations**. As used herein, the term "**Guaranteed Obligations**" means, collectively, the payment in full, after application of all Gross Income from Operations generated by the Property for the applicable period, of all Taxes, Insurance Premiums, Other Charges, Operating Expenses, required Reserve Account deposits, interest due and payable on the Loan, any Projected Interest Shortfall due and payable from Borrower in accordance with Section 7.2.4 of the Loan Agreement, and all other operating expenses to the extent not described above, in each case to the extent necessary to own and operate the Property, and in each case as and when due and payable, whether same are incurred prior to, on or after an Event of Default or prior to or after Lender's exercise of remedies in connection with the Loan, including any foreclosure or deed or assignment in lieu thereof. For the avoidance of doubt, Lender shall not be required to demonstrate a loss, liability or other impairment under the Loan in order to enforce Guarantor's obligations under this Guaranty. The indebtedness guaranteed by Guarantor hereunder shall be deemed to be the last indebtedness which remains outstanding under the Loan Documents after the application of payments received from Borrower and the application of proceeds received from the foreclosure of the Security Instrument and other liquidation of any Collateral for the Loan, and Guarantor may not claim or contend so long as any such indebtedness remains outstanding that any payments received by Lender from Borrower or otherwise, or proceeds received by Lender on the liquidation of the Collateral, shall have reduced or discharged any Guarantor's liability or obligations hereunder. Notwithstanding anything to the contrary in this Guaranty or in any of the other Loan Documents, Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Debt secured by the Security Instrument or to require that all collateral shall continue to secure all of the Obligations in accordance with the Loan Documents. Guarantor expressly waives any defense or benefits arising out of any voluntary or involuntary filing by or on behalf of Borrower for protection under any federal or state bankruptcy, insolvency, or debtor relief laws, including without limitation under Sections 364 or 1111(b)(2) of the Bankruptcy Code.

Section 1.3 **Nature of Guaranty**. This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection. This Guaranty may not be revoked by Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor and after (as to any Guarantor that is a natural person) such Guarantor's death (in which event this Guaranty shall be binding upon such Guarantor's estate and such Guarantor's legal representatives and heirs). The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release

2

or discharge the obligation of any Guarantor to Lender with respect to the Guaranteed Obligations. This Guaranty may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment or negotiation of all or part of the Note.

Section 1.4 **Guaranteed Obligations Not Reduced by Offset**. The Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder, shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower, or any other party, against Lender or against payment of the Guaranteed Obligations, whether such offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

Section 1.5 **Payment By Guarantor**. If all or any part of the Guaranteed Obligations shall not be paid when due, whether at demand, maturity, acceleration or otherwise, Guarantor shall, immediately upon demand by Lender, and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity, or any other notice whatsoever, all such notices being hereby waived by Guarantor pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein. Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Guaranteed Obligations, and may be made from time to time with respect to the same or different items of Guaranteed Obligations. Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

Section 1.7 **No Duty To Pursue Others**. It shall not be necessary for Lender (and Guarantor hereby waives any rights which such Guarantor may have to require Lender), in order to enforce the obligations of such Guarantor hereunder, first to (a) institute suit or exhaust its remedies against Borrower, any other Guarantor, or others liable on the Loan or the Guaranteed Obligations or any other Person, (b) enforce Lender's rights against any other Guarantor or any collateral which shall ever have been given to secure the Loan, (c) enforce Lender's rights against any other guarantors of the Guaranteed Obligations, (d) join Borrower, any other Guarantor, or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (e) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan, or (f) resort to any other means of obtaining payment of the Guaranteed Obligations. Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

Section 1.8 **Waivers**. Guarantor agrees to the provisions of the Loan Documents, and hereby waives to the fullest extent now or hereafter not prohibited by applicable law (I) notice of (a) any loans or advances made by Lender to Borrower, (b) acceptance of this Guaranty, (c) any amendment or extension of the Note, the Loan Agreement or any other Loan Document, (d) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory notes or other documents arising under the Loan Documents or in connection with the Property, (e) the occurrence of (X) any breach by Borrower of any of the terms or conditions of the Loan Agreement or any other Loan Documents, or (Y) an Event of Default, (f) Lender's transfer or disposition of the Guaranteed Obligations, or any part thereof, (g) sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral for the Guaranteed Obligations, (h) protest, proof of non-payment or default by

3

Borrower, and (i) any other action at any time taken or omitted by Lender, and, generally, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations and/or the obligations hereby guaranteed, (II) all suretyship defenses and defenses in the nature thereof, (III) any right or claim of right to cause a marshalling of the assets of Borrower or of any collateral for the Loan, or to cause Lender to proceed against any of the other security for the Guaranteed Obligations or the Obligations of Borrower before proceeding under this Guaranty against Guarantor, or, if there shall be more than one Guarantor, to require Lender to proceed against any other Guarantor in any particular order, (IV) the right to assert a counterclaim, other than a mandatory or compulsive counterclaim, in any action or proceeding brought against or by Guarantor, (V) any defense that may arise by reason of the incapacity, lack of authority, death or disability of any other person or persons or the failure of Lender to file or enforce a claim against the estate (in administration, bankruptcy or any other proceeding) of any other person or persons, (VI) any defense based upon an election of remedies by Lender, (VII) any duty on the part of Lender to disclose to Guarantor any facts Lender may now or hereafter know about Borrower, any Tenant, or the Property, regardless of whether Lender has reason to believe that any such facts materially increase the risk beyond that which Guarantor intend to assume or has reason to believe that such facts are unknown to Guarantor or has a reasonable opportunity to communicate such facts to Guarantor, it being understood and agreed that each Guarantor is fully responsible for being and keeping informed of the financial condition of Borrower, any Tenant or of the condition of the Property and of any and all circumstances bearing on the risk that liability may be incurred by Guarantor hereunder; (VIII) any lack of notice of disposition or of manner of disposition of any collateral for the Loan, (IX) any invalidity, irregularity or unenforceability, in whole or in part, of any one or more of the Loan Documents, (X) any lack of commercial reasonableness in dealing with the collateral for the Loan, (XI) any deficiencies in the collateral for the Loan or any deficiency in the ability of Lender to collect or to obtain performance from any persons or entities now or hereafter liable for the payment and performance of any obligation hereby guaranteed, (XII) an assertion or claim that the automatic stay provided by 11 U.S.C. §362 (arising upon the voluntary or involuntary bankruptcy proceeding of Borrower) or any other stay provided under any other debtor relief law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, which may be or become applicable, shall operate or be interpreted to stay, interdict, condition, reduce or inhibit the ability of Lender to enforce any of its rights, whether now or hereafter required, which Lender may have against any Guarantor or the collateral for the Loan, and (XIII) any modifications of the Loan Documents or any obligation of Borrower relating to the Loan by operation of law or by action of any court, whether pursuant to the Bankruptcy Code, or any other debtor relief law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, or otherwise. Guarantor hereby irrevocably waives reliance on any anti-deficiency statute, through subrogation or otherwise, and any such statute shall in no way affect or impair Guarantor's obligations and liabilities hereunder.

Section 1.9    **No Impairment**.  The liability of Guarantor hereunder shall in no way be limited, expanded or impaired by, and Guarantor hereby assents to and agrees to be bound by, any amendment or modification of the provisions of the Loan Documents to or with Lender by Borrower or any other Guarantor or any person who succeeds Borrower as owner of the Property. In addition, the liability of Guarantor under this Guaranty and the other Loan Documents shall in no way be limited, expanded or impaired by:

A.    any acceleration of the Loan or any extensions of time for performance required by any of the Loan Documents;

B.    any amendment to or modification of any of the Loan Documents;

C.    any sale or assignment of the Loan or any sale, assignment or foreclosure of the Security Instrument or any sale, transfer or exchange of all or part of the Property;

D.    any exculpatory, or nonrecourse, or limited recourse, provision in any of the Loan Documents limiting Lender's recourse to the Property encumbered by the Security Instrument or to any other property or limiting Lender's rights to a deficiency judgment against Borrower or any other Person;

E.    the accuracy or inaccuracy of the representations and warranties made by or on behalf of any Guarantor herein or by or on behalf of Borrower, or any Affiliate or successor of Borrower in any of the Loan Documents;

F.    the release of Borrower, any Affiliate or successor of Borrower or of any other Person from performance or observance of any of the agreements, covenants, terms or conditions contained in any of the Loan Documents by operation of law, Lender's voluntary act or otherwise;

G.    the filing of any bankruptcy or reorganization proceeding by or against Borrower, any Affiliate or successor of Borrower or any subsequent owner of the Property;

H.    the release or substitution in whole or in part of any collateral or security for the Obligations;

I.    Lender's failure to record the Security Instrument or file any UCC financing statements, or Lender's improper recording or filing of any thereof, or Lender's failure to otherwise perfect, protect, secure, or insure any security interest or lien given as security for the Obligations;

J.    the release of any other party now or hereafter liable upon or in respect of this Guaranty or any of the other Loan Documents;

K.    the invalidity or unenforceability of all or any portion of any of the Loan Documents as to Borrower or any other Person;

L.    any change in the composition of Borrower, including, without limitation, the withdrawal or removal of the beneficial owner from any current or future position of ownership, management or control of Borrower; or

M.    the taking or failure to take any action of any type whatsoever.

Any of the foregoing may be accomplished with or without notice to Borrower or any Guarantor and with or without consideration.

Section 1.10  **Payment**.  In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall, immediately upon demand by Lender, pay to Lender (a) the applicable Guaranteed Obligations and (b) all costs and expenses (including court costs and attorneys' fees and costs) incurred by Lender or its successors or assigns in the enforcement hereof or the preservation of Lender's rights hereunder, in each case together with interest thereon at the Default Rate from the date requested by Lender until the date of payment to Lender.  The covenant contained in this Section 1.9 shall survive the payment and performance of the Guaranteed Obligations.

Section 1.11  **Effect of Bankruptcy**.  In the event that, pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law, or any judgment, order or decision thereunder, Lender must rescind or restore any payment, or any part thereof, received by Lender in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Guarantor by Lender shall be without effect, and this Guaranty shall remain (or shall be reinstated to be) in full force and effect. It is the intention of Borrower and Guarantor that Guarantor's obligations hereunder shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance.

Section 1.12  **Subordination and Waiver of Subrogation, Reimbursement and Contribution**.  Notwithstanding anything to the contrary contained in this Guaranty, until the Loan is indefeasibly repaid in full, each Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating Guarantor to the rights of Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower, any other Guarantor or any other party liable for payment of any or all of the Guaranteed Obligations for any payment made by Guarantor under or in connection with this Guaranty or otherwise.

Section 1.13  **Delay Not Waiver**.  No delay on Lender's part in exercising any right, power or privilege hereunder or under any of the Loan Documents shall operate as a waiver of any such privilege, power or right.  No waiver by Lender in any instance shall constitute a waiver in any other instance.

Section 1.14  **Borrower/Guarantor**.  The term "Borrower" or "Guarantor" as used herein shall include any new or successor corporation, association, partnership (general or limited), limited liability company, joint venture, trust or other individual or organization formed as a result of any merger, reorganization, sale, transfer, devise, gift or bequest of Borrower or any Guarantor, as the case may be, or any interest in Borrower or any Guarantor, as the case may be.

Section 1.15  **Survival**. This Guaranty shall survive the exercise of remedies following an Event of Default under the Loan Agreement or the other Loan Documents, including but not limited to a foreclosure of the Security Instrument and/or any exercise of remedies against any other collateral given in connection with the Loan by Lender, and shall remain in full force and effect until all of the Obligations and other sums due under the Loan Agreement and the other Loan Documents have been satisfied and indefeasibly paid in full to Lender.

Case 1:26-cv-04240-RA   Document 1-1   Filed 05/20/26   Page 225 of 316

## ARTICLE 2

### EVENTS AND CIRCUMSTANCES NOT REDUCING OR DISCHARGING GUARANTOR'S OBLIGATIONS

Each Guarantor hereby consents and agrees to each of the following, and agrees that such Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following, and waives any common law, equitable, statutory or other rights (including without limitation rights to notice) which such Guarantor might otherwise have as a result of or in connection with any of the following:

**Section 2.1    Modifications/Sales**.    Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Note, the Security Instrument, the Loan Agreement, the other Loan Documents or any other document, instrument, contract or understanding between Borrower and Lender or any other parties pertaining to the Guaranteed Obligations, or any sale, assignment or foreclosure of the Note, the Loan Agreement, the Security Instrument, or any other Loan Documents or any sale or transfer of the Property, or any failure of Lender to notify Guarantor of any such action, except as otherwise provided in Section 1.15 herein.

**Section 2.2    Adjustment**.    Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower or any Guarantor.

**Section 2.3    Condition of Borrower or Guarantor**.    The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Borrower, any Guarantor or any other Person at any time liable for the payment of all or part of the Guaranteed Obligations; or any dissolution of Borrower or any Guarantor, or any sale, lease or transfer of any or all of the assets of Borrower or any Guarantor, or any changes in the shareholders, partners or members, as applicable, of Borrower or any Guarantor; or any reorganization of Borrower or any Guarantor.

**Section 2.4    Intentionally Omitted**.

**Section 2.5    Release of Obligors**.    Any full or partial release of the liability of Borrower for the Guaranteed Obligations, or any part thereof, or of any co-guarantors, or any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof, it being recognized, acknowledged and agreed by each Guarantor that Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support from any other Person, and such Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other Persons (including Borrower) will be liable to pay or perform the Guaranteed Obligations, or that Lender will look to other Persons (including Borrower) to pay or perform the Guaranteed Obligations.

**Section 2.6    Other Collateral**.    The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

Section 2.7    **Release of Collateral**.  Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including without limitation negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

Section 2.8    **Care and Diligence**.  The failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of such collateral, property or security, including but not limited to any neglect, delay, omission, failure or refusal of Lender (a) to take or prosecute any action for the collection of any of the Guaranteed Obligations or (b) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (c) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

Section 2.9    **Unenforceability**.  The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by each Guarantor that Guarantor are not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectability or value of any of the collateral for the Guaranteed Obligations.

Section 2.10    **Representation**.  The accuracy or inaccuracy of the representations and warranties made by Guarantor herein or by Borrower in any of the Loan Documents.

Section 2.11    **Offset**.  The Note, the Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder shall not be reduced, discharged or released by reason of any existing or future right of offset, claim or defense of Borrower against Lender, or any other Person, or against payment of the Guaranteed Obligations, whether such right of offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

Section 2.12    **Merger**.  The reorganization, merger or consolidation of Borrower or any Guarantor into or with any Person.

Section 2.13    **Preference**.  Any payment by Borrower to Lender is held to constitute a preference under bankruptcy laws, or for any reason Lender is required to refund such payment or pay such amount to Borrower or to any other Person.

Section 2.14    **Other Actions Taken or Omitted**.  Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations, or the security and collateral therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms hereof, it being the unambiguous and unequivocal intention of each Guarantor that Guarantor shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether contemplated or uncontemplated,

8

and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.

Section 2.15    **Ability to Enforce Certain Environmental Claims**.  Nothing contained in this Guaranty shall prevent or in any way diminish or interfere with any rights or remedies, including, without limitation, the right to contribution, which Lender may have against Borrower, Guarantor or any other party under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (codified at Title 42 U.S.C. §9601 et seq.) as it may be amended from time to time, or any other applicable federal, state or local laws, all such rights being hereby expressly reserved.

# ARTICLE 3

## REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into the Loan Documents and extend credit to Borrower, each Guarantor represents and warrants to Lender as follows:

Section 3.1    **Benefit**.  Each Guarantor is an Affiliate of Borrower, is the owner of a direct or indirect interest in Borrower, and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Obligations.

Section 3.2    **Familiarity and Reliance**.  Each Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of the Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note or Guaranteed Obligations; however, no Guarantor is relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

Section 3.3    **No Representation By Lender**.  Neither Lender nor any other party has made any representation, warranty or statement to any Guarantor in order to induce the Guarantor to execute this Guaranty.

Section 3.4    **Guarantor's Financial Condition**.  As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, each Guarantor is solvent, and has assets which, fairly valued, exceed its obligations, liabilities (including contingent liabilities) and debts, and has and will have property and assets sufficient to satisfy and repay its obligations and liabilities, including the Guaranteed Obligations.  In addition, true and complete copies of the financial statements of each Guarantor have been delivered to Lender and each of the same are true, accurate and complete in all material respects and fairly present each Guarantor's financial condition as of the dates thereof and no material and adverse change has occurred in any Guarantor's financial condition or business since the respective dates thereof; and each financial statement of Guarantor submitted in the future shall be true, accurate and complete in all material respects and shall fairly present Guarantor's financial condition as of the dates thereof.

Section 3.5    **Legality**.  The execution, delivery and performance by each Guarantor of this Guaranty and the consummation of the transactions contemplated hereunder do not, and will

not, contravene or conflict with any law, statute or regulation whatsoever to which such Guarantor is subject or constitute a default (or an event which with notice or lapse of time or both would constitute a default) under, or result in the breach of, any indenture, mortgage, deed of trust, charge, lien, or any contract, agreement or other instrument to which such Guarantor is a party or which may be applicable to such Guarantor.  This Guaranty is a legal and binding obligation of each Guarantor and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights.

Section 3.6    **No Violation**.  The payment and performance by each Guarantor of such Guarantor's obligations under the Loan Agreement and this Guaranty do not and shall not constitute a violation of any law, order, regulation, contract or agreement to which such Guarantor is a party or by which such Guarantor or such Guarantor's property may be bound.

Section 3.7    **No Litigation**.  There is no material litigation now pending or, to the best of Guarantor's knowledge threatened in writing, against Guarantor which, if adversely decided would materially impair the ability of Guarantor to pay and perform Guarantor's obligations under the Loan Agreement or this Guaranty.  There is no litigation (whether or not material) pending, or threatened in writing, against Guarantor in which the amount in controversy exceeds $125,000.00.

Section 3.8    **Material Economic Benefit**.  The granting of the Loan to Borrower will constitute a material economic benefit to Guarantor.

Section 3.9    **Enforceability**. The Loan Documents are not subject to any right of recession, set-off, counterclaim or defense by any Guarantor, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable (subject to principles of equity and bankruptcy, insolvency and other laws generally affecting creditors' rights and the enforcement of debtors' obligations), and no Guarantor has asserted any right of recession, set-off, counterclaim or defense with respect thereto.

Section 3.10    **Filing of Returns; Payment of Taxes**. Each Guarantor has filed, or caused to be filed, all federal, state, local and foreign Tax returns, reports and other Tax-related documents required to be filed by it and has paid all Taxes payable by it that have become due, other than those not yet delinquent and except for those being contested in good faith (in accordance with the terms of this Agreement and the other Loan Documents) by appropriate proceedings for which adequate reserves have been established on its financial statements.

Section 3.11    **Intentionally Omitted**.

Section 3.12    **Survival**.  All representations and warranties made by Guarantor herein shall survive the execution hereof.

## ARTICLE 4

## SUBORDINATION OF CERTAIN INDEBTEDNESS

Section 4.1    **Subordination of All Guarantor Claims**.  As used herein, the term "**Guarantor Claims**" shall mean all debts and liabilities of (i) Borrower to any Guarantor, or (ii)

10

a Guarantor to any other Guarantor, in either case whether such debts and liabilities now exist or are hereafter incurred or arise, and whether the obligations of Borrower or such Guarantor-thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the Person or Persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by any Guarantor.  The Guarantor Claims shall include without limitation all rights and claims of a Guarantor against Borrower or any other Guarantor (arising as a result of subrogation or otherwise) as a result of such Guarantor's payment of all or a portion of the Guaranteed Obligations.  So long as any portion of the Debt or the Guaranteed Obligations remain outstanding, no Guarantor shall receive or collect, directly or indirectly, from Borrower, any other Guarantor or any other Person any amount upon the Guarantor Claims.

Section 4.2    **Claims in Bankruptcy**.  In the event of any receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceeding involving any Guarantor as a debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims. Each Guarantor hereby assigns such dividends and payments to Lender.  Should Lender receive, for application against the Guaranteed Obligations, any such dividend or payment which is otherwise payable to any Guarantor, and which, as between Borrower and such Guarantor, shall constitute a credit against the Guarantor Claims, then upon payment to Lender in full of the Guaranteed Obligations, such Guarantor shall become subrogated to the rights of Lender to the extent that such payments to Lender on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that proportion of the Guaranteed Obligations which would have been unpaid if Lender had not received dividends or payments upon the Guarantor Claims.

Section 4.3    **Payments Held in Trust**.  Notwithstanding anything to the contrary in this Guaranty, in the event that any Guarantor shall receive any funds, payments, claims or distributions which are prohibited by this Guaranty, such Guarantor agrees to hold in trust for Lender an amount equal to the amount of all funds, payments, claims or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims and/or distributions so received except to pay such funds, payments, claims and/or distributions promptly to Lender, and such Guarantor covenants promptly to pay the same to Lender.

Section 4.4    **Liens Subordinate**.  Each Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's or any other Guarantor's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's or any other Guarantor's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of any Guarantor or Lender presently exist or are hereafter created or attach.  Without the prior written consent of Lender, no Guarantor shall (a) exercise or enforce any creditor's rights it may have against Borrower or any other Guarantor, or (b) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including without limitation the commencement of, or the joinder in, any

11

liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, mortgages, deeds of trust, security interests, collateral rights, judgments or other encumbrances on assets of Borrower or any other Guarantor held by such Guarantor.

## ARTICLE 5

## COVENANTS

Section 5.1    **Prohibited Transactions**.  No Guarantor shall, at any time while a default in the payment of the Guaranteed Obligations has occurred and is continuing, either (i) enter into or effectuate any transaction with any Affiliate, including the payment of any dividend or distribution to a shareholder, or the redemption, retirement, purchase or other acquisition for consideration of any stock in such Guarantor or (ii) sell, pledge, mortgage or otherwise transfer to any Person any of such Guarantor's assets, or any interest therein, in either case, which could have the effect of reducing the Net Worth of such Guarantor.

Section 5.2    **Financial Covenants**.  Until all of the Obligations and the Guaranteed Obligations have been paid in full, (i) Guarantor shall, at all times maintain, (A) a Net Worth in excess of Thirty-Five Million and No/100 Dollars ($35,000,000.00), and (B) Liquid Assets having a market value in excess of (x) Two Million and No/100 Dollars ($2,000,000.00) for the period commencing on and including the date hereof through and including December 31, 2024 and (y) Four Million and No/100 Dollars ($4,000,000.00) commencing on and including January 1, 2025 and thereafter, (ii) Guarantor shall deliver to Lender within five (5) Business Days of receipt, copies of any default notices received by Guarantor in respect of any Indebtedness of Guarantor, and (iii) Guarantor shall deliver to Lender, concurrently with the delivery of each quarterly or annual financial statement required to be delivered by Guarantor hereunder, a certificate signed by Guarantor setting forth in reasonable detail Guarantor's Net Worth and Liquid Assets, based on such financial statement.

Section 5.3    **Definitions**.  As used in this Article 5, "Liquid Assets" and "Net Worth" shall have the meanings set forth in the Guaranty of Recourse Obligations (Unsecured):

## ARTICLE 6

## MISCELLANEOUS

Section 6.1    **Waiver**.  No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Lender hereunder shall be in addition to all other rights provided by law.  No modification or waiver of any provision of this Guaranty, nor consent to departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved.  No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

Section 6.2    **Notices**.  All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document shall be given in writing and shall be effective for

12

all purposes if (a) hand delivered, (b) intentionally omitted, (c) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, or (d) by electronic transmission (email), so long as such notice is also sent via one of the methods set forth in (a) through (c) above within one (1) Business Day of such electronic transmission, addressed as follows (or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a notice to the other parties hereto in the manner provided for in this Section 6.2):

| | |
|---|---|
| Guarantor: | Roberto Castro Contreras<br>c/o DC Partners Management<br>2506 W. Main, 5th Floor<br>Houston, Texas 77098 |
| With a copy to: | Andrews Myers, P.C.<br>1885 St. James Place, 15th Floor<br>Houston, Texas 77056<br>Attention: Patrick Hayes |
| Lender: | Southern Realty Trust Holdings LLC<br>c/o Southern Realty Trust Inc.,<br>2 Wisconsin Circle #700,<br>Chevy Chase, Maryland 20815<br>Attention: General Counsel |
| With a copy to: | Sunrise Realty Trust, Inc.<br>525 Okeechobee Blvd., Suite 1650,<br>West Palm Beach, FL 33401<br>Attention: Stuart Swann |
| With a copy to: | Akerman LLP<br>999 Peachtree Street NE, Suite 1700<br>Atlanta, Georgia 30309<br>Attention: Anne Marie Garavaglia, Esq.<br>Email: annemarie.garavaglia@akerman.com |

A notice shall be deemed to have been given: (a) in the case of hand delivery, at the time of delivery; (b) intentionally omitted; (c) in the case of expedited prepaid delivery, upon the first attempted delivery on a Business Day; and (d) in the case of electronic transmission, as of the date that delivery of any of the methods of delivery set forth in clauses (a) through (c) above is deemed to have been given pursuant to the foregoing. Any failure to deliver a notice by reason of a change of address not given in accordance with this Section 6.2, or any refusal to accept a notice, shall be deemed to have been given when delivery was attempted. Any notice required or permitted to be given by any party hereunder or under any other Loan Document may be given by its respective counsel. Additionally, any notice required or permitted to be given by Lender hereunder or under any other Loan Document may also be given by the Servicer.

13

Section 6.3 **Governing Law**. **THIS GUARANTY WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT TO THE LOAN AGREEMENT WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES IRREVOCABLY AND UNCONDITIONALLY AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS GUARANTY AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, EACH GUARANTOR HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS GUARANTY, AND THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.**

ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST ANY GUARANTOR ARISING OUT OF OR RELATING TO THIS GUARANTY MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT LOCATED IN THE STATE OF NEW YORK, ANY STATE OR FEDERAL COURT LOCATED IN THE COUNTY OF NEW YORK AND EACH GUARANTOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND EACH GUARANTOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. EACH GUARANTOR DOES HEREBY DESIGNATE AND APPOINT:

> CT CORPORATION SYSTEM
> 28 LIBERTY STREET, 42ND FLOOR
> NY, NY 10005

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND NOTICE OF SAID SERVICE MAILED OR DELIVERED TO GUARANTOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON GUARANTOR IN ANY SUCH SUIT, ACTION OR PROCEEDING INCLUDING WITHOUT LIMITATION THOSE IN THE STATE OF NEW YORK. EACH GUARANTOR (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE

14

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 233 of 316

DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR. NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST GUARANTOR IN ANY JURISDICTION.

Section 6.4    **Invalid Provisions**.  If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

Section 6.5    **Amendments**.  This Guaranty may be amended only by an instrument in writing executed by the party or an authorized representative of the party against whom such amendment is sought to be enforced.

Section 6.6    **Parties Bound; Assignment; Joint and Several**.  This Guaranty shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, permitted assigns, heirs and legal representatives.  Lender may sell, assign, pledge, participate, transfer or delegate, as applicable to one or more Persons all or a portion of its rights and obligations under this Guaranty in connection with any assignment, sale, pledge, participation or transfer of the Loan and the Loan Documents.  Any assignee or transferee of Lender shall be entitled to all the benefits afforded to Lender under this Guaranty, no Guarantor shall have the right to delegate, assign or transfer its rights or obligations under this Guaranty without the prior written consent of Lender, and any attempted assignment, delegation or transfer without such consent shall be null and void.  The obligations of each Guarantor under this Guaranty shall be joint and several.

Section 6.7    **Headings**.  Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

Section 6.8    **Recitals**.  The recitals and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered prima facie evidence of the facts and documents referred to therein.

Section 6.9    **Counterparts**.  To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required.  It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all Persons required to bind any party, appear on each counterpart.  All counterparts shall collectively constitute a single instrument.  It shall not be necessary in making proof of this Guaranty to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the

15

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 234 of 316

legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages. This Guaranty may be executed by Portbale Document Forman (PDF) or other form of electronic communication and such form of execution shall be deemed to be an original signature for execution purposes.

Section 6.10 **Rights and Remedies**. If any Guarantor becomes liable for any indebtedness owing by Borrower to Lender, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby and the rights of Lender hereunder shall be cumulative of any and all other rights that Lender may ever have against Guarantor. The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

Section 6.11 **Entirety**. **THIS GUARANTY EMBODIES THE FINAL AND ENTIRE AGREEMENT OF GUARANTOR AND LENDER WITH RESPECT TO GUARANTOR'S GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THIS GUARANTY, AND NO COURSE OF DEALING AMONG GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY. THERE ARE NO ORAL AGREEMENTS AMONG GUARANTOR AND LENDER.**

Section 6.12 **Waiver of Right To Trial By Jury**. **EACH GUARANTOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY, THE NOTE, THE LOAN AGREEMENT, THE SECURITY AGREEMENT, OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH GUARANTOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY GUARANTOR.**

Section 6.13 **Cooperation**. Each Guarantor acknowledges that Lender and its successors and assigns may, from time to time, effect a Securitization in accordance with Section 9.1 of the Loan Agreement. Each Guarantor shall, in accordance with Section 9.2 of the Loan Agreement, cooperate with Lender in effecting any such Securitization and shall cooperate to implement all requirements imposed by any Rating Agencies involved in any Securitization. In addition,

Guarantor shall make available to Lender all information concerning their business and operations that Lender may reasonably request. Lender shall be permitted to share all such information with the investment banking firms, Rating Agencies, accounting firms, law firms and other third-party advisory firms involved with the Loan and the Loan Documents or the applicable Securitization. It is understood that the information provided by Guarantor to Lender including any and all financial statements provided to Lender pursuant to Article V hereof, if any, may ultimately be incorporated into the offering documents for the Securitization and thus various investors or potential investors may also see some or all of the information. Lender and all of the aforesaid third-party advisors and professional firms shall be entitled to rely on the information supplied by, or on behalf of, Guarantor in the form as provided by Guarantor. Lender may publicize the existence of the Loan in connection with its marketing for a Securitization or otherwise as part of its business development.

Section 6.14 **Reinstatement in Certain Circumstances**. If at any time any payment of the principal of or interest under the Note or any other amount payable by the Borrower under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment had been due but not made at such time.

Section 6.15 **Gender; Number; General Definitions**. Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, (a) words used in this Guaranty may be used interchangeably in the singular or plural form, (b) any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, (c) the word "Borrower" shall mean "each Borrower and any subsequent owner or owners of the Property or any part thereof or interest therein", (d) the word "Lender" shall mean "Lender and any subsequent holder of the Note", (e) the word "Note" shall mean "the Note and any other evidence of indebtedness secured by the Loan Agreement, as amended, restated or otherwise modified", (f) the word "Property" shall include any portion of the Property and any interest therein, and (g) the phrases "attorneys' fees", "legal fees" and "counsel fees" shall include any and all attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels, incurred or paid by Lender in protecting its interest in the Property, the Leases and/or the Rents and/or in enforcing its rights hereunder.

Section 6.16 **No Waiver; Time of Essence**. The failure of any party hereto to enforce any right or remedy hereunder, or to promptly enforce any such right or remedy, shall not constitute a waiver thereof nor give rise to any estoppel against such party nor excuse any of the parties hereto from their respective obligations hereunder. Any waiver of such right or remedy must be in writing and signed by the party to be bound. This Guaranty is subject to enforcement at law or in equity, including actions for damages or specific performance. Time is of the essence hereof.

Section 6.17 **Assignments By Lender**. (a) Lender may at its sole cost and expense, without notice to, or consent of, any Guarantor, sell, assign or transfer to or participate with any entity or entities all or any part of the indebtedness evidenced by the Note and secured by the Security Instrument, and each such entity or entities shall have the right to enforce the provisions of this Guaranty and any of the other Loan Documents as fully as Lender, provided that Lender shall continue to have the unimpaired right to enforce the provisions of this Guaranty and any of

17

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 236 of 316

the other Loan Documents as to so much of the Loan that Lender has not sold, assigned or transferred. Lender shall give notice to Guarantor of the name, address, telephone number and contact person of any assignee of Lender within a reasonable period of time after the effective date of the assignment, provided, that failure to provide such notice shall in no way affect the validity or effect of the assignment or Guarantor's obligations hereunder. In particular, each Guarantor acknowledges and agrees that Lender and its successors and assigns may (i) sell the Loan, this Guaranty and each of the other Loan Documents to one or more investors as a whole loan in a rated or unrated public offering or private placement, (ii) grant participation interests in the Loan, to one or more investors in a rated or unrated public offering or private placement, (iii) deposit this Guaranty and each of the other Loan Documents with a trust, which trust may sell certificates to investors evidencing an ownership in the trust assets in a rated or unrated public offering or private placement, or (iv) otherwise sell the Loan or any interest therein to investors in a rated or unrated public offering or private placement.

Section 6.18 **Independent Obligations**. The obligations of the Guarantor under this Guaranty are independent of Borrower's obligations under the Loan Agreement, the Note and the other Loan Documents, and a separate action or actions may be brought and prosecuted against the Guarantor to enforce this Guaranty, irrespective of whether an action is brought against Borrower or whether Borrower is joined in any such action or more successive and/or concurrent actions may be brought hereon against Guarantor either in the same action, if any, brought against Borrower or in separate actions, as often as Lender, in its sole discretion, may deem advisable. Guarantor, on behalf of itself and on behalf of each Person claiming by, through or under each Guarantor, hereby irrevocably and unconditionally waives any right to object to Lender bringing simultaneous actions to (i) recover the Guaranteed Obligations against Borrower under the Loan Agreement, the Note or any other Loan Document, at law or in equity, or (ii) recover any amounts due under this Guaranty.

[THE REMAINDER OF THE PAGE IS INTENTIONALLY BLANK]

FILED: NEW YORK COUNTY CLERK 04/17/2026 04:35 PM          INDEX NO. 652311/2026
NYSCEF DOC. NO. 8                                          RECEIVED NYSCEF: 04/17/2026
Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 236 of 316

IN WITNESS WHEREOF, Guarantor has executed this Guaranty the day and year first above written.

**GUARANTOR:**

Roberto Castro Contreras

[signature page to Interest and Carry Guaranty – Thompson Hotel]

## CONSENT OF SPOUSE OF GUARANTOR

The undersigned spouse of Roberto Castro Contreras, a Guarantor, hereby consents to the execution of the foregoing Guaranty of Interest and Carry Costs by their spouse and agrees to be bound thereby to the extent of their interest in any assets or property of such Guarantor and further agrees that their joint assets shall be bound thereby and that their claims against such assets are subordinate to any claims of Lender. This consent shall not be construed as an agreement by the undersigned spouse that such spouse's separate property is subject to the claims of Lender arising out of enforcement of this Guaranty.

_Martha C. Contreras_
Martha Claudia Contreras, an individual

[signature page to Spousal Consent to Interest and Carry Guaranty – Thompson Hotel]

# EXHIBIT F



Mark S. Lichtenstein

Akerman LLP
1251 Avenue of the Americas
37th Floor
New York, NY 10020

D: 212 259 8707
T: 212 880 3800
F: 212 880 8965
DirF: 212 259 8578
mark.lichtenstein@akerman.com

December 16, 2025

**BY OVERNIGHT COURIER AND EMAIL**

Lex Avenue Hotel, LLC
c/o DC Partners Management
2000 W Loop S Floor 21
Houston, Texas 77027
Attention: Roberto Contreras

Andrews Myers, P.C.
1885 St. James Place, 15th Floor
Houston, Texas 77056
Attention: Patrick Hayes

Roberto Castro Contreras
2000 W Loop S Floor 21
Houston, Texas 77027

> **Re:** **Thompson Hotel – San Antonio – Notice of Payment Default, Acceleration of Loan and Reservation of Rights**

Ladies and Gentlemen:

Reference is made to that certain mortgage loan in the maximum principal amount of $44,000,000.00 (the "**Loan**") made by **SOUTHERN REALTY TRUST HOLDINGS LLC**, a Delaware limited liability company (together with its permitted successors and assigns, collectively, "**SRT**") and **SUNRISE REALTY TRUST HOLDINGS I, LLC** a Delaware limited liability company (as successor in interest to **SUNRISE REALTY TRUST, INC.**, a Maryland corporation) (together with its permitted successors and assigns, collectively, "**SUNS**", and together with SRT, collectively, "**Lender**") to **LEX AVENUE HOTEL, LLC**, a Delaware limited liability company ("**Borrower**"), which Loan is (i) governed by that certain Loan Agreement, dated as of July 31, 2024, by and among Borrower and Lender (the "**Loan Agreement**"), as amended by that certain Note Splitter and Loan Modification Agreement by and between Borrower and Lender and made effective as of November 27, 2024, and as may be further amended, restated,

84749353;3

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 241 of 316

supplemented or otherwise modified from time to time, collectively, the "**Loan Agreement**"), and (ii) evidenced by (a) that certain that certain Replacement Promissory Note A-1, made effective as of November 27, 2024, in the principal amount of $15,400,000, made by Borrower in favor of SRT, and (b) that certain Replacement Promissory Note A-2, made effective as of November 27, 2024, in the principal amount of $28,600,000, by Borrower in favor of SUNS (as may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Note**", and (iii) and guaranteed by that certain Guaranty of Interest and Carry Costs agreement made as of July 31,2024 by Roberto Castro Contreras (the "**Guarantor**") for the benefit of Lender, the "**Guaranty**", together with the Note and the Loan Agreement and all of the other documents evidencing, securing, guaranteeing or otherwise executed in connection with the Loan, collectively, the "**Loan Documents**"). Capitalized terms used but not defined herein, shall have the meaning ascribed thereto in the Loan Agreement, as applicable.

Pursuant to that certain notice letter dated July 14, 2025, TCG RE Agent LLC, a Delaware limited liability company, was designated as the agent for the Lender (hereinafter the "**Agent**").

Reference is further made to (A) those certain Demand Letters delivered to Borrower and Guarantor by electronic mail on July 15, 2025 and via FedEx Express priority overnight service on July 17, 2025 and the follow up letters (updating the notice address for Borrower and Guarantor and clarifying the date the demand payment was due) delivered to Borrower and Guarantor via FedEx Express standard overnight service on July 25, 2025 (collectively, the "**July Demand Letters**"), in which a demand for payment was made for past due amounts and the Carry Shortfall Amount (as defined in such July Demand Letters) and was due no later than ten (10) Business Days from July 15, 2025 (the "**July Demand Due Date**") and (B) that certain Demand Letter dated August 6, 2026, acknowledged by Borrower and Guarantor (the "**August Demand Letter**"; and together with the July Demand Letter, the "**Demand Letters**"), in which a demand for payment was made for the Carry Shortfall Amount (as defined in the July Demand Letters) and was due no later than 5:00 pm EST on August 29, 2025 (the "**Extended Demand Due Date**"). Pursuant to the August Demand Letter, Lender reserved the right to declare an immediate Event of Default, if on or prior to the expiration of the Extended Demand Due Date, (i) Borrower failed to deposit the Carry Shortfall Amount (as defined in the July Demand Letters) or (ii) the loan parties failed to enter into a loan modification based on the basic terms and conditions specified in the August Demand Letter.

Reference is further made to that certain notice letter dated November 24, 2025 (the "**November Default Notice**"), pursuant to which we notified Borrower and Guarantor in writing that an Event of Default had occurred and was continuing under Section 8.1(a) of the Loan Agreement resulting from the failure of the Borrower to make the monthly payment due on November 10, 2025 as required by the Loan Agreement and to satisfy the requirements in the August Demand Letter (the "**Existing Defaults**"). Immediate payment of all amounts past due was demanded on or before 5:00 pm EST on December 9, 2025 (the "**Demand Due Date**").

84749353;3

Despite the expiration of the Demand Due Date, Borrower has not remedied the Existing Defaults. Instead, Borrower failed to timely make its monthly debt service payment due on December 9, 2025, as required by the Loan Agreement.

**BE ADVISED THAT**, as a result of the Existing Defaults, and in accordance with Article 2 of the Note and other applicable provisions of the Loan Documents, the Lender hereby exercises its option to accelerate all of the obligations under the Loan documents and declares the entire unpaid principal balance of the Loan, together with all accrued and unpaid interest, default interest, fees, costs, expenses, and all other sums owing under the Loan Documents, to be immediately due and payable in full, without further notice or demand.

**BE FURTHER ADVISED THAT,** pursuant to Section 7.5(b) of the Loan Agreement, Lender has elected, in addition to any and all other rights and remedies available to Lender, to apply any sums now present in the FF&E Reserve Account to the reduction of the Outstanding Principal Balance. As of this date, there exists approximately $637,047.76 in the FF&E Account.

**DEMAND IS HEREBY MADE** for the immediate payment of all amounts now past due and owing including, but not limited to, the unpaid principal of $41,221,263.62, delinquent interest payments of $1,134,100.01, Servicing Fees of $3,774.19, AM Fee of $5,032.26, Late Fees equal to $19,431.63, all as specifically set forth in the Summary of Amount Due annexed hereto, as well as legal fees and costs of collection in an amount to be determined.

Please be advised that Lender may elect to pursue its remedies under the Loan Documents and applicable law, including, without limitation, foreclosing on or taking possession of and liquidating any and all Collateral securing payment of the obligations under the Note and pursuing all of its legal remedies against all parties obligated to repay the Loan, including seeking recovery of amounts due from the Guarantor under the applicable Guaranty instruments.  Further, this letter is notice to the Borrower and Guarantor that default interest shall be enforced and the accelerated balance of the Loan shall bear interest as set forth in the Note.

Furthermore, this letter shall serve as notice to the Borrower that Lender's acceptance of any payments on the Loan referenced for less than the full amount now due and owing does not constitute a waiver of any term, provision, condition, covenant, or agreement contained in any of the Loan Documents, nor shall it (i) operate as a waiver of any right, power or privileges thereunder; (ii) prejudice or preclude any other or further exercise of any right or remedy provided by law or equity; (iii) entitle the Borrower to any other or further notice or demand whatsoever; or (iv) in any way modify, change, impair, affect, diminish, or release any liability of the Borrower under or pursuant to any of the Loan Documents.  All rights and remedies available to Lender are cumulative and may be pursued separately, successively or concurrently against the Borrower and Guarantor, the collateral, or any person or entity that is, or may become, liable for all or any portion of the Loan, without further notice to any other person or entity.

Agent and Lender expressly reserve all of their rights and remedies under the Loan Agreement, the other Loan Documents, and applicable law as a result of the occurrence and continuance of the Existing Defaults and any other Default or Event of Default occurring at any time. Agent and Lender have not waived, and have no intention of waiving, any Defaults or any

84749353;3

Events of Default (including, without limitation, the Existing Defaults) that exist on the date hereof or that may occur after the date hereof. Agent and Lender have not agreed to forbear with respect to any rights or remedies relating to any Defaults or Events of Default (including, without limitation, the Existing Defaults) that are continuing on the date hereof or that may occur after the date hereof. Nothing herein, nor Agent's and Lender's election to take or not take any action on account of the Existing Defaults constitutes, or shall be deemed to constitute, an election by Agent or Lender to waive or forbear with respect to their exercise of any or all of their respective rights and remedies at any time. The foregoing shall not represent, is not intended to, and will not for any purpose, (x) constitute a waiver of any claims, rights or remedies, or of any Event of Default or other default under the Loan Documents, (y) serve as a course of dealing obligating Agent and/or Lender to provide any additional or other accommodations, financial, temporal or otherwise, to Borrower or any other party to the Loan Documents, or (z) serve as a commitment or any agreement to make a commitment with respect to any possible waiver, amendment, consent or other modification of the terms of the Loan Documents.

Please be further advised that it is the intention of Agent and Lender to strictly enforce the covenants, conditions, provisions and terms of the Loan Documents and Agent and Lender hereby demand Borrower's and Guarantor's strict compliance with said covenants, conditions, provisions and terms. Agent and Lender retain and reserve all of its respective rights to exercise any and all remedies as provided for in the Loan Documents or as otherwise available pursuant to applicable law or equity, including all remedies provided under the UCC.

For the avoidance of doubt, any past, ongoing or future negotiations or other statements of Agent or Lender or their respective representatives or agents to the Borrower, Guarantor, any of their respective Affiliates, or any of their respective representatives or agents shall only be binding upon and enforceable against Agent and Lender if and to the extent hereafter set forth in a written agreement duly executed by Agent and Lender. The only agreements that continue to exist between Agent, Lender, Borrower and Guarantor are those set forth in their respective Loan Documents, which may only be amended by agreement of the parties in writing and fully executed.

PLEASE GOVERN YOURSELVES ACCORDINGLY

Very truly yours,

Mark S. Lichtenstein, Esq.
AKERMAN LLP

CC:
TCG RE AGENT LLC
525 Okeechobee Blvd., Suite 1650
West Palm Beach, FL 33401
Attn: Brian Sedrish, Chief Executive Officer

84749353;3

## Summary of Amount Due

|  | October | November | December (12.16.2025) | Total |
|---|---|---|---|---|
| Unpaid Principal |  |  |  | $41,221,263.62 |
| Interest | $385,132.56 | $372,708.93 | $198,778.09 | $956,619.57 |
| Default Interest |  | $85,877.63 | $91,602.81 | $177,480.44 |
| Late Fees | $19,431.63 |  |  | $19,431.63 |
| Servicing Fees | $1,500.00 | $1,500.00 | $774.19 | $3,774.19 |
| AM Fees | $2,000.00 | $2,000.00 | $1,032.26 | $5,032.26 |

84749353;3

# EXHIBIT G

## Guaranteed Obligations: Thompson SA

**Key Dates:**

| | | |
|---|---|---|
| Default Notice: 11/24/2025 | (start of Default Interest) | |
| Acceleration: 12/16/2025 | (start of Interest and Default Interest Accruals) | |
| Foreclosure: 3/3/2026 | | |
| 2025 Property Tax Demand: 1/29/2026 | (start of Property Tax Default Interest) | |

### (1) 2025 Property Taxes

| | | |
|---|---|---|
| 2025 Property Tax Bill | $1,683,808.10 | (TCG sent notice to Demand to Guarantor on 1/29/26 to pay 2025 property taxes) |
| (+) Bexar County Impositions and Fees | $254,436.29 | Assumes 2025 property taxes are paid on 7/1/26 |
| (+) Default Interest (15.85%) | $113,425.52 | from date of Tax Demand (1/29/26) until 7/1/26 |
| **(1) 2025 Property Taxes** | **$2,051,669.91** | |

### (2) Interest, Default Interest & Fees

| Description | Start Date | End Date | Days | UPB + Accrued | Default Rate | Interest Rate | Total Rate | Current Interest | Default Interest | Total Interest | Servicing Fee | Late Fee % | Late Fee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| October Full Month | 10/9/2025 | 11/8/2025 | 31 | 41,221,263.62 | | 10.85% | 10.85% | 385,132.56 | - | 385,132.56 | 3,500.00 | 5.0% | 19,431.63 |
| November Partial Month (until Default Notice) | 11/9/2025 | 11/23/2025 | 15 | 41,221,263.62 | | 10.85% | 10.85% | 186,354.46 | - | 186,354.46 | 3,500.00 | 5.0% | 9,492.72 |
| Default Notice Date | 11/24/2025 | 12/8/2025 | 15 | 41,221,263.62 | 5.0% | 10.85% | 15.85% | 186,354.46 | 85,877.63 | 272,232.10 | | 5.0% | 13,611.60 |
| December Partial Month (until Acceleration) | 12/9/2025 | 12/15/2025 | 7 | 41,221,263.62 | 5.0% | 10.85% | 15.85% | 86,965.42 | 40,076.23 | 127,041.64 | 3,500.00 | 5.0% | 6,527.08 |
| Acceleration Date | 12/16/2025 | 12/18/2025 | 3 | 42,202,524.38 | 5.0% | 10.85% | 15.85% | 38,158.12 | 17,584.39 | 55,742.50 | | N/A | |
| FF&E Reserve Application | 12/19/2025 | 1/8/2026 | 21 | 41,621,219.12 | 5.0% | 10.85% | 15.85% | 263,427.63 | 121,395.22 | 384,822.86 | | N/A | |
| January Full Month | 1/9/2026 | 2/8/2026 | 31 | 42,006,041.97 | 5.0% | 10.85% | 15.85% | 392,464.78 | 180,859.35 | 573,324.13 | | N/A | |
| February Partial Month (until Foreclosure) | 2/9/2026 | 3/3/2026 | 23 | 42,579,366.11 | 5.0% | 10.85% | 15.85% | 295,157.80 | 136,017.42 | 431,175.22 | | N/A | |
| Subtotal | | | | | | | | | | 2,415,825.47 | 10,500.00 | | 49,063.04 |
| **(2) Interest, Default Interest & Fees** | **$2,475,388.50** | As of 3/3/2026 | | | | | | | | | | | |

### (3) Legal Fees

| | | |
|---|---|---|
| **(3) Legal Fees** | **$272,038.00** | through 3/25/2026 |

### (4) Carry Costs

| | | |
|---|---|---|
| Beginning Balance | $1,913,906 | TCG starting cash from January 2026 Managed and Operating Account sweep |
| (-) January 2026 Payment to Hyatt/Property | ($244,804) | for payroll |
| (-) February 2026 Payment to Hyatt/Property | ($248,319) | for insurance, ground rent, chiller, and other Operating Expenses |
| (-) April 2026 Payment to Hyatt/Property | ($350,000) | for Operating Account replenishment; Hyatt requesting in early April 2026 |
| (-) Summer 2026 Payments to Hyatt | ($1,000,000) | Expected cash needs through Q2 2026 based on 2025 summer performance |
| (=) Net Cash to Cover Future Operating Shortfalls | $70,783 | |
| (-) Future Operating Shortfalls | ($2,000,000) | Negative NOI forecast from Q3 2026 until Hotel is "breakeven" |
| **(4) Carry Cost Obligation** | **$1,929,216.69** | Net of future anticipated Gross Collections and Net Cash on hand |

| | | |
|---|---|---|
| **Total: Guaranteed Obligations** | **$6,728,313.11** | Note: this proposal shall expire on 7/1/26 |

Case 1:26-cv-04240-RA Document 1-1 Filed 05/20/26 Page 247 of 316

# EXHIBIT H

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 248 of 316

# akerman

Mark S. Lichtenstein

Akerman LLP
1251 Avenue of the Americas
37th Floor
New York, NY 10020

D: 212 259 8707
T: 212 880 3800
F: 212 880 8965
DirF: 212 259 8578
mark.lichtenstein@akerman.com

March 30, 2026

**EMAIL & OVERNIGHT MAIL**

Roberto Castro Contreras
c/o DC Partners Management
2000 W Loop S Floor 21
Houston, Texas 77027

**Lender:** SOUTHERN REALTY TRUST HOLDINGS LLC ("**SRT**") and SUNRISE REALTY TRUST HOLDINGS I (as successor in interest to SUNRISE REALTY TRUST, INC.) (together with its permitted successors and assigns, collectively "**SUNS**")

**Borrower:** LEX AVENUE HOTEL, LLC

**Re:    Interest and Carry Guaranty – Thompson San Antonio**

Dear Mr. Contreras:

We write in furtherance of recent conversations between you and the Lender regarding the Thompson San Antonio loan and your obligations under the Guaranty of Interest and Carry Costs, dated July 31, 2024 (the "Guaranty"). This letter is intended to provide clarity as to the current status of your obligations under the Guaranty and to continue the dialogue regarding a consensual path forward and is without prejudice of Lender's rights and remedies under the Guaranty, including the right to commence litigation to collect all sums due thereunder. .

As you know, you guaranteed the payment of, among other things, interest, operating shortfalls and carry costs to the extent gross income from operations generated from the property is insufficient to cover those amounts. Based on the financial information provided to date, and after application of operating revenues, there remains an outstanding interest and carry shortfall obligation for which you are responsible under the Guaranty.

As of March 24, 2026, the total amount due under the Guaranty is **$6,728,313.11**. Schedule 1, attached hereto, provides the detail supporting these amounts. For the avoidance of doubt, Lender reserves the right to reforecast and recalculate the total amount due under the Guaranty if an agreement is not reached and memorialized with Guarantor prior to July 1, 2026, given that

akerman.com

Roberto Castro Contreras
March 30, 2026
Page 2

Guarantor's carry obligations under the Guaranty have no stated end date and continue to accrue until all Guaranteed Obligations are paid in full.

Nothing in this letter is intended to be, nor should it be construed as, a waiver, modification, or relinquishment of any rights or remedies available to Lender under the Guaranty, the loan documents, or applicable law. All such rights are expressly reserved. The Guaranty remains in full force and effect, and any amounts that continue to accrue thereunder will remain your obligation until satisfied.

We encourage you to review the attached schedule and to contact either us or the Lender directly as soon as possible to discuss this further. We believe there is an opportunity to address these matters pragmatically without the time and expense attendant to litigation and are willing to entertain a reasonable resolution if you are.

Sincerely,

Mark Lichtenstein

Mark S. Lichtenstein

Copies by Federal Express and E-Mail to:

Lex Avenue Hotel, LLC
c/o DC Partners Management
2000 W Loop S Floor 21
Houston, Texas 77027
Attention: Roberto Contreras

Andrews Myers, P.C.
1885 St. James Place, 15th Floor
Houston, Texas 77056
Attention: Patrick Hayes

**Schedule 1**

**Guaranteed Obligations: Thompson SA**

**Key Dates:**

| | | |
|---|---|---|
| Default Notice: 11/24/2025 | (start of Default Interest) | |
| Acceleration: 12/16/2025 | (start of Interest and Default Interest Accruals) | |
| Foreclosure: 3/3/2026 | | |
| 2025 Property Tax Demand: 1/29/2026 | (start of Property Tax Default Interest) | |

**(1) 2025 Property Taxes**

| | | |
|---|---|---|
| 2025 Property Tax Bill | $1,683,808.10 | (TCG sent notice to Demand to Guarantor on 1/29/26 to pay 2025 property taxes) |
| (+) Bexar County Impositions and Fees | $254,436.29 | Assumes 2025 property taxes are paid on 7/1/26 |
| (+) Default Interest (15.85%) | $113,425.52 | from date of Tax Demand (1/29/26) until 7/1/26 |
| **(1) 2025 Property Taxes** | **$2,051,669.91** | |

**(2) Interest, Default Interest & Fees**

| Description | Start Date | End Date | Days | UPB + Accrued | Default Rate | Interest Rate | Total Rate | Current Interest | Default Interest | Total Interest | Servicing Fee | Late Fee % | Late Fee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| October Full Month | 10/9/2025 | 11/8/2025 | 31 | 41,221,263.62 | | 10.85% | 10.85% | 385,132.56 | - | 385,132.56 | 3,500.00 | 5.0% | 19,431.63 |
| November Partial Month (until Default Notice) | 11/9/2025 | 11/23/2025 | 15 | 41,221,263.62 | | 10.85% | 10.85% | 186,354.46 | - | 186,354.46 | 3,500.00 | 5.0% | 9,492.72 |
| Default Notice Date | 11/24/2025 | 12/8/2025 | 15 | 41,221,263.62 | 5.0% | 10.85% | 15.85% | 186,354.46 | 85,877.63 | 272,232.10 | | 5.0% | 13,611.60 |
| December Partial Month (until Acceleration) | 12/9/2025 | 12/15/2025 | 7 | 41,221,263.62 | 5.0% | 10.85% | 15.85% | 86,965.42 | 40,076.23 | 127,041.64 | 3,500.00 | 5.0% | 6,527.08 |
| Acceleration Date | 12/16/2025 | 12/18/2025 | 3 | 42,202,524.38 | 5.0% | 10.85% | 15.85% | 38,158.12 | 17,584.39 | 55,742.50 | | N/A | |
| FF&E Reserve Application | 12/19/2025 | 1/8/2026 | 21 | 41,621,219.12 | 5.0% | 10.85% | 15.85% | 263,427.63 | 121,395.22 | 384,822.86 | | N/A | |
| January Full Month | 1/9/2026 | 2/8/2026 | 31 | 42,006,041.97 | 5.0% | 10.85% | 15.85% | 392,464.78 | 180,859.35 | 573,324.13 | | N/A | |
| February Partial Month (until Foreclosure) | 2/9/2026 | 3/3/2026 | 23 | 42,579,366.11 | 5.0% | 10.85% | 15.85% | 295,157.80 | 136,017.42 | 431,175.22 | | N/A | |
| Subtotal | | | | | | | | | | 2,415,825.47 | 10,500.00 | | 49,063.04 |
| **(2) Interest, Default Interest & Fees** | **$2,475,388.50** | As of 3/3/2026 | | | | | | | | | | | |

**(3) Legal Fees**

| | | |
|---|---|---|
| **(3) Legal Fees** | **$272,038.00** | through 3/25/2026 |

**(4) Carry Costs**

| | | |
|---|---|---|
| Beginning Balance | $1,913,906 | TCG starting cash from January 2026 Managed and Operating Account sweep |
| (-) January 2026 Payment to Hyatt/Property | ($244,804) | for payroll |
| (-) February 2026 Payment to Hyatt/Property | ($248,319) | for insurance, ground rent, chiller, and other Operating Expenses |
| (-) April 2026 Payment to Hyatt/Property | ($350,000) | for Operating Account replenishment; Hyatt requesting in early April 2026 |
| (-) Summer 2026 Payments to Hyatt | ($1,000,000) | Expected cash needs through Q2 2026 based on 2025 summer performance |
| (=) Net Cash to Cover Future Operating Shortfalls | $70,783 | |
| (-) Future Operating Shortfalls | ($2,000,000) | Negative NOI forecast from Q3 2026 until Hotel is "breakeven" |
| **(4) Carry Cost Obligation** | **$1,929,216.69** | Net of future anticipated Gross Collections and Net Cash on hand |

| | | |
|---|---|---|
| **Total: Guaranteed Obligations** | **$6,728,313.11** | Note: this proposal shall expire on 7/1/26 |

Case 1:26-cv-04240-RA     Document 1-1     Filed 05/20/26     Page 251 of 316

# EXHIBIT I

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 252 of 316

## NOTE SPLITTER AND LOAN MODIFICATION AGREEMENT

THIS NOTE SPLITTER AND LOAN MODIFICATION AGREEMENT (this "***Agreement***"), is made effective as of November 27, 2024 (the "***Effective Date***"), by and between **LEX AVENUE HOTEL, LLC,** a Delaware limited liability company ("***Borrower***"); and **SOUTHERN REALTY TRUST HOLDINGS LLC,** a Delaware limited liability company ("***SRH Lender***"), and **SUNRISE REALTY TRUST HOLDINGS I LLC**, a Delaware limited liability company ("***SRT Lender***" and together with SRH Lender, individually and/or collectively as the context may require, together with their respective successors and assigns, "***Lender***").

RECITALS

WHEREAS, on July 31, 2024, SRH Lender and **SUNRISE REALTY TRUST, INC.**, a Maryland corporation (the "***Original SRT Lender***" and together with SRH Lender, "***Original Lenders***"), made a loan to Borrower in the maximum principal amount of **FORTY-FOUR MILLION and No/100 DOLLARS ($44,000,000.00)** (the "***Loan***"); and

WHEREAS, the Loan is evidenced by, among other things, that certain Promissory Note with a maximum principal amount of **FORTY-FOUR MILLION and No/100 DOLLARS ($44,000,000.00)**, dated as of July 31, 2024 (the "***Original Note***"), made by Borrower to the order of Original Lenders; and

WHEREAS, to further evidence and secure the Loan and the Original Note, Borrower executed that certain Loan Agreement, dated as of July 31, 2024 (the "***Original Loan Agreement***"), as well as the Loan Documents (as that term is defined in the Loan Agreement) including without limitation, that certain Fee and Leasehold Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing, dated as of the date of the Original Loan Agreement, made by Borrower for the benefit of Original Lenders (the "***Original Security Instrument***"); and

WHEREAS, Original SRT Lender assigned all of its rights, title and interest in the Loan to SRT Lender pursuant to (1) that certain Allonge, dated as of November 26, 2024 and executed by Original SRT Lender and acknowledged by SRH Lender (together with the Original Note, the "***Current Note***"), (2) that certain Assignment of Fee and Leasehold Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing, dated as of November 26, 2024 and executed by Original SRT Lender and acknowledged by SRH Lender, as recorded on _____ __, 2024 in the Official Records of Bexar County, Texas as Document Number: _____, (together with the Original Security Instrument, the "***Security Instrument***"), (3) that certain Assignment of Assignment of Leases and Rents, dated as of November 26, 2024 and executed by Original SRT Lender and acknowledged by SRH Lender, as recorded on _____ __, 2024 in the Official Records of Bexar County, Texas as Document Number: _____, (4) that certain General Assignment and Assumption Agreement, dated as of November 26, 2024, executed by Original SRT Lender and SRT Lender and acknowledged by SRH Lender (together with the Original Loan Agreement, the "***Current Loan Agreement***"), (5) UCC-3 Assignment (Bexar County, Texas) for Initial Filing Number 20240139215, recorded on _____ __, 2024 in the Official Records of Bexar County, Texas as File Number:

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 253 of 316

_____, (6) UCC-3 Assignment (DE SOS) for Initial Filing Number 2024 5584931, recorded on _____ \_\_, 2024 with the Delaware Secretary of State as File Number: _____, and (7) UCC-3 Assignment (DE SOS - Pledge) for Initial Filing Number 2024 5247505, recorded on _____ \_\_, 2024 with the Delaware Secretary of State as File Number: _____; and

WHEREAS, there is presently outstanding on the Current Note an unpaid principal balance of $[39,745,814.23], plus accrued interest thereon (pro rata to the amount of each Lender's respective Commitment (as defined hereunder)) in accordance with the Current Loan Agreement (said principal balance, accrued interest and all other sums which may or shall become due under the Current Note, as modified, split, amended and restated pursuant to the provisions hereof, are hereinafter collectively referred to as the "*Indebtedness*"); and

WHEREAS, Lender and Borrower have agreed, in the manner hereinafter set forth, that (i) the Current Loan Agreement shall be amended and modified as set forth in this Agreement and (ii) the Current Note shall be split and severed into two (2) separate notes, which two (2) separate notes shall each be secured by the lien of the Security Instrument and by the other applicable Loan Documents; and

WHEREAS, Borrower and Lender have agreed to execute this Agreement in order to effectuate such splitting and severing of the Current Note and the amendment and modification of the Current Loan Agreement (the Current Loan Agreement, as amended by this Agreement, is referred to as the "*Loan Agreement*");

NOW, THEREFORE, in consideration of the mutual promises and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Borrower and Lender hereby represent, warrant, covenant and agree as follows:

1.      All capitalized terms used herein and not herein defined shall have the meanings assigned to such terms in the Loan Agreement.

2.      The Current Note is hereby split and severed and modified from and after the date hereof into two (2) notes as follows:

(a)     that certain Replacement Promissory Note A-1, dated the date hereof, evidencing Borrower's obligation to pay the principal amount of up to a maximum of **FIFTEEN MILLION FOUR HUNDRED THOUSAND and No/100 DOLLARS ($15,400,000.00)**, in the form attached hereto as **Exhibit A**, executed and delivered by Borrower to SRH Lender ("*Note A-1*"); and

(b)     that certain Replacement Promissory Note A-2, dated the date hereof, evidencing Borrower's obligation to pay the principal amount of up to a maximum of **TWENTY-EIGHT MILLION SIX HUNDRED THOUSAND and No/100 DOLLARS ($28,600,000.00)**, in the form attached hereto as **Exhibit B**, executed and delivered by Borrower to SRT Lender ("*Note A-2*", and collectively with Note A-1, the "*Replacement Notes*").

3.       The Replacement Notes are each secured by the lien of the Security Instrument and evidence the same indebtedness evidenced by the Current Note and fully substitute the Current Note in its entirety.  Nothing in the Replacement Notes, as the same are herein or hereafter split or modified, or in any other agreement between Borrower and Lender, shall (a) extinguish the Indebtedness or (b) create any new or additional indebtedness. Lender shall have the right to further divide the Replacement Notes into component notes pursuant to, and in accordance with, Section 9.4 of the Loan Agreement.

4.       Whenever the term "Note" shall be used in the Loan Agreement, Security Instrument and the other Loan Documents, such term shall mean and refer to the Replacement Notes.

5.       Whenever the term "SRT" shall be used in the Loan Agreement, such term shall mean and refer to **SUNRISE REALTY TRUST HOLDINGS I LLC**, a Delaware limited liability company.

6.       Section 1.1 of the Current Loan Agreement is hereby amended by amending and restating the following defined terms:

"**Note**" means, individually and collectively, Note A-1 and Note A-2, as the same may be amended, restated, modified or supplemented and in effect from time to time.

7.       Section 1.1 of the Current Loan Agreement is hereby amended to add the following defined terms:

"**Commitment**" means, as to each Lender, such Lender's agreement to make a Loan pursuant to Article II hereof in the amount set forth for such Lender on Schedule VIII attached hereto as such Lender's Commitment.

"**Note A-1**" means that certain Replacement Promissory Note A-1 by and among Borrower, as maker, and SRH, as payee, dated as of November 27, 2024, with a maximum principal amount of up to **FIFTEEN MILLION FOUR HUNDRED THOUSAND and No/100 DOLLARS ($15,400,000.00)**, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Note A-2**" means that certain Replacement Promissory Note A-2 by and among Borrower, as maker, and SRT, as payee, dated as of November 27, 2024, with a maximum principal amount of up to **TWENTY-EIGHT MILLION SIX HUNDRED THOUSAND and No/100 DOLLARS ($28,600,000.00)**, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

8.       Section 2.1.3 of the Current Loan Agreement is hereby deleted in its entirety and replaced with the following language:

2.1.3    The Note, Security Instrument and Loan Documents.  The Loan shall be evidenced by the Note and secured by the Security Instrument, the Assignment of Leases and the other Loan Documents, as applicable. Note A-1 and Note A-2 shall be cross-defaulted and

cross-collateralized with each other.

9.      Section 2.1.5 of the Current Loan Agreement is hereby deleted in its entirety and replaced with the following language:

2.1.5 Pro Rata Treatment.  Except to the extent otherwise provided herein: (i) each borrowing from the Lenders under Article II shall be made by each Lender pro rata to the amounts of their respective Commitments; (ii) each payment or prepayment of principal of Loans by Borrower shall be made for the account of the Lenders pro rata in accordance with the respective unpaid principal amounts of the Loans held by them, provided that if immediately prior to giving effect to any such payment in respect of any Loans, the outstanding principal amount of the Loans shall not be held by the Lenders pro rata in accordance with their respective Commitments in effect at the time such Loans were made, then such payment shall be applied to the Loans in such manner as shall result, as nearly as is practicable, in the outstanding principal amount of the Loans being held by the Lenders pro rata in accordance with their respective Commitments; (iii) each payment of interest on Loans by Borrower shall be made for the account of the Lenders pro rata in accordance with the amount of interest on such Loans then due and payable to the respective Lenders; (iv) the making of Loans shall be made pro rata among the Lenders according to the amounts of their respective Commitments; and (v) without duplicating the foregoing, the Lenders' participation in, and payment obligations in respect of, Loans under Article II, shall be in accordance with their respective Commitments.  All payments of principal, interest, fees and other amounts in respect of the Loans shall be for the account of the Lenders as provided herein and the other Loan Documents.

10.      Section 2.4 of the Current Loan Agreement is hereby amended to add the following sentence immediately following "Section 2.4 Prepayments.":

Except during the continuance of an Event of Default (in which case Section 2.4.3 and Section 8.2(a) hereof shall govern), any prepayment of the principal balance of the Loan, in whole or in part, whether voluntary or involuntary (including, without limitation, any prepayment tendered in accordance with Section 2.4.1 or Section 2.4.2 hereof), shall be applied by Lender pro rata to the amounts of their respective Commitments.

11.      Section 2.5.1 of the Current Loan Agreement is hereby deleted in its entirety and replaced with the following language:

2.5.1 Future Interest Shortfall Advances.  Subject to the terms of this Section 2.5.1, Lender shall make one or more Future Interest Shortfall Advances to Borrower for Interest Shortfalls in an amount not to exceed the unfunded portion of the Future Interest Shortfall Advance Amount, which Future Interest Shortfall Advance shall be deposited into the Interest Shortfall Reserve Account upon satisfaction by Borrower of each of the following conditions with respect to such Future Interest Shortfall Advance. For the avoidance of doubt, any Future Interest Shortfall Advance to Borrower shall be made by the holder of Note A-1 and Note A-2 pro rata to the amount of each Lender's respective Commitment in

accordance with, and subject to Borrower's compliance with the terms and conditions of this Section 2.5.1.

(a)    Deliveries.  The following items or documents shall have been delivered to Lender:

(i)    Lender's standard form of draw request for payment not less than ten (10) Business Days prior to the date on which Borrower requests such advance is to be made; and

(ii)    a title search for the Property indicating that the Property is free and clear from all Liens, claims and other encumbrances not previously approved by Lender (other than Permitted Encumbrances), and a T-3 P-9b(4) R-11c endorsement to the Title Insurance Policy.

(b)    Performance; No Default.  On the date of such Future Interest Shortfall Advance, no Default or Event of Default shall have occurred and be continuing.

(c)    Representations and Warranties.  The representations and warranties made by Borrower and Guarantor in the Loan Documents or in any certificate or instrument delivered in connection with the Loan Documents shall have been true and correct in all material respects on the date made and shall also be true and correct in all material respects as if remade on the date of the Future Interest Shortfall Advance, except for such changes in facts and circumstances as shall have occurred in the ordinary course of business and which do not otherwise give rise to or constitute a Default or Event of Default.

(d)    Cap on Future Interest Shortfall Advance.  In no event shall Lender have any obligation to make a Future Interest Shortfall Advance in excess of the Future Interest Shortfall Advance Amount.

(e)    Fees and Expenses.  All fees and expenses payable to Lender shall have been (or contemporaneously are being) paid in full, and all title premiums and other title and survey charges shall have been (or contemporaneously are being) paid in full, if applicable.

12.    Section 2.5.2 of the Current Loan Agreement is hereby deleted in its entirety and replaced with the following language:

2.5.2 Earnout Advances.  Subject to the terms of this Section 2.5.2, Lender shall make one or more Earnout Advances to Borrower in an amount not to exceed (in the aggregate) the unfunded portion of the Earnout Advance Amount upon satisfaction by Borrower of each of the following conditions with respect to each such Earnout Advance. For the avoidance of doubt, any Earnout Advance to Borrower shall be made by the holder of Note A-1 and Note A-2 pro rata to the amount of each Lender's respective Commitment in accordance with, and subject to Borrower's compliance with the terms and conditions of this Section 2.5.2.

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 257 of 316

(a)      Deliverables. The following items or documents shall have been delivered to Lender:

(i)      Not less than ten (10) Business Days prior to the date on which Borrower requests such Earnout Advance be made, which request shall specify the amount of the Earnout Advance requested and evidence that all conditions thereto have been satisfied, together with an Officer's Certificate certifying as to same; and

(ii)      A title search for the Property indicating that the Property is free and clear from all Liens, claims and other encumbrances not previously approved by Lender (other than Permitted Encumbrances);

(b)      Debt Yield. The Debt Yield, after taking into account the applicable Earnout Advance then remaining undisbursed, shall be equal to or greater than nine percent (9.00%) for one (1) calendar year;

(c)      Performance; No Default. On the date such Earnout Advance is requested and on the date of such Earnout Advance, there shall exist no monetary Default, material nonmonetary Default, or Event of Default;

(d)      Earnout Funding Fee. Upon the funding of each Earnout Advance, Borrower shall pay to Lender the Earnout Funding Fee;

(e)      Representations and Warranties. The representations and warranties made by Borrower, Pledgor and Guarantor in the Loan Documents or in any certificate or instrument delivered in connection with the Loan Documents shall have been true and correct on the date in all material respects on which made and shall also be true and correct in all material respects as if remade on the date of the Earnout Advance, except for such changes in facts and circumstances as shall have occurred in the ordinary course of business and which do not otherwise give rise to or constitute a Default or Event of Default; and

(f)      Cap on Earnout Advances. In no event shall Lender have any obligation to make Earnout Advances in excess of, in the aggregate, the Earnout Advance Amount.

13.      Section 2.5.3 is hereby added to the Current Loan Agreement in its entirety with the following language:

2.5.3 Notwithstanding anything to the contrary contained in this Section 2.5, Borrower agrees that in no event shall: (i) the holder of Note A-1 have any obligation to make a Future Advance in excess of, in the aggregate, the unfunded portion of its Commitment and (ii) the holder of Note A-2 have any obligation to make a Future Advance in excess of, in the aggregate, the unfunded portion of its Commitment. Borrower further agrees that (i) any failure of the holder of Note A-1 to fund its pro rata share of any Future Advance will not give rise to any defense, set-off, right of recoupment, claim or counterclaim against the holder of Note A-2 and (ii) any failure of the holder of Note A-2 to fund its pro rata

share of any Future Advance will not give rise to any defense, set-off, right of recoupment, claim or counterclaim against the holder of Note A-1.

14.     Section 8.2(a) of the Current Loan Agreement is hereby amended to add the following sentence at the end of the Section:

> In addition, Lender shall have the right (without limiting any other rights of Lender hereunder or under any other Loan Document) to apply amounts received by Lender during the continuance of an Event of Default in respect of the Debt (including any Monthly Debt Service Payment Amount or any portion thereof) to the payment of amounts then due under Note A-1 and/or Note A-2 or the other Loan Documents in such amounts and priority as Lender shall determine in its sole discretion.

15.     Schedule VIII attached hereto shall be added in its entirety to the Current Loan Agreement as Schedule VIII.

16.     All of the terms, covenants, and conditions contained in the Loan Documents shall be and remain in full force and effect, except as specifically modified in this Agreement, and are hereby ratified and reaffirmed in their entirety by the parties hereto. It is expressly understood that the execution and delivery of this Agreement and the Replacement Notes do not and shall not (i) give rise to any defense, set-off, right of recoupment, claim or counterclaim with respect to any of Borrower's, Guarantor's or Manager's obligations under the Loan Documents or the enforcement thereof except as specifically set forth in the Loan Documents, (ii) operate as a waiver of any of Lender's rights, powers or privileges under the Loan Documents, or (iii) prejudice, limit or affect in any way any present or future rights, remedies, powers or benefits available to Lender under the Loan Documents or any other documents executed by Borrower, Guarantor or Manager for the benefit of Lender in connection with the Loan. In addition, the parties hereto expressly disclaim any intent to effect a novation or an extinguishment or discharge of any of the Indebtedness evidenced by the Note, the Loan Agreement or any of the other Loan Documents or by any other document executed in connection therewith by reason of this Agreement.

17.     Each party hereto hereby represents and warrants that such party (a) is authorized to enter into this Agreement and consummate the transactions contemplated hereby and (b) has obtained all necessary or requisite approvals, permits, consents and/or authorizations, if any, needed to enter into this Agreement and consummate the transactions contemplated hereby. Each of Borrower and Guarantor represent and warrant to Lender that (i) neither Borrower nor any direct or indirect owner of Borrower has any claims or counterclaims against Lender with respect to the Loan or any collateral for the Loan or otherwise relating to the Loan or the subject matter of any of the Loan Documents, and (ii) Borrower has no offsets or defenses with respect to any of its obligations or liabilities under the Loan Documents or otherwise to the enforcement by Lender of its rights and remedies as provided in the Loan Documents.

18.     Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 259 of 316

such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

19.     This Agreement may be executed by one or more of the parties hereto on any number of separate counterparts, each of which shall be an original and all of which taken together shall constitute one and the same instrument.

20.     This Agreement shall inure to the benefit of and is binding upon Borrower and Lender, and their respective successors and permitted assigns.

21.     This Agreement constitutes the entire agreement among the parties hereto with respect to the matters identified herein.  This Agreement and the Loan Documents may only be amended, revised, waived, discharged, released or terminated by a written instrument executed by the party against which enforcement of the amendment, revision, waiver, discharge, release or termination is asserted. Any alleged amendment, revision, waiver, discharge, release or termination of this Agreement which is not in writing and signed by the parties shall not be effective as to any party.

22.     This Agreement shall be governed in accordance with the terms and provisions of Section 10.3 of the Loan Agreement.

[THE REMAINDER OF THE PAGE IS INTENTIONALLY BLANK]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, to be effective as of the day and year first above written.

BORROWER:

**LEX AVENUE HOTEL, LLC,**
a Delaware limited liability company

By: _____
Name: Acho Azuike
Title: Vice President

CONSENTED AND AGREED TO BY:

**GUARANTOR**:

_____
Roberto Castro Contreras

[signature page to Note Splitter and Loan Modification Agreement – Thompson San Antonio]

**LENDER:**

**SOUTHERN REALTY TRUST HOLDINGS LLC,**
a Delaware limited liability company

By: Southern Realty Trust Inc., its Sole Member

By: _____
    Name: Brandon Hetzel
    Title: Chief Financial Officer

**SUNRISE REALTY TRUST HOLDINGS I LLC,**
a Delaware limited liability company

By: Sunrise Realty Trust Inc., its Sole Member

By: _____
    Name: Brandon Hetzel
    Title:   Chief Financial Officer

[signature page to Note Splitter and Loan Modification Agreement – Thompson San Antonio]

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 262 of 316

**Exhibit A**

**NOTE A-1**

[ATTACHED]

## REPLACEMENT PROMISSORY NOTE A-1

$15,400,000.00

New York, New York
November 27, 2024

THIS **REPLACEMENT PROMISSORY NOTE A-1** (as amended, restated, supplemented, increased, extended, split or otherwise modified from time to time, this "**Note**") is made as of this November 27, 2024 by and between **LEX AVENUE HOTEL, LLC,** a Delaware limited liability company, having its principal place of business at 2506 W. Main, 5th Floor, Houston, Texas 77098, ("**Borrower**"), as maker, and **SOUTHERN REALTY TRUST HOLDINGS LLC,** a Delaware limited liability company, having an address at 525 Okeechobee Blvd., Suite 1650, West Palm Beach, FL 33401 (together with its permitted successors and/or assigns, "**Lender**"), as payee.

**WHEREAS**, Lender and **SUNRISE REALTY TRUST, INC.**, a Maryland corporation ("**Original SRT Lender**"), made a loan to Borrower in the maximum principal amount of up to **FORTY-FOUR MILLION and No/100 DOLLARS ($44,000,000.00)** (the "**Loan**"), which Loan is evidenced by that certain Loan Agreement, dated as of July 31, 2024, among Borrower, Lender, and Original SRT Lender (as the same may hereafter be amended, restated, replaced, supplemented, renewed, extended or otherwise modified from time to time, the "**Loan Agreement**"). All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement.

**WHEREAS**, in connection with the making of the Loan, Borrower executed and delivered in favor of Lender and Original SRT Lender, that certain Promissory Note, dated as of July 31, 2024, in the maximum principal amount of up to **FORTY-FOUR MILLION and No/100 DOLLARS ($44,000,000.00)** (the "**Original Note**").

**WHEREAS**, Original SRT Lender assigned all of its rights, title and interest in the Original Note to **SUNRISE REALTY TRUST HOLDINGS I LLC**, a Delaware limited liability company ("**SRT Lender**"), pursuant to that certain Allonge, dated as of November 26, 2024 and executed by Original SRT Lender and acknowledged by Lender (together with the Original Note, the "**Current Note**").

**WHEREAS**, pursuant to that certain Note Splitter Agreement, dated as of the date hereof, between Borrower, SRT Lender and Lender, the Current Note was split into two (2) promissory notes, which are represented by (i) this Note and (ii) that certain Replacement Promissory Note A-2 made by Borrower in favor of SRT Lender ("**Note A-2**").

**NOW THEREFORE**, in consideration of the premises, the agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby covenant and agree as follows, effective as of the date first above written:

**FOR VALUE RECEIVED**, Borrower hereby unconditionally promises to pay to the order of Lender, at the address set forth above or at such other place as the holder hereof may from time to time designate in writing, the maximum principal sum of up to **FIFTEEN MILLION FOUR**

**HUNDRED THOUSAND and No/100 DOLLARS ($15,400,000.00)**, or so much thereof as is advanced pursuant to the Loan Agreement, in lawful money of the United States of America, with interest thereon to be computed from the date of this Note at the Interest Rate (as defined in the Loan Agreement), and to be paid in accordance with the terms of this Note and the Loan Agreement.

## ARTICLE 1
### PAYMENT TERMS

Borrower agrees to pay the principal sum of this Note and interest on the unpaid principal sum of this Note and all other amounts due under the Loan Agreement and other Loan Documents from time to time outstanding without relief from valuation and appraisement laws at the rates and at the times specified in the Loan Agreement and the outstanding balance of the principal sum of this Note and all accrued and unpaid interest thereon and all other amounts due under the Loan Agreement and other Loan Documents shall be due and payable, in all events, on the Maturity Date.

## ARTICLE 2
### DEFAULT AND ACCELERATION

The Debt shall without notice become immediately due and payable at the option of Lender, if any payment required in this Note is not paid (a) in accordance with the terms of the Loan Agreement, or (b) on the happening of any other Event of Default.

## ARTICLE 3
### LOAN DOCUMENTS

This Note is secured by the Security Instrument and the other Loan Documents. All of the terms, covenants and conditions contained in the Loan Agreement, the Security Instrument and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein. In the event of a conflict or inconsistency between the terms of this Note and the Loan Agreement, the terms and provisions of the Loan Agreement shall govern.

## ARTICLE 4
### SAVINGS CLAUSE

Notwithstanding anything to the contrary contained herein, (a) all agreements and communications between Borrower and Lender are hereby and shall automatically be limited so that, after taking into account all amounts deemed interest, the interest contracted for, charged or received by Lender shall never exceed the Maximum Legal Rate or amount, (b) in calculating whether any interest exceeds the Maximum Legal Rate, all such interest shall be amortized, prorated, allocated and spread over the full amount and term of all principal indebtedness of Borrower to Lender, and (c) if through any contingency or event Lender receives or is deemed to receive interest in excess of the Maximum Legal Rate, any such excess shall be deemed to have been applied toward payment of the principal of any and all then outstanding indebtedness of Borrower to Lender.

## ARTICLE 5
### NO ORAL CHANGE

Case 1:26-cv-04240-RA   Document 1-1   Filed 05/20/26   Page 265 of 316

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

## ARTICLE 6
## WAIVERS

Except as otherwise expressly provided in the Loan Agreement and other Loan Documents, Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby jointly and severally waive presentment and demand for payment, notice of dishonor, notice of intention to accelerate, notice of acceleration, protest and notice of protest and non-payment and all other notices of any kind.  No release of any security for the Debt or extension of time for payment, of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Loan Agreement or the other Loan Documents made by agreement between Lender or any other Person shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and any other Person who may become liable for the payment of all or any part of the Debt, under this Note, the Loan Agreement or the other Loan Documents.  No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Loan Agreement or the other Loan Documents.  If Borrower is a partnership or limited liability company, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the individuals or entities comprising the partnership or limited liability company, and the term "Borrower," as used herein, shall include any alternate or successor partnership or limited liability company, but any predecessor partnership or limited liability company and their partners or members shall not thereby be released from any liability.  If Borrower is a corporation, the agreements contained herein shall remain in full force and be applicable notwithstanding any changes in the shareholders comprising, or the officers and directors relating to, the corporation, and the term "Borrower" as used herein, shall include any alternative or successor corporation, but any predecessor corporation shall not be relieved of liability hereunder.  Nothing in the foregoing two sentences shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in such partnership, limited liability company or corporation, as applicable, which may be set forth in the Loan Agreement, the Security Instrument or any other Loan Document.

## ARTICLE 7
## TRANSFER

Upon the transfer of this Note, Lender may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under Legal Requirements given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or

Case 1:26-cv-04240-RA   Document 1-1   Filed 05/20/26   Page 266 of 316

responsibility in the matter; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.

**ARTICLE 8**
**EXCULPATION**

The provisions of <u>Section 3.1</u> of the Loan Agreement are hereby incorporated by reference into this Note to the same extent and with the same force as if fully set forth herein.

**ARTICLE 9**
**GOVERNING LAW**

**THIS NOTE WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES IRREVOCABLY AND UNCONDITIONALLY AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS NOTE AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS NOTE, AND THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.**

**ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST BORROWER ARISING OUT OF OR RELATING TO THIS NOTE MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT LOCATED IN THE STATE OF NEW YORK, INCLUDING WITHOUT LIMITATION, ANY STATE OR FEDERAL COURT LOCATED IN THE COUNTY OF NEW YORK AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT:**

C T CORPORATION SYSTEM
28 LIBERTY STREET, 42ND FLOOR
NY, NY 10005

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING INCLUDING WITHOUT LIMITATION THOSE IN THE STATE OF NEW YORK.  BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.  NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST BORROWER IN ANY JURISDICTION.

## ARTICLE 10
## NOTICES

All notices or other written communications hereunder shall be delivered in accordance with Section 10.6 of the Loan Agreement.

## ARTICLE 11
## EXISTING INDEBTEDNESS

This Note, together with Note A-2, replaces the Current Note and supersedes the terms of the Current Note in its entirety.  This Note is not intended to, nor shall it be construed to, constitute a novation of the Current Note or the obligations contained therein.  Borrower hereby renews its covenant and agreement to perform, comply with and be bound by each and every term and provision of the Current Note, as amended and restated by this Note.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Case 1:26-cv-04240-RA     Document 1-1     Filed 05/20/26     Page 268 of 316

IN WITNESS WHEREOF, the Borrower and Lender have duly executed this Note as of the day and year first above written.

**BORROWER**:

**LEX AVENUE HOTEL, LLC,**
a Delaware limited liability company

By: _____
Name: Acho Azuike
Title:   Vice President

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

[signature page to Replacement Amended and Restated Promissory Note A-1 – Thompson San Antonio]

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 269 of 316

**LENDER:**

**SOUTHERN REALTY TRUST HOLDINGS LLC,**
a Delaware limited liability company

By: Southern Realty Trust Inc., its Sole Member

By: _____
    Name: Brandon Hetzel
    Title:   Chief Financial Officer

[signature page to Replacement Amended and Restated Promissory Note A-1 – Thompson San Antonio]

**Exhibit B**

**NOTE A-2**

[ATTACHED]

## REPLACEMENT PROMISSORY NOTE A-2

$28,600,000.00

New York, New York
November 27, 2024

THIS **REPLACEMENT PROMISSORY NOTE A-2** (as amended, restated, supplemented, increased, extended, split or otherwise modified from time to time, this "**Note**") is made as of this November 27, 2024 by and between **LEX AVENUE HOTEL, LLC,** a Delaware limited liability company, having its principal place of business at 2506 W. Main, 5th Floor, Houston, Texas 77098, ("**Borrower**"), as maker, and **SUNRISE REALTY TRUST HOLDINGS I LLC**, a Delaware limited liability company, having an address at c/o SOUTHERN REALTY TRUST HOLDINGS LLC., 525 Okeechobee Blvd., Suite 1650, West Palm Beach, FL 33401 (together with its permitted successors and/or assigns, "**Lender**"), as payee.

**WHEREAS**, **SOUTHERN REALTY TRUST HOLDINGS LLC,** a Delaware limited liability company ("**SRH Lender**"), and **SUNRISE REALTY TRUST, INC.**, a Maryland corporation ("**Original SRT Lender**"), made a loan to Borrower in the maximum principal amount of up to **FORTY-FOUR MILLION and No/100 DOLLARS ($44,000,000.00)** (the "**Loan**"), which Loan is evidenced by that certain Loan Agreement, dated as of July 31, 2024, among Borrower, SRH Lender, and Original SRT Lender (as the same may hereafter be amended, restated, replaced, supplemented, renewed, extended or otherwise modified from time to time, the "**Loan Agreement**"). All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement.

**WHEREAS**, in connection with the making of the Loan, Borrower executed and delivered in favor of SRH Lender and Original SRT Lender, that certain Promissory Note, dated as of July 31, 2024, in the maximum principal amount of up to **FORTY-FOUR MILLION and No/100 DOLLARS ($44,000,000.00)** (the "**Original Note**").

**WHEREAS**, Original SRT Lender assigned all of its rights, title and interest in the Original Note to Lender, pursuant to that certain Allonge, dated as of November 26, 2024 and executed by Original SRT Lender and acknowledged by SRH Lender (together with the Original Note, the "**Current Note**").

**WHEREAS**, pursuant to that certain Note Splitter Agreement, dated as of the date hereof, between Borrower, SRH Lender and Lender, the Current Note was split into two (2) promissory notes, which are represented by (i) this Note and (ii) that certain Replacement Promissory Note A-1 made by Borrower in favor of SRH Lender ("**Note A-1**").

**NOW THEREFORE**, in consideration of the premises, the agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby covenant and agree as follows, effective as of the date first above written:

**FOR VALUE RECEIVED**, Borrower hereby unconditionally promises to pay to the order of Lender, at the address set forth above or at such other place as the holder hereof may from time to time designate in writing, the maximum principal sum of up to **TWENTY-EIGHT MILLION**

**SIX HUNDRED THOUSAND and No/100 DOLLARS ($28,600,000.00),** or so much thereof as is advanced pursuant to the Loan Agreement, in lawful money of the United States of America, with interest thereon to be computed from the date of this Note at the Interest Rate (as defined in the Loan Agreement), and to be paid in accordance with the terms of this Note and the Loan Agreement.

## ARTICLE 1
## PAYMENT TERMS

Borrower agrees to pay the principal sum of this Note and interest on the unpaid principal sum of this Note and all other amounts due under the Loan Agreement and other Loan Documents from time to time outstanding without relief from valuation and appraisement laws at the rates and at the times specified in the Loan Agreement and the outstanding balance of the principal sum of this Note and all accrued and unpaid interest thereon and all other amounts due under the Loan Agreement and other Loan Documents shall be due and payable, in all events, on the Maturity Date.

## ARTICLE 2
## DEFAULT AND ACCELERATION

The Debt shall without notice become immediately due and payable at the option of Lender, if any payment required in this Note is not paid (a) in accordance with the terms of the Loan Agreement, or (b) on the happening of any other Event of Default.

## ARTICLE 3
## LOAN DOCUMENTS

This Note is secured by the Security Instrument and the other Loan Documents. All of the terms, covenants and conditions contained in the Loan Agreement, the Security Instrument and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein. In the event of a conflict or inconsistency between the terms of this Note and the Loan Agreement, the terms and provisions of the Loan Agreement shall govern.

## ARTICLE 4
## SAVINGS CLAUSE

Notwithstanding anything to the contrary contained herein, (a) all agreements and communications between Borrower and Lender are hereby and shall automatically be limited so that, after taking into account all amounts deemed interest, the interest contracted for, charged or received by Lender shall never exceed the Maximum Legal Rate or amount, (b) in calculating whether any interest exceeds the Maximum Legal Rate, all such interest shall be amortized, prorated, allocated and spread over the full amount and term of all principal indebtedness of Borrower to Lender, and (c) if through any contingency or event Lender receives or is deemed to receive interest in excess of the Maximum Legal Rate, any such excess shall be deemed to have been applied toward payment of the principal of any and all then outstanding indebtedness of Borrower to Lender.

## ARTICLE 5
## NO ORAL CHANGE

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 273 of 316

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

## ARTICLE 6
## WAIVERS

Except as otherwise expressly provided in the Loan Agreement and other Loan Documents, Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby jointly and severally waive presentment and demand for payment, notice of dishonor, notice of intention to accelerate, notice of acceleration, protest and notice of protest and non-payment and all other notices of any kind. No release of any security for the Debt or extension of time for payment, of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Loan Agreement or the other Loan Documents made by agreement between Lender or any other Person shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and any other Person who may become liable for the payment of all or any part of the Debt, under this Note, the Loan Agreement or the other Loan Documents. No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Loan Agreement or the other Loan Documents. If Borrower is a partnership or limited liability company, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the individuals or entities comprising the partnership or limited liability company, and the term "Borrower," as used herein, shall include any alternate or successor partnership or limited liability company, but any predecessor partnership or limited liability company and their partners or members shall not thereby be released from any liability. If Borrower is a corporation, the agreements contained herein shall remain in full force and be applicable notwithstanding any changes in the shareholders comprising, or the officers and directors relating to, the corporation, and the term "Borrower" as used herein, shall include any alternative or successor corporation, but any predecessor corporation shall not be relieved of liability hereunder. Nothing in the foregoing two sentences shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in such partnership, limited liability company or corporation, as applicable, which may be set forth in the Loan Agreement, the Security Instrument or any other Loan Document.

## ARTICLE 7
## TRANSFER

Upon the transfer of this Note, Lender may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under Legal Requirements given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or

Case 1:26-cv-04240-RA   Document 1-1   Filed 05/20/26   Page 274 of 316

responsibility in the matter; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.

## ARTICLE 8
## EXCULPATION

The provisions of <u>Section 3.1</u> of the Loan Agreement are hereby incorporated by reference into this Note to the same extent and with the same force as if fully set forth herein.

## ARTICLE 9
## GOVERNING LAW

**THIS NOTE WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES IRREVOCABLY AND UNCONDITIONALLY AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS NOTE AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS NOTE, AND THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.**

**ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST BORROWER ARISING OUT OF OR RELATING TO THIS NOTE MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT LOCATED IN THE STATE OF NEW YORK, INCLUDING WITHOUT LIMITATION, ANY STATE OR FEDERAL COURT LOCATED IN THE COUNTY OF NEW YORK AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT:**

C T CORPORATION SYSTEM
28 LIBERTY STREET, 42ND FLOOR
NY, NY 10005

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 275 of 316

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING INCLUDING WITHOUT LIMITATION THOSE IN THE STATE OF NEW YORK.  BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.  NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST BORROWER IN ANY JURISDICTION.

## ARTICLE 10
## NOTICES

All notices or other written communications hereunder shall be delivered in accordance with Section 10.6 of the Loan Agreement.

## ARTICLE 11
## EXISTING INDEBTEDNESS

This Note, together with Note A-1, replaces the Current Note and supersedes the terms of the Current Note in its entirety.  This Note is not intended to, nor shall it be construed to, constitute a novation of the Current Note or the obligations contained therein.  Borrower hereby renews its covenant and agreement to perform, comply with and be bound by each and every term and provision of the Current Note, as amended and restated by this Note.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Borrower and Lender have duly executed this Note as of the day and year first above written.

**BORROWER**:

**LEX AVENUE HOTEL, LLC,**
a Delaware limited liability company

By: _____
Name: Acho Azuike
Title: Vice President

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

[signature page to Replacement Amended and Restated Promissory Note A-2 – Thompson San Antonio]

**LENDER:**

**SUNRISE REALTY TRUST HOLDINGS I LLC,**
a Delaware limited liability company

By: Sunrise Realty Trust Inc., its Sole Member

By: _____
     Name: Brandon Hetzel
     Title:  Chief Financial Officer

[signature page to Replacement Amended and Restated Promissory Note A-2 – Thompson San Antonio]

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 278 of 316

## Schedule VIII

### COMMITMENT AMOUNT/PERCENTAGE

| Bank | Commitment Amount | Commitment Percentage |
|---|---|---|
| **SOUTHERN REALTY TRUST HOLDINGS LLC,** a Delaware limited liability company | $15,400,000.00 | 35% |
| **SUNRISE REALTY TRUST HOLDINGS I LLC**, a Delaware limited liability company | $28,600,000.00 | 65% |

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 279 of 316

# EXHIBIT J

Case 1:26-cv-04240-RA   Document 1-1   Filed 05/20/26   Page 280 of 316

## REPLACEMENT PROMISSORY NOTE A-1

$15,400,000.00

New York, New York
November 27, 2024

THIS **REPLACEMENT PROMISSORY NOTE A-1** (as amended, restated, supplemented, increased, extended, split or otherwise modified from time to time, this "**Note**") is made as of this November 27, 2024 by and between **LEX AVENUE HOTEL, LLC,** a Delaware limited liability company, having its principal place of business at 2506 W. Main, 5th Floor, Houston, Texas 77098, ("**Borrower**"), as maker, and **SOUTHERN REALTY TRUST HOLDINGS LLC,** a Delaware limited liability company, having an address at 525 Okeechobee Blvd., Suite 1650, West Palm Beach, FL 33401 (together with its permitted successors and/or assigns, "**Lender**"), as payee.

**WHEREAS**, Lender and **SUNRISE REALTY TRUST, INC.**, a Maryland corporation ("**Original SRT Lender**"), made a loan to Borrower in the maximum principal amount of up to **FORTY-FOUR MILLION and No/100 DOLLARS ($44,000,000.00)** (the "**Loan**"), which Loan is evidenced by that certain Loan Agreement, dated as of July 31, 2024, among Borrower, Lender, and Original SRT Lender (as the same may hereafter be amended, restated, replaced, supplemented, renewed, extended or otherwise modified from time to time, the "**Loan Agreement**"). All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement.

**WHEREAS**, in connection with the making of the Loan, Borrower executed and delivered in favor of Lender and Original SRT Lender, that certain Promissory Note, dated as of July 31, 2024, in the maximum principal amount of up to **FORTY-FOUR MILLION and No/100 DOLLARS ($44,000,000.00)** (the "**Original Note**").

**WHEREAS**, Original SRT Lender assigned all of its rights, title and interest in the Original Note to **SUNRISE REALTY TRUST HOLDINGS I LLC**, a Delaware limited liability company ("**SRT Lender**"), pursuant to that certain Allonge, dated as of November 26, 2024 and executed by Original SRT Lender and acknowledged by Lender (together with the Original Note, the "**Current Note**").

**WHEREAS**, pursuant to that certain Note Splitter Agreement, dated as of the date hereof, between Borrower, SRT Lender and Lender, the Current Note was split into two (2) promissory notes, which are represented by (i) this Note and (ii) that certain Replacement Promissory Note A-2 made by Borrower in favor of SRT Lender ("**Note A-2**").

**NOW THEREFORE**, in consideration of the premises, the agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby covenant and agree as follows, effective as of the date first above written:

**FOR VALUE RECEIVED**, Borrower hereby unconditionally promises to pay to the order of Lender, at the address set forth above or at such other place as the holder hereof may from time to time designate in writing, the maximum principal sum of up to **FIFTEEN MILLION FOUR**

**HUNDRED THOUSAND and No/100 DOLLARS ($15,400,000.00)**, or so much thereof as is advanced pursuant to the Loan Agreement, in lawful money of the United States of America, with interest thereon to be computed from the date of this Note at the Interest Rate (as defined in the Loan Agreement), and to be paid in accordance with the terms of this Note and the Loan Agreement.

## ARTICLE 1
## PAYMENT TERMS

Borrower agrees to pay the principal sum of this Note and interest on the unpaid principal sum of this Note and all other amounts due under the Loan Agreement and other Loan Documents from time to time outstanding without relief from valuation and appraisement laws at the rates and at the times specified in the Loan Agreement and the outstanding balance of the principal sum of this Note and all accrued and unpaid interest thereon and all other amounts due under the Loan Agreement and other Loan Documents shall be due and payable, in all events, on the Maturity Date.

## ARTICLE 2
## DEFAULT AND ACCELERATION

The Debt shall without notice become immediately due and payable at the option of Lender, if any payment required in this Note is not paid (a) in accordance with the terms of the Loan Agreement, or (b) on the happening of any other Event of Default.

## ARTICLE 3
## LOAN DOCUMENTS

This Note is secured by the Security Instrument and the other Loan Documents. All of the terms, covenants and conditions contained in the Loan Agreement, the Security Instrument and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein. In the event of a conflict or inconsistency between the terms of this Note and the Loan Agreement, the terms and provisions of the Loan Agreement shall govern.

## ARTICLE 4
## SAVINGS CLAUSE

Notwithstanding anything to the contrary contained herein, (a) all agreements and communications between Borrower and Lender are hereby and shall automatically be limited so that, after taking into account all amounts deemed interest, the interest contracted for, charged or received by Lender shall never exceed the Maximum Legal Rate or amount, (b) in calculating whether any interest exceeds the Maximum Legal Rate, all such interest shall be amortized, prorated, allocated and spread over the full amount and term of all principal indebtedness of Borrower to Lender, and (c) if through any contingency or event Lender receives or is deemed to receive interest in excess of the Maximum Legal Rate, any such excess shall be deemed to have been applied toward payment of the principal of any and all then outstanding indebtedness of Borrower to Lender.

## ARTICLE 5
## NO ORAL CHANGE

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

## ARTICLE 6
## WAIVERS

Except as otherwise expressly provided in the Loan Agreement and other Loan Documents, Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby jointly and severally waive presentment and demand for payment, notice of dishonor, notice of intention to accelerate, notice of acceleration, protest and notice of protest and non-payment and all other notices of any kind. No release of any security for the Debt or extension of time for payment, of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Loan Agreement or the other Loan Documents made by agreement between Lender or any other Person shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and any other Person who may become liable for the payment of all or any part of the Debt, under this Note, the Loan Agreement or the other Loan Documents. No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Loan Agreement or the other Loan Documents. If Borrower is a partnership or limited liability company, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the individuals or entities comprising the partnership or limited liability company, and the term "Borrower," as used herein, shall include any alternate or successor partnership or limited liability company, but any predecessor partnership or limited liability company and their partners or members shall not thereby be released from any liability. If Borrower is a corporation, the agreements contained herein shall remain in full force and be applicable notwithstanding any changes in the shareholders comprising, or the officers and directors relating to, the corporation, and the term "Borrower" as used herein, shall include any alternative or successor corporation, but any predecessor corporation shall not be relieved of liability hereunder. Nothing in the foregoing two sentences shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in such partnership, limited liability company or corporation, as applicable, which may be set forth in the Loan Agreement, the Security Instrument or any other Loan Document.

## ARTICLE 7
## TRANSFER

Upon the transfer of this Note, Lender may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under Legal Requirements given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or

Case 1:26-cv-04240-RA   Document 1-1   Filed 05/20/26   Page 283 of 316

responsibility in the matter; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.

## ARTICLE 8
## EXCULPATION

The provisions of <u>Section 3.1</u> of the Loan Agreement are hereby incorporated by reference into this Note to the same extent and with the same force as if fully set forth herein.

## ARTICLE 9
## GOVERNING LAW

**THIS NOTE WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES IRREVOCABLY AND UNCONDITIONALLY AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS NOTE AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS NOTE, AND THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.**

**ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST BORROWER ARISING OUT OF OR RELATING TO THIS NOTE MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT LOCATED IN THE STATE OF NEW YORK, INCLUDING WITHOUT LIMITATION, ANY STATE OR FEDERAL COURT LOCATED IN THE COUNTY OF NEW YORK AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT:**

C T CORPORATION SYSTEM
28 LIBERTY STREET, 42ND FLOOR
NY, NY 10005

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 284 of 316

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING INCLUDING WITHOUT LIMITATION THOSE IN THE STATE OF NEW YORK.  BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.  NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST BORROWER IN ANY JURISDICTION.

## ARTICLE 10
### NOTICES

All notices or other written communications hereunder shall be delivered in accordance with Section 10.6 of the Loan Agreement.

## ARTICLE 11
### EXISTING INDEBTEDNESS

This Note, together with Note A-2, replaces the Current Note and supersedes the terms of the Current Note in its entirety.  This Note is not intended to, nor shall it be construed to, constitute a novation of the Current Note or the obligations contained therein.  Borrower hereby renews its covenant and agreement to perform, comply with and be bound by each and every term and provision of the Current Note, as amended and restated by this Note.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Borrower and Lender have duly executed this Note as of the day and year first above written.

**BORROWER**:

**LEX AVENUE HOTEL, LLC,**
a Delaware limited liability company

By: _____
Name: Acho Azuike
Title:   Vice President

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

[signature page to Replacement Amended and Restated Promissory Note A-1 – Thompson San Antonio]

**LENDER:**

**SOUTHERN REALTY TRUST HOLDINGS LLC,**
a Delaware limited liability company

By: Southern Realty Trust Inc., its Sole Member

By: _____
      Name: Brandon Hetzel
      Title:   Chief Financial Officer

[signature page to Replacement Amended and Restated Promissory Note A-1 – Thompson San Antonio]

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 287 of 316

## REPLACEMENT PROMISSORY NOTE A-2

$28,600,000.00

New York, New York
November 27, 2024

THIS **REPLACEMENT PROMISSORY NOTE A-2** (as amended, restated, supplemented, increased, extended, split or otherwise modified from time to time, this "**Note**") is made as of this November 27, 2024 by and between **LEX AVENUE HOTEL, LLC,** a Delaware limited liability company, having its principal place of business at 2506 W. Main, 5th Floor, Houston, Texas 77098, ("**Borrower**"), as maker, and **SUNRISE REALTY TRUST HOLDINGS I LLC**, a Delaware limited liability company, having an address at c/o SOUTHERN REALTY TRUST HOLDINGS LLC., 525 Okeechobee Blvd., Suite 1650, West Palm Beach, FL 33401 (together with its permitted successors and/or assigns, "**Lender**"), as payee.

**WHEREAS**, **SOUTHERN REALTY TRUST HOLDINGS LLC,** a Delaware limited liability company ("**SRH Lender**"), and **SUNRISE REALTY TRUST, INC.**, a Maryland corporation ("**Original SRT Lender**"), made a loan to Borrower in the maximum principal amount of up to **FORTY-FOUR MILLION and No/100 DOLLARS ($44,000,000.00)** (the "**Loan**"), which Loan is evidenced by that certain Loan Agreement, dated as of July 31, 2024, among Borrower, SRH Lender, and Original SRT Lender (as the same may hereafter be amended, restated, replaced, supplemented, renewed, extended or otherwise modified from time to time, the "**Loan Agreement**"). All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement.

**WHEREAS**, in connection with the making of the Loan, Borrower executed and delivered in favor of SRH Lender and Original SRT Lender, that certain Promissory Note, dated as of July 31, 2024, in the maximum principal amount of up to **FORTY-FOUR MILLION and No/100 DOLLARS ($44,000,000.00)** (the "**Original Note**").

**WHEREAS**, Original SRT Lender assigned all of its rights, title and interest in the Original Note to Lender, pursuant to (i) that certain Allonge, dated as of November 26, 2024 and executed by Original SRT Lender and acknowledged by SRH Lender (together with the Original Note, the "**Current Note**") and (ii) that certain General Assignment and Assumption Agreement, dated as of November 26, 2024, executed by Original SRT Lender and Lender and acknowledged by SRH Lender (together with the Loan Agreement, the "**Current Loan Agreement**").

**WHEREAS**, pursuant to that certain Note Splitter Agreement, dated as of the date hereof, between Borrower, SRH Lender and Lender, the Current Note was split into two (2) promissory notes, which are represented by (i) this Note and (ii) that certain Replacement Promissory Note A-1 made by Borrower in favor of SRH Lender ("**Note A-1**").

**NOW THEREFORE**, in consideration of the premises, the agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby covenant and agree as follows, effective as of the date first above written:

**FOR VALUE RECEIVED**, Borrower hereby unconditionally promises to pay to the order of Lender, at the address set forth above or at such other place as the holder hereof may from time to time designate in writing, the maximum principal sum of up to **TWENTY-EIGHT MILLION SIX HUNDRED THOUSAND and No/100 DOLLARS ($28,600,000.00),** or so much thereof as is advanced pursuant to the Loan Agreement, in lawful money of the United States of America, with interest thereon to be computed from the date of this Note at the Interest Rate (as defined in the Loan Agreement), and to be paid in accordance with the terms of this Note and the Loan Agreement.

## ARTICLE 1
## PAYMENT TERMS

Borrower agrees to pay the principal sum of this Note and interest on the unpaid principal sum of this Note and all other amounts due under the Loan Agreement and other Loan Documents from time to time outstanding without relief from valuation and appraisement laws at the rates and at the times specified in the Loan Agreement and the outstanding balance of the principal sum of this Note and all accrued and unpaid interest thereon and all other amounts due under the Loan Agreement and other Loan Documents shall be due and payable, in all events, on the Maturity Date.

## ARTICLE 2
## DEFAULT AND ACCELERATION

The Debt shall without notice become immediately due and payable at the option of Lender, if any payment required in this Note is not paid (a) in accordance with the terms of the Loan Agreement, or (b) on the happening of any other Event of Default.

## ARTICLE 3
## LOAN DOCUMENTS

This Note is secured by the Security Instrument and the other Loan Documents. All of the terms, covenants and conditions contained in the Loan Agreement, the Security Instrument and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein. In the event of a conflict or inconsistency between the terms of this Note and the Loan Agreement, the terms and provisions of the Loan Agreement shall govern.

## ARTICLE 4
## SAVINGS CLAUSE

Notwithstanding anything to the contrary contained herein, (a) all agreements and communications between Borrower and Lender are hereby and shall automatically be limited so that, after taking into account all amounts deemed interest, the interest contracted for, charged or received by Lender shall never exceed the Maximum Legal Rate or amount, (b) in calculating whether any interest exceeds the Maximum Legal Rate, all such interest shall be amortized, prorated, allocated and spread over the full amount and term of all principal indebtedness of Borrower to Lender, and (c) if through any contingency or event Lender receives or is deemed to receive interest in excess of the Maximum Legal Rate, any such excess shall be deemed to have been applied toward payment of the principal of any and all then outstanding indebtedness of Borrower to Lender.

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 289 of 316

## ARTICLE 5
## NO ORAL CHANGE

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

## ARTICLE 6
## WAIVERS

Except as otherwise expressly provided in the Loan Agreement and other Loan Documents, Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby jointly and severally waive presentment and demand for payment, notice of dishonor, notice of intention to accelerate, notice of acceleration, protest and notice of protest and non-payment and all other notices of any kind.  No release of any security for the Debt or extension of time for payment, of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Loan Agreement or the other Loan Documents made by agreement between Lender or any other Person shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and any other Person who may become liable for the payment of all or any part of the Debt, under this Note, the Loan Agreement or the other Loan Documents.  No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Loan Agreement or the other Loan Documents.  If Borrower is a partnership or limited liability company, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the individuals or entities comprising the partnership or limited liability company, and the term "Borrower," as used herein, shall include any alternate or successor partnership or limited liability company, but any predecessor partnership or limited liability company and their partners or members shall not thereby be released from any liability.  If Borrower is a corporation, the agreements contained herein shall remain in full force and be applicable notwithstanding any changes in the shareholders comprising, or the officers and directors relating to, the corporation, and the term "Borrower" as used herein, shall include any alternative or successor corporation, but any predecessor corporation shall not be relieved of liability hereunder.  Nothing in the foregoing two sentences shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in such partnership, limited liability company or corporation, as applicable, which may be set forth in the Loan Agreement, the Security Instrument or any other Loan Document.

## ARTICLE 7
## TRANSFER

Upon the transfer of this Note, Lender may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under Legal Requirements given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 290 of 316

responsibility in the matter; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.

## ARTICLE 8
## EXCULPATION

The provisions of Section 3.1 of the Loan Agreement are hereby incorporated by reference into this Note to the same extent and with the same force as if fully set forth herein.

## ARTICLE 9
## GOVERNING LAW

**THIS NOTE WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES IRREVOCABLY AND UNCONDITIONALLY AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS NOTE AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS NOTE, AND THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.**

**ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST BORROWER ARISING OUT OF OR RELATING TO THIS NOTE MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT LOCATED IN THE STATE OF NEW YORK, INCLUDING WITHOUT LIMITATION, ANY STATE OR FEDERAL COURT LOCATED IN THE COUNTY OF NEW YORK AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT:**

C T CORPORATION SYSTEM
28 LIBERTY STREET, 42ND FLOOR
NY, NY 10005

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING INCLUDING WITHOUT LIMITATION THOSE IN THE STATE OF NEW YORK.  BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.  NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST BORROWER IN ANY JURISDICTION.

## ARTICLE 10
### NOTICES

All notices or other written communications hereunder shall be delivered in accordance with Section 10.6 of the Loan Agreement.

## ARTICLE 11
### EXISTING INDEBTEDNESS

This Note, together with Note A-1, replaces the Current Note and supersedes the terms of the Current Note in its entirety.  This Note is not intended to, nor shall it be construed to, constitute a novation of the Current Note or the obligations contained therein.  Borrower hereby renews its covenant and agreement to perform, comply with and be bound by each and every term and provision of the Current Note, as amended and restated by this Note.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Borrower and Lender have duly executed this Note as of the day and year first above written.

**BORROWER**:

**LEX AVENUE HOTEL, LLC,**
a Delaware limited liability company

By: _____
Name: Acho Azuike
Title: Vice President

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

[signature page to Replacement Amended and Restated Promissory Note A-2 – Thompson San Antonio]

**LENDER:**

**SUNRISE REALTY TRUST HOLDINGS I LLC,**
a Delaware limited liability company

By: Sunrise Realty Trust Inc., its Sole Member

By: _____
      Name: Brandon Hetzel
      Title:   Chief Financial Officer

[signature page to Replacement Amended and Restated Promissory Note A-2 – Thompson San Antonio]

Case 1:26-cv-04240-RA   Document 1-1   Filed 05/20/26   Page 294 of 316

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------------x

SOUTHERN REALTY TRUST HOLDINGS LLC, and
SUNRISE REALTY TRUST HOLDINGS I LLC

                            Plaintiffs,

           -against-

ROBERTO CASTRO CONTRERAS,

                        Defendant.

-------------------------------------------------------------------------x

Index No.:

Mot. Seq. #001

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' CPLR § 3213 MOTION FOR SUMMARY JUDGMENT IN LIEU OF COMPLAINT

86174657;5

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ ii

UNDISPUTED MATERIAL FACTS REQUIRING SUMMARY JUDGMENT ......................... 1

    I.      THE PARTIES AND RELEVANT THIRD PARTIES      1

    II.     THE LOAN      2

          A.      The Loan      2

               1.      The Notes And Loan Agreement      2

               2.      The Pledge Agreement      2

          B.      The Assignment Of The Loan Documents To SUNS      3

          C.      The Relevant Terms Of The Notes And Loan Agreement      3

          D.      The Guaranty      4

    III.    GUARANTOR IS LIABLE FOR INTEREST AND CARRY AMOUNTS DUE UNDER THE GUARANTY      6

    IV.    THE AMOUNTS DUE AND OWING BY GUARANTOR      7

ARGUMENT ........................................................................................................... 7

    I.      PLAINTIFFS ARE ENTITLED TO JUDGMENT AGAINST GUARANTOR      7

          A.      Judgment On The Guaranty Is Proper Under N.Y. CPLR § 3213      7

          B.      The Court Should Grant Judgment In Plaintiffs' Favor Because Guarantor Failed To Satisfy His Absolute And Unconditional Guaranties of Payment      8

    II.    THE GUARANTY ALSO ENTITLES PLAINTIFFS TO SUMMARY JUDGMENT UNDER CPLR § 3213 AS TO PLAINTIFFS' ATTORNEYS' FEES      10

CONCLUSION ......................................................................................................... 12

86174657;5

i

## TABLE OF AUTHORITIES

Page

**Cases**

*13900 Chadwick Parkway, LLC v Kia*,
   No. 659373/2024, 2025 WL 660095 (Sup. Ct. N.Y. Cnty. Feb. 26, 2025) ......................... 9, 11

*3939 East Trinity Mills, LLC v. Kia*,
   No. 659368/2024 (Sup. Ct. N.Y. Cnty. April 18, 2025)......................................................... 9, 11

*A&M Global Mgmt. Corp. v. Northtown Urology Assocs., P.C.*,
   115 A.D.3d 1283 (4th Dep't 2014) ...................................................................................... 11

*Bronsnick v. Brisman*,
   30 A.D.3d 224 (1st Dep't 2006) ........................................................................................... 11

*Chem. Bank v. Nattin Realty, Inc.*,
   61 A.D.2d 921 (1st Dep't 1978) ........................................................................................... 11

*Cmty. Nat'l Bank & Tr. Co. of N.Y. v. I.M.F. Trading, Inc.*,
   167 A.D.2d 193 (1st Dep't 1990) ......................................................................................... 11

*Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A. v. Navarro*,
   25 N.Y.3d 485 (2015) ........................................................................................................... 8

*DB Auraria, LLC v. Nelson*,
   228 A.D.3d 424 (1st Dep't 2024) .......................................................................................... 9

*Hooper Assocs., Ltd. v. AGS Computs., Inc.*,
   74 N.Y.2d 487 (1989) ......................................................................................................... 10

*Interman Indus. Prods., Ltd. v. R.S.M. Electron Power, Inc.*,
   37 N.Y.2d 151 (1975) ........................................................................................................... 8

*Jason Trading Corp. v. Lason Trading Corp.*,
   303 A.D.2d 180 (1st Dep't 2003) ........................................................................................... 8

*Korea First Bank of N.Y. v. Noah Enters., Ltd.*,
   12 A.D.3d 321 (1st Dep't 2004) ............................................................................................. 8

*Mount Vernon City Sch. Dist. v. Nova Cas. Co.*,
   19 N.Y.3d 28 (2012) ........................................................................................................... 10

*Nordea Bank Finland PLC v. Holten*,
   84 A.D.3d 589 (1st Dep't 2011) ........................................................................................ 9, 10

*Shearson Lehman Hutton, Inc. v. Myerson & Kuhn*,
   197 A.D.2d 410 (1st Dep't 1993) ........................................................................................... 8

*UBS Commercial Mortg. Trust 2007-FL1 v. Garrison Special Opportunities Fund, L.P.*,
   33 Misc.3d 1204(A), 2011 N.Y. Slip. Op. 51774(U), 2011 WL 4552404 (Sup. Ct. N.Y. Cnty.
   Mar. 8, 2011) ....................................................................................................................... 9

*Valencia Sportswear, Inc. v. D.S.G. Enters., Inc.*,
   237 A.D.2d 171 (1st Dep't 1997) ........................................................................................... 8

ii

86174657;5

Case 1:26-cv-04240-RA     Document 1-1     Filed 05/20/26     Page 297 of 316

**Rules**

CPLR § 3212.................................................................................................................... 10

CPLR § 3213................................................................................................................ passim

86174657;5

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 298 of 316

Plaintiffs Southern Realty Trust Holdings LLC ("**SRT**") and Sunrise Realty Trust Holdings I LLC ("**SUNS**," together with SRT, "**Plaintiffs**") respectfully submit this Memorandum of Law in Support of their CPLR § 3213 Motion for Summary Judgment in Lieu of Complaint.

## PRELIMINARY STATEMENT

This action involves a guaranty contract that is an instrument for the payment of money only, and there is no genuine dispute concerning Guarantor's liability under those guaranty contracts. Specifically, and as detailed herein:

- Defendant Roberto Castro Contreras ("**Guarantor**") executed a Guaranty of Interest and Carry Costs ("**Guaranty**") in 2024 relating to a commercial real estate loan transaction.

- Plaintiffs are entitled to enforce the Guaranty.

- Guarantor agreed in the Guaranty to "irrevocably and unconditionally" make certain payments to Plaintiffs.

- Under the Guaranty, Guarantor is irrevocably and unconditionally liable for at least $6,728,313.11, plus interest and attorneys' fees and expenses which have accrued and will continue to accrue through the date of judgment in this matter. All predicate acts triggering Guarantor's liability under the Guaranty have occurred.

Plaintiffs are therefore entitled to the immediate entry of summary judgment against Guarantor pursuant to CPLR § 3213 and to such other and further relief that this Court deems just and proper.

## UNDISPUTED MATERIAL FACTS REQUIRING SUMMARY JUDGMENT[1]

### I.     THE PARTIES AND RELEVANT THIRD PARTIES

*Plaintiffs*. Plaintiffs are the lenders on the loan that is at issue in this matter (the "**Loan**").

*Lex Avenue Hotel, LLC*. Lex Avenue Hotel, LLC ("**Borrower**") is the borrower on the Loan.

---

[1] Filed herewith is the Affirmation of Brian Sedrish in Support of Plaintiffs' CPLR § 3213 Motion for Summary Judgment in Lieu of Complaint, dated April 17, 2026 ("**Sedrish Aff.**").

86174657;5

1

*Guarantor*. Guarantor is the guarantor of certain obligations relating to the Loan, as further described below. Guarantor consented to venue in this Court and irrevocably submitted to the jurisdiction of this Court for actions arising out of or relating to the Guaranty. (Guaranty § 6.3.)

## II.     THE LOAN

Borrower and Guarantor agreed to and executed various documents in connection with the Loan. Each document is defined and described below.

### A.     The Loan

#### 1.     The Notes And Loan Agreement

On July 31, 2024, SRT and Sunrise Realty Trust, Inc. ("*SUN*", together with SRT, "*Original Lenders*") made the Loan in the principal amount of $44,000,000.00 to Borrower. (Sedrish Aff. ¶ 6.) The Loan was evidenced by a certain Promissory Note, dated July 31, 2024, in the original principal amount of $44,000,000.00 ("*Original Note*"). (*Id.* ¶ 7.) A true and correct copy of the Original Note is attached to the Sedrish Affirmation as **Exhibit A**. (*Id.*)

The Loan is further evidenced by a Loan Agreement ("*Loan Agreement*") dated as of July 31, 2024. (Sedrish Aff. ¶ 8.) The Loan Agreement, among other things, describes the loan transaction and the various security interests securing the Loan. (*Id.*) A true and correct copy of the Loan Agreement is attached to the Sedrish Affirmation as **Exhibit B**. (*Id.*)

The Note and the Loan Agreement are governed by New York law. (Sedrish Aff., Ex. A, Note, Art. 9; *id.*, Ex. B, Loan Agmt. § 10.3.)

#### 2.     The Pledge Agreement

The Loan is secured by, among other things, a certain Pledge and Security Agreement, dated as of July 31, 2024, executed by Lexav Owner, LLC, the legal and beneficial owner of 100% of Borrower's outstanding limited liability company interests (the "*Pledge Agreement*"). (Sedrish

2

86174657;5

Aff. ¶ 9.) A true and correct copy of the Pledge Agreement is attached to the Sedrish Affirmation as **Exhibit C**.[2]

### B.     The Assignment Of The Loan Documents To SUNS

SRT remained a holder of the Loan Documents. (Sedrish Aff. ¶ 10.) By virtue of duly executed and, where applicable, recorded assignment documents, SUNS succeeded to SUN's ownership of the Loan Documents, and, pursuant to a Note Splitter and Loan Modification Agreement effective November 27, 2024 ("***Note Splitter***"), the Original Note was split into (a) that certain Replacement Promissory Note A-1, effective as of November 27, 2024, in the principal amount of $15,400,000, made by Borrower in favor of SRT, and (b) that certain Replacement Promissory Note A-2, made effective as of November 27, 2024, in the principal amount of $28,600,000, by Borrower in favor of SUNS (collectively, the "***Note***"). (Sedrish Aff. ¶ 10.) True and correct copies of the assignments are attached to the Sedrish Affirmation as **Exhibit D,** a true and correct copy of the Note Splitter is attached to the Sedrish Affirmation as **Exhibit I**, and true and correct copies of the Note are attached to the Sedrish Affirmation as **Exhibit J**.

### C.     The Relevant Terms Of The Notes And Loan Agreement

In relevant part, and among other things, the Notes provide that "[t]he Debt, including without limitation, the Exit Fee, shall without notice become immediately due and payable at the option of Lender, if any payment required in this Note is not paid (1) in accordance with the terms of the Loan Agreement, or (b) on the happening of any other Event of Default." (Sedrish Aff., Ex. J, Note, Art. 2; *see also* Sedrish Aff. ¶ 12.)

In turn, the Loan Agreement details Borrower's debt payment requirements, including Borrower's obligation to make monthly debt service payments and to pay all interest accrued and

---

[2] The Note, Loan Agreement, Pledge Agreement, Guaranty, and all other documents evidencing, securing, or relating to the Loan are sometimes collectively referred to herein as the "***Loan Documents***." (Sedrish Aff. ¶ 11.)

86174657;5

unpaid, and all other sums due from Borrower under the Loan Documents (the "***Debt***," as more fully defined in the Loan Agreement). (Sedrish Aff., Ex. B, Loan Agmt. §§ 1.1, 2.3.2; *see also* Sedrish Aff. ¶ 13.) The Loan Agreement also provides that an Event of Default occurs if, among other things, any amount due under the Loan Documents is not paid when due. (Sedrish Aff., Ex. B, Loan Agmt. § 8.1(a); *see also* Sedrish Aff. ¶ 14.)

Finally, the Loan Agreement provides that Plaintiffs are entitled to all of their expenses, including reasonable attorneys' fees and disbursements, incurred in connection with, among other things, Plaintiffs enforcing their rights under the Loan Documents. (Sedrish Aff., Ex. B, Loan Agmt. § 10.13; *see also* Sedrish Aff. ¶ 15.)

### D.      The Guaranty

On or about July 31, 2024, Guarantor agreed to and entered into that certain Guaranty of Interest and Carry Costs (the "***Guaranty***"). (Sedrish Aff. ¶ 16.) A true and correct copy of the Guaranty is attached to the Sedrish Affirmation as **Exhibit E**. (*Id*.) The Guaranty contains the following relevant terms.

<u>***First***</u>, the Guaranty provides that Guarantor "hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise. Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor." (Sedrish Aff., Ex. E, Guaranty § 1.1; *see also* Sedrish Aff. ¶ 17.)

<u>***Second***</u>, Guarantor agreed that "[t]his Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection." (Sedrish Aff., Ex. E, Guaranty § 1.3; *see also* Sedrish Aff. ¶ 18.)

4

86174657;5

***Third***, the Guaranty defines the Guaranteed Obligations as follows:

[C]ollectively, the payment in full, after application of all Gross Income from Operations generated by the Property for the applicable period, of all Taxes, Insurance Premiums, Other Charges, Operating Expenses, required Reserve Account deposits, interest due and payable on the Loan, any Projected Interest Shortfall due and payable from Borrower in accordance with Section 7.2.4 of the Loan Agreement, and all other operating expenses to the extent not described above, in each case to the extent necessary to own and operate the Property, and in each case as and when due and payable, whether same are incurred prior to, on or after an Event of Default or prior to or after Lender's exercise of remedies in connection with the Loan, including any foreclosure or deed or assignment in lieu thereof. For the avoidance of doubt, Lender shall not be required to demonstrate a loss, liability or other impairment under the Loan in order to enforce Guarantor's obligations under this Guaranty. The indebtedness guaranteed by Guarantor hereunder shall be deemed to be the last indebtedness which remains outstanding under the Loan Documents after the application of payments received from Borrower and the application of proceeds received from the foreclosure of the Security Instrument and other liquidation of any Collateral for the Loan, and Guarantor may not claim or contend so long as any such indebtedness remains outstanding that any payments received by Lender from Borrower or otherwise, or proceeds received by Lender on the liquidation of the Collateral, shall have reduced or discharged any Guarantor's liability or obligations hereunder.

(Sedrish Aff., Ex. E, Guaranty § 1.2; *see also* Sedrish Aff. ¶ 19.)

***Fourth***, the Guaranty provides that "The Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder, shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower, or any other party, against Lender or against payment of the Guaranteed Obligations, whether such offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise." (Sedrish Aff., Ex. E, Guaranty § 1.4; *see also* Sedrish Aff. ¶ 20.)

***Fifth***, the Guaranty provides that "[i]f all or any part of the Guaranteed Obligations shall not be paid when due, whether at demand, maturity, acceleration or otherwise, Guarantor shall, immediately upon demand by Lender, and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the

86174657;5

Case 1:26-cv-04240-RA     Document 1-1     Filed 05/20/26     Page 303 of 316

maturity, or any other notice whatsoever, all such notices being hereby waived by Guarantor pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein." (Sedrish Aff., Ex. E, Guaranty § 1.5; *see also* Sedrish Aff. ¶ 21.)

**Sixth**, the Guaranty provides that "In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall, immediately upon demand by Lender, pay to Lender (a) the applicable Guaranteed Obligations and (b) all costs and expenses (including court costs and attorneys' fees and costs) incurred by Lender or its successors or assigns in the enforcement hereof or the preservation of Lender's rights hereunder, in each case together with interest thereon at the Default Rate from the date requested by Lender until the date of payment to Lender." (Sedrish Aff., Ex. E, Guaranty § 1.10; *see also* Sedrish Aff. ¶ 22.)

**Seventh**, New York law governs the Guaranty. (Sedrish Aff., Ex. E, Guaranty § 6.3.)

## III.   GUARANTOR IS LIABLE FOR INTEREST AND CARRY AMOUNTS DUE UNDER THE GUARANTY

Borrower defaulted under the Loan by, among other things, failing to pay Plaintiffs all amounts when due on at least the November 10, 2025 Payment Date through present (collectively, the "***Payment Events of Default***"). (Sedrish Aff., Ex. B, Loan Agreement § 8.1; Sedrish Aff. ¶ 23.)

Borrower's Payment Events of Default include, but are not limited to, Borrower's failure to pay interest payable under the Loan Documents at the Interest Rate or the Default Rate and to pay the Projected Interest Shortfall (the "***Carry Shortfall Amount***"). (Sedrish Aff., Ex. B, Loan Agmt. §§ 2.3.2, 7.2.4; *see also* Sedrish Aff. ¶ 24.) Therefore, Borrower failed to pay certain of the Guaranteed Obligations as defined in the Guaranty. (Sedrish Aff., Ex. E, Guaranty §§ 1.1, 1.2; *see also* Sedrish Aff. ¶ 25.) Guarantor is, in turn, liable for the Guaranteed Obligations under the Guaranty. (*Id.*)

6

86174657;5

## IV.    THE AMOUNTS DUE AND OWING BY GUARANTOR

On December 16, 2025, Plaintiffs accelerated the Loan given Borrower's various Events of Default (the "***Acceleration Notice***"). (Sedrish Aff. ¶ 27.) A true and correct copy of the Acceleration Notice is attached to the Sedrish Affirmation as **Exhibit F**.

Guarantor is liable for the amounts due under the Guaranty. As of March 30, 2026, those Guaranty amounts totaled $6,728,313.11, comprised of the following:

1.    2025 Property Taxes: $2,051,669.91

2.    Interest: $2,415,825.47

3.    Servicing Fee: $10,500.00

4.    Late Fee: $49,063.04

5.    Legal Fees: $272,038.00

6.    Net Carry Costs: $1,929,216.69

(Sedrish Aff. ¶ 28 and **Exhibit G** thereto.)

Plaintiffs demanded that Guarantor pay all due and owing Guaranteed Obligations (as defined in the Guaranty). (Sedrish Aff. ¶ 31.) A true and correct copy of Plaintiffs' March 30, 2026 demand upon Guarantor is attached to the Sedrish Affirmation as **Exhibit H**. Guarantor did not repay the Guaranteed Obligations despite that demand for payment. (Sedrish Aff. ¶ 32.) Plaintiffs were therefore forced to file this lawsuit.

## ARGUMENT

## I.    PLAINTIFFS ARE ENTITLED TO JUDGMENT AGAINST GUARANTOR

### A.    Judgment On The Guaranty Is Proper Under N.Y. CPLR § 3213

"When an action is based upon an instrument for the payment of money only or upon any judgment, the plaintiff may serve with the summons a notice of motion for summary judgment and the supporting papers in lieu of a complaint." CPLR § 3213. "CPLR 3213 is intended to provide a

86174657;5

speedy and effective means of securing a judgment on claims presumptively meritorious. In the actions to which it applies, a formal complaint is superfluous, and even the delay incident upon waiting for an answer and then moving for summary judgment is needless." *Interman Indus. Prods., Ltd. v. R.S.M. Electron Power, Inc.*, 37 N.Y.2d 151, 154 (1975) (internal quotation marks and citation omitted).

Under New York law, an unconditional guaranty of payment is an "***instrument for the payment of money only***" enforceable under CPLR § 3213. *See, e.g., Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A. v. Navarro*, 25 N.Y.3d 485, 491-92 (2015); *Jason Trading Corp. v. Lason Trading Corp.*, 303 A.D.2d 180, 180 (1st Dep't 2003). Accordingly, the procedure for accelerated judgment under CPLR § 3213 is appropriate where a lender establishes a *prima facie* case, *i.e.*, the guarantor's unconditional promise to pay on a guaranty and the guarantor's failure to make payments called for therein. *See Navarro*, 25 N.Y.3d at 492; *Korea First Bank of N.Y. v. Noah Enters., Ltd.*, 12 A.D.3d 321, 322 (1st Dep't 2004); *Valencia Sportswear, Inc. v. D.S.G. Enters., Inc.*, 237 A.D.2d 171, 171 (1st Dep't 1997); *Shearson Lehman Hutton, Inc. v. Myerson & Kuhn*, 197 A.D.2d 410, 411 (1st Dep't 1993).

**B.     The Court Should Grant Judgment In Plaintiffs' Favor Because Guarantor Failed To Satisfy His Absolute And Unconditional Guaranties of Payment**

Here, the undisputed record before this Court confirms that: (i) the Guaranty is an unconditional promise to pay; and (ii) Guarantor failed to make the payment required by the Guaranty. (*See supra*.) Judgment is therefore proper in Plaintiffs' favor under CPLR § 3213 for the entire Guaranteed Obligations, *i.e.*, $6,728,313.11. *See Navarro*, 25 N.Y.3d at 492 (affirming judgment in the lender's favor on a guaranty claim under § 3213 when the guarantor's "absolute and unconditional" liability precluded the guarantor's asserted defense); *UBS Commercial Mortg. Trust 2007-FL1 v. Garrison Special Opportunities Fund, L.P.*, 33 Misc.3d 1204(A), 2011 N.Y.

86174657;5

Slip. Op. 51774(U), 2011 WL 4552404, at *5 (Sup. Ct. N.Y. Cnty. Mar. 8, 2011) (granting the lender's CPLR 3213 motion to enforce a guaranty similar to the Recourse Guaranty at issue here and noting that such guaranties are a lender's "assurance against borrowers being permitted to take certain acts," which "is a common feature in commercial mortgage loans").

New York courts regularly employ CPLR § 3213 to enforce guaranties that, like the Guaranty, are absolute and unconditional obligations to pay, regardless of their reference to and/or incorporation of underlying loan document terms. *See*, *e.g.*, *DB Auraria, LLC v. Nelson*, 228 A.D.3d 424, 425 (1st Dep't 2024) (holding that plaintiff's CPLR 3213 motion was properly granted in a guaranty action when, among other defaults, the borrower on the underlying loan had allowed mechanic's liens to encumber the real property securing the loan); *Nordea Bank Finland PLC v. Holten*, 84 A.D.3d 589, 590 (1st Dep't 2011); *UBS Commercial Mortg. Tr. 2007-FL1*, 2011 WL 4552404, at *4; *see 13900 Chadwick Parkway, LLC v Kia*, No. 659373/2024, 2025 WL 660095 at *1 (Sup. Ct. N.Y. Cnty. Feb. 26, 2025) (granting a lender's 3213 motion seeking full recourse liability based on an unauthorized lien trigger); *see* Decision + Order on Mot., *3939 East Trinity Mills, LLC v. Kia*, No. 659368/2024, Dkt. 44 (Sup. Ct. N.Y. Cnty. April 18, 2025) (same).

In the *UBS* case, for example, Justice Schweitzer entered summary judgment against the guarantor after rejecting the guarantor's argument that the reference to other loan documents took the case outside of the purview of CPLR § 3213. *UBS Commercial Mortg. Tr. 2007-FL1*, 2011 WL 4552404, at *4 ("[T]he Guaranty is an instrument for the payment of money only which is suitable for a CPLR 3213 motion for summary judgment in lieu of complaint."); *see also DB Auraria, LLC*, 228 A.D.3d at 425 (rejecting the defendants' argument that the loan agreement's reference to "[o]ther obligations" somehow precluded the entry of summary judgment as "unavailing"). Similarly, in *Nordea Bank Finland PLC*, the First Department affirmed the entry of

9

86174657;5

summary judgment in lieu of a complaint, concluding that the agreement at issue was an "independent, absolute and unconditional obligation to pay money only . . . even though the obligation was referenced by underlying agreements." *Nordea Bank Finland PLC*, 84 A.D.3d at 590.

Plaintiffs anticipate that the amount owed by Guarantor will grow during the pendency of this matter, as Plaintiffs continue to incur legal fees. Moreover, the Guaranty contains no end date for Guarantor's obligation for carrying costs, and accordingly those costs continue to accrue as well. For purposes of this motion, Plaintiffs have included in their claimed damages the expected future operating shortfalls through December 31, 2027. (Sedrish Aff. ¶ 30 & Ex. G.) Plaintiffs reserve the right to update the calculation of this amount, as well as include additional future costs and attorneys' fees, at the time of the entry of judgment in this matter.[3]

This Court should enter summary judgment in Plaintiffs' favor and against Guarantor in the amount of $6,728,313.11 as of March 30, 2026. (*See supra*.)

## II. THE GUARANTY ALSO ENTITLES PLAINTIFFS TO SUMMARY JUDGMENT UNDER CPLR § 3213 AS TO PLAINTIFFS' ATTORNEYS' FEES

New York courts enforce contractual provisions for the recovery of attorneys' fees. *See, e.g., Mount Vernon City Sch. Dist. v. Nova Cas. Co.*, 19 N.Y.3d 28, 39 (2012) ("[A]ttorneys' fees and disbursements . . . [may be collected if] an award is authorized by agreement between the parties[.]"); *Hooper Assocs., Ltd. v. AGS Computs., Inc.*, 74 N.Y.2d 487, 491 (1989); *see also*

---

[3] The Court should enter summary judgment in the full amount requested for the reasons set forth herein and in the Sedrish Affirmation. In the alternative, and in the event that the Court enters summary judgment in Plaintiffs' favor as to liability but finds a disputed issue of fact as to damages, Plaintiffs request that the Court "order an immediate trial" on damages to render an "expeditious disposition" of this matter. *See* CPLR § 3212(c). In the event that the Court finds any issue of fact warranting denial of summary judgment as to liability (which the Court should not find, for the reasons detailed herein), Plaintiffs respectfully request that this case be converted into an ordinary action and permitted to proceed as such. *See* CPLR § 3213.

86174657;5

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 308 of 316

*A&M Global Mgmt. Corp. v. Northtown Urology Assocs., P.C.*, 115 A.D.3d 1283, 1290 (4th Dep't 2014).

As discussed above, Guarantor failed to perform his obligations under the Guaranty. Moreover, Plaintiffs incurred attorneys' fees and costs in connection with enforcing the Guaranty and will continue to incur those fees throughout this matter. (Sedrish Aff. ¶ 33.) Guarantor is responsible for repaying the attorneys' fees and costs under the Guaranty. (Sedrish Aff., Ex. B, Loan Agmt. § 10.13; *id.*, Ex. E, Guaranty § 1.10.)

On a motion for summary judgment in lieu of a complaint, the appropriate procedure is for the Court to enter a judgment for the principal amount and separately make an assessment of the reasonableness of Plaintiffs' attorneys' fees. *See*, *e.g.*, *Bronsnick v. Brisman*, 30 A.D.3d 224, 224 (1st Dep't 2006) (affirming summary judgment in lieu of complaint on promissory note which awarded monetary damages and referred the issue of attorneys' fees to a special referee); *Cmty. Nat'l Bank & Tr. Co. of N.Y. v. I.M.F. Trading, Inc.*, 167 A.D.2d 193, 195 (1st Dep't 1990) (reversing denial of summary judgment in lieu of complaint by awarding plaintiff $110,000 plus interest and remanding for assessment of reasonable value of attorneys' services); *Chem. Bank v. Nattin Realty, Inc.*, 61 A.D.2d 921, 921 (1st Dep't 1978) (reversing denial of motion for summary judgment in lieu of complaint and directing trial court to conduct "an assessment of plaintiff's reasonable attorney's fees"); *see 13900 Chadwick Parkway, LLC*, 2025 WL 660095 at *1 (granting a lender's 3213 motion and giving the lender leave to file a fee petition within a defined period after the entry of that order); *see* Decision + Order on Mot., *3939 East Trinity Mills, LLC*, No. 659368/2024, Dkt. 44 (granting a lender's 3213 motion and severing the issue of attorneys' fees for later resolution).

86174657;5

11

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 309 of 316

Therefore, in addition to awarding Plaintiffs the judgment in the amount of $6,728,313.11 (which includes legal fees through March 25, 2026), this Court should award Plaintiffs, following the entry of judgment, the reasonable and recoverable attorneys' fees and costs that Plaintiffs have incurred after March 25, 2026 and will continue to incur in connection with this matter through the date of judgment.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that this Court grant them summary judgment against Guarantor in the amount of $6,728,313.11, plus interest and further attorneys' fees and costs until Plaintiffs receive the full amount owed under the Guaranty. Plaintiffs also respectfully requests all other and further relief as the Court may deem just and proper.

Dated:  New York, New York
        April 17, 2026

**AKERMAN LLP**

By: _/s/ Mark S. Lichtenstein_
    Mark S. Lichtenstein, Esq.
    Keith Blackman, Esq.
1251 Avenue of the Americas, 37th Floor
New York, NY 10020
Tel. No.: (212) 880-3800
E-mail: mark.lichtenstein@akerman.com
E-mail: keith.blackman@akerman.com

*Attorneys for Plaintiffs Southern Realty Trust Holdings LLC and  Sunrise Realty Trust Holdings I LLC*

12

86174657;5

Case 1:26-cv-04240-RA   Document 1-1   Filed 05/20/26   Page 310 of 316

## COMMERCIAL DIVISION RULE 17 CERTIFICATION OF COMPLIANCE

I, counsel for Plaintiffs Southern Realty Trust Holdings LLC and Sunrise Realty Trust Holdings I LLC, hereby certify, pursuant to Rule 17 of the Rules for the Commercial Division of the Supreme Court that the above Memorandum of Law in Support of Plaintiffs' CPLR § 3213 Motion for Summary Judgment in Lieu of Complaint contains 3,655 words, inclusive of headings and exclusive of the caption, table of contents, table of authorities, the signature block and this Statement, in compliance with Rule 17.

Dated:  New York, New York
        April 17, 2026

AKERMAN LLP

By: /s/ *Mark S. Lichtenstein*
    Mark S. Lichtenstein, Esq.
    Keith Blackman, Esq.
1251 Avenue of the Americas, 37th Floor
New York, NY 10020
Tel. No.: (212) 880-3800
E-mail: mark.lichtenstein@akerman.com
E-mail: keith.blackman@akerman.com

*Attorneys for Plaintiffs Southern Realty Trust Holdings LLC and Sunrise Realty Trust Holdings I LLC*

13

86174657;5

UCS-840
(rev. 12/16/2024)

# REQUEST FOR JUDICIAL INTERVENTION

**SUPREME** COURT, COUNTY OF <u>NEW YORK</u> ▼

Index No: _____     Date Index Issued: _____

| **CAPTION** | Enter the complete case caption. Do not use et al or et ano. If more space is needed, attach a caption rider sheet. |
|---|---|

SOUTHERN REALTY TRUST HOLDINGS LLC, and
SUNRISE REALTY TRUST HOLDINGS I LLC

Plaintiff(s)/Petitioner(s)

-against-

ROBERTO CASTRO CONTRERAS

Defendant(s)/Respondent(s)

**For Court Use Only:**

IAS Entry Date

Judge Assigned

RJI Filed Date

---

**NATURE OF ACTION OR PROCEEDING**    Check only one box and specify where indicated.

**COMMERICIAL**
- ○ Business Entity (includes corporations, partnerships, LLCs, LLPs, etc.)
- ⦿ Contract
- ○ Insurance (where insurance company is a party, except arbitration)
- ○ UCC (includes sales and negotiable instruments)
- ○ Other Commercial (*specify*): _____
  *NOTE: For Commercial Division assignment requests pursuant to 22 NYCRR 202.70(d), complete and attach the **COMMERCIAL DIVISION RJI ADDENDUM (UCS-840C)**.*

**TORTS**
- ○ Asbestos
- ○ Environmental (*specify*): _____
- ○ Medical, Dental or Podiatric Malpractice
- ○ Motor Vehicle
- ○ Products Liability (*specify*): _____
- ○ Other Negligence (*specify*): _____
- ○ Other Professional Malpractice (specify): _____
- ○ Other Tort (specify): _____

**MATRIMONIAL**
- ○ Contested
  *NOTE: If there are children under the age of 18, complete and attach the **MATRIMONIAL RJI ADDENDUM (UCS-840M)**.*
  *For Uncontested Matrimonial actions, use the Uncontested Divorce RJI (**UD-13**).*

**REAL PROPERTY**    Specify how many properties the application includes: _____
- ○ Condemnation
- ○ Mortgage Foreclosure (*specify*): ○Residential  ○Commercial
  Property Address: _____
  *NOTE: For Mortgage Foreclosure actions involving a one to four-family, owner-occupied residential property or owner-occupied condominium, complete and attach the **FORECLOSURE RJI ADDENDUM (UCS-840F)**.*
- ○ Partition
  *NOTE: Complete and attach the **PARTITION RJI ADDENDUM (UCS-840P)**.*
- ○ Tax Certiorari (*specify*):   Section:_____  Block:_____  Lot:_____
- ○ Tax Foreclosure
- ○ Other Real Property (*specify*): _____

**SPECIAL PROCEEDINGS**
- ○ Child-Parent Security Act (*specify*): ○Assisted Reproduction  ○Surrogacy Agreement
- ○ CPLR Article 75 – Arbitration  [see *NOTE* in **COMMERCIAL** section]
- ○ CPLR Article 78 – Proceeding against a Body or Officer
- ○ Election Law
- ○ Extreme Risk Protection Order
- ○ MHL Article 9.60 – Kendra's Law
- ○ MHL Article 10 – Sex Offender Confinement (*specify*): ○Initial  ○Review
- ○ MHL Article 81 (Guardianship)
- ○ Other Mental Hygiene (*specify*): _____
- ○ Other Special Proceeding (*specify*): _____

**OTHER MATTERS**
- ○ Certificate of Incorporation/Dissolution  [see *NOTE* in **COMMERCIAL** section]
- ○ Emergency Medical Treatment
- ○ Habeas Corpus
- ○ Local Court Appeal
- ○ Mechanic's Lien
- ○ Name Change/Sex Designation Change
- ○ Pistol Permit Revocation Hearing
- ○ Sale or Finance of Religious/Not-for-Profit Property
- ○ Other (*specify*): _____

---

**STATUS OF ACTION OR PROCEEDING**    Answer YES or NO for every question and enter additional information where indicated.

|  | YES | NO |  |
|---|---|---|---|
| Has a summons and complaint or summons with notice been filed? | ⦿ | ○ | If yes, date filed: <u>04/17/2026</u> |
| Has a summons and complaint or summons with notice been served? | ○ | ⦿ | If yes, date served: _____ |
| Is this action/proceeding being filed post-judgment? | ○ | ⦿ | If yes, judgment date: _____ |

---

**NATURE OF JUDICIAL INTERVENTION**    Check one box only and enter additional information where indicated.

- ○ Infant's Compromise
- ○ Extreme Risk Protection Order Application
- ○ Note of Issue/Certificate of Readiness
- ○ Notice of Medical, Dental or Podiatric Malpractice    Date Issue Joined: _____
- ⦿ Notice of Motion    Relief Requested: <u>SUMMARY JUDGMENT</u>    Return Date: <u>06/12/2026</u>
- ○ Notice of Petition    Relief Requested: _____    Return Date: _____
- ○ Order to Show Cause    Relief Requested: _____    Return Date: _____
- ○ Other Ex Parte Application    Relief Requested: _____
- ○ Partition Settlement Conference
- ○ Request for Preliminary Conference
- ○ Residential Mortgage Foreclosure Settlement Conference
- ○ Waiver of Court Costs, Fees, and Expenses
- ○ Writ of Habeas Corpus
- ○ Other (specify): _____

1 of 2

**RELATED CASES** List any related actions. For Matrimonial cases, list any related criminal or Family Court cases. If none, leave blank.
If additional space is required, complete and attach the **RJI ADDENDUM (UCS-840A)**.

| Case Title | Index/Case Number | Court | Judge (if assigned) | Relationship to instant case |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**PARTIES** For parties without an attorney, check the "Un-Rep" box and enter the party's address, phone number and email in the space provided.
If additional space is required, complete and attach the **RJI ADDENDUM (UCS-840A)**.

| Un-Rep | Parties — List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant, 3rd party plaintiff, etc.) | Attorneys and Unrepresented Litigants — For represented parties, provide attorney's name, firm name, address, phone and email. For unrepresented parties, provide party's address, phone and email. | Issue Joined — For each defendant, indicate if issue has been joined. | Insurance Carriers — For each defendant, indicate insurance carrier, if applicable. |
|---|---|---|---|---|
| ☐ | Name: SOUTHERN REALTY TRUST HOLDINGS LLC  Role(s): Plaintiff | Mark S. Lichtenstein; Keith Blackman; Akerman LLP 1251 Avenue of the Americas, 37th Floor, New YORK, NY 10020 Email: mark.lichtenstein@akerman.com; keith.blackman@akerman.com | ○ YES  ⦿ NO |  |
| ☐ | Name: SUNRISE REALTY TRUST HOLDINGS I LLC  Role(s): Plaintiff | Mark S. Lichtenstein; Keith Blackman; Akerman LLP 1251 Avenue of the Americas, 37th Floor, New YORK, NY 10020 Email: mark.lichtenstein@akerman.com; keith.blackman@akerman.com | ○ YES  ⦿ NO |  |
| ☐ | Name: ROBERTO CASTRO CONTRERAS  Role(s): Defendant | Roberto Castro Contreras c/o DC Partners Management 2000 W Loop S Floor 21 Houston, Texas 77027 | ○ YES  ⦿ NO |  |
| ☐ | Name:  Role(s): |  | ○ YES  ○ NO |  |
| ☐ | Name:  Role(s): |  | ○ YES  ○ NO |  |
| ☐ | Name:  Role(s): |  | ○ YES  ○ NO |  |
| ☐ | Name:  Role(s): |  | ○ YES  ○ NO |  |
| ☐ | Name:  Role(s): |  | ○ YES  ○ NO |  |
| ☐ | Name:  Role(s): |  | ○ YES  ○ NO |  |
| ☐ | Name:  Role(s): |  | ○ YES  ○ NO |  |
| ☐ | Name:  Role(s): |  | ○ YES  ○ NO |  |
| ☐ | Name:  Role(s): |  | ○ YES  ○ NO |  |
| ☐ | Name:  Role(s): |  | ○ YES  ○ NO |  |
| ☐ | Name:  Role(s): |  | ○ YES  ○ NO |  |
| ☐ | Name:  Role(s): |  | ○ YES  ○ NO |  |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, UPON INFORMATION AND BELIEF, THERE ARE NO OTHER RELATED ACTIONS OR PROCEEDINGS, EXCEPT AS NOTED ABOVE, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION BEEN PREVIOUSLY FILED IN THIS ACTION OR PROCEEDING.**

Dated: _____**04/17/2026**_____                     /s/ Mark. S. Lichtenstein
                                          _____
                                                        Signature

_____          _____
          **2527455**                                   Mark S. Lichtenstein
     Attorney Registration Number                          Print Name

[ Print Form ]
2 of 2

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 313 of 316



**New York State Unified Court System**

# Request for Judicial Intervention
# Commercial Division Addendum

**Supreme Court**
**County of** NEW YORK ▼

**Plaintiff/Petitioner** (persons/entities that started the case)**:**

SOUTHERN REALTY TRUST HOLDINGS LLC, and SUNRISE REALTY TRUST HOLDINGS I LLC

**Index #:** _____

**Defendant/Respondent** (persons/entities the case is against)**:**

ROBERTO CASTRO CONTRERAS

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

☒ Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g., unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g., sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; technology transactions and/or commercial disputes involving or arising out of technology; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)

☐ Transactions governed by the Uniform Commercial Code, excluding those concerning individual cooperative or condominium units

☒ Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only

☐ Shareholder derivative actions (without consideration of the monetary threshold)

☐ Commercial class actions (without consideration of the monetary threshold)

☐ Business transactions involving or arising out of dealings with commercial banks and other financial institutions

☐ Internal affairs of business organizations

☐ Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters

☐ Environmental insurance coverage

☐ Commercial insurance coverage (e.g., directors and officers, errors and omissions, and business interruption coverage)

☐ Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures (without consideration of the monetary threshold)

☐ Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues (where the applicable agreement provides for the arbitration to be heard outside the United States, the monetary threshold set forth in 22 NYCRR 202.70(a) shall not apply)

**ADA Accommodations**
ada@nycourts.gov

**Spoken or Sign Language Interpreters**
interpreter@nycourts.gov

 **1-800-COURT-NY**
**(268-7869)**

1 of 2

FILED: NEW YORK COUNTY CLERK 04/17/2026 04:35 PM
NYSCEF DOC. NO. 16
INDEX NO. 652311/2026
RECEIVED NYSCEF: 04/17/2026

**UCS-840C** (03/2025)        Page **2** of **2**        **Index #:** _____

Plaintiff/Petitioner's claim for compensatory damages, excluding punitive damages, interest, costs, and counsel fees claimed: $6,728,313.11_____

Plaintiff/Petitioner's claim for equitable or declaratory relief, including a brief description of the intended benefit, right being protected, or injury being averted through the equitable or declaratory relief sought and its monetary value:

Defendant/Respondent's counterclaims:

- For counterclaims seeking monetary relief, provide a brief description of the claim, including the amount of compensatory damages sought, excluding punitive damages, interest, costs, and counsel fees claimed

- For counterclaims seeking equitable or declaratory relief, provide a brief description, including the intended benefit, right being protected, or injury being averted through the relief sought and its monetary value

I request that this case is assigned to the Commercial Division. I certify that the case meets the Commercial Division's jurisdictional requirements as set forth in 22 NYCRR 202.70(a), (b) and (c).

Date: ___4/17/2026_____

_____/s/ Mark S. Lichtenstein_____
Signature
**Mark S. Lichtenstein**
_____
Print Name

[ Print Form ]

2 of 2

Case 1:26-cv-04240-RA    Document 1-1    Filed 05/20/26    Page 315 of 316

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| Southern Realty Trust Holdings LLC, and Sunrise Realty Trust Holdings I LLC<br>Plaintiff(s),<br><br>vs.<br><br>Roberto Castro Contreras<br>Defendant(s). | ATTORNEY: AKERMAN LLP<br><br>INDEX NUMBER: 652311/2026<br><br>DATE OF FILING: 04/17/2026<br><br>COURT DATE: 06/12/2026 |

## AFFIRMATION OF SERVICE

I, Kirsten Porter, affirms and says deponent is not a party to this action and is over the age of eighteen years and resides in the state of Texas.

That on **04/23/2026** at **3:12 PM** at **c/o DC Partners Management, 2000 W Loop S Floor 21, Houston, TX 77027,**
Deponent served the **Summons, Notice of CPLR § 3213 Motion for Summary Judgment in Lieu of Complaint, Affirmation of Brian Sedrish in Support of Plaintiffs' CPLR § 3213 Motion for Summary Judgment in Lieu of Complaint with Exhibit A-J, Memorandum of Law in Support of Plaintiffs' CPLR § 3213 Motion for Summary Judgment in Lieu of Complaint, Request for Judicial Intervention with RJI Commercial Division Addendum, Notice of Electronic Filing** upon **Roberto Castro Contreras,** defendant/respondent/recipient herein.

Said service was effected in the following manner;

By delivering thereat a true copy to **Celeste Sanchez, Investor Relations Associate**, a person of suitable age and discretion. That person was also asked by deponent whether said premises was the defendant/respondent/recipient actual place of business and their reply was affirmative.

Deponent describes the individual served to the best of deponent's ability at the time and circumstances of service as follows: Sex: **Female**  Skin: **Hispanic**  Hair: **Brown**  Age (Approx): **25-35** Height(Approx): **5'6"**  Weight(Approx): **200-225 lbs**  Glasses: **No** Other:

I certify that the foregoing statements made by me are true, correct and my free act and deed. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

*Kirsten Porter*

I affirm on 04/23/2026 under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, except as to matters alleged on information and belief and as to those matters I believe it to be true, and I understand that this document may be filed in an action or proceeding in a court of law.

Kirsten Porter

Executive Attorney Service, Inc. 100 Crossways Park Dr W, Ste 402, Woodbury, NY 11797 5162261073 Lic# 142206(

Case No: 1750076

Document Ref: VU5JP-IXJKR-LPPAT-JIEPT

Case 1:26-cv-04240-RA Document 1-1 Filed 05/20/26 Page 316 of 316

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

Southern Realty Trust Holdings LLC, and Sunrise Realty Trust Holdings I LLC
Plaintiff(s),

vs.

Roberto Castro Contreras
Defendant(s).

ATTORNEY: AKERMAN LLP

INDEX NUMBER: 652311/2026

DATE OF FILING: 04/17/2026

COURT DATE: 06/12/2026

## AFFIRMATION OF SERVICE

I, Michael Weiner, affirms and says deponent is not a party to this action and is over the age of eighteen years and resides in the state of New York.

On **04/23/2026**, I served a true copy of the **Summons, Notice of CPLR § 3213 Motion for Summary Judgment in Lieu of Complaint, Affirmation of Brian Sedrish in Support of Plaintiffs' CPLR § 3213 Motion for Summary Judgment in Lieu of Complaint with Exhibit A-J, Memorandum of Law in Support of Plaintiffs' CPLR § 3213 Motion for Summary Judgment in Lieu of Complaint, Request for Judicial Intervention with RJI Commercial Division Addendum, Notice of Electronic Filing** by mailing the same in a sealed envelope by First Class Priority Mail, Tracking Number, 9405536106196295075661, with postage prepaid thereon, in a post office or official depository of the United States Postal Service within the State of New York, addressed to the last known address of the addressee(s) as indicated below:

Roberto Castro Contreras
c/o DC Partners Management, 2000 W Loop S Floor 21, Houston, TX 77027

The envelope bore the Legend "Personal & Confidential" and did not indicate on the outside thereof, by return address or otherwise, that the communication was from an attorney or concerned an action against the addressee(s).

I certify that the foregoing statements made by me are true, correct and my free act and deed. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

I affirm on 04/23/2026 under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, except as to matters alleged on information and belief and as to those matters I believe it to be true, and I understand that this document may be filed in an action or proceeding in a court of law.

Michael Weiner